UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WOODROW FLEMMING,

                                            Plaintiff,
                                                                    9:11-CV-01232
v.
                                                                    (GLS/TWD)
BRIAN FISCHER, et al.,

                                            Defendants.
_____

APPEARANCES:                         OF COUNSEL:

WOODROW FLEMMING
Plaintiff *pro se*
PO Box 146
New York, New York 10039

HON. ERIC T. SCHNEIDERMAN          LAURA A. SPRAGUE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

     *Pro se* Plaintiff Woodrow Flemming commenced this 42 U.S.C. § 1983 civil rights action

against more than one hundred twenty individual defendants.[1]  (Dkt. No. 1.)  Plaintiff's

Complaint originally included eight causes of action arising out of his confinement at Upstate

Correctional Facility ("Upstate").  *Id.*  On initial screening of the Complaint pursuant to 28

---

[1]  The District Court ruled that the three-strikes provision of 28 U.S.C. § 1915(g) barred
Plaintiff from proceeding *in forma pauperis* in this action.  (Dkt. No. 4.)  Plaintiff has filed more
than thirty lawsuits in the Northern District of New York since 2005.  *See* Northern District of
New York CM/ECF.

U.S.C. § 1915A, the Hon. Gary L. Sharpe, Chief District Court Judge, dismissed all of Plaintiff's claims except for the Eighth Amendment medical indifference claims set forth in his fifth cause of action against remaining Defendants Adam Southworth ("Southworth"), Corrections Officer; Todd LaRose ("LaRose"), Corrections Sergeant; Nancy Smith ("Smith"), Nurse Administrator; Richard Adam ("Adam"), Physician; Amber A. Lashway ("Lashway"), Nurse Practitioner; K. Rabideau ("Rabideau"), Acting Nurse Administrator; D. Hammac ("Hammac"), RN II; E. White ("White"), RN II; G. Waterson ("Waterson"), RN II; G. Wilson ("Wilson"), RN II; A. Cushman ("Cushman"), RN II; and H. Baker ("Baker"), RN II.[2]  (Dkt. No. 12.)  Plaintiff's two medical indifference claims involve: (1) the alleged refusal of Defendants Southworth and LaRose to turn the power to Plaintiff's CPAP (continuous positive airway pressure) machine back on after it had stopped working on March 6, 2011 (Dkt. No. 1 at ¶ 127A); and (2) the remaining Defendants' alleged deliberate indifference to Plaintiff's serious medical needs, including failing to transfer him from the Special Housing Unit ("SHU") to the infirmary; failure to allow Plaintiff treatment and medication for his pain and his bad shoulder, hip, leg and knees; and depriving him of the use of his walking cane while he was in his SHU cell and ultimately taking it away completely. *Id*. at ¶ 128.

The remaining Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 82.)  Plaintiff has opposed the motion (Dkt. Nos. 91 and 95), and Defendants have filed a reply to Plaintiff's opposition.  (Dkt. No. 97.)  For the reasons that follow, the Court recommends that Defendants' motion be granted.

_____

[2]  All of the remaining Defendants worked at Upstate during the time period relevant to Plaintiff's Complaint.  (Dkt. No. 1 at ¶ 3.)

## I. BACKGROUND

### A. Plaintiff's CPAP Machine

In his Complaint, Plaintiff alleged that at around 7:00 p.m. on March 6, 2011, his medical machine went off, and Defendants Southworth and LaRose refused to turn it back on, resulting in the machine being off for about twelve hours. (Dkt. No. 1 at ¶ 127A.) The medical machine was a CPAP machine used by Plaintiff for sleep apnea. (Dkt. No. 82-2 at 8, 12.) Plaintiff's Inmate Health Care Transit Form, dated April 5, 2005, indicates that Plaintiff had been diagnosed with sleep apnea. (Dkt. No, 1-1 at 32.) According to Plaintiff, it was mandatory that his CPAP machine be turned on, and there was a sign on his door in March of 2011 directing the officers to check daily to make sure it was on. (Dkt. No. 82-2 at 14-15.)

At his deposition, Plaintiff testified that the machine actually went off at around 3:00 p.m. and was off until the following morning. *Id*. at 9. According to Plaintiff, the CPAP machine turned off because the circuit breaker in the hallway closet tripped, and when the closet door was locked, only the sergeant, in this case Defendant LaRose, could open it to reset the breaker. *Id*. at 10. Plaintiff asked Defendant Southworth to turn the CPAP machine back on, and Southworth told Plaintiff he had to get the key from LaRose. *Id*. at 8-9. Plaintiff claims that he saw Southworth four or five times after that and was told by him and another officer that LaRose was going to turn the machine back on. *Id*. at 9. Plaintiff contends the machine was not turned back on. *Id*. at 9.

Plaintiff testified that when LaRose came by on his rounds around the time of the evening meal, he asked him to turn the CPAP machine on and thought that LaRose had turned it on. *Id*. at 11. However, LaRose kept on walking, and the machine did not go back on. *Id*. Plaintiff was

not able to sleep that night because he is unable to sleep without his CPAP machine.  *Id*. at 12.

He asked other officers to turn it on, but they told him they could not get the key.  *Id*.  Plaintiff

also called for the nurse a few times but received no response.  *Id*. at 16.

Plaintiff filed a grievance regarding the CPAP machine incident on April 25, 2011.[3]  *Id*. at

12.  In his grievance, Plaintiff claimed that Southworth refused to contact LaRose to ask him to

turn the CPAP machine back on, and that the refusal was retaliatory.  (Dkt. No. 82-4 at 4-5.)  At

his deposition, Plaintiff testified that Southworth and LaRose refused to turn the CPAP machine

back on in retaliation for prior instances of use of force and cell searches by them and grievances

filed by Plaintiff.[4]  (Dkt. No. 82-2 at 13-14.)

In his Declaration, Defendant Southworth states that on March 6, 2011, he was advised

by Plaintiff that his power needed to be turned on, that he promptly notified Defendant LaRose,

and that it is his understanding that LaRose reset the power breaker at approximately 4:45 p.m.

(Dkt. No. 82-5 at ¶ 3.)  Southworth denies being told by Flemming that his machine remained off

after 4:45 p.m. and denies having any information that there could be serious medical concerns

associated with Plaintiff on March 6, 2011.  *Id*. at  ¶¶ 4, 6.  Consequently, Southport did not

communicate any such concern to LaRose.  He simply passed on the message from Plaintiff that

---

[3]  Plaintiff's grievance was denied based upon the Internal Grievance Review
Committee's conclusion that Plaintiff's power had been turned back on.  (Dkt. No. 82-4 at 5.)
The Upstate superintendent concurred with the denial, as did the Central Office Review
Committee.  *Id*. at 2-3.

[4]  When pressed as to whether he had any knowledge as to why he believed Southworth
and LaRose refused to turn on his CPAP machine, Plaintiff testified "[t]he only knowledge that I
have is that they didn't turn it on.  I mean, it was just harassment or refusal or a retaliation thing
against me that they refused to turn it on knowing that I need it, and they just left it off."  (Dkt.
No. 82-2 at 14.)

the power was off. *Id*. at ¶ 6.

According to LaRose, on March 6, 2011, he was told by Southworth that the power in Plaintiff's cell needed to be turned on. (Dkt. No. 82-7 at ¶ 3.) While on rounds at approximately 4:45 p.m., LaRose checked the power breaker for Plaintiff's cell and reset it by turning the breaker off and on even though it appeared to be on. *Id*. He was not told that there were continuing issues. *Id*. at ¶ 4. In his Affidavit in opposition, Plaintiff acknowledges that LaRose passed his cell at around 4:45 p.m. but claims that LaRose did not turn the circuit breaker on before he left.[5] (Dkt. No. 91-1 at ¶ 3.)

**B.** **Plaintiff's Shoulder, Hip, Leg and Knee Problems; Defendants' Failure to Transfer Him From SHU to the Infirmary; Refusal to Allow Him to Use a Cane; and Discontinuance of Ultram**

Plaintiff alleged in conclusory fashion in his Complaint that Defendants Smith, Adam, Lashway, Rabideau, Hammac, White, Waterson, Wilson, Cushman, and Baker kept him in SHU rather than the infirmary despite his health problems, and showed deliberate indifference to his serious medical needs, including his need for medical treatment for his shoulder, hip, leg and knee problems, and his need for a walking cane. (Dkt. No. 1 at ¶ 128; *see also* Dkt. No. 82-2 at 16.)

Plaintiff testified at his deposition that he arrived at Upstate using both a wheelchair and cane. (Dkt. No. 82-2 at 17.) However, from day one at Upstate, Plaintiff was not allowed to use either a cane or wheelchair in his cell in SHU. *Id*. The decision not to allow Plaintiff to use a cane in his cell "dealt with the medical department, Nurse Melf and other medical staff, Nurse

---

[5] According to Plaintiff, as a part of a cover-up, Defendants have destroyed a videotape that would support Plaintiff's assertion that LaRose did not turn on the breaker. (Dkt. No. 95.)

Waterson and other medical individuals." *Id*. at 18.

According to Plaintiff, on April 5, 2005, he wrote to Albany in response to being denied the use of his walker, wheelchair, and cane. *Id*. at 19. Department of Corrections and Community Supervision ("DOCCS") Healthcare Administrator, Stephen Van Buren ("Van Buren") responded to Plaintiff's letter informing him that Plaintiff's concerns had been investigated and Van Buren had been advised that Plaintiff did not need a wheelchair and was being provided a walking cane when he left his cell for outside trips. *Id*.

Plaintiff's claims against Defendant Smith are that she was one of the people who kept him in SHU by approving his transfer to and assisting in keeping him in Upstate. *Id.* at 22. Smith also denied Plaintiff his walking cane and mental health care. *Id*. at 22, 35.

Defendant Adam completely deprived Plaintiff of his walking cane in July of 2010 and has denied Plaintiff treatment for herniations and arthritis in his back, his arthritic knee and hip, his frozen left shoulder, and his left side weakness, as well as for mental health issues. *Id*. at 20-22, 35. Adam also took away Plaintiff's pain medication Ultram. *Id*.

Defendants Lashway, Rabideau, Wilson, and Cushman denied Plaintiff treatment and therapy and would not let him use his cane in his cell even though they knew he needed it. *Id*. at 22-24. Defendant Hammac was aware that Plaintiff was not allowed to use his cane in his cell, knew that Defendant Adam took away his cane, and knew Plaintiff was being denied all of his treatment. *Id*. at 22-23. Defendant Waterson, one of the nurses when Plaintiff entered Upstate on April 5, 2005, denied him use of his cane, denied him all of his treatment, and kept him locked in his cell for eight years. *Id*. at 23-24. Defendant Baker also denied Plaintiff his cane and medication, although Baker tried unsuccessfully to help Plaintiff and was just following

instructions.  *Id*. at 24.  Plaintiff faults Baker, as well as the other nurses, for not reporting the

wrongdoing up the chain of command or taking other measures to correct it.  *Id*. at 26.

## II.    APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d

at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to

be treated as an affidavit.[6] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir 1995) ("A verified

complaint is to be treated as an affidavit . . . and therefore will be considered in determining

whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro*

*se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not

sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981

(WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28,

1999)[7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.    ANALYSIS

### A.    Inmate's Eighth Amendment Right to Receive Adequate Medical Care

Claims that prison officials have intentionally disregarded an inmate's serious medical

needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and

unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must

ensure, among other things, that inmates receive adequate medical care. *Id*. (citing *Hudson v.*

---

[6] Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

[7] Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

*Palmer*, 468 U.S. 517, 526-27 (1984)).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72. (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted). "[N]ot every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when the two requirements are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted); *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at

834).   Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id*.  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id*.  The standard to which prison officials are held in that regard is one of reasonableness. *Id.*

The second question is whether the purported inadequacy in the medical care was "sufficiently serious."  *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or is likely to cause plaintiff.  *Id*.  "In cases where the inadequacy is in the medical treatment given, the seriousness of the inquiry is narrower.  For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."  *Salahuddin*, 467 F.3d at 280 (citation and internal quotation marks omitted).

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, *i.e*., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.  To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702; *see also Salahuddin*, 467 F.3d at 280 (mental state for deliberate indifference "requires that the charged official act or fail to act while actually aware of a substantial risk that serious harm will result.").

Disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a § 1983 claim, since those issues implicate medical judgment and at worst negligence constituting malpractice. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Only medical malpractice that rises to the level of culpable recklessness constitutes deliberate indifference. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

The Second Circuit has made it clear that while whether or not a defendant acted with a specific state of mind is frequently a question for resolution by a jury, "summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim, and Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation." *Castillo v. Rodas*, No. 09 Civ. 9919(AJN), 2014 WL 1257274, at *6, 2014 U.S. Dist. LEXIS 41282, at *18 (S.D.N.Y. Mar. 25, 2014).

### B. Defendants Southworth and LaRose

Plaintiff testified at his deposition that despite making repeated requests to Defendants Southworth and LaRose to reset the circuit breaker so that his CPAP machine would work during the afternoon and evening of March 6, 2011, the two refused, leaving him to spend the night without it. (Dkt. 82-2 at 8-12.) Southworth, on the hand, has stated in his Declaration that when Plaintiff told him his power needed to be turned back on, Southworth promptly notified LaRose, and it is his understanding that LaRose reset the power breaker at around 4:45 p.m. (Dkt. No. 82-5 at ¶ 3.) In his Declaration, LaRose states that Southworth told him the power in Plaintiff's cell needed to be turned on, and that he checked the power breaker for Plaintiff's cell at around 4:45

p.m. and reset it even though it appeared to be on.  (Dkt. No. 82-7 at ¶ 3.)

The conflicting evidence raises a question of fact with regard to Plaintiff's claim that Southworth and LaRose refused to reset the power breaker, leaving him without his CPAP machine until the following morning.  However, the Court finds that even if Southworth and LaRose did intentionally fail to restore the power in Plaintiff's cell so that he could use his CPAP machine, as Plaintiff claims, they are entitled to summary judgment.

Recently, in *Griffin v. Amatucci*, No. 9:11-CV-1125 (MAD/TWD), 2014 WL 2779305, at *12, 2014 U.S. Dist. LEXIS 83219, at *13-14 (N.D.N.Y. June 19, 2014), the Hon. Mae A. D'Agostino, District Court Judge, noted that a number of district courts have concluded that sleep apnea may constitute a serious medical need.  *See, e.g.*, *Ross v. Westchester County*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *5, 2012 U.S. Dist. LEXIS 3502, at *15 (S.D.N.Y. Jan. 11, 2012) (finding that sleep apnea "may be a life-threatening disorder" and, therefore may be a serious medical condition); *Dortch v. Davis*, No. 11-cv-00841 -MJR-SCW, 2014 WL 1125588, at *5, 2014 U.S. Dist. LEXIS 37216, at *13-14 (S.D. Ill. Mar. 21, 2014) (finding sleep apnea to be a serious medical condition that may have long term effects including "high blood pressure, stroke, heart failure, diabetes, depression, and ADHD"); *Goudlock v. Perez*, Civil No. 08cv204 AJB (RBB), 2012 WL 846444, at *5, 2012 U.S. Dist. LEXIS 33485, at *14-15 (S.D. Cal. Mar. 12, 2012) (acknowledging that courts have concluded that sleep apnea may be a serious medical condition).

The evidence shows that Plaintiff had been diagnosed with sleep apnea as long ago as 2003, and that he had already been prescribed a CPAP machine at that point.  (Dkt. No. 91-5 at 56.)  While it may be that Plaintiff's sleep apnea does not rise to the level of a serious medical

condition, Defendants have failed in their burden of showing that to be the case through admissible evidence, and have not disputed that Plaintiff suffered from sleep apnea on March 6, 2011, and needed a CPAP machine.

However, even if a genuine issue of fact can be found as to the seriousness of Plaintiff's sleep apnea, because Plaintiff's claim is for interruption of his sleep apnea treatment, *i.e.*, loss use of his CPAP machine for one night, the Eighth Amendment seriousness analysis focuses on the impact of the interruption and not Plaintiff's sleep apnea alone. *See Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 185 ("When the basis for a prisoner's Eighth Amendment claim is a temporary . . . interruption in the provision of otherwise adequate treatment, it is appropriate to focus on the challenged interruption . . . in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original). The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in a degeneration of a plaintiff's condition or extreme pain. *See Chance*, 143 F.3d at 702. In evaluating the objective prong in cases of delay or interruption, "a court may consider the 'absence of adverse medical effects or demonstrable physical injury' associated with such delay or interruption." *O'Connor v. McArdle*, No. 04-CV-314 (TJM), 2006 WL 436091, at *8, 2006 U.S. Dist. LEXIS 8701, at *24 (N.D.N.Y. Feb. 22, 2006) (quoting *Smith*, 316 F.3d at 187), *aff'd*, 217 F. App'x 81 (2d Cir. 2007).

Plaintiff testified at his deposition that he was unable to sleep all night because he did not have his CPAP machine. (Dkt. No. 82-2 at 12.) When questioned as to whether he sustained any other injuries as a result of being without his CPAP machine for the night, Plaintiff was unable to

identify any.  *Id.* at 15-16.  Furthermore, Plaintiff's own evidence, an August 2, 2011, memorandum regarding Plaintiff from David Karandy, M.D., of Great Meadow Correctional Facility ("Great Meadow"), to Assistant Attorney General Aaron M. Baldwin, stated that while Plaintiff was temporarily at Great Meadow for a Hematology specialty appointment, his CPAP machine had to be inspected, a permit issued, and proper housing found with the appropriate electrical outlet before it could be returned to Plaintiff to use at Great Meadow.  According to Dr. Karandy, "not having the machine for a brief period of time had no adverse effects on the health of this individual."  (Dkt. No. 1-1 at 8.)  A handwritten notation on the memorandum, which appears to match Plaintiff's handwritten Complaint and other his submissions in the case, indicates that he was without his CPAP machine from July 12, 2011, through July 19, 2011, substantially longer than the one night at issue in this lawsuit.  *Id.*

In sum, the evidence submitted by Defendants in the form of Plaintiff's deposition transcript establishes that at most, Plaintiff lost a night's sleep because the power for his CPAP machine was off, and Plaintiff's own evidence reveals that he went for several days without his CPAP machine some four months later without any adverse effects on his health.  The Court therefore finds that Plaintiff has failed to present any evidence from which a factfinder could conclude that the loss of his CPAP machine for one night exacerbated his medical condition or presented a serious medical need or risk to his health, as required for satisfaction of the objective prong of the test for a violation of his Eighth Amendment right to adequate medical care.  *See Santana v. Watson*, No. 13 Civ. 1549(SAS), 2014 WL 1803308, at *5, 2014 U.S. Dist. LEXIS 62628, at *23 (S.D.N.Y. May 6, 2014) (failure to show that delay or interruption in the provision of a CPAP machine was sufficiently serious to constitute an Eighth Amendment violation where

there was "no indication that [plaintiff's] health declined during the time he was without a CPAP machine, or that the temporary deprivation significantly affected his daily activities or caused him chronic or substantial pain"); *Nesmith v. Southern Health Partners*, Civil Action No. 11-425 (TFM/LPL), 2012 WL 426606, at *4, 2012 U.S. Dist. LEXIS 16317, at *10 (W.D. Pa. Jan. 10, 2012) (recommending dismissal with prejudice where even if plaintiff's sleep apnea was a serious medical condition, his Eighth Amendment claim for delaying in receiving a CPAP machine failed where his claims were limited to not sleeping well and occasional headaches and chest pains in the morning), *adopting Report and Recommendation*, 2012 WL 425986, 2012 U.S. Dist. LEXIS 16318 (W.D. Pa. Feb. 9, 2012).

Inasmuch as Plaintiff has failed to satisfy the objective prong of his Eighth Amendment claim regarding his CPAP machine, there is no need for the Court to consider whether Defendants Southworth and LaRose acted with deliberate indifference, and the Court recommends that Defendants Southworth and LaRose be granted summary judgment.

### C. Defendants Smith, Adam, Lashway, Rabideau, Hammac, White, Waterson, Wilson, Cushman, and Baker

Defendants Smith, Adam, Lashway, Rabideau, Hammac, White, Waterson, Wilson, Cushman, and Baker seek summary judgment dismissing Plaintiff's Eighth Amendment medical indifference claims against them on the grounds that Plaintiff's claims regarding denial of adequate medical care and treatment for his left shoulder, back, hip, and knee problems and loss of use of his walking cane are presently pending in *Flemming v. Smith*, 9:11-CV-00804 (N.D.N.Y.) ("*Flemming v. Smith*"). Since the filing of Defendants' summary judgment motion, however, Plaintiff's Amended Complaint in *Flemming v. Smith* has been dismissed with prejudice on initial review under 28 U.S.C. ¶ 1915A. *See Flemming v. Smith*, No. 9:11-CV-

00804 (NAM/TWD), 2014 WL 3698004, 2014 U.S. Dist. LEXIS 100633 (N.D.N.Y. July 24, 2014).

1.  <u>*Res Judicata* as to Plaintiff's Claims Relating to the Alleged Lack of Medical Care for his Left Shoulder, Back, Hip, and Knee Problems, Discontinuance of Ultram, and Having his Cane Taken Away in July of 2010</u>

In light of the dismissal with prejudice, the question now is whether the recent judgment in *Flemming v. Smith* has any preclusive effect on Plaintiff's claims in this case.[8]  Claim preclusion, or *res judicata*, applies if: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [same] parties or those in privity with them; and (3) the claims in the subsequent action were, or could have been, raised in the prior action."[9] Pike v. Freeman, 266 F.3d 78, 90 (2d Cir. 2001).  Whether a claim that was not raised in a prior action could have been raised "depends in part on whether the same transaction or connected series of transactions is at issue. . . ."  *Id.* at 91 (citation and internal quotation marks omitted).

---

[8]  Plaintiff's time to appeal the judgment in the defendants' favor to the Second Circuit has not expired.  *See* Fed.R.App.P. 4(a)(1)(A) (a party has thirty days to appeal from the entry of a district court judgment), codified at 28 U.S.C. § 2107(a).  However, even if Plaintiff elects to appeal, "in the federal courts the general rule has long been recognized that appeal . . . does not unless and until reversed    detract from [a judgment's] decisiveness and finality."  *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941); *see also Malcolm v. Bd. of Educ. of the Honeoye Falls    Lima Central School District*, 506 F. App'x 65, 68 (2d Cir. 2012) ("A judgment on appeal generally retains it preclusive effect.")

[9]  A district court is free to raise *sua sponte* the defense of *res judicata*, even in those cases where the parties have seemingly waived it.  *Scherer v. Equitable Life Assur. Soc'y of U.S.*, 347 F.3d 394, 398 n.4 (2d Cir. 2003); *see also Bey v. City of New York*, 454 F. App'x 1 (2d Cir. 2011) ("*res judicata* applies to *pro se* plaintiffs whose claims in a second action are based on the same factual predicates presented in the first action."); *Skinner v. Chapman,* 489 F. Supp. 2d 298, 301-03 (W.D.N.Y. 2007) (second federal court action against same defendants for same incident dismissed on *res judicata* grounds as to both claims dismissed under § 1915).

Claims asserted by Plaintiff in *Flemming v. Smith* included: (1) that the defendants knew that Plaintiff had serious medical problems with his left shoulder, back, hip, and knees and failed to diagnose his problems and give him needed treatment; and (2) Defendant Adam took Plaintiff's walking cane away from him on July 29, 2010, and discontinued his pain medication. (No. 9:11-CV-00804, Dkt. No. 1 at ¶¶ 61, 63, 65, 67-68, 72, 74.)  Present Defendants Smith, Adam, Waterson, White, and Hammac were also named as defendants in *Flemming v. Smith*. (No. 9:11-CV-00804, Dkt. No. 49.)  Defendants Lashway, Rabideau, Wilson, Cushman, and Baker were not.  However, the claims asserted against them in this case with regard to Plaintiff's left shoulder, back, hip, and knees are the same as those that were asserted in *Flemming v. Smith* and dismissed with prejudice.  *Id*. at ¶¶ 36, 42-44.  In addition, both lawsuits include the claims regarding Defendant Adam taking away Plaintiff's walking cane and his pain medication Ultram, (No. 9:11-CV-00804, Dkt. No. 49 at ¶ 68; No. 9:11-CV-01232, Dkt. No. 82-2 at 20-22, 35), and involve the same time period.

Modern privity, as applicable to *res judicata,* "bars relitigation of the same cause of action against a new defendant known by a plaintiff at the time of the first suit where the new defendant has a sufficiently close relationship to the original defendant to justify preclusion." *Central Hudson Gas & Elec. Corp*. *v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 367-68 (2d Cir. 1995); *see also Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003) ("*Res judicata* operates to preclude claims, rather than particular configurations of parties; Plaintiff's addition of new defendants, in the context of allegations of their involvement in the series of alleged deprivations, does not entitle him to revive the previously-dismissed claims.").

In *Barclay v. Lowe*, 131 F. App'x 778, 779 (2d Cir. 2005), the Second Circuit applied the modern definition in finding privity among state corrections officers in a § 1983 action commenced by an inmate. Although *Barclay* involved duplicative pending lawsuits, the Court relied upon the privity determination in *Alpert's Newspaper Delivery Inc. v. The New York Times*, 876 F.2d 266, 271 (2d Cir. 1989), a case involving the applicability of *res judicata. See also Watson v. Mayo*, No. 07 Civ. 54(NRB), 2008 WL 538442, at *8-9, 2008 U.S. Dist LEXIS 18444, at *26-27 (S.D.N.Y. Feb. 26, 2008) (applying *Barclay* privity analysis in deciding that corrections officer defendants in first action were in privity with defendant corrections officer in second action for purposes of determining whether the second action was barred by *res judicata*).

The Court finds that the requirements for the application of *res judicata* with regard to Plaintiff's claims for alleged lack of medical treatment; having his walking cane taken away in July of 2010; and discontinuation of the pain killer Ultram against Defendants Smith, Adam, Lashway, Rabideau, Hammac, White, Waterson, Wilson, Cushman, and Baker have been satisfied, and that those claims are barred under the doctrine of *res judicata*.

2. <u>*Res Judicata* as to Plaintiff's Claims Regarding Being Kept in SHU Instead of Being Transferred to the Infirmary and Having Use of His Cane Limited to Travel Outside of His Cell</u>

Plaintiff's claims with regard to being kept in SHU at Upstate rather than being placed in the infirmary and not being allowed to use his cane in his SHU cell from the time he arrived at Upstate until the cane was taken away completely in July of 2010, have also been recycled from previous litigation. In *Flemming v. Goord*, No. 06-CV-26 (N.D.N.Y.) ("*Flemming v. Goord*"), Plaintiff challenged both his transfer to Upstate from the Regional Medical Unit at Mohawk Correctional Facility <u>and</u> his subsequent transfer to SHU at Upstate. (No. 06-cv-26, Dkt. No. 81

18

at ¶ 8.)  Plaintiff also alleged an Eighth Amendment claim for denial of adequate medical care based upon his not being allowed to use his cane while he was in his SHU cell in that lawsuit. *Id.* at ¶¶ 38-40.

Magistrate Judge David R. Homer issued a Report-Recommendation and Order in *Flemming v. Goord* recommending that the defendants' Rule 12(b)(6) motion to dismiss Plaintiff's Second Amended Complaint be granted.  (No. 6-CV-26, Dkt. No. 89), 2008 WL 4532506, 2008 U.S. Dist. LEXIS 117436 (N.D.N.Y. Sept. 29, 2008).  Magistrate Judge Homer recommended dismissal of the claims related to Plaintiff's transfer on *res judicata* grounds, and his claim regarding the prohibition on his use of his cane in his SHU cell on the grounds that Plaintiff had "failed to assert any serious medical need necessitating such assistive devices and constitut[ing] a need outweighing the penological and institutional safety concerns and regulations which otherwise support the prohibition of inmates from having such devices which could be used as weapons."  2008 WL 4532506 at *6, 2008 U.S. Dist. LEXIS 117436, at *19. The Hon. Thomas J. McAvoy, Senior District Judge, adopted the Report and Recommendation and dismissed Plaintiff's claims in their entirety.  (Dkt. No. 92.)

In *Flemming v. Kemp*, No. 09-CV-1185 (N.D.N.Y.) ("*Flemming v. Kemp*"), Plaintiff again asserted an Eighth Amendment claim based upon the prohibition on the use of his walking cane in his SHU cell, and also a asserted a claim regarding being housed in SHU at Upstate with a medical machine.  (No. 09-CV-1185, Dkt. No. 6 at ¶¶ 33, 36.)   Before the action was transferred to the Northern District of New York, the Hon. Michael A. Telesca, District Court Judge W.D.N.Y, dismissed those claims with prejudice upon initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  (No. 09-CV-1185, Dkt. No. 8.)

In light of the dismissals in *Flemming v. Goord* and *Flemming v. Kemp*, the Court finds that Plaintiff's claims regarding his being kept in SHU instead of the infirmary and not being able to use his cane inside his cell are also barred by *res judicata*.

### 3. Defendants' Entitlement to Summary Judgment on the Merits

Plaintiff has a long history of filing nearly illegible handwritten complaints filled with conclusory assertions of wrongdoing by defendants and of failing to support his claims with specific facts or evidence, even when given multiple chances to do so.  *See, e.g., Flemming v. Smith*, 2014 WL 3698004 (amended complaint, which like original complaint, included nothing more than conclusory allegations, dismissed with prejudice on initial review); *Flemming v. Goord*, No. 9:11-CV-1026 (LEK/RFT), 2013 WL 317059, 2013 U.S. Dist. LEXIS 11127 (N.D.N.Y. Jan. 28, 2013) (dismissal on initial review where complaint contained claims set forth in wholly conclusory fashion); *Flemming v. Kemp*, No. 09-CV-1185 (TJM/DRH), 2012 WL 4094196, 2012 U.S. Dist. LEXIS 132255 (N.D.N.Y. Aug. 30, 2012) (finding conclusory allegations without more insufficient to main retaliation claims and recommending summary judgment in defendants' favor); *Flemming v. Goord*, No. 9:06-CV-562, 2009 WL 4667108, 2009 U.S. Dist. LEXIS 114178 (N.D.N.Y. Dec. 8, 2009) (recommending summary judgment in defendants' favor where plaintiff's conclusory assertions, without more, were insufficient to maintain claims); *Flemming v. Rosadro*, No. 9:06-CV-809 (FJS/RFT), 2008 WL 907364, 2008 U.S. Dist. LEXIS 26302 (N.D.N.Y. Mar. 31, 2008) (motion to dismiss granted where plaintiff's claims were hollow since factual allegations in support of the claims were missing from the complaint);  *Flemming v. Goord*, No. 9:06-CV-26 (TJM/DRH), 2007 WL 2726276, at * 2, 2007 U.S. Dist. LEXIS 99964, at *5 (N.D.N.Y. Sept. 13, 2007) (dismissal of amended complaint with

leave to file a proper second amended complaint where amended complaint, like his original

complaint, "failed to set forth specific allegations as to the alleged wrongdoing of each

defendant"); *Flemming v. Wurzberger*, 490 F. Supp. 2d 320, 324 (W.D.N.Y. 2007) (noting in

granting defendants' motion for summary judgment that plaintiff had presented no evidence

supporting his generally vague and conclusory claims); *Flemming v. Wright*, No. 9:06-CV-0086

(GLS/GJD), 2006 WL 1174314, at *1, 2006 U.S. Dist. LEXIS 24742, at *2 (N.D.N.Y. Apr. 28,

2006) ("A review of the amended Complaint finds that Flemming's statement of claims, to the

extent it is legible, is an incomprehensible grouping of conclusory allegations regarding alleged

violations of his Eighth Amendment rights, alleged conspiracies, movement of Plaintiff from one

facility to another, and alleged failure to train and supervise staff. While Plaintiff sets forth a

long listing of individuals who he seeks to name as defendants herein, the statement of Plaintiff's

claims fails to sufficiently allege any wrongful conduct by each of the named Defendants. Rather,

Plaintiff simply repeats the conclusory allegations that the February Order directed were

insufficient.").

    This lawsuit is no different, and even if Plaintiff's claims were not barred by *res judicata*,

the Court would recommend that Defendants Smith, Adam, Lashway, Rabideau, Hammac,

White, Waterson, Wilson, Cushman, and Baker be granted summary judgment. Plaintiff's

Complaint does not include a single non-conclusory fact with regard to his Eighth Amendment

claims against those Defendants. Plaintiff's deposition testimony contains only conclusory

assertions that various of the Defendants kept him in SHU; denied him medical treatment for his

frozen shoulder, arthritic back, hip, and knee; stopped giving him Ultram; and took away his

cane. The testimony is devoid of evidence supporting Plaintiff's conclusory assertion of

wrongdoing by individual Defendants. The various documents attached to Plaintiff's Complaint and submitted by him in opposition to Defendants' motion for summary judgment, consisting largely of outdated medical records and grievance determinations, do not raise any material issues of fact with regard to Plaintiff's claims, and in some instances arguably hurt his claim.[10]

On the issues on which the non-moving party bears the burden of proof on a summary judgment motion, the moving party need only point out the absence of evidence to support the movant's case. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Defendants, through the submission of Plaintiff's deposition testimony containing nothing more than conclusory assertions of their alleged wrongdoing, have satisfactorily revealed the absence of evidence supporting Plaintiff's claims. The law is well-settled that "[c]onclusory allegations, conjecture and speculation . . . are insufficient to avoid summary judgment," *Kerzer*, 156 F.3d at 400, and Plaintiff has offered nothing but conclusory assertions.

---

[10] For example, Plaintiff has submitted a superintendent's determination on a grievance filed with regard to the discontinuance of Ultram. (Dkt. No, 91-5 at 36.) The September 15, 2010, determination indicates that the Ultram was tapered down and ultimately discontinued because of the risk factors associated with its use in conjunction with Plaintiff's other medications. It also shows that Tylenol was substituted for the Ultram. *Id.* A July 11, 2011, superintendent determination on a grievance regarding Plaintiff's cane noted that Plaintiff had been advised by Defendant Lashway that "there was no clinical indication found to warrant continuation of cane use. . . ." (Dkt. No. 1-1 at 75.) "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703; *see also Walker v. Fischer*, 523 F. App'x 43-45 (2d Cir. 2013) (allowing plaintiff to use supportive medical boots only outside of his cell because boots could be used to fashion a weapon inside his cell did not give rise to an Eighth Amendment claim), *cert denied*, ___ U.S. ___, 143 S.Ct. 1028 (2014); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."), *aff'd* 178 F. App'x 39 (2d Cir. 2006).

Therefore, the Court recommends that in the event the District Court finds that Plaintiff's claims against Defendants Smith, Adam, Lashway, Rabideau, Hammac, White, Waterson, Wilson, Cushman, and Baker are not barred by *res judicata*, that their motion for summary judgment be granted on the merits.

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 82) be **GRANTED** in its entirety; and it is

**ORDERED**, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (*per curiam*)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: August 11, 2014
     Syracuse, New York

                              Thérèse Wiley Dancks
                              United States Magistrate Judge

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Pedro CASTILLO, Plaintiff,
v.
Byron RODAS and Carl Koenigsmann, Defendants.

No. 09 Civ. 9919(AJN).
Signed March 25, 2014.

*MEMORANDUM & ORDER*
ALISON J. NATHAN, District Judge.

**\*1** Plaintiff Pedro Castillo, an inmate at the Green Haven Correctional Facility ("Green Haven"), brings claims under 42 U.S.C. § 1983 alleging that Defendants Byron Rodas and Carl Koenigsmann were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, and that Rodas retaliated against him for filing a grievance, in violation of the First Amendment. Before the Court is Defendants' motion for summary judgment. Dkt. No. 75. For the following reasons, Defendants' motion is granted.

## I. BACKGROUND

The Court will first describe the record evidence relevant to Plaintiff's claims, and then briefly summarize this action's procedural history.

### A. Factual Background

The following facts and disputes of fact are based on the Court's review of the record, undertaken with particular attention to the evidence cited in the parties' Local Rule 56.1 statements.[FN1] *See Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000); *Agence Fr. Presse v. Morel,* 934 F.Supp.2d 547, 551 (S.D.N.Y.), *superseded on other grounds on reconsideration,* 934 F.Supp.2d 584 (S.D.N.Y.2013). The facts are undisputed unless otherwise noted. Because the Court discusses certain facts in more detail later in this opinion, a general overview suffices here.

> FN1. Plaintiff has filed only a response to Defendants' 56.1 statement, not his own statement.

Plaintiff is an inmate at Green Haven, in Stormville, New York. Pl. 56.1 Resp. ¶ 1. Under the terms of the consent decree governing the provision of inmate medical care at Green Haven, each inmate is assigned a primary care provider, who can be a physician assistant, a nurse practitioner, or a primary care physician. *Id.* ¶ 15. The "primary interface" between inmates and the medical staff is "sick call," at which an inmate, after seeking permission from a corrections officer, can make an appointment with a nurse, who can then refer them to their primary care provider for further treatment or distribute certain over-the-counter medications. *Id.* ¶ 16. If an inmate's primary care provider is unavailable, the inmate will be seen by another primary care provider. *Id.* An inmate can also make an "emergency sick call" to receive treatment immediately. *Id.* ¶ 18.

For an inmate to receive specialty care, the primary care provider must initiate a "request for consultation." Pl. 56.1 Resp. ¶ 25. Such requests describe the patient's condition and indicate a level of urgency indicating how soon a consultation with a specialist is needed. *Id.* ¶ 26. They are reviewed by a Regional Medical Director ("RMD") responsible for the medical care at several correctional facilities. *Id.* ¶¶ 7–8, 28. After the RMD approves a request for consultation, the request goes to a "quality review company" to determine whether the request meets the applicable standard of care. *Id.* ¶ 31. If the company preliminarily

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

declines the request, it goes back to the RMD for a final decision, but if the company approves the request, it bypasses the RMD and goes to a centralized state coordination system for the scheduling of specialty care. *Id.* ¶¶ 32–34.

**\*2** After a consultation request is approved, the inmate sees a specialist, who sends a report with any recommendations to the inmate's primary care provider for review. Pl. 56.1 Resp. ¶ 35. The primary care provider then fills out a new request for consultation based on the specialist's report, and then submits it according to the same process. *Id.* ¶ 36.

At all relevant times, Rodas was a physician's assistant on Green Haven's medical staff and was Plaintiff's primary care provider.FN2 Pl. 56.1 Resp. ¶¶ 2–4. Rodas is not a licensed physician. Bendheim Dep., Youngwood Decl. Ex. C, at 154–55. Koenigsmann was the RMD for Green Haven and responsible for reviewing its consultation requests. Pl. 56.1 Resp. ¶ 7.

> FN2. Plaintiff presents evidence that Rodas has been suspended since October 2011 after being indicted and pleading guilty to criminal charges unrelated to this action. Pl. 56.1 Resp. ¶ 2. The Court questions Plaintiff's choice to describe those charges in detail since it is well established that "[e]vidence of a crime ... is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b); *see also* Raskin v. Wyatt Co., 125 F.3d 55, 65 (2d Cir.1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

In August 2005, Plaintiff began experiencing hemorrhoid symptoms. Pl. 56.1 Resp. ¶ 49. Hemor-

rhoids occur in four stages: Stage I is the least severe and Stage IV is the most severe. *Id.* ¶ 42. Stage IV hemorrhoids generally require surgery—a "hemorrhoidectomy"—relatively quickly, but patients with milder symptoms ordinarily "will have relief with conservative or minimally invasive treatment." *Id.* ¶¶ 45, 43. Stage III hemorrhoids do not always require surgery, and depending on the circumstances, they can also be treated with "topical creams and suppositories." *Id.* ¶ 46. Additionally, "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. ¶ 41 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

On August 29, 2006, Plaintiff was seen by Rodas at sick call for complaints of blood in his stool and lower back pain; Rodas prescribed Tucks wipes and ordered a "stool occult blood test," which came back negative for blood. Pl. 56.1 Resp. ¶¶ 50–51; Pl. Decl., Youngwood Decl. Ex. D, ¶ 8. From that appointment through May 1, 2007, Plaintiff did not complain about hemorrhoids to the medical staff. Pl. 56.1 Resp. ¶ 52, Pl. Decl., Youngwood Decl. Ex. D, ¶ 9. Plaintiff was seen numerous times by the medical staff between May 1, 2007 and February 25, 2008 for various ailments, and at several of these appointments he was given hemorrhoid cream. Pl. 56.1 Resp. ¶¶ 53–72.

On April 25, 2008, Plaintiff "bled while defecating and felt 'tremendous pain.' " Pl. 56.1 Resp. ¶ 73. On April 28, he saw a nurse during sick call; he complained of "hemorrhoids and bleeding from the rectum during bowel movements," and the nurse gave him a pass to go to the clinic that afternoon. *Id.* ¶ 74. There, he saw Dr. John Bendheim, who diagnosed hemorrhoids, prescribed "a basin with Epsom salts for soaks and Preparation H and Dibucaine ointment," and noted in Plaintiff's records that Plaintiff "may benefit from" a general surgery consultation. *Id.* ¶ 75. Rodas saw Plaintiff on May 1, 2008 and submitted a consultation request for Plaintiff to see a surgeon for follow-up. *Id.* ¶ 78. He wrote in his request that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

Plaintiff was experiencing "rectal bleeding with pain in the rectum on and off for four years," and that conservative treatments were "no longer effective." *Id.*

**\*3** On May 22, 2008, Plaintiff was seen by a general surgeon, Dr. Aaron Roth, who conducted a physical examination and referred Plaintiff for "evaluation under anesthesia." Pl. 56.1 Resp. ¶ 80. (That meant surgery. *Id.*) Roth also recommended that Plaintiff undergo a colonoscopy. *Id.* On May 23, 2008, Rodas submitted a request for consultation for further evaluation based on Roth's recommendation. That request stated that "conventional treatment was no longer effective" and reported that Roth's examination had found a "stage III internal hemorrhoid." *Id.* ¶ 81. From May 22 to August 5, Plaintiff states that he complained of "severe" pain to Rodas and nurses on the medical staff. *Id.* ¶ 80.

On May 23, 2008, Koenigsmann denied Rodas's request for consultation and determined that Plaintiff should be referred for a colonoscopy to rule out more serious causes of his left lower quadrant pain and rectal bleeding. Pl. 56.1 Resp. ¶ 82; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–59. From a medical standpoint, a colonoscopy is not part of a course of treatment for hemorrhoids, nor is it an effective means of diagnosing hemorrhoids. Pl. 56.1 Resp. ¶¶ 82–83; Freed Dep., Youngwood Decl. Ex. F, at 95–97.

On June 16, 2008, Rodas referred Plaintiff for a colonoscopy. Pl. 56.1 Resp. ¶ 86. The colonoscopy was performed on August 5, 2008, by Dr. Robert Antonelle. *Id.* ¶ 89. Antonelle wrote a report following the procedure, which described "internal hemorrhoids [and] minimal rectal prolapse" that was "easily reducible" and noted internal bleeding. *Id.* ¶ 90 (alteration in original). Antonelle prescribed "Anusol hydrocortisone cream and follow-up as needed," and recommended a follow-up colonoscopy in ten years. *Id.* ¶¶ 90–91. Antonelle's report did not say anything about whether Plaintiff's hemorrhoids required surgery.

In a declaration submitted by Plaintiff, Antonelle indicates that he did not intend for his report to suggest that hemorrhoid surgery was not necessary; in fact, it was his understanding that the treatments he prescribed would be supplemental to the surgery that he anticipated would be taking place. Pl. 56.1 Resp. ¶¶ 91–94; Antonelle Decl., Youngwood Decl. Ex. H. However, "Rodas did not believe surgery was necessary because it was not prescribed in Dr. Antonelle's plan." [FN3] Pl. 56.1 Resp. ¶ 93; *accord* Rodas Dep., Youngwood Decl. Ex. A, at 229–31. As a result, he did not request a hemorrhoidectomy on Plaintiff's behalf, and Plaintiff continued to receive conservative treatments from the medical staff. Pl. 56.1 Resp. ¶¶ 96, 101–103.

> [FN3]. This statement of fact is listed as disputed in Plaintiff's response to Defendants' 56.1 statement, because Antonelle did not intend for his report to be interpreted in the way that Rodas interpreted it. However, as explained later in this opinion, Antonelle's intentions alone are not a valid basis for disputing Rodas's subjective thought process.

On February 17, 2009, Plaintiff saw a general surgeon, Dr. Bhopale, for complaints of rectal bleeding; the rectal exam was "normal," and Plaintiff was given two containers of laxatives. Pl. 56.1 Resp. ¶ 104. The nature of Bhopale's examination is disputed: Plaintiff claims that Bhopale asked him to lower his underwear but did not examine his rectum, and he asserts on information and belief that "Dr. Bhopale ... regularly diagnos[e]s his patients or inmates referred to him with normal findings, even when an inmate has a condition worthy of medical attention." *Id.;* Castillo Decl., Youngwood Decl. Ex. D, ¶¶ 41–42.

**\*4** On February 27, 2009, Plaintiff saw Rodas and

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

requested surgery for his hemorrhoids. Rodas denied the request and told Plaintiff that his rectal examination had been normal. Pl. 56.1 Resp. ¶ 105. According to Plaintiff, Rodas also told him that "the director of the clinic" had denied his surgery, that he would have to file a grievance if he wanted surgery, and that Rodas was "not going to do anything else." *Id.;* Castillo Decl., Youngwood Decl. Ex. D, ¶ 44.

Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009, Dr. Frederick Bernstein, who reviewed the grievance, responded to it by stating that Plaintiff would be sent to a general surgeon to determine whether he was an "appropriate candidate for surgical treatment." Pl. 56.1 Resp. ¶¶ 108, 110. Rodas then requested a surgical consultation, which Koenigsmann approved. *Id.* ¶ 111. Rodas placed Plaintiff in the infirmary on March 27, 2009. *Id.* ¶ 118. Roth saw Plaintiff and made arrangements for a hemorrhoidectomy, Rodas scheduled the procedure, and Koenigsmann approved it. *Id.* ¶¶ 142, 144. According to Plaintiff, during his consultation with Roth, "Roth became upset because his recommendation was ignored." Pl. Decl., Youngwood Decl. Ex. D, ¶ 67. Plaintiff finally received a hemorrhoidectomy on July 2, 2009, more than a year after Roth initially recommended the procedure. Pl. 56.1 Resp. ¶ 147.

**B. Procedural History**

Plaintiff filed a pro se complaint on December 3, 2009, naming Rodas and Bernstein as Defendants, and the case was assigned to Judge Jones. Following an initial discovery period, Rodas and Bernstein moved for summary judgment. In his brief opposing that motion, Plaintiff conceded that he had named Bernstein as a defendant on the mistaken belief that Bernstein, and not Koenigsmann, was responsible for denying his surgery after Rodas requested it in May 2008. Dkt. No. 31, at 12–13. On September 19, 2011, Judge Jones denied the contested portion of Defendants' motion without a written opinion and granted Plaintiff leave to amend his complaint to add Koenigsmann as a Defendant. Dkt. No. 38.

After Plaintiff filed an amended complaint and Defendants answered, counsel appeared on Plaintiff's behalf, and the case was reassigned to the undersigned. The Court granted Plaintiff leave to file a Second Amended Complaint (the "2AC"), which was filed on May 2, 2012. Dkt. No. 56. After Defendants answered, the parties engaged in additional discovery, and Defendants again moved for summary judgment on April 1, 2013. That motion is fully submitted.

**II. LEGAL STANDARD**

Summary judgment is properly granted when, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ramos,* 687 F.3d at 558 (quoting *Niagara Mohawk Power Corp. v. Hudson River—Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012)) (internal quotation marks omitted).

**\*5** As the moving party, Defendants bear the burden of demonstrating the absence of a genuine issue of material fact. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). When the burden of proof at trial would fall on the non-moving party, a movant can carry its burden by pointing to a lack of record evidence on an essential element of its opponent's claim. *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## III. DISCUSSION

Plaintiff brings two claims under § 1983: an Eighth Amendment claim against both Rodas and Koenigsmann, and a First Amendment claim against Rodas. 2AC at 7–8. Defendants move for summary judgment with respect to both of Plaintiff's claims. The Court will address these two claims in turn.

### A. Eighth Amendment Claim

In Count 1, brought pursuant to § 1983, Plaintiff alleges that Defendants denied him adequate medical treatment in violation of the Eighth Amendment. 2AC ¶¶ 34–36. A prison official's failure to provide adequate medical treatment can constitute " 'deliberate indifference' to a substantial risk of serious harm to an inmate," and thereby violate the Eighth Amendment's prohibition against cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994); *see Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Courts evaluating deliberate indifference claims must conduct two inquiries. The first is an objective inquiry that asks whether the alleged deprivation of medical care was "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The second inquiry is a subjective one that asks whether the charged official acted "with a sufficiently culpable state of mind." *Id . at 280.* Defendants argue that no genuine issue of material fact exists concerning either inquiry, and that they are therefore entitled to summary judgment.

### 1. *Qualified Immunity*

The Court will first address Defendants' contention that even if they violated the Eighth Amendment, they are entitled to qualified immunity. Def. Br. at 24. The doctrine of qualified immunity protects government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800,

818 (1982). Following the Supreme Court's decision in *Pearson v. Callahan,* 555 U.S. 223 (2009), lower courts have discretion to decide whether the right a plaintiff invokes was "clearly established" at the time of the defendant's conduct before addressing whether that right was actually violated. *See id. at 236.* If the right was not clearly established, then the defendant is immune from suit, and whether his conduct in fact violated the plaintiff's rights is irrelevant.

**\*6** In this case, however, the Court will not address the question of whether the Eighth Amendment rights Defendants allegedly violated were "clearly established." That question is a difficult one, which depends on the level of generality at which the rights are defined. For example, Plaintiff assumes that the relevant right is defined by "the elements" of his claim, Pl. Opp. at 25, but in stripping away all the facts constituting the alleged violation, his approach appears to be too broad. *See Saucier v. Katz,* 533 U.S. 194, 202–03 (2001); *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987). For their part, Defendants argue that they are immune because no precedent suggests that hemorrhoids are a sufficiently serious medical condition. But their focus on symptoms—rather than, for instance, the pain or danger associated with the symptoms—is likely too narrow. The parties' briefing on this issue is sparse. As a result, "there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong," *Pearson,* 555 U.S. at 236, and the Court will proceed to consider whether there are genuine issues of material fact concerning whether Defendants violated the Eighth Amendment. There are not.

### 2. *Deliberate Indifference*

As noted above, the parties contest both the objective and subjective elements of Plaintiff's Eighth Amendment claim. For purposes of this motion, the Court will assume that the objective prong is met—i.e., that Plaintiff "was actually deprived of adequate medical care" and that the deprivation was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

"sufficiently serious," *Salahuddin,* 467 F.3d at 279–80–because Defendants are entitled to summary judgment on the subjective prong. That is, no reasonable jury could conclude that Defendants acted with deliberate indifference.

The Eighth Amendment forbids only cruel and unusual *punishments* . As a result, the Supreme Court has described the "deliberate indifference" standard carefully, taking pains to distinguish it from less culpable mental states. *See Farmer,* 511 U.S. at 835–47; *Wilson v. Setter,* 501 U.S. 294, 296–304 (1991). The mental state required for an Eighth Amendment violation in the context of prison medical care is "subjective recklessness as used in the criminal law." *Farmer,* 511 U.S. at 839. That is, the defendant must "know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *accord Salahuddin,* 467 F.3d at 280 (defendant must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result").

Although the question of whether a defendant acted with a particular state of mind is frequently a factual one appropriate for resolution by a jury, the Second Circuit has made clear that summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim, and Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation. *See Salahuddin,* 467 F.3d at 281–82; *Brock v. Wright,* 315 F.3d 158, 164–65 (2d Cir.2003); *see also Hernandez v. Keane,* 341 F.3d 137, 145–47 (2d Cir.2003) (affirming Rule 50 judgment for defendants). For the reasons that follow, the Court concludes that Plaintiff has failed to introduce sufficient evidence to create a triable issue of fact regarding deliberate indifference, so Defendants are entitled to summary judgment.

3. *Rodas Was Not Deliberately Indifferent*

**\*7** The Court will assess the claims against Rodas first. *See, e.g ., Brock,* 215 F.3d at 162 (deliberate indifference must be shown for "each defendant"). Plaintiff characterizes the record as establishing that he consistently suffered from severe and worsening hemorrhoid symptoms, that he repeatedly complained of these severe symptoms to Rodas, and that Rodas continued to provide the same non-surgical treatments whose ineffectiveness was evident from the very symptoms of which Plaintiff complained. Pl. Opp. at 5–11, 15–16. In several respects, however, that is not what the evidence actually shows. To explain why, the Court must review the record in significant detail.

As an initial matter, in asserting that he "consistently complained about his hemorrhoids," Pl. Opp. at 15, Plaintiff points to certain complaints that did not concern hemorrhoids at all. For example, on May 8, 2007, Plaintiff complained that he "felt a burning sensation while urinating" and was diagnosed with a urinary tract infection. Pl. 56.1 Resp. ¶ 57. On June 18, 2007, he complained of "left lower quadrant pain" and told the nursing staff that hemorrhoid cream—the treatment that he now argues was inadequate—"relieved the pain." *Id.* ¶ 58. And with respect to many of his complaints that were, in fact, "about his hemorrhoids," the record does not always indicate that Plaintiff complained to Rodas, as opposed to someone else. *See* Pl. 56.1 Resp. ¶ ¶ 63, 65, 66, 71, 74, 79 (describing sick calls or meetings with a nurse). FN4 Focusing on Rodas's own response to Plaintiff's symptoms, the record reveals the following:

> FN4. At sick calls, inmates are initially "triaged by a nurse," who may then refer them to their primary care provider or another primary care provider if their own is not available. Bendheim Dep., Youngwood Decl. Ex. C, at 104–05. With respect to the portions of Plaintiff's Rule 56.1 response cited in the text, the paragraphs describing Plaintiff's sick calls do not state whether Plaintiff was re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

ferred to Rodas after being triaged by a nurse.

Plaintiff's hemorrhoid symptoms began in August 2005, but he did not seek medical attention until August 2006, at which point Rodas ordered a blood test and prescribed Tucks wipes. Pl. 56.1 Resp. ¶¶ 49, 50. In his Rule 56.1 response, Plaintiff disputes Defendants' assertion that he did not complain about hemorrhoids following that appointment, noting that his complaints were not always noted in his medical records. *Id.* ¶ 52. But Plaintiff's own declaration states that "between ... August 29, 2006 and February 2007, it is true that I did not complain of hemorrhoids, because I was keeping up with defendant Rodas' treatment directions." Pl. Decl., Youngwood Decl. Ex. D, ¶ 9. Plaintiff also does not dispute that between February 2007 and August 3, 2007, he did not complain about hemorrhoids, although he sought medical attention for other ailments.[FN5] Pl. 56.1 Resp. ¶¶ 53–59. On August 3, 2007, a nurse referred Plaintiff to Rodas for hemorrhoid symptoms, and on August 10, Rodas met with Plaintiff, requested a "stool guaiac test," which came back negative, and prescribed hemorrhoid cream and Bacitracin ointment. *Id.* ¶¶ 60–62. It is disputed whether Rodas performed a "physical examination" during that appointment. *Id.* ¶ 60.

> FN5. Indeed, Plaintiff's description of his condition, and the medical staff's response to his complaints, must be understood in the context of the undisputed fact that "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. 141 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

From August 2007 to February 2008, it is true that the medical staff—both nurses and Rodas—continued treating Plaintiff with hemorrhoid cream. Pl. 56.1 Rep. ¶¶ 63–72. But in at least one instance, Plaintiff himself requested the cream that he now alleges was inadequate, *id.* ¶ 68, and there also is no indication either

that Plaintiff's symptoms were severe or getting worse [FN6] or, more importantly, that he complained to the medical staff of any severe symptoms. The record simply reflects that Plaintiff saw the medical staff several times and received hemorrhoid cream. No reasonable jury could conclude that, during this period, Rodas was "actually aware" that the treatments he was prescribing put Plaintiff at a "substantial risk" of "serious harm." *Salahuddin,* 467 F.3d at 280; *see Youngblood v. Glasser,* No. 9:10–CV–1430 (NAM/DEP), 2012 WL 4051846, at *8–9 (N.D.N.Y. Aug. 22, 2012) (no deliberate indifference where inmate complaining of hemorrhoids was given "stool softeners and ointment" by a nurse), *adopted,* 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Domenech v.. Taylor,* No. 9:09–CV–162 (FJS/DEP), 2010 WL 6428459, at *8 (N.D.N.Y. Sept. 8, 2010) (same where inmate was given "hemorrhoidal cream, cleansing pads, suppository pads, and a stool softener"), *adopted,* 2011 WL 1214431 (N.D.N.Y. Mar. 31, 2011).

> FN6. In August 2007, Plaintiff's symptoms included "burning, itching, and irritation," and "always bleeding during bowel movements." Pl. 56.1 Resp. ¶ 61.

**\*8** On April 25, 2008, Plaintiff's symptoms surely did become more severe: he "bled while defecating and felt 'tremendous pain.' " Pl. 56.1 Resp. ¶ 73. He saw a nurse during sick call on April 28, who referred him to Dr. Bendheim in the clinic. Bendheim prescribed Epsom salts, Preparation H, and an ointment, and indicated that Plaintiff "may benefit" from a surgery consultation—a question ultimately to be determined by Rodas, his primary care provider. *Id.* ¶ 75. The very next time that Rodas met with Plaintiff—on May 1, 2008, three days after Bendheim did—it is undisputed that he "submitted a consultation request for plaintiff to see a surgeon for follow-up." *Id.* ¶ 78. At that point, Rodas recognized (and wrote in his consultation request) that the conservative course of treatment he had previously recommended was "no

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

longer effective." *Id.* But at that point, of course, Rodas also altered that conservative course of treatment by requesting that Plaintiff see a surgeon. And after the surgeon, Roth, recommended surgery and a colonoscopy, Rodas "submitted a request for consultation for further evaluation based on the surgeon's recommendation." *Id.* ¶ 81. No reasonable jury could find that in taking these steps, Rodas was simply "persist[ing] in a course of treatment known to be largely ineffective," as Plaintiff claims. Pl. Opp. at 15.

It is undisputed that Koenigsmann initially denied the request for surgery because he believed a colonoscopy should be performed first in order to rule out more serious causes of Plaintiffs symptoms. Pl. 56.1 Resp. ¶ 82. And at that point, the evidence plausibly suggests that Rodas made a mistake. Antonelle's report stated that Plaintiff's hemorrhoids were "easily reducible," and he prescribed "Anusol hydrocortisone cream and follow-up as needed." He also recommended a "[f]ollow up [c]olonoscopy in 10 years." *Id.* ¶¶ 90, 91. Rodas asserts that he interpreted this report, which did not mention surgery, as an indication that Antonelle believed that surgery was unnecessary, and he therefore did not submit a further request for Plaintiff to undergo surgery. *Id.* ¶ 93; Rodas Supp. Decl., Dawkins Decl. Ex. F, ¶ 8 ("Dr. Antonelle, an expert in the field of gastroenterology, did not write ... that the surgery was necessary after the colonoscopy. I interpreted Dr. Antonelle's written report to mean that since the colonoscopy revealed that plaintiff's hemorrhoids were easily reducible, the Anusol cream was sufficient and further surgical procedures [were] unnecessary.") (citations omitted).

Plaintiff disputes Rodas's interpretation because Antonelle did not intend for his report to have any bearing on whether Plaintiff needed surgery, and because a colonoscopy is not part of a course of treatment for hemorrhoids. Pl. 56.1 Resp. ¶¶ 83, 91–94. But because the deliberate indifference standard is subjective, *see Farmer,* 511 U.S. at 837, neither what Antonelle intended nor what Rodas objectively should

have understood the colonoscopy results to mean can suffice to establish that Rodas was "actually aware" that Plaintiff still required surgery in order to address a "substantial risk" of "serious harm." *See Salahuddin,* 467 F.3d at 282 ("the mental-state inquiry does not include an objective-reasonableness test"). At most, the evidence presented by Plaintiff suggests that Rodas was negligent, which is insufficient.

**\*9** Plaintiff points to no direct evidence to counter Rodas's testimony that he interpreted Antonelle's report as indicating that surgery was not required. Nor could a reasonable jury infer from other evidence in the record that Rodas's explanation is pretextual. *See Salahuddin,* 467 F.3d at 282 (asking, in the absence of direct evidence, whether "circumstantial evidence" contradicted defendant's showing "that [he] was not aware of a substantial risk that postponing [plaintiff's] liver biopsy would cause serious harm"). Rodas is not a doctor, and in any case Plaintiff never suggests that Rodas's interpretation of Antonelle's report was so egregiously incorrect from a medical standpoint that his explanation is implausible.[FN7] Nor was Plaintiff's condition so severe as to suggest that Rodas must have known surgery was necessary. *See Farmer,* 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). Plaintiff describes reporting severe pain to Rodas and the medical staff before his colonoscopy, but not after. Pl. 56 .1 Resp. ¶ 80. On September 16, 2008, roughly a month after his colonoscopy, Plaintiff complained to Rodas that his hemorrhoid condition was "deteriorating," but although he now claims that he was in severe pain at the time, he does not say that he communicated the extent of his pain to Rodas-his September 16 appointment dealt primarily with "complaints of pain in the left side of his abdomen." *Id.* ¶ 96. Additionally, while Plaintiff complained of hemorrhoids on other occasions after his colonoscopy and was given hemorrhoid cream, there is no evidence that he complained of severe pain. [FN8] *Id.* ¶¶ 98, 101, 103. He did not complain about not receiving surgery until February 2009. *Id.* ¶ 106. And

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

throughout this period, Rodas continued to treat Plaintiff for other ailments, including requesting a surgical consult for a growth on Plaintiff's forehead. *Id.* ¶ 100. Plaintiff does not explain why Rodas, who filled out several consultation requests on his behalf—including the May 23, 2008 and June 16, 2008 requests related to hemorrhoids—would refuse to request a hemorrhoidectomy that he actually believed was necessary.

> FN7. In fact, Bernstein, who denied Plaintiff's grievance requesting that Rodas be relieved as his primary care provider, concluded that Plaintiff was receiving "good medical care" in part because "plaintiff's colonoscopy ... was normal," suggesting that at least one doctor also believed that Antonelle's colonoscopy report indicated that Plaintiff did not require surgery. Pl. 56.1 Resp. ¶ 127; *see* Mauro Decl., Hawkins Decl. Ex. O.

> FN8. Consistent with the lack of evidence supporting Plaintiff's claim with respect to Rodas's mindset, Rodas testified that Plaintiff's lack of complaints in the aftermath of his colonoscopy confirmed his interpretation of Antonelle's report. *See* Rodas Dep., Youngwood Decl. Ex. A, at 229–30 (stating that because "the GI ... recommended to use cream for the hemorrhoids" and "didn't recommend any surgery," and because Plaintiff "didn't complain" about hemorrhoids after his colonoscopy, Rodas believed "that the hemorrhoids [were] resolved.").

Plaintiff's hemorrhoid condition worsened again in February and March of 2009. On February 17, 2009, he saw Bhopale, who reported that Plaintiff's "rectal exam was normal." Pl. 56.1 Resp. ¶ 104. Plaintiff then saw Rodas ten days later and requested surgery, which Rodas denied because Plaintiff's "rectal examination had been normal." *Id.* ¶ 105.

Plaintiff attempts to cast doubt on Rodas's motivations by claiming that Bhopale's examination was inadequate, but he does not explain why Rodas would have known about any inadequacy. *Id.* ¶ 104. Thus, there is no evidence suggesting that Rodas actually thought Plaintiff required surgery. That Rodas allegedly said that Plaintiff's surgery had been denied and that Plaintiff would have to file a grievance if he wanted surgery is somewhat troubling, *id.* ¶ 105, but the most straightforward interpretation of Rodas's behavior is that, in light of Antonelle's and Bhopal's reports, he strongly believed that Plaintiff did not need surgery. The Court cannot conclude that a reasonable jury could infer the opposite. At most, Rodas's statement that he was "not going to do anything else" on Plaintiff's behalf suggests that *if* he thought Plaintiff faced a risk of serious harm, he still would not request surgery. But it does not by itself suggest that he *did* believe that Plaintiff faced such a risk at the time, and, as explained above, there is no other evidence from which to infer that he did. Rodas also ordered "a complete blood count and stool samples" following the appointment, negating any inference that his comments evidenced a complete refusal to treat Plaintiff. Pl. 56.1 Resp. ¶ 105.

**\*10** Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009, Bernstein responded to the grievance by stating that Plaintiff would be sent to a general surgeon to determine whether he was an "appropriate candidate for surgical treatment." Pl. 56.1 Resp. ¶¶ 108, 110. As a result, Rodas requested a surgical consultation, which Koenigsmann approved. *Id* . ¶ 111. The fact that Bernstein reached a different conclusion than Rodas is not sufficient to establish Rodas's deliberate indifference. *See, e.g., Chapman v. Parke,* 946 F.2d 894 (Table), 1991 WL 203080, at *1–2 (6th Cir.1991) (disagreement between doctors over plaintiff's need for hemorrhoid surgery did not evidence deliberate indifference); *Webb v. Jackson,* No. 92 Civ. 2149(SS), 1994 WL 86390, at *3 (S.D.N.Y. Mar. 16, 1994) ("It is well established that a mere difference[ ] in opinion,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation ...."). Between March 17 and July 2, when Plaintiff received a hemorrhoidectomy, Rodas admitted Plaintiff to the infirmary, and while the parties characterize Plaintiff's condition during that period in different ways, there is nothing from which a jury could infer that Rodas himself delayed Plaintiff's surgery or otherwise could have done anything differently to reduce Plaintiff's risk of harm.

To summarize, the Court's review of the record has uncovered no basis for concluding that at any point, Rodas himself subjectively believed that his prescribed course of treatment for Plaintiff's hemorrhoid symptoms put Plaintiff at a substantial risk of serious harm. Plaintiff never claims that he was denied treatment. *See, e.g., Estelle,* 429 U.S. at 107–08 (no deliberate indifference where plaintiff was treated many times by medical staff); *Poole v. Koehler,* No. 87 Civ. 6881(PNL), 1992 WL 316179, at *1 (S.D.N.Y. Oct. 19,1992) (no deliberate indifference where defendants introduced "several affidavits and numerous medical records demonstrating that plaintiff received on-going medical attention and care"). And Plaintiff's argument that Rodas persisted in prescribing non-surgical treatments that he knew to be inadequate does not accurately describe the record. No reasonable jury could conclude that Rodas ever believed Plaintiff required surgery but prescribed non-surgical treatment instead. When Plaintiff's condition worsened in 2008, Rodas requested a surgical consultation, and when it worsened in 2009, nothing suggests that Rodas actually believed that Plaintiff faced a significant risk of serious harm without surgery. Even assuming that Rodas interpreted Antonelle's colonoscopy report incorrectly, that is at most evidence from which a reasonable jury could conclude that Rodas acted negligently, and not that he acted with deliberate indifference. As a result, the Court concludes as a matter of law that Rodas did not have a sufficiently culpable state of mind to support Plaintiff's Eighth Amendment claim against him.

*11 The case law that Plaintiff relies upon does not require a different result. First, Plaintiff cites two cases purportedly establishing that a defendant acts with deliberate indifference by "fail[ing] to investigate the cause of an inmate's medical condition." Pl. Opp. at 13–14, 14–15 (citing *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990), *overruled by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir.2009); and *Burton v. Lynch,* 664 F.Supp.2d 349, 364 (S.D.N.Y.2009)). Plaintiff argues that there is a factual dispute regarding whether Rodas "appropriately examined" Plaintiff, because despite Rodas's testimony to the contrary, Plaintiff maintains that Rodas never conducted a "physical examination of [his] rectum" throughout the course of his treatment. Pl. Decl., Youngwood Decl. Ex. D, ¶ 17. On its own, however, the question of whether Rodas's examination techniques were objectively "appropriate" as a medical matter is only tangentially relevant to his subjective culpability.

As an initial matter, *Liscio v. Warren,* 901 F.2d 274, has been overruled—the Second Circuit recently described it as applying an "objective standard" that is no longer "good law" after *Farmer.* [FN9] *Caiozzo,* 581 F.3d at 70. In any event, the defendant in *Liscio* had seen medical records suggesting that the plaintiff was suffering from alcohol withdrawal—a condition that was "both life-threatening and fast-degenerating"—yet he failed to examine the plaintiff *at all* for three days. *Id.* at 276–77. From those facts, a jury could arguably infer that the defendant knew the plaintiff was in danger, yet did nothing. The second case that Plaintiff cites, *Burton v. Lynch,* 664 F.Supp.2d 349, is readily distinguishable too: the defendant there knew the plaintiff's elbow was in severe pain, did not examine it, brusquely told the plaintiff there was "nothing wrong with" it, and prescribed Motrin, to which he knew the defendant was allergic. *Id.* at 355, 355–56. In this case, even if the nature of Rodas's examinations is disputed, he clearly knew that Plaintiff had hemorrhoids, and nothing suggests that he subjectively believed that the treat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ments he was prescribing were inappropriate. In this context, Plaintiff's complaint that Rodas should have conducted a physical examination is the kind of difference in opinion that cannot establish deliberate indifference. *See Estelle,* 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Joiner v. Greiner,* 195 F.Supp.2d 500, 504–05 (S.D.N.Y.2002) (failure to perform an MRI did not establish deliberate indifference).

> FN9. Plaintiff describes *Liscio* as "overruled on other grounds." Pl. Opp. at 14. But he cites it for the proposition that failing to examine an inmate can constitute deliberate indifference, despite the fact that the deliberate indifference standard that the *Liscio* court employed is no longer good law. *See Caiozzo,* 581 F.3d at 70. Thus, the case appears to have been overruled on very much the same ground for which Plaintiff cites it.

Second, Plaintiff cites several cases supporting his argument that Rodas knew non-surgical treatments were largely ineffective yet continued prescribing them anyway. Pl. Opp. at 14, 16. In *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), the Second Circuit held that a rational jury could find [FN10] deliberate indifference where the defendant knew an inmate was in pain because of two broken pins in his hip, did not tell him about the pins, and waited two years to seek a surgical consultation despite receiving more than fifty complaints of severe pain. 37 F.3d at 67–69. The court put significant weight on the non-disclosure: one could infer that the defendant knew the plaintiff would elect surgery had he known about the pins, and that withholding that information effectively denied him the surgery. *See also Hernandez,* 341 F.3d at 146 (discussing *Hathaway* ). By contrast, Rodas did not withhold information, nor did he deliberately withhold surgery: he referred Plaintiff for a surgical consult in 2008, when Plaintiff's complaints first became severe,

and the evidence shows that he believed that surgery was unnecessary after Antonelle's report.

> FN10. *Hathaway* was decided on appeal of the district court's order denying the defendant's Rule 50 motion following a trial at which the jury was deadlocked. *See* 37 F.3d at 66.

**\*12** Additionally, unlike in *Hathaway,* where the plaintiff "continued to experience great pain over an extended period of time" and complained of that pain to the defendant, 37 F.3d at 67, 68, there is no evidence that Plaintiff's hemorrhoid complaints were accompanied by reports of severe pain between his colonoscopy and February 2009, shortly before he was again referred for surgery. And even assuming that Rodas was, in fact, aware that Plaintiff was in pain, the delay for which he is responsible is at most seven months: from the time of Antonelle's colonoscopy on August 5, 2008, to March 17, 2009, when Rodas again requested a surgical consultation. Plaintiff received treatment over that interval. The delay in his surgery does not evidence deliberate indifference under these circumstances. *See Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233 (Table), 1999 WL 753142, at \*1, \*2 (2d Cir. Sept. 17, 1999) (although plaintiff did not receive knee surgery for three years and "complained of knee pain on multiple occasions," he received other treatment and the delay did not "rise to the egregious level identified in *Hathaway"* ); *cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (one-year delay in treating plaintiff's cavity, where there was no evidence that defendants would have treated it absent plaintiff's consent to unwanted procedure on another tooth, raised factual issue as to deliberate indifference); *Stevens v. Goord,* 535 F.Supp.2d 373, 388–89 (S.D.N.Y.2008) (unfounded assertion that plaintiff's chest pain and respiratory symptoms were "essentially untreatable," which led to no treatment at all for nine months, raised factual issue).[FN11]

FN11. The other cases Plaintiff cites are readily distinguishable. *See Rodriguez v. Downstate Corr. Facility,* No. 00 Civ. 9337(LAP), 2003 WL 1698204, at *6–7 (S.D.N.Y. Mar. 31, 2003) (defendant expressed fear that plaintiff would die without a transfer to another facility but did not seek such a transfer); *Ruffin v. Deperio,* 97 F.Supp.2d 346, 354 (W.D.N.Y.2000) (plaintiff's deterioration, which included "blackening of his toes" and "glycerin levels which were regularly three to five times the normal levels," was "sufficiently obvious to infer the defendants' actual knowledge of a substantial risk"); *Pugliese v. Cuomo,* 911 F.Supp. 58, 62–63 (N.D.N.Y.1996) (upon transfer to a new facility, plaintiff's treatment was discontinued against his doctors' advice, and his condition deteriorated to the point that he could not lift a one-pound weight with his left arm). Both *Rodriguez* and *Pugliese* also rely on *Liscio,* which, as noted in the text, is no longer good law.

Finally, Plaintiff argues that Rodas disregarded the recommendations of Plaintiff's treating physicians. Pl. Opp. at 17–18 (citing *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005); and *Jones v. Simek,* 193 F.3d 485 (7th Cir.1999)). Again, however, disregarding a treating physician's recommendation demonstrates deliberate indifference only if it permits an inference of subjective culpability. In *Johnson,* it was "beyond cavil that all of plaintiff's treating physicians, including two prison physicians, expressly recommended that the plaintiff be prescribed Ribavirin," and the defendants ignored them. 412 F.3d at 405; *see also Jones,* 193 F.3d at 490 (defendant "knew that something might be seriously wrong," failed to give him pain medication for six months before referring him to specialists, and then failed to follow the specialists' prescriptions). In this case, the only available inference to be drawn from the record is that Rodas thought he was *following* Antonelle's recommendation by not

scheduling surgery. In short, Plaintiff's efforts to squeeze the facts of this case into favorable doctrinal boxes fail; the evidence of subjective culpability is insufficient as a matter of law, and Rodas is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

4. *Koenigsmann Was Not Deliberately Indifferent*

**\*13** The Court also concludes that the evidence is insufficient to permit a reasonable jury to conclude that Koenigsmann was deliberately indifferent. Unlike Rodas, Koenigsmann was not involved in Plaintiff's day-to-day medical care. Thus, Plaintiff's argument that Koenigsmann violated the Eighth Amendment centers on just one decision: his denial of Rodas's request that Plaintiff receive surgery for his hemorrhoid condition.FN12 Pl. Opp. at 18, 24.

FN12. The 2AC includes a claim of "supervisory liability" alleged against Koenigsmann. 2AC ¶¶ 41–13. Except insofar as the denial of Plaintiff's surgery is concerned, Plaintiff has abandoned any claim premised on Koenigsmann's role as supervisor. Pl. Opp. at 24; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (where a defendant does not participate personally in a violation, he may be liable under § 1983 only if he refused to remedy the violation after learning of it, implicitly sanctioned it, or was grossly negligent in supervising subordinates who caused it).

Plaintiff suggests that Koenigsmann should not have denied the request for surgery. But to say that he "denied" the request is to oversimplify: it is undisputed that he did so because he believed that it was medically necessary for Plaintiff to undergo a colonoscopy to rule out more severe causes of his symptoms. *See* Pl. 56.1 Resp. ¶¶ 82–83; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–64. According to Plaintiff, Defendants' assertion that "all medical professionals agree" that Koenigsmann's decision was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

correct is unsupported, Pl. Opp. at 18, but at least two other doctors agreed that a colonoscopy was appropriate. *See* Freed Report, Dawkins Decl. Ex. B, at 3 ("Ordering the colonoscopy ... was good medical practice in view of the persistent bleeding to rule out other more potentially dangerous conditions like cancer."); Bendheim Dep., Dawkins Decl. Ex. H, at 249 (opining that it would have been "irresponsible" not to conduct a colonoscopy first). Had he known that Antonelle's colonoscopy had come back normal, Koenigsmann (unlike Rodas) might well have interpreted it to mean that surgery was necessary. But there is no evidence that he received or knew about Antonelle's report. *See* Koenigsmann Decl., Dawkins Decl. Ex. G, ¶ 15 ("It would not have been necessary for ... Rodas to notify me of Dr. Antonelle's recommendations.").

Perhaps Koenigsmann can be faulted for not following up on Rodas's initial request, since denying it meant that another surgery request should have been forthcoming if the colonoscopy came back normal. But his failure to do was at most negligent, and therefore insufficient to support an Eighth Amendment claim. *See Salahuddin,* 467 F.3d at 282 (postponing biopsy was not evidence of deliberate indifference because no one "aroused [the defendant's] suspicion that postponing the biopsy rather than allowing treatment to proceed would be seriously harmful"); *Hernandez,* 341 F.3d at 147 (defendants' failure to "follow up on the duties of others'" to put a medical hold on plaintiff "arguably could support a finding of negligence," but plaintiff "presented no evidence that the defendants had any reason to doubt [the others'] reliability"). The same is true of Plaintiff's argument that Koenigsmann could have approved the surgery while simultaneously ordering a colonoscopy to be performed first. Pl. Opp. at 18. Whether or not his failure to do so was a mistake, it does not demonstrate deliberate indifference. As a result, Koenigsmann is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

**B. Retaliation Claim**

**\*14** In Count 2, brought pursuant to § 1983, Plaintiff alleges that Rodas retaliated against him for filing a grievance by confining him to Green Haven's infirmary, in violation of the First Amendment. 2AC ¶¶ 38–40. Defendants concede that filing a grievance is a protected activity, but the parties dispute whether Plaintiff suffered any "adverse action," and, if so, whether there was a "causal connection between the protected [activity] and the adverse action." *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (setting forth the elements of a retaliation claim) (quoting *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)) (internal quotation mark omitted). As explained below, however, the Court need not reach these arguments because Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim.

*1. Plaintiff Failed to Exhaust His Administrative Remedies*

In most § 1983 cases, the plaintiff need not exhaust administrative remedies before bringing suit. *See Patsy v. Bd. of Regents of Fla.,* 457 U.S. 496, 516 (1982). But this general rule does not apply to prisoners. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[FN13] The failure to exhaust administrative remedies is an affirmative defense to a prisoner's claim, *Jones v. Bock,* 549 U.S. 199, 216 (2007), and Defendants bear the burden of demonstrating that Plaintiff's claim is not exhausted, *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009).

> FN13. Plaintiff correctly does not contest that his retaliation claim is a claim "brought with respect to prison conditions." The Supreme Court has clarified that the "PLRA's exhaustion requirement applies to all inmate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also, e.g., Espinal v. Goord,* 558 F.3d 119, 127 (2d Cir.2009) (assessing whether plaintiff exhausted retaliation claim).

To satisfy the PLRA's exhaustion requirement, a plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon,* 491 F.Supp.2d 442, 447 (S.D.N.Y.2007); *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004). These mechanisms are prescribed by the applicable prison grievance process, and not by the PLRA itself. *See Jones,* 549 U.S. at 218. In New York, where Plaintiff is incarcerated, there is a three-tiered process for adjudicating inmate complaints: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ('IGRC'), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ('CORC')." *Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir.2009); *see* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.5(b)-(d).

The facts related to Defendants' exhaustion defense are not contested. On April 3, 2009, after Plaintiff was discharged from the infirmary, he filed grievance GH–67076–09, which alleged that his confinement to the infirmary was retaliatory. Pl. 56.1 Resp. ¶ 126. Plaintiff does not dispute Defendants' statement that he "did not file an appeal of GH–67076–09 to the Superintendent's office." *Id.* ¶ 128. As a result, Defendants have established as a matter of law that Plaintiff failed to exhaust the second level of review required by New York law. Nor does Plaintiff suggest that further review was somehow not "available" to him. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) ("Depending on the in-

mate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact 'available' to the prisoner.").[FN14] Indeed, the record shows that he appealed another grievance regarding his medical treatment to both the superintendent and the CORC. Pl. 56.1 Resp. ¶¶ 132–136. But because he did not do the same for his retaliation claim, the PLRA's exhaustion requirement bars him from asserting that claim in this Court.

> FN14. *Hemphill* set forth a framework governing PLRA exhaustion defenses that asks (1) whether administrative remedies were actually available, (2) whether the defendants forfeited or waived their exhaustion arguments, and (3) whether any "special circumstances" justify the plaintiff's failure to exhaust. 380 F.3d at 686; *see also, e.g., Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007). *But cf. Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) (questioning *Hemphill'* s continued vitality in light of subsequent Supreme Court decisions requiring strict compliance with grievance procedures but following it "in the absence of a clear indication that [it] has been overruled"). The parties do not explicitly invoke *Hemphill'* s three-part approach, which seems most relevant where the plaintiff advances some reason for not exhausting his remedies—which Plaintiff does not do. In any case, the Court has addressed whether administrative remedies were available, the next section of this opinion discusses waiver, and Plaintiff does not argue that any "special circumstances" are present.

**\*15** The Court rejects Plaintiff's argument that his exhaustion of *another* grievance—GH–67116–09—should excuse his failure to exhaust GH–67076–09. Pl. Opp. at 23. In support of that argument, Plaintiff cites a single decision from the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

Eastern District of Pennsylvania, *Thomas v. Zinkel,* 155 F.Supp.2d 408 (E.D.Pa.2001). In *Thomas,* the plaintiff fell and grieved both the working conditions leading to his fall and his subsequent medical care, but he exhausted only the latter grievance. The court deemed the plaintiff's working-conditions claim exhausted nonetheless, because it was "evident" from his medical-care claim that "he was also grieving the dangerous conditions." *Id.* at 413.

In this case, the Court is at a loss to see how the allegations in GH–67116–09 have anything to do with Plaintiff's retaliation claim. That grievance concerned an appointment with Rodas on April 6, 2009, in which Rodas asked Plaintiff to provide a urine sample. Plaintiff complained that Rodas's "attitude ... was very unprofessional and hostile," asserted that Plaintiff was having trouble communicating with Rodas, and asked for Rodas to no longer be his primary care provider. Pl. 56.1 Resp. ¶ 132. As Plaintiff notes, the PLRA's exhaustion requirement is intended to allow prison officials an opportunity to address complaints before the federal courts do. *See Woodford v. Ngo,* 548 U.S. 81, 93 (2006); *Porter v. Nussle,* 534 U.S. 516, 524–25 (2002). For that reason, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), *overruled on other grounds by Woodford,* 548 U.S. at 94–95. The officials evaluating Plaintiff's exhausted claim on appeal would not have had any inkling that Rodas had even placed Plaintiff in the infirmary, much less that his doing so was allegedly retaliatory. The Court therefore concludes as a matter of law that Plaintiff did not exhaust his retaliation claim.

**2.** *Rodas Did Not Waive His Exhaustion Defense*

Plaintiff also argues that any failure to exhaust his administrative remedies is irrelevant because Rodas waived his exhaustion defense. Indeed, the PLRA's mandatory exhaustion requirement is not jurisdictional: because the failure to exhaust administrative

remedies is an affirmative defense, it can be waived. *See Johnson,* 380 F.3d at 695. Plaintiff contends that Rodas waived this defense by failing to raise it in his first summary judgment motion, in 2011. Pl. Opp. at 22. The Court disagrees.

Plaintiff has amended his complaint twice since Judge Jones denied the initial summary judgment motion filed by Rodas and Bernstein. "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977). When Plaintiff amended his complaint, Defendants were entitled to amend their answer to assert new defenses. *See, e.g., Diesel Props S.r.L. v. Greystone Bus. Credit II LLC,* No. 07 Civ. 9580(HB), 2008 WL 4833001, at *5 (S.D.N.Y. Nov. 5, 2008). Defendants raised Plaintiff's failure to exhaust as an affirmative defense in answering the 2AC, thereby preserving that defense for purposes of this motion. *See, e.g., Avent v. Solfaro,* No. 02 Civ. 914(DAB) (RLE), 2010 WL 2985904, at *3 (S.D.N.Y. July 29, 2010) ("Having raised the defense in their Answer, Defendants clearly have not waived the exhaustion defense."); *see also Massey v. Helman,* 196 F.3d 727, 735 (7th Cir.1999) (holding that exhaustion defense was not waived despite defendants' failure to raise it in answering plaintiff's earlier pleadings); *Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 222 (S.D.N.Y.2000) (same).[FN15] Moreover, Plaintiff does not argue that he was prejudiced by Rodas's failure to raise exhaustion earlier. The parties were able to take discovery after Defendants answered the 2AC, at which point Plaintiff was on notice that his failure to exhaust was at issue. *See* Dkt. No. 53 (providing that discovery would extend for three months after Defendants' answer); *Shariff v. Coombe,* 655 F.Supp.2d 274, 287 (S.D.N.Y.2009) (rejecting plaintiffs' waiver argument because it was "apparent to the Court that the parties have produced discovery on the exhaustion issue").

FN15. The Second Circuit has held that defenses involving "core issue [s] of a party's

Slip Copy, 2014 WL 1257274 (S.D.N.Y.)
**(Cite as: 2014 WL 1257274 (S.D.N.Y.))**

willingness to submit a dispute to judicial resolution," are not revived by the filing of an amended complaint. *Gilmore v. Shearson/Am. Exp. Inc.,* 811 F.2d 108, 112 (2d Cir.1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271 (1988). But that principle appears to be applicable only to the kinds of defenses listed in Federal Rule of Civil Procedure 12(b)(2)-(5), which are subject to stricter waiver rules. *See* Fed.R.Civ.P. 12(h); *Rosenberg v. City of New York,* No. 09 Civ. 4016(CBA)(LB), 2011 WL 4592803, at *15–16 (E.D.N.Y. Sept. 30, 2011); *Pruco Life Ins. Co. v. Wilmington Trust Co.,* 616 F.Supp.2d 210, 215 (D.R.I.2009).

**\*16** Plaintiff's reliance on *Handberry v. Thompson,* 436 F.3d 52 (2d Cir.), *amended on other grounds on reh'g,* 446 F.3d 335 (2d Cir.2006), is unavailing. In *Handberry,* the Second Circuit affirmed the district court's conclusion that certain defendants could not raise an exhaustion defense on summary judgment because all the information relevant to that defense was available before discovery—at which time the defendants *denied* that the defense applied, suggesting to the plaintiffs that "prison grievance procedures were not available" for them to invoke. *Id.* at 60. Unlike in this case, there were no intervening amendments that altered the set of claims and defenses subject to litigation. Also unlike in this case, the plaintiffs in *Handberry* were given the impression that discovery would be irrelevant to exhaustion.

Accordingly, the Court concludes that Rodas has not waived his failure-to-exhaust defense. And because the undisputed record evidence establishes that Plaintiff failed to exhaust his administrative remedies, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is requested to terminate this case.

　　SO ORDERED.

S.D.N.Y.,2014.
Castillo v. Rodas
Slip Copy, 2014 WL 1257274 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven Correctional Facility, R. Pflueger, A. Glemmon, Sgt. Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T. Healey, and John Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.

Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

### MEMORANDUM & ORDER
PAULEY, J.

**\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

### REPORT AND RECOMMENDATION
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.")

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

> FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. Illinois.
Robert E. Dortch, Plaintiff,
v.
Randy Davis, Christine Brown, Dennis Larson, M.D.,
and John R. Shepherd, M.D., Defendants.

Case No. 11–cv–0841–MJR–SCW
3:11–cv–00841Signed March 21, 2014

Robert E. Dortch, Pinckneyville, IL, pro se.

Joanne Scher, Illinois Attorney General's Office, Springfield, IL, Timothy P. Dugan, Tyler C. Thompson, Sandberg, Phoenix et al., St. Louis, MO, for Defendants.

*MEMORANDUM AND ORDER*
REAGAN, District Judge:
**A. *Introduction and Procedural Overview***
    **\*1** Robert Dortch filed suit in this Court under 42 U.S.C.1983, alleging violations of his federally secured constitutional rights while incarcerated at Pinckneyville Correctional Center (PCC). The complaint named four Defendants: Randy Davis, Warden of PCC; Chris Brown, the Healthcare Administrator of PCC; and two physicians who saw Dortch at PCC, listed on the complaint as Dr. Larson and Dr. Sheppard.FN1 In an August 2012 Order (Doc. 12), the undersigned concluded that the complaint survived threshold review under 28 U.S.C.1915A as to Dortch's claim for deliberate indifference to serious medical needs, as to all four Defendants.

> FN1. Later pleadings clarified that these Defendants' full and correctly spelled names

are Dennis Larson, M.D., John R. Shepherd, M.D., and Christine Brown. *See, e.g.,* Answers at Doc. 29, Doc. 33, and Doc. 40. **The Clerk's Office shall correct the docket sheet accordingly.**

    Now before the Court are two summary judgment motions. Plaintiff filed briefs opposing both motions. The first motion, filed October 9, 2013 by Defendants Larson and Shepherd, ripened with a reply brief on November 7, 2013. The second motion, filed November 14, 2013 by Defendants Brown and Davis, ripened with a reply brief on January 27, 2014.FN2 For the reasons stated below, the Court grants both summary judgment motions.

> FN2. Plaintiff filed sur-replies to both summary judgment motions. Because the Local Rules of this District Court prohibit sur-replies, the Court has not considered those briefs. *See* SDIL–LR 7.1(g).

**B. *Applicable Legal Standards***
    Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir.2012), *citing* FED. R. CIV. P. 56(a). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 547 (7th Cir.2011), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

    Summary judgment has been described as the "put up or shut up moment" in the case, at which "the non-moving party is required to marshal and present the court with the evidence she contends will prove

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

her case," evidence on which a reasonable jury could rely. *Porter v. City of Chicago,* 700 F.3d 944, 956 (7th Cir.2012), *citing Goodman v. National Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir.2010).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *Anderson,* 699 F.3d at 994; *Righi v. SMC Corp.,* 632 F.3d 404, 408 (7th Cir.2011); *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir.2011). But the district court may not resolve issues of credibility when deciding a summary judgment motion. "Those are issues for a jury at trial, not a court on summary judgment." *Williams v. City of Chicago,* 733 F.3d 749, 752 (7th Cir.2013).

### C. *Summary of Evidence*

**\*2** Robert Dortch (Plaintiff) claims that Defendants were deliberately indifferent to his medical needs by failing to adequately treat his sleep apnea. Specifically, Plaintiff alleges that Defendants denied him the use of a machine used to treat sleep apnea (a "CPAP" machine) for approximately three months, and as a result, he suffered pain, sleep deprivation, difficulty breathing, and emotional distress. The Court now summarizes the evidence (including depositions, affidavits, medical records, and other documents), viewing the facts and reasonable inferences in the light most favorable to Plaintiff.

Plaintiff was diagnosed with severe sleep apnea in 2002, after experiencing problems with gasping for air in the middle of the night, chest pains, headaches, loud snoring, and fatigue throughout the day. (Plaintiff's Deposition ("Dep."), p. 15). The doctor who performed the sleep study informed him that while sleeping, Plaintiff would continually stop breathing throughout the night and that he was at risk to die in his sleep without treatment. (Pl.'s Dep. p. 14).

Plaintiff arrived at PCC in August of 2010. (Pl.'s

Dep. p. 8). He went through medical intake screening at PCC on August 20, 2010. (Pl.'s Dep. p. 24). He testified that he told everyone he spoke to about his diabetes and sleep apnea, but he cannot recall specifically who he told. (Pl.'s Dep. p. 24). Approximately one week after arriving, Plaintiff told Christine Brown, Administrator of PCC's Health Care Unit, that he would have his CPAP machine sent from his house to PCC, but she informed him that would not be possible due to security concerns. (Pl.'s Dep. pp. 25, 51–52; *see also* Brown Affidavit, Doc. 79–1, pp. 7–8). Security must approve all medical equipment sent to the facility from an outside source. (Davis Affidavit, Doc. 79–1, ¶ 5). Brown directed Plaintiff to seek approval from the medical staff. (Pl.'s Dep. p. 53). Plaintiff's medical records document his report of sleep apnea on that date. (Doc. 66–4, p. 1). Plaintiff did not see a doctor on September 1, 2010, he saw only a nurse that day. (Pl.'s Dep. p. 30).

Plaintiff saw the Defendant doctors—Dr. Larson and Dr. Shepherd—one time each. (Pl.'s Dep. p. 25). Dr. Larson is an employee of Wexford Health Sources, Inc. (Wexford) and served as Regional Medical Director for the region encompassing PCC from July 18, 2006 through September 4, 2011 (Doc. 66, p. 2). Dr. Shepherd worked for Wexford as an onsite independent contractor between 2001 and March 8, 2013 (*id.*).

Plaintiff saw Dr. Larson once—on September 12, 2010. (Pl.'s Dep. p. 25; Larson Aff. ¶ 9). Larson asked Plaintiff about his medical care prior to PCC, and Plaintiff gave him the names of Dr. Bonapart and Nurse McMills. (Pl.'s Dep. p. 25, p. 30). Plaintiff signed a medical consent form so that Larson could get Plaintiff's medical records from Cook County Jail. (Pl.'s Dep. pp. 25–26; Doc. 66–4, p. 13). Dr. Larson ordered Plaintiff's medical records from Cook County pertaining to his sleep apnea treatment that same day—September 12, 2010. (Pl.'s Dep. p. 2; Larson Affidavit, Doc. 66–1, ¶ 8).

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

On September 21, 2010, the PCC medical unit received a phone call from Monica Smith regarding the Cook County Jail records request. (Doc. 66–4, p. 3). Smith said the records were at Stroger Hospital. (Doc. 66–4, p. 3). On October 1, 2010, a representative of Stroger Hospital called and informed PCC staff that Stroger did not have the sleep study. (Doc. 66–4, p. 3). Wexford approved Larson's request to perform a new sleep study on Plaintiff on October 8, 2010, due to the inability to obtain the records from other sources. (Doc. 66–4, p. 10; Larson Aff. ¶ 13). Larson did not tell Plaintiff what steps he was taking during this time. (Pl.'s Dep. p. 26).

**\*3** Plaintiff saw Shepherd once—on September 14, 2010. Shepherd told Plaintiff he was only there to treat Plaintiff's diabetes. (Pl.'s Dep. pp. 28, 34; Shepherd Aff. ¶ 10).

Plaintiff was not informed that the doctors requested another sleep study for him. (Pl.'s Dep. p. 37). He testified that he would have never initiated the grievance process and would have gladly welcomed another sleep study. (Pl.'s Dep. p. 37). Plaintiff became concerned after several weeks and began to attempt to follow-up himself on getting his medical records by getting another consent form and sending it to his wife to send to his previous institution. (Pl.'s Dep. p. 64) Plaintiff submitted a request to staff inquiring about the status of his records on November 4, 2010. (Doc. 90, p. 5).

Plaintiff received his CPAP machine at PCC from his family in November 2010. According to Plaintiff, Warden Davis approved this around November 4, 2010, and Plaintiff received the CPAP on November 19, 2010 (Pl.'s Dep. p. 38, p. 56). Medical records reflect that Plaintiff was given his CPAP machine on November 18, 2010. (Doc. 66–4, p. 5). The CPAP machine, which came from Plaintiff's wife, had a broken hose. It was temporarily repaired with tape, and an equipment request form was sent to Wexford for approval. (Doc. 66–4, p. 5). Plaintiff was informed

that his machine was broken, but that the prison would order new parts. (Pl.'s Dep. p. 39).

Plaintiff was issued a lower bunk permit to enable him to use his machine. (Pl.'s Dep. p. 40). He requested distilled water for use in his machine in November of 2010, but Brown told him he would have to use tap water. (Pl.'s Dep. p. 61).[FN3] Plaintiff received a new mask for the CPAP machine on December 21, 2010. (Pl.'s Dep. p. 42; Doc. 66–4, p. 6). Upon receiving his mask the prison staff told Plaintiff to let them know if he had any problems. (Pl.'s Dep. p. 42).

> [FN3]. Plaintiff testified that he did not suffer any harm from not using distilled water. (Pl.'s Dep. p. 61). Nurse Rector agreed to provide distilled water to Plaintiff for use in his machine in May 2011. (Pl.'s Dep. p. 61).

Plaintiff received new water and a new water chamber for his machine on December 30, 2010. (Pl.'s Dep. p. 42; Doc. 66–4, p.7). Plaintiff asked for a larger strap for his machine on May 2, 2011, which he received later. (Pl.'s Dep. p. 43). Plaintiff was approved for a new mask on May 22, 2011 and again on June 29, 2012. (Pl.'s Dep. pp. 43–45; Doc. 66–4, p. 9). Plaintiff has not been deprived of his CPAP machine since receiving it on November 19, 2010. (Pl.'s Dep. p. 46).

Defendant Davis served as the Warden of PCC during the relevant time period. (Davis Aff. ¶ 1). He is not a medical treatment provider; he relies on the expertise of the medical staff on medical issues. (Davis Aff. ¶ 3).

Plaintiff saw Davis walking the galleries and spoke to Davis about his sleep apnea problem sometime during the first week of September 2010. (Pl.'s Dep. p. 49).[FN4] Davis referred Plaintiff to the medical department. Davis told Plaintiff his family could not just send in a CPAP machine due to security concerns. (Pl.'s Dep. p. 50). Davis determined that two griev-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

ances submitted by Plaintiff about his sleep apnea were emergencies, but concurred in the grievance officer's report which found that medical staff was appropriately addressing the problem. (Davis Aff. ¶¶ 6–7).

> FN4. Plaintiff later stated (in his affidavit opposing summary judgment) that he saw Warden Davis on October 20, 2010. (Doc. 90, p.2).

**\*4** Lester T. Bricker, Plaintiff's cellmate, witnessed Plaintiff waking up gasping for air in the night on October 10, 2010 and October 19, 2010. (Exhibit A to Plaintiff's Memo. Opposing Summary Judgment, Doc. 90, at p. 4). On these two occasions, Bricker pushed the emergency call button but got no response from the guards. (Doc. 90, p. 4).

**D.** *Analysis*

"Courts interpret the Eighth Amendment, as incorporated through the Fourteenth Amendment, to impose a duty on state 'to provide adequate medical care to incarcerated individuals.' " *McGee v. Adams,* 721 F.3d 474, 480 (7th Cir.2013), *quoting Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir.2006). *See also Roe v. Elyea,* 631 F.3d 843, 856–58 (7th Cir.2011). Officials violate this duty if they are deliberately indifferent to the serious medical needs of a prisoner. *Id.* A "successful deliberate indifference claim is comprised of both an objective and a subjective element." *Roe,* 631 F.3d at 857, *citing Farmer v. Brennan,* 511 U.S. 825, 834 (1994). *Accord Dale v. Poston,* 548 F.3d 563, 569 (7th Cir.2008) ("The deliberate indifference test ... has both objective and subjective prongs....").

To prevail on a deliberate indifference claim, the plaintiff must show (objectively) that the deprivation he suffered was sufficiently serious and (subjectively) that the defendants acted with a sufficiently culpable state of mind to support liability. *See Greeno v. Da-*

*ley,* 414 F.3d 645, 653 (7th Cir.2005). Similarly, to defeat summary judgment in a deliberate indifference case, the plaintiff must satisfy both an objective and a subjective element. *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir.2012).

As to the *objective element* of the deliberate indifference test, the plaintiff must offer evidence of an objectively serious medical need, i.e., something that "has been diagnosed by a physician as mandating treatment" or is so obvious that a lay person would recognize the need for attention. *Id., citing Zentmyer v. Kendall County, Illinois,* 220 F.3d 805, 810 (7th Cir.2000).

As to the *subjective element,* the plaintiff must "demonstrate a genuine issue of fact on the question whether [defendants] were aware of this serious medical need and were deliberately indifferent to it." *Id., citing Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir.2001). "Negligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm.... The standard is comparable to that required for criminal recklessness." *King,* 680 F.3d at 1018. *Accord McGee,* 721 F.3d at 840 (to show deliberate indifference, a plaintiff must meet "essentially a criminal recklessness standard.... Even gross negligence is insufficient to impose constitutional liability").

Deliberate indifference claims are examined differently depending on whether the defendants are medical professionals or lay persons. *McGee,* 721 F.3d at 481. Medical professionals are entitled to deference in their treatment decisions, "unless no minimally competent professional would have so responded" under the circumstances. *Id.*

A medical professional may be held to have displayed deliberate indifference only if his decision is such a substantial departure from accepted professional judgment, practice or standards as to demon-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

strate that he did not base the decision on such a judgment. *Id. See also Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir.2008) (deliberate indifference is not medical malpractice; "the Eighth Amendment does not codify common law torts"). Bearing these principles in mind, the undersigned turns to the record before him as to each Defendant's treatment of Plaintiff.

### *Serious Medical Need (Objective Element)*

**\*5** The medical Defendants (Larson and Shepherd) first assert that the chest pain Plaintiff allegedly suffered while waiting for a CPAP machine was not a serious medical need. Defendants draw the scope of the inquiry too narrowly by attempting to study one symptom of Plaintiff's condition in isolation. The question is whether sleep apnea itself presents a serious medical condition.

A medical need is "serious" if it has been diagnosed and treated by a physician, or is so obvious that a layperson would recognize the condition as requiring treatment. *Thomas v. Walton,* 461 F.Supp.2d 786, 793 (S.D.Ill.2006), *citing Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). *See also Meloy v. Schuetzle,* 230 F.3d 1363 (8th Cir.2000) (finding obstructive sleep apnea is a serious medical condition). Sleep apnea is a condition where breathing may become disrupted during sleep. *Sleep apnea,* WebMD, http://www.webmd.com/sleep-disorders/ sleep-apnea/sleep-apnea (last visited March 5, 2014). Long term effects can include high blood pressure, stroke, heart failure, diabetes, depression, and ADHD. *Id.*

Plaintiff testified that he was diagnosed with sleep apnea in 2002 by a doctor after experiencing problems with gasping for air at night, chest pains, headaches, loud snoring, and fatigue throughout the day. Plaintiff testified that without his CPAP machine, he experienced episodes where he stopped breathing while asleep; he also submitted his cell mate's corroborating testimony on this point. Plaintiff testified that he experienced chest pains and other symptoms. Plaintiff

has shown that he suffers from a serious medical condition. *See Jackson v. Pollion,* 733 F.3d 786, 789 (7th Cir.2013). Which brings the Court to the second prong of the inquiry—whether Defendants were deliberately indifferent to this condition.

### *Deliberate Indifference (Subjective Element)*

### MEDICAL DEFENDANTS—LARSON AND SHEPHERD

A court will defer to the treatment decisions of medical professionals unless the decision is clearly outside the bounds of a minimally competent decision. *Roe,* 631 F.3d at 857. A medical professional will only be found liable for deliberate indifference if his decision "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir.2008). And, clearly, medical malpractice is not deliberate indifference. *Duckworth,* 532 F.3d at 679; *McGee,* 721 F.3d at 481.

Plaintiff's claims against Larson and Shepherd fail here. Plaintiff's complaints of sleep apnea were not ignored by Larson or Shepherd. Upon learning of Plaintiff's sleep apnea on September 12, 2010, Larson immediately took steps to treat it. He instructed the health care center to request medical records to confirm Plaintiff's past treatment. The health care unit had Plaintiff sign a medical consent form two days later, which they then faxed to Cook County Jail. When Cook County Jail indicated they thought Stroger Hospital had the records, PCC staff followed up with Stroger Hospital. When it was discovered that Stroger did not have the records of Plaintiff's prior sleep study, Larson obtained approval from Wexford to perform another sleep study on Plaintiff. That study was only canceled when Plaintiff's family located his CPAP machine and sent it to the prison, where it was issued

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

to Plaintiff. Thereafter, health care staff took appropriate follow-up steps, like issuing the low bunk permit and supplying replacement parts for the CPAP.

**\*6** Plaintiff alleges that he told other medical providers that he had sleep apnea prior to September 12, 2010, but there is no evidence that those unnamed people relayed that information to Larson or Shepherd prior to their respective visits. There is also no evidence that Larson or Shepherd knew of and deliberately disregarded Plaintiff's statement that he could have a CPAP machine sent from his house, just to delay or to purposely pursue a more time consuming method of getting Plaintiff treatment. It is not unreasonable under the Eighth Amendment for physicians to attempt to confirm previous prescriptions with other medical treatment providers prior to continuing with that same course of treatment. *See, e.g., Williams v. Guzman*, 346 Fed. Appx. 102, 105 (7th Cir.2009). Any delay caused by the medical unit's attempt to confirm Plaintiff's previous treatment is not actionable.

Plaintiff argues that *Shepherd* is not entitled to summary judgment because Shepherd was rude to Plaintiff when he attempted to discuss his sleep apnea during an appointment regarding his diabetes on September 14, 2010. Rudeness is not grounds for recovery under the deliberate indifference framework, and the evidence shows that the medical staff was working to confirm Plaintiff's diagnosis of sleep apnea at the time that he met with Shepherd about his diabetes. Plaintiff is not entitled to have the medical unit staff member of his choice address a given health problem.

Plaintiff offers three reasons why *Larson* is not entitled to summary judgment: (a) Larson never communicated with him after the September 12, 2010 consultation; (b) Larson contacted the wrong people via the wrong method to get Plaintiff's medical records from Cook County Jail; and (c) Plaintiff was told that his family could not send in his CPAP machine, but

PCC took a different position three months later.

The first argument is a complete nonstarter. The Seventh Circuit has never held that failure of medical staff to communicate with a patient is grounds for a deliberate indifference claim. Moreover, even though Plaintiff never met with Larson again, Plaintiff was able to obtain (from other sources) updates on the status of his records request. And Plaintiff has not alleged that he sought to meet with Larson again and was denied. He has not alleged that he put in further sick call slips that were ignored. Construing all reasonable inferences in Plaintiff's favor, it appears that Plaintiff and his wife attempted to follow up with Brown, but any deficiencies there cannot be attributed to Larson. Larson may have not met with Plaintiff again in person, but Plaintiff's medical records show that the medical staff continued to follow his instructions about Plaintiff's care after Larson examined Plaintiff.

Similarly unavailing are Plaintiff's claims about the manner in which Larson attempted to secure the prior medical records. Plaintiff was in custody at Cook County Jail for approximately one year. It was not unreasonable for Larson to contact Cook County Jail, as opposed to the federal prison where Plaintiff was incarcerated eight years prior, to secure recent medical records. Plaintiff concedes that he used a CPAP machine while at Cook County Jail, and Larson's attempt to seek records there related to his sleep apnea was reasonable.

Plaintiff makes much of the fact that the records request was allegedly mailed (not faxed), despite the fact that the form itself bears a "faxed" stamp with a date of September 16, 2010, two days after Plaintiff signed it. (Doc. 66–4, p.13). Even if the form was mailed rather than faxed, the record contains no evidence that anyone made a decision to mail the form deliberately to slow down Plaintiff's care.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

Plaintiff simply disagrees with how the medical Defendants conducted their inquiry into his past medical history/ treatment. The record is devoid of evidence from which a fact-finder could conclude that the medical Defendants' handling of Plaintiff's records inquiry reaches the sufficiently culpable state of mind required to support a deliberate indifference claim.

**\*7** Plaintiff's main argument is that the health care unit did not immediately overrule security personnel's concern about having a CPAP machine sent from home. However, during the relevant time period, the medical Defendants were trying (and taking reasonable steps) to determine whether a CPAP machine was even medically necessary for Plaintiff. Although Plaintiff claims he suffered symptoms of his sleep apnea during the interim, he never submitted sick call slips on those symptoms. Nor is there evidence that he suffered an acute event as a result of his sleep apnea.

Construed in the light most favorable to Plaintiff, the record before this Court does not permit the undersigned to conclude that Drs. Larson and Shepherd (in trying to confirm Plaintiff's sleep apnea before ordering or permitting the CPAP machine) fell so far afield of professional medical standards as to constitute deliberate indifference. *See, e.g., McGee,* 721 F.3d at 482–83 (7th Cir.2013) (finding no deliberate indifference when staff enforced a security procedure).

To show that a defendant acted with a "sufficiently culpable state of mind," so as to survive summary judgment in a deliberate indifference case, a plaintiff must put forth evidence to establish not only that the defendant knew of a serious risk to the inmate's health but also that the defendant consciously disregarded that risk. This "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware County Sheriff,* 700 F.3d 1063, 1073 (7th Cir.2012). Simply put, Plaintiff has not satisfied this subjective element of the deliberate indifference test as to Defendants Larson and Shepherd.

These medical Defendants are entitled to summary judgment.

## THE CORRECTIONAL DEFENDANTS—DAVIS AND BROWN

Generally, non-medical professionals are entitled to rely on the determinations of medical professionals. *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir.2011) ("Nonmedical defendants ... can rely on the expertise of medical personnel."). There is one exception which permits liability if the non-medical defendants have reason to believe that the medical staff is ignoring a prisoner's serious medical needs. *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir.2012).

Here, Plaintiff claims that Davis, as Warden of PCC, was deliberately indifferent to his serious medical needs. The evidence shows that Davis spoke to Plaintiff in person once while making his rounds, either in September or October 2010, and that Davis responded to two emergency grievances submitted by Plaintiff. Davis determined that Plaintiff's grievances about his sleep apnea were emergencies and expedited them accordingly. Davis confirmed that the health care department was investigating Plaintiff's sleep apnea and determined that the health care unit was appropriately addressing Plaintiff's concerns. Davis was entitled to rely on the medical staff's judgment.

Plaintiff also argues that Davis did not investigate the two instances when his roommate pushed the emergency call button in his cell and the guards did not respond. But Plaintiff has presented (and the record contains) no evidence that Davis *knew* about those incidents.

Finally as to Davis, Plaintiff stresses that Davis initially said the CPAP machine could not just be sent from Plaintiff's home (citing security concerns) and then later changed course and *allowed* the machine to be sent from Plaintiff's home and given to Plaintiff. Assuming this characterization of the record to be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

accurate, Davis' actions do not constitute deliberate indifference. It is undisputed that when any medical equipment is sent to PCC from an outside source, it must be approved by security before it is issued to the inmate. So it is true that Plaintiff's family could not just directly send Plaintiff the CPAP (bypassing security protocols). Additionally, Davis was entitled to defer to the medical Defendants' decision about whether Plaintiff actually needed a CPAP machine, and the medical Defendants were working to confirm precisely that (Plaintiff's need for the machine) in requesting the prior medical records and ordering the new sleep study.

**\*8** Davis at no time ignored advice from a medical professional that Plaintiff would suffer from an acute medical event without his CPAP. The fact that Davis changed his mind at some time during the relevant events and allowed the family to send the CPAP does not show deliberate indifference. Plaintiff's total delay in obtaining the CPAP was less than three months, and there is no evidence that any of the Defendants deliberately dragged their feet, purposely slowed the process of approving the machine, or knowingly ignored Plaintiff's needs in that time period.

This leaves Plaintiff's claims against Defendant Brown. Christine Brown is the Health Care Unit Administrator at PCC, a position she has held since 2010. She is not a physician. She is not trained or licensed to diagnose patients, prescribe medicine, or recommend treatments. Plaintiff alleges that Brown told him he could not send his CPAP machine from home to PCC, and that Brown refused to give him distilled water for his CPAP machine once he obtained it. The record clearly demonstrates that although Brown oversees the health care unit at PCC, she has no authority to make medical determinations for inmates or to make security decisions for the facility.

As already noted above, the record here contains evidence of legitimate security concerns regarding inmates having medical devices like CPAP machines. Indeed, in his deposition, Plaintiff conceded that this was a security issue. Brown had no authority to allow Plaintiff's family to directly give Plaintiff the CPAP and no authority to bypass the normal process for clearing/authorizing an outside medical device to be given to an inmate. The medical unit had the ability to work to get Plaintiff a CPAP machine, which they undertook immediately after Larson's visit. Brown was entitled to rely on them to do so.

Plaintiff also claims that Brown told him he could not have distilled water for his CPAP machine (i.e., that obtaining distilled water "was not going to happen"). In her sworn affidavit, Brown denies ever saying this, but the Court need not resolve that conflict—it is not a genuine issue of material fact. Assuming (for the purposes of this motion) that Brown told Plaintiff he could not have distilled water, this does not constitute deliberate indifference.

Deliberate indifference requires a showing of "serious harm." *See, e.g., McGee v. Adams,* 721 F.3d at 484 (7th Cir.2013); *Munson v. Gaetz,* 673 F.3d 630, 637 (7th Cir.2012). As the Seventh Circuit reiterated earlier this month, deliberate indifference requires that an official was aware of facts from which an inference could be drawn that a "substantial risk of serious harm exists" (and the official must draw that inference). *Pittman ex rel. Hamilton v. Madison County, Illinois,* —— F.3d ——, 2014 WL 904672, \*7 (7th Cir. March 10, 2014). Plaintiff conceded at his deposition that he suffered "no harm" from the lack of distilled water, and that he thought Brown's refusal to get it for him showed her poor attitude. A bad attitude is not deliberate indifference. Plaintiff has not shown (and cannot show) that a lack of distilled water posed a substantial risk of serious harm to him, a risk that Brown disregarded. Therefore Brown is entitled to summary judgment.

**E. Conclusion**
Prisoners do not have a right to unqualified access

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)
**(Cite as: 2014 WL 1125588 (S.D.Ill.))**

to healthcare but rather only to adequate medical care. And there is not one proper way to practice medicine in prison, but instead there is "a range of acceptable courses based on prevailing standards in the field." *Holloway,* 700 F.3d at 1073, *quoting Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir.2008). Thus, a medical professional may be held liable under the deliberate indifference standard only if he makes a decision that so substantially departs from accepted professional judgment, practice or standards as to reveal the exercise of no such judgment at all. *Holloway,* 700 F.3d at 1073, *citing Sain,* 512 F.3d at 895. Viewing the record in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not shown that Defendants Larson and Shepherd were deliberately indifferent to Plaintiff's serious medical needs.

**\*9** A prison official cannot be held liable under the Eighth Amendment for deliberate indifference unless he both "knows of and disregards an excessive risk to inmate health or safety." *Estate of Miller, ex rel. Bertram v. Tobiasz,* 680 F.3d 984, 989 (7th Cir.2012). Objectively, the claimed deprivation must be sufficiently serious, and subjectively, the prison official's state of mind must be sufficiently culpable. *Id.* at 982. Viewing the facts and reasonable inferences in the light most favorable to Plaintiff, the Court concludes that the record does not permit a reasonable jury to find Davis or Brown acted with deliberate indifference to Plaintiff's serious medical needs.

For the foregoing reasons, the Court **GRANTS** the motion for summary judgment filed by Defendants Larson and Shepherd (Doc. 65) and **GRANTS** the motion for summary judgment filed by Defendants Brown and Davis (Doc. 78). The Court **DENIES as moot** Defendants' March 21, 2014 motion to continue trial (Doc. 96). No claims remain herein, and the Clerk of the Court **SHALL ENTER JUDGMENT** in favor of Defendants, Randy Davis, Christine Brown, Dennis Larson and John Shepherd, and against Plaintiff, Robert E. Dortch. The Clerk shall then close the case.

IT IS SO ORDERED.

S.D.Ill., 2014

Dortch v. Davis

Not Reported in F.Supp.2d, 2014 WL 1125588 (S.D.Ill.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Glenn GOORD; et al., Defendants.

No. 9:11–CV–1026 (LEK/RFT).
Jan. 28, 2013.

Woodrow Flemming, Malone, NY, pro se.

### DECISION and ORDER

LAWRENCE E. KAHN, District Judge.

## I. INTRODUCTION

*1 Currently before the Court in this *pro se* prisoner civil-rights action filed under 42 U.S.C. § 1983 is Plaintiff Woodrow Flemming's ("Plaintiff") Amended Complaint. Dkt. No. 12 ("Amended Complaint"). For the reasons set forth below, Plaintiff's Amended Complaint is *sua sponte* dismissed under 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief can be granted.

## II. BACKGROUND

Plaintiff commenced this action by filing a civil-rights Complaint together with an Application to proceed *in forma pauperis*. Dkt. Nos. 1 ("Complaint"), 2 ("IFP Application"). By Decision and Order filed December 20, 2011, the Court denied Plaintiff's IFP Application under 28 U.S.C. § 1915(g) because Plaintiff has "three strikes" and did not demonstrate that the "imminent danger" exception was applicable to this action. Dkt. No. 5 ("December 2011 Order"). Upon Plaintiff's payment of the filing fee, the Court reviewed the sufficiency of the Complaint in

accordance with 28 U.S.C. § 1915A.[FN1] Plaintiff claimed that he filed his Complaint to reassert claims that he previously raised in another action that he filed in this District, namely, *Flemming v. Goord,* No. 9:06–CV–1244 (N.D.N.Y. filed Oct. 12, 2006) (Kahn, J.) (*"Flemming I"* ). Compl. at 1, 7–8. In a Decision and Order filed July 12, 2012, the Court *sua sponte* dismissed all of the claims set forth in the Complaint. Dkt. No. 11 ("July 2012 Order"). The July 2012 Order held, *inter alia,* that: (1) Plaintiff's retaliatory transfer claim arising out of his transfer from Walsh Regional Medical Unit ("Walsh RMU") to Upstate Correctional Facility ("Upstate") Special Housing Unit ("SHU") in April 2005 and all of his claims against the Walsh RMU Defendants (which all arose prior to his transfer out of Walsh RMU in April, 2005) were barred by the applicable statute of limitations; (2) Plaintiff failed to state a claim for a continuing violation; (3) Plaintiff failed to allege personal involvement in any wrongdoing by Reginald Bishop, Andrew J. Bouchey, Gary Brian, Robert R. Clintsman, Kirk Crossett, Henry Dobbis, Guy R. Falcon, Franklin County, Michael Gokey, Jerry E. Laramay, Kelvin Premo, Donald Selsky, Gary G. Thanatt, Marie Tirone, Donald Uhler, Goord, Fischer, Boucard, and Wright; (4) Plaintiff failed to state a claim against Defendants Wissman, Smith, Tichenor, Waterson, Buffham, and Proof; and (5) the remainder of Plaintiff's Complaint consisted

> FN1. Under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
(Cite as: 2013 WL 317059 (N.D.N.Y.))

of a series of conclusory statements, both legal and factual, about supervisory liability, municipal liability, and Plaintiff's inadequate conditions of confinement in Upstate SHU.... These remaining allegations [were] asserted in wholly conclusory terms, and [were] non-specific as to when or where they occurred or which defendants might be responsible for the alleged wrongdoing. Thus, the [remaining] allegations [were] simply too vague to provide any sort of notice of a claim against any particular Defendant.

**\*2** July 2012 Order at 5–12. Thus, the Court concluded that Plaintiff's Complaint was subject to dismissal under § 1915A(b) for failure to state a claim upon which relief may be granted. *Id.* at 13–14. In light of his *pro se* status, Plaintiff was afforded an opportunity to submit an amended complaint. *Id.* at 13.

### III. STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, "[t]he court must review ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b) (2006); *see also Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (holding that § 1915A applies to all actions brought by prisoners against government officials even when the plaintiff paid the filing fee).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)). Federal Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown,* 335 F. App'x 102, 104 (2d Cir.2009).

While *pro se* parties are held to less stringent pleading standards, the Second Circuit has held that "district courts may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee." *See Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000). Indeed, "district courts are especially likely to be exposed to frivolous actions and, thus, have a[ ] ... need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources." *Id.* at 364. A complaint is properly deemed frivolous "where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### IV. DISCUSSION

**\*3** The Amended Complaint includes allegations against more than one hundred Defendants regarding events that allegedly occurred between April 2005 and July 2012 at Walsh RMU and Upstate SHU. *See generally* Am. Compl. The gravamen of Plaintiff's

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

Amended Complaint is that his constitutional rights were violated at Walsh RMU prior to April 2005; he was transferred from Walsh RMU in April 2005 to Upstate SHU in retaliation for his complaints and grievances against staff at Walsh RMU; and his constitutional rights were violated at Upstate SHU beginning with his transfer there in April 2005 and continuing up until July 2012. *Id.* Plaintiff claims that in January 2011 he discovered for the first time that he was supposed to be transferred to the Mid–State Correctional Facility Medical Unit in April 2005. *Id.* at 5–7. Plaintiff claims that the Defendants instead had him transferred to Upstate SHU in April 2005 in retaliation for his complaints and grievances. *Id.* Plaintiff alleges that he is still suffering the consequences of the April 2005 retaliatory transfer while confined in Upstate SHU. *Id.* at 26–55. For a complete statement of Plaintiff's claims, reference is made to the Amended Complaint.

**A. Claims Against the Walsh RMU Defendants and Relating to the April 2005 Transfer from Walsh RMU to Upstate SHU**

As stated in the July 2012 Order, Plaintiff's claims against the Walsh RMU Defendants that occurred at Walsh RMU prior to April 2005 [FN2] and his claims relating to the alleged retaliatory transfer from Walsh RMU to Upstate SHU in April 2005 [FN3] are barred by the three-year statute of limitations applicable to civil-rights actions filed in federal court in New York State. *See* July 2012 Order at 5–6. In his Amended Complaint, in an attempt to overcome the time-bar, Plaintiff states that he "invokes the benefit of equitable tolling or equitable estoppel." Am. Compl. at 5.

> [FN2]. Plaintiff alleges, *inter alia,* that in 2005, the Walsh RMU Defendants subjected him to excessive force in retaliation for filing a state court action; denied him medical treatment for the injuries suffered from the use of force; issued him a false misbehavior report; and denied him due process at a disciplinary hearing. Am. Compl. at 21–23.

> [FN3]. Plaintiff claims that the Walsh RMU Defendants conspired with Defendants at Upstate and at the New York State Department of Corrections and Community Supervision to arrange for this transfer. Am. Compl. at 16.

In support of his contention that he is entitled to equitable tolling or equitable estoppel, Plaintiff alleges that he did not have the necessary "evidence" to raise his retaliatory transfer claim prior to January 28, 2011. [FN4] Am. Compl. at 5. Plaintiff states that he "could not raise what he did not [k]no[w]." *Id.* at 7. He claims that he did not know that there was "a special request" that Plaintiff be transferred to the "Midstate medical infirmary [or that defendants] violated the transfer order request." [FN5] *Id.* Even if the Court accepts as true that on January 28, 2011, Plaintiff obtained new evidence in support of his retaliatory transfer claim, this does not change the fact that his April 2005 retaliatory transfer claim is time-barred. As the July 2012 Order stated:

> [FN4]. The "evidence" that he refers to is a letter that he received from the New York State Attorney General's office dated January 28, 2011 and a computer print-out dated in April 2005 that was attached to the letter. Am. Compl. at 67–68. The letter and the print-out were provided to Plaintiff in the course of discovery in another action Plaintiff had filed in this District, namely, *Flemming v. Wurzberger,* No. 9:09–CV–1242 (N.D.N.Y. filed May 16, 2005). The letter and the print-out appear to indicate that Plaintiff was transferred in April 2005 to Upstate SHU because he was sentenced to serve time in keeplock or SHU for violent conduct, harassment, and threats. Am. Compl. at 67–68. None of this information entitles Plaintiff to invoke equitable tolling or equitable estoppel for any of his claims that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

arose in April 2005 or earlier.

FN5. Under "explanation for transfer," the computer print-out states "transfer is requested for infirmary placement." Compl. at 67. However, the print-out also states "unsuitable-medical," citing Plaintiff's disciplinary history, and directs his transfer to Upstate. *Id.*

In applying the doctrine of equitable tolling, this Circuit "has made an important distinction between fraudulent concealment of the existence of a cause of action and fraudulent concealment of facts that, if known, would enhance a plaintiff's ability to prevail as to a cause of action of which the plaintiff was previously aware." Here, Flemming was obviously aware of his cause of action for retaliatory transfer at the time of the 2005 transfer, and not only could have sued Defendants, but he actually did so. Like the plaintiff in *Paige,* Plaintiff appears to claim that he has more persuasive evidence of his retaliatory transfer claim, not a newly discovered awareness of a cause of action previously concealed. Since Plaintiff knew of and brought a retaliatory transfer cause of action shortly after it accrued in 2005 (by filing [ *Flemming I* ] ), any suggestion that the discovery of "new evidence" to support the alleged merits of that claim would toll or reset the statute of limitations is wholly unfounded.

*4 July 2012 Order at 7 (internal citations omitted).

Second, Plaintiff claims that since he did not have the information contained in the January 28, 2011 letter when he filed *Flemming I,* he could not raise the retaliatory transfer claim. Am. Compl. at 5. The amended complaint filed by Plaintiff in *Flemming I,* however, makes it abundantly clear that Plaintiff was aware of the retaliatory transfer claim when he brought that lawsuit, and indeed he explicitly raised the claim. *See Flemming I,* No. 9:06–CV–1244, Dkt. No. 5 at 12 (alleging that Walsh RMU defendants Rosadro, Dr. Sharma, Dr. Burdick, Nurse Bates,

Nurse O'Bryant, Lt. Mitchell, C.O. Louise Russo, C.O. Durrante "retaliated by moving the plaintiff to a max jail on or about April 4, 2005").

With respect to Plaintiff's conditions-of-confinement claims against the Walsh RMU Defendants that occurred prior to April 2005, Plaintiff's alleged "new evidence" bears no relation to Plaintiff's claims that the Walsh RMU Defendants subjected him to excessive force or denied him medical care and due process. Therefore, it does not provide any basis for equitable tolling or equitable estoppel for these claims.

To the extent that Plaintiff attempts to assert that the continuing-violation doctrine saves his otherwise untimely retaliatory transfer claim, or any claim against the Walsh RMU Defendants, on the theory that he is still suffering the consequences of the alleged 2005 retaliatory transfer, the Court has already concluded that the continuing-violation doctrine is not applicable on the facts presented. *See* July 2012 Order at 8. Plaintiff's Amended Complaint does not include anything to alter this conclusion.

Plaintiff has presented nothing in the Amended Complaint to demonstrate that his claims against the Walsh RMU Defendants or claims relating to the alleged retaliatory transfer from Walsh RMU to Upstate SHU in April 2005 are timely filed. Thus, all of the aforementioned claims (Plaintiff's first through eighth causes of action) are time-barred and dismissed with prejudice.

**B. Remaining Claims**

In light of Plaintiff's *pro se* status, the Court has examined the Amended Complaint carefully to determine whether Plaintiff's remaining claims state a claim for relief. *See* Am. Compl. at 26–56 (ninth through twenty-ninth causes of action). However, the Court is not able to discern either a factual or legal basis for those claims or this action.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

The remainder of Plaintiff's Amended Complaint sets forth only vague and conclusory allegations that multiple Defendants have violated Plaintiff's constitutional rights at Upstate SHU between April 2005 and July 2012.[FN6] *See* Am. Compl. at 25–56. While Plaintiff refers to extensive lists of Defendants for some of his claims, he does not provide a single reference to any specific action taken by a specific Defendant. Indeed, Plaintiff's remaining claims amount to nothing more than legal conclusions that dozens of Defendants violated his constitutional rights, but those conclusions are unsupported by any facts.[FN7]

> FN6. The claims which arose prior to August 19, 2008 (three years before Plaintiff commenced this action) are likely barred by the applicable three-year statute of limitations for § 1983 claims.

> FN7. The Amended Complaint includes twenty-nine causes of action. Many of Plaintiff's purported "causes of action" are not actual claims but merely recitations of elements of a claim, and do not identify a single Defendant to whom any wrongdoing could be attributed. *See, e.g.* Am. Compl. at 20 (sixth cause of action alleging that all defendants acted under color of state law), 35 (thirteenth cause of action alleging state action and municipal liability), 37–39 (sixteenth cause of action alleging municipal liability and custom and policy), 40–43 (seventeenth and twenty-first causes of action alleging atypical and significant hardship, and nineteenth cause of action alleging state action), 52 (twenty-eighth cause of action alleging municipal liability and state action).

**\*5** In his ninth cause of action, Plaintiff asserts that: (1) from April 5, 2005 until July, 2008, forty-two Defendants tortured, threatened, and harassed him;

subjected him to cruel and unusual conditions of confinement; and denied him a rule book, the use of his cane, and due process; and (2) between May 2008 until July 2012, he was tortured; retaliated against; denied due process; not given a rule book or his walking cane; subjected to cell searches; deprived of his legal work; and denied access to the grievance process by forty-six Defendants. Am. Compl. at 26–31. Plaintiff's claims against these Defendants are set forth in wholly conclusory fashion and consist of nothing other than legal conclusions that are unsupported by any factual allegations that might even suggest that one or more of these Defendants was personally involved in conduct that violated Plaintiff's statutory or constitutional rights. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citations omitted)). Thus, Plaintiff fails to state a claim against Defendants named in the ninth cause of action that is cognizable under § 1983.

In his tenth and eleventh causes of action, Plaintiff names twenty-six Defendants, claiming that, as supervisors, they are liable for his wrongful confinement and the inadequate conditions of confinement in Upstate SHU, including his being subjected to torture, harassment, retaliation, and threats, and being denied due process and a rule book. *Id.* at 32–34. Plaintiff's twenty-ninth cause of action identifies twenty-nine supervisory Defendants and claims that they are all responsible for all of the wrongdoing of their subordinates. *Id.* at 53–55. These allegations, apart from being totally lacking in any factual support, are grounded simply on the basis of respondeat superior, and therefore fail to state a claim against these supervisory Defendants. *See Richardson v. Goord,* 347 F.3d

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

431, 435 (2d Cir.2003) (holding that a supervisor cannot be liable for damages under § 1983 solely by virtue of being a supervisor because there is no respondeat superior liability under § 1983).

Plaintiff's twelfth, fourteenth, fifteenth, eighteenth, twentieth, and twenty-second through twenty-seventh causes of action appear to assert, in wholly conclusory terms, claims for breach of contract; violations of constitutional rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution; and violations of state laws. *Id.* at 34, 36, 39–40, 44–51. However, Plaintiff does not identify a single Defendant as responsible for the alleged violations nor does he assert a single fact in support of his legal conclusions that his rights were violated.[FN8] Plaintiff therefore fails to state any cognizable claim.

> FN8. Plaintiff alleged many similar claims, in equally conclusory form, in his Complaint. For example, Plaintiff alleged that he was placed in Upstate SHU without due process; his confinement in Upstate SHU imposed an atypical and significant hardship upon him; he has been denied periodic review of his disciplinary confinement; he has been confined in SHU without a rule book; and he has been placed on the disciplinary diet in SHU. Compl. at 23–26. The July 2012 Order dismissed those claims with leave to amend and advised Plaintiff that such conclusory allegations would not suffice.

**\*6** In sum, Plaintiff's remaining allegations (as set forth in the ninth through twenty-ninth causes of action) consist of a series of factual and legal conclusions, and are generally nonspecific as to when they occurred [FN9] or which Defendants might be responsible for the alleged wrongdoing. Significantly, most of these allegations are not attributed to an identifiable individual, but rather to large groups of Defendants. Thus, the allegations are simply too vague to provide any particular Defendant "fair notice" of the grounds upon which Plaintiff's claims are based. Plaintiff's Amended Complaint therefore falls far short of meeting the standards set forth in Rule 8, and accordingly fails to state a claim upon which relief may be granted. *See* Iqbal, 556 U.S. at 678.

> FN9. Plaintiff identifies most of the wrongdoing as spanning years. The few times that Plaintiff does identify alleged wrongdoing by date, he fails to indicate which Defendant is responsible for the alleged misconduct. *See, e.g.,* Am. Compl. at 44.

While recognizing that Plaintiff is proceeding *pro se* and that this requires the Court to construe his pleadings liberally, the Court finds that these allegations are wholly insufficient to state any plausible claim for relief or to allow a Defendant to make a reasonable response. Under these circumstances, the Court concludes that the remainder of the Amended Complaint fails to state a claim upon which relief may be granted and is subject to dismissal under 28 U.S.C. § 1915A.

**C. Nature of Dismissal**

Generally, when a district court dismisses a *pro se* action *sua sponte,* the plaintiff will be allowed to amend his action. *See* Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend. *Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at *8 (N.D.N .Y. Jan. 13, 2008) (Kahn, J.); *Shuler v. Brown,* No. 07–CV–0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. Mar.23, 2009) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.").

Moreover, an opportunity to amend is not required where the defects in the Plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that the denial of leave to amend is not abuse of discretion where amendment would be futile). This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at *1.

While the special leniency afforded to *pro se* civil-rights litigants somewhat loosens the procedural rules governing the form of pleadings, *see Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Federal Rule of Civil Procedure 8, 10, and 12, *see Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (holding that the liberal pleading standard set forth in *Haines,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, did not save a *pro se* complaint from dismissal for failing to comply with Rule 8). Rather, as both the Supreme Court and Second Circuit have repeatedly stated, the requirements set forth in Rules 8, 10, and 12 are procedural rules that even *pro se* civil-rights plaintiffs must follow. *See, e.g., McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (holding that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law"). When a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 214 n. 28 (N.D.N.Y.2008).

**\*7** For all of the foregoing reasons, and because Plaintiff has already had one opportunity to amend his claims, Plaintiff's Amended Complaint is dismissed in its entirety under 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. Because they are time-barred, the claims asserted in Plaintiff's first through eighth causes of action are dismissed with prejudice. Plaintiff's remaining claims asserted in the ninth through twenty-ninth causes of action are dismissed without prejudice, without leave to amend. [FN10]

> FN10. Plaintiff has already been afforded one opportunity to amend herein. Moreover, in several other actions that he filed in this District, Plaintiff alleged claims very similar to the claims in the ninth through twenty-ninth causes of action. Those claims, some of which were asserted against some of the same Defendants in this Amended Complaint, were equally conclusory and unsupported by facts, and were thus dismissed for failure to state a claim. *See, e.g., Flemming v. Wright,* No. 9:11–CV–0804, Dkt. No. 21, Decision and Order at 5–11 (N.D.N.Y. filed June 28, 2012); *Flemming v. Goord,* No. 9:11–CV–1022, Dkt. No. 10, Decision and Order at 13–18 (N.D.N.Y. filed Aug. 10, 2012). Thus, Plaintiff is well aware of his obligation to allege his claims in nonconclusory fashion and will not, therefore, be given a second opportunity to amend any claims in this action.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED** in accordance with this Decision and Order. Plaintiff's first through eighth causes of action are **DISMISSED with prejudice** under 28 U.S.C. § 1915A(b) as time-barred. Plaintiff's remaining claims (the ninth through twenty-ninth causes of action) are **DISMISSED without prejudice** under 28 U.S.C. § 1915A(b) for failure to state a claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)
**(Cite as: 2013 WL 317059 (N.D.N.Y.))**

upon which relief may be granted, **without leave to amend;** and it is further

    **ORDERED,** that the Clerk serve a copy of this Decision and Order on Plaintiff.

    **IT IS SO ORDERED.**

N.D.N.Y.,2013.
Flemming v. Goord
Not Reported in F.Supp.2d, 2013 WL 317059 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2726276 (N.D.N.Y.)
**(Cite as: 2007 WL 2726276 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Petitioner,
v.
Glenn GOORD, Commissioner of NYS Department
of Corrections; Donald Selsky, Director of Special
Housing for DOC Inmates; Michael Maher, Deputy
Acting Supervisor; Norman Bezio, Captain; Donald
G. Uhler, Captain; Anthony Boucaud, Deputy Su-
perintendent for Administration; Mitchell, Security
Lt. in Charge; Admiks, Lut. for Hearing and Acting
Captain; Donald Quinn, Lut.; Martin, Lut. for Inves-
tigation; Fletcher, Sgt. for Security at RMU Walsh;
Carpenter, Sgt. for Security at RMU Walsh; Thomas J.
Kourofsky, Sgt.; Allan, Sgt. for Security at RMU
Walsh; George L. Lafrance, Sgt. with Grievance Of-
fice; Bishop, Sgt. in 11 Block; James Sorell, CO Se-
curity Officer; Guy R. Falcon, CO Security Officer;
Steven K. Wentzel, CO Security Officer; Edmund
Barr, Security Officer Co.; Terry James, CO Security
Officer; Brian R. Granfe, CO Security Officer; Terry
D. Charland, CO Security Officer; Dannie Malloni,
CO Security Officer at RMU Walsh; Mrs. C.O.
Lovette, Security Officer at RMU Walsh; Anthony
Durrante, Security Officer of RMU Walsh; Andy
Meachum, Security Officer at RMU Walsh; James
Bennett, CO Law Library Supervisor; Gerald Caron,
Security Officer; Kirk Crossett, Security Officer;
Patricia, Security Officer at RMU Walsh-Mohawk;
Deana Buffham, Medical and Medication Nurse;
George Waterson, Medical and Medication Nurse;
Evelyn Weissman, Head Doctor in Charge; Leo
Payant, Superintendent of RMU Walsh; Deputy Ro-
sadro, D.S.H.Head of RMU Walsh Medical; Dr.
Sharma; Dr. Burdick; C.O. Terry Ashlaw; and C.O.
Szajer, Respondents.

No. 06-CV-26.
Sept. 13, 2007.

Woodrow Flemming, Malone, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Megan M. Brown, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, United States District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer,
United States Magistrate Judge, for a Re-
port-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c).

No objections to the August 23, 2007 Re-
port-Recommendation have been raised. After exam-
ining the record, this Court has determined that the
Report-Recommendation is not subject to attack for
plain error or manifest injustice. Accordingly, this
Court adopts the Report-Recommendation for the
reasons stated therein and GRANTS the motion to
dismiss the Amended Complaint. Plaintiff is granted
leave to file a Second Amended Complaint within
thirty days of the date of this Order. *Any new pleading*
*must comply with the terms of the Re-*
*port-Recommendation. Failure to file a proper*
*Complaint will result in dismissal of this case.* De-
fendants are granted leave to renew their motion to
dismiss after Plaintiff has filed an amended pleading.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND OR-
DER**[FN1]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2726276 (N.D.N.Y.)
**(Cite as: 2007 WL 2726276 (N.D.N.Y.))**

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se Woodrow Flemming [FN2] ("Flemming"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, forty DOCS employees,[FN3] violated his constitutional rights under the First, Fifth, Eighth, and Fourteenth Amendments. Am. Compl. (Docket No. 5). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 8 and 10, or, in the alternative, an order for a more definite statement under Rule 12(e). *See* Docket No. 67. Defendants also contend that one of Flemming's claims is barred by the doctrine of res judicata. *See id.* Flemming opposes the motion.[FN4] Docket Nos. 69, 70. Because the amended pleading filed by Flemming fails to satisfy the basic pleading requirements established by the Federal Rules of Civil Procedure, it is recommended that Flemming be given thirty (30) days to file a second and final amended complaint and that the motion otherwise be denied.

FN2. Flemming has extensive litigation experience, filing twenty-nine other federal actions since 1997. *See U.S. Party/Case Index* (visited Aug. 21, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

FN3. Two other defendants were previously dismissed. *See* Docket Entry dated 4/5/06.

FN4. On March 2, 2007, Flemming filed what appears to be a motion for summary judgment pursuant to Fed.R.Civ.P. 56. *See* Docket No. 70 at 1-2. However, because Flemming's apparent motion for summary

judgment proffers no evidence in support of his claims, and instead reiterates the factual allegations made in the amended complaint, the motion is denied without prejudice but will be considered in opposition to defendants' motion to dismiss. Further, Flemming's papers are nearly illegible and he is instructed that future submissions should be either typewritten or in legible handwriting. This is not the first time that Flemming has been warned about filing illegible papers. *See, e.g., Flemming v. City of New York,* No. Civ. 03-662(NCG)(LB), 2006 WL 2853872, at *2 n. 3 (E.D.N.Y. Sept. 29,2006); *Flemming v. Wright,* No. Civ. 06-86(GLS)(GJD), 2006 WL 1174314, at *1 n. 1 (N.D.N.Y. Apr. 28, 2006).

## I. Discussion
### A. Pleading Requirements

Fed.R.Civ.P. 8(a) requires that a pleading "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ..., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." "The purpose of this Rule is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Herbert v. Syracuse, N.Y. Welfare Office,* No. Civ. 06-848 (FJS/GHL), 2006 WL 2794400, at *1 (N.D.N.Y. Sept. 25, 2006) (citations and internal quotation marks omitted).

Rule 10 of the Federal Rules of Civil Procedure states, in relevant part, that:

All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2726276 (N.D.N.Y.)
(Cite as: 2007 WL 2726276 (N.D.N.Y.))

transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth.

**\*2** Fed.R.Civ.P. 10(b); *see also Herbert,* 2006 WL 2794400, at \*1. Rule 10 "was designed 'to facilitate[ ] the clear presentation of the matters set forth,' so that allegations might easily be referenced in subsequent pleadings.' " *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005) (quoting Fed.R.Civ.P. 10(b)).

"A complaint that fails to comply with these Rules presents too heavy a burden for the defendants in shaping a comprehensive defense, provides no meaningful basis for the court to assess the sufficiency of the plaintiff's claims, and is properly subject to dismissal." *Herbert,* 2006 WL 2794400, at \*1 (citing *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). As the Second Circuit has stated, " '[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint.' " *Herbert,* 2006 WL 2794400, at \*1 (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1998)). However, dismissal is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Hudson v. Artuz,* No. Civ. 95-4768(JSR), 1998 WL 832708, at \*2 (S.D.N.Y. Nov. 30, 1998) (citation and internal quotation marks omitted).

### B. Allegations in Flemming's Amended Complaint

On February 9, 2006, the district court held that Flemming's original complaint in this action did not comply with Rules 8 and 10 of the Federal Rules of Civil Procedure and granted Flemming thirty days to file an amended complaint or the action would be dismissed. *See* Docket No. 4. On February 21, 2006, Flemming submitted an amended complaint in compliance with that order. A review of Flemming's amended complaint reveals that it fails substantially to satisfy the requirements of the above-mentioned rules.

Although Flemming's amended complaint contains separately numbered paragraphs, each paragraph is approximately one page long and contains more than one allegation. Further, Flemming has still failed to set forth specific allegations as to the alleged wrong doing of each defendant. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Accordingly, it is impossible for this Court to determine what, if anything, each person named in the amended complaint allegedly did, or failed to do, and how such action or inaction violated Flemming's rights. Thus, Flemming is advised that absent specific allegations of personal involvement, the defendants for whom such allegations are lacking are entitled to be dismissed from this action.

Any second amended complaint, which shall supersede and replace in its entirety the previous complaint and amended complaint filed by Flemming, must contain sequentially numbered paragraphs containing ***only one factual allegation per paragraph.*** Thus, if Flemming claims that his rights were violated by more than one defendant, or on more than one occasion, he shall include a corresponding number of paragraphs in his second amended complaint for each such allegation. Further, each such paragraph shall specify (1) the alleged fact, (2) the ***date*** on which such fact or misconduct occurred, (3) the names of each and every individual who participated in such act or misconduct, and (4) where appropriate, the ***location*** where the alleged fact or misconduct occurred. Finally, Flemming is cautioned that conclusory statements of wrong doing, such as "defendants violated my Eighth Amendment rights," are not sufficient. Rather, Flemming must state what actions were taken, by whom they were taken, and how such actions violated his constitutional rights.[FN5]

FN5. It should be noted that in his fourth

Not Reported in F.Supp.2d, 2007 WL 2726276 (N.D.N.Y.)
**(Cite as: 2007 WL 2726276 (N.D.N.Y.))**

cause of action, Flemming has sufficiently alleged, albeit barely, an Eighth Amendment excessive force violation. Flemming alleges that "CO Anthony Durrante" assaulted him on February 15, 2005. *See* Am. Compl. at ¶ 46. However, Flemming is directed to supplement this claim with supporting facts about how the assault occurred and any injuries that resulted.

## II. Conclusion[FN6]

FN6. Defendants also contend that Flemming's amended complaint is barred by res judicata and that they are entitled to qualified immunity. *See* Defs. Mem. of Law (Docket No. 67) at 1-3, 6-7. However, as discussed *supra,* the true nature of Flemming's claims have yet to be determined. Thus, it would be premature to rule on either issue until Flemming has had an opportunity to amend his complaint. Therefore, it is recommended that defendants' motion on these grounds be denied without prejudice to be renewed upon Flemming's submission of a second amended complaint.

**\*3** For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Docket No. 67) be **GRANTED** to the extent that Flemming be granted *thirty (30) days* from the date of the district court's decision on this motion to file a second amended complaint which complies fully with the terms detailed above, and that defendants' motion be **DENIED** without prejudice in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Flemming v. Goord
Not Reported in F.Supp.2d, 2007 WL 2726276 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Glenn GOORD, Commissioner of NYS Department of Corrections; Donald Selsky, Director of Special Housing for Docs Inmates; Michael Maher, Deputy Acting Supervisor; Norman Bezio, Captain; Donald G. Uhler, Captain; Anthony Boucaud, Deputy Superintendent for Administration; Mitchell, Security Lt. in Charge; Admiks, Lut. for Hearing and Acting Captain; Donald Quinn, Lut.; Martin, Lut. for Investigation; Fletcher, Sgt. for Security at RMU Walsh; Carpenter, Sgt. for Security at RMU Walsh; Thomas J. Kourofsky, Sgt.; Allan, Sgt. for Security at RMU Walsh; George L. Lafrance, Sgt. with Grievance Office; Bishop, Sgt. in 11 Block; James Sorell, CO Security Officer; Guy R. Falcon, CO Security Officer; Steven K. Wentzel, CO Security Officer; Edmund Barr, Security Officer Co.; Terry James, CO Security Officer; Brian R. Granfe, CO Security Officer; Terry D. Charland, CO Security Officer; Dannie Malloni, CO Security Officer at RMU Walsh; Mrs. C.O. Lovette, Security Officer at RMU Walsh; Anthony Durrante, Security Officer of RMU Walsh; Andy Meachum, Security Officer at RMU Walsh; James Bennett, CO Law Library Supervisor; Gerald Caron, Security Officer; Kirk Crossett, Security Officer; Patrica, Security Officer at RMU Walsh-Mohawk; Deana Buffham, Medical and Medication Nurse; George Waterson, Medical and Medication Nurse; Evelyn Weissman, Head Doctor in Charge; Leo Payant, Superintendent of RMU Walsh; Deputy Rosadro, D.S.H. Head of RMU Walsh Medical; Dr. Sharma; Dr. Burdick; C.O. Terry Ashlaw; and C.O. Szajer, Defendants.

No. 06-cv-26.
Sept. 29, 2008.

Woodrow Flemming, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Megan M. Brown, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David R. Homer, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Objections to the September 9, 2008 Report-Recommendation have been filed. After examining the record de novo, this Court adopts the Report-Recommendation for the reasons stated therein and DISMISSES Plaintiff's claims in their entirety. Plaintiff's objections fail to cure or otherwise any of the deficiencies identified in the Report-Recommendation.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

Plaintiff pro se Woodrow Flemming [FN2] ("Flemming"), an inmate currently in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, forty DOCS employees,[FN3] violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Second Am. Compl. (Docket No. 81). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 8, 10 and 12(b)(6). Docket No. 84.[FN4] Flemming opposes the motion. Docket No. 85. For the following reasons, it is recommended that defendants' motion be granted.

FN2. Flemming has extensive litigation experience, having filed at least thirty-one other federal actions since 1997. *See U.S. Party/Case Index* (visited Sept. 2, 2008) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

FN3. Two other defendants, Lizer and Asklane, were named in the original complaint but were terminated as defendants on April 5, 2006. *See* second docket entry for 4/5/06.

FN4. The motion is made on behalf of all defendants except Mitchell and Patrica. *See* Defs. Notice of Motion (Docket No. 84-1) at 1. Flemming proceeds here *in forma pauperis.* Docket Nos. 2, 4. Summonses were issued for service by the United States Marshals Service for both Mitchell and Patrica on June 26, 2006. Docket entry for 6/26/06. Both summonses were returned unexecuted. Docket No. 10. Neither Mitchell nor Patrica have answered or otherwise appeared in the action. More than 120 days have elapsed since the complaint was filed and the summonses were issued. Accordingly, it is recommended that the second amended complaint be dismissed without prejudice as to both Mitchell and Patrica pursuant to

Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

# I. Background

The facts are related herein in the light most favorable to Flemming as the non-moving party. *See* subsection II(A) *infra.* Flemming's allegations concern numerous incidents involving numerous defendants and are presented herein as best they can be discerned.

On or about December 13, 2003, Flemming was the subject of a retaliatory transfer from the Walsh Regional Medical Unit ("RMU") to Upstate RMU which was located in a maximum security prison. Second Am. Compl. ¶¶ 7-8, 14. Flemming was subjected to a second retaliatory transfer on April 5, 2005. *Id.* ¶¶ 7, 12. These transfers, and subsequent housing in Special Housing Units ("SHU") [FN5] deprived Flemming of due process and equal protection and inflicted cruel and unusual punishment. *Id.* ¶ 7. In addition, Flemming's health, safety, and constitutional rights were further infringed during his housing in SHU where he was housed with a medical machine which was not properly monitored. *Id.*

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On or about March 30, 2004, defendant Lovette confiscated his legal work and it was never returned to him. *Id.* ¶ 16. Additionally, during an absence from his cell on February 3, 2005, all Flemming's legal work was taken from his cell and he has yet to recover all of it. *Id.* ¶¶ 22, 49-50; Flemming Mem. of Law (Docket

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

No. 81) ¶ 76.

Flemming also alleges multiple instances where excessive force was used. On March 20, 2004, defendant Durrante injured Flemming during a search of his cell. Second Am. Compl. ¶ 15. On February 15, 2005, the same defendant pushed him to the floor and then wrote a false misbehavior report against Flemming. *Id.* ¶¶ 29, 32. On September 5, 2005, a use-of-force report was written detailing the release of chemical agents and subsequent events of Hyde, Tulip, Brousseau, Rushlow, and Paquin, who are not defendants herein. Second Am. Compl. ¶ 51; Docket 85 at 63-72. The next month, defendant Kourofsky physically assaulted Flemming and defendant Bishop assisted. Second Am. Compl. ¶¶ 53-55; Docket 85 at 63-72.

**\*2** According to Flemming, the facility inmate handbook was intentionally denied him, the hearing officers at his disciplinary hearings were biased, he was wrongly denied good time credits, he was prevented from participating in religious programs and services, he was given a diet consisting exclusively of loaf and cabbage for seven to fifteen days at a time, and he was denied the use of his wheelchair, walker, and cane while in his cell. Second Am. Compl. ¶¶ 7, 21, 60, 40, 43-46, 55(l),(m); Docket No. 85, ex. C at ¶¶ 2-3, 5-9; Flemming Mem. of Law ¶¶ 62-65, 72.[FN6]

> FN6. These claims are derived from a liberal reading of Flemming's second amended complaint and an attempt to decipher his nearly illegible submissions and piecemeal documentary support. It should be noted that "[t]his is not the first time that Flemming has been warned about filing illegible papers." Docket No. 35 (*citing Flemming v. City of New York*, No. 03-CV-662 (NCG/LB), 2006 WL 2853872, at \*2 n. 3 (E.D.N.Y. Sept. 29, 2006); *Flemming v. Wright*, No. 06-CV-86 (GLS/GJD), 2006 WL 1174314, at \*1 n. 1 (N.D.N.Y. Apr. 28, 2006))

This action followed. In an order dated February 9, 2006, Flemming was directed to file an amended complaint complying with the pleading requirements of the federal rules by "set[ting] forth any specific allegations of wrong doing by each of the defendants [as] ... it is [currently] impossible for this Court to determine what, if anything, each person named in the complaint allegedly did, or failed to do, and how such action or inaction violated [Flemming's] rights." Docket No. 4 at 3. The district court granted Flemming thirty days to file an amended complaint or the action would be dismissed. *Id.*

On February 21, 2006, Flemming filed his first amended complaint. Docket No. 5. Defendants moved to dismiss this amended complaint pursuant to Fed.R.Civ.P. 8 and 10 and the doctrine of res judicata. Docket No. 67. In a report-recommendation and order, the undersigned stated that "Flemming's amended complaint ... fails substantially to satisfy the requirements of [Rules 8 and 10]," and that

> any second amended complaint, which shall supersede and replace in its entirety the previous complaint and amended complaint ... must contain sequentially numbered paragraphs containing **only one factual allegation per paragraph** ... [and] each such paragraph shall specify (1) the alleged fact, (2) the **date** on which such fact or misconduct occurred, (3) the names of each and every individual who participated in such act or misconduct, and (4) where appropriate, the **location** where the alleged fact or misconduct occurred ... caution[ing] that conclusory statements ... are not sufficient.

Docket No. 78 at 5-6 (emphasis in original). Flemming was again granted thirty days within which to amend his complaint. *Id.* On September 4, 2007, Flemming filed his second amended complaint. Docket No. 81. This motion followed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

## II. Discussion

In his second amended complaint, Flemming alleges that defendants violated his (1) First Amendment rights by retaliating against him, impeding his access to the courts by confiscating and failing to protect his legal mail, and preventing him from participating in religious services; (2) Eighth Amendment rights by subjecting him to excessive force, cruel and inhumane conditions of confinement, and deliberately interfering with his medical treatment by prohibiting him from using his wheelchair, walker, and cane in his cell; and (3) Fourteenth Amendment rights by destroying and failing adequately to protect his property, failing properly to investigate and conduct hearings pertaining to the grievances he filed, and confining him in SHU. Defendants argue that the second amended complaint should be dismissed because (1) Flemming did not comply with the pleading requirements, (2) Flemming's claims are barred by res judicata, and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

**\*3** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Dismissal is only warranted if it appears beyond a reasonable doubt that the non-moving party can prove no set of facts in support of his or her claim which would be entitled to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 2008 WL 3294864, at \*5 (2d Cir. Aug. 12, 2008) ("On occasions too numerous to count, we have reminded district courts that 'when

[a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally .' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Res Judicata

Under the Full Faith and Credit Clause of the United States Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980).

"A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen,* 449 U.S. at 94 (applying res judicata to a § 1983 action). Thus, to sustain a claim of res judicata, a defendant must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach by which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

The bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

792 F.2d 275, 278 (2d Cir.1986). Even if res judicata is inapplicable to a § 1983 action because the state court forum was incapable of awarding the requested relief, it does not preclude the application of collateral estoppel. *See Phifer v. City of New York,* 289 F.3d 49, 56 (2d Cir.2002).

**\*4** In this case, res judicata serves to bar many of Flemming's claims. Most of Flemming's contentions here were dismissed by an order dated December 4, 2006 from another civil rights action filed in this district. *See Flemming v. Payant,* No. 05-CV-473 (DNH/DEP) (hereinafter *"Flemming I"* ). In *Flemming I,* the court noted that "[Flemming's] amended complaint remain[ed] disjointed and confused, making it next to impossible for the Court to discern the sufficiency of [Flemming's] claims," but the court ultimately dismissed the complaint because the conclusory allegations Flemming asserted were insufficient to state a claim upon which relief could be granted. *Id.* at 2-3.

However, the district court did not specify whether the case was dismissed with or without prejudice and, thus, whether the case was dismissed on the merits. This, however, is immaterial. *See Hoffman v. Wisner Classic Mfg. Co.,* 927 F.Supp. 67, 72 (E.D.N.Y.1996) (holding that failure to specify whether a case is dismissed with or without prejudice does not render the decision incapable of being based on the merits as "the Second Circuit infers prejudice in the absence of an indication to the contrary." (*citing Kern v. Hettinger,* 303 F.2d 333, 340 (2d Cir.1962) (holding that in "the absence of the words 'without prejudice,' we must and do decide that the dismissal was on the merits and that it was intended to be on the merits."))); *see also* Fed.R.Civ.P. 41(b) (stating that unless (1) otherwise stated or (2) based upon lack of jurisdiction, improper venue or failure to join a party, any dismissal order "operates as an adjudication on the merits."). In this case, *Flemming I* was not dismissed for lack of jurisdiction, improper venue, or failure to join a party. Nor did it specify that the case was dis-

missed without prejudice. Therefore, *Flemming I* is inferred to be adjudged on the merits.

The prior action involved only five defendants,[FN7] but all five were also named in the present action. The additional thirty-five defendants named in the present action are all clearly in privity with those five defendants by virtue of the allegations herein and that each was allegedly involved in the same transactions alleged in the two actions. Additionally, *Flemming I* asserted some of the same claims asserted in the present action. These claims include (1) the retaliatory transfers and the subsequent due process, equal protection, and Eighth Amendment deprivations stemming therefrom (*Flemming I*[FN8] ¶¶ 6, 8-10; Second Am. Compl. ¶¶ 7-8, 12, 14; Docket No. 85, ex. C ¶¶ 2, 6, 8, 9; Flemming Mem. of Law ¶¶ 48-49, 61); (2) due process, equal protection, and Eighth Amendment violations pertaining to confinement in SHU with medical equipment (*Flemming I* ¶ 10; Second Am. Compl. ¶ 7; Docket No. 85, ex. C ¶¶ 3, 7; Flemming Mem. of Law ¶¶ 48-49); (3) denial of an inmate handbook (*Flemming I* ¶ 6; Second Am. Compl. ¶¶ 7, 21; Docket No. 85, ex. C ¶¶ 6, 9; Flemming Mem. of Law ¶¶ 63-65); (4) excessive force by Durrante on March 20, 2004 and February 15, 2005 (*Flemming I* ¶ 11; Second Am. Compl. ¶¶ 15, 29); (5) due process violations in the denial of good time credits (*Flemming I* ¶ 12; Docket No. 85, ex. C ¶ 5); (6) due process violations from biased disciplinary hearing officers (*Flemming I* ¶ 18; Second Am. Compl. ¶ 60); and (7) denial of access to and participation in religious programs and worship services (*Flemming I* ¶ 19; Flemming Mem. of Law ¶ 62). Each of these seven contentions was pled in both complaints in practically identical terms. Additionally, both final amended complaints draw on the same factual bases to assert the seven claims as the dates and events are the same in each complaint.

FN7. Goord, Admiks, Fletcher, Payant, and Burdick. *See Flemming I,* (Am. Compl. (Docket No. 6). In addition, five other de-

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

fendants in this action (Selsky, Malloni, Durrante, Szajer, and Carpenter) were originally named as defendants but were dismissed from the action before the final adjudication. *See Flemming I* Docket entry for 10/17/05.

FN8. All references to allegations in *Flemming I* are to those contained in the second amended complaint (Docket No. 40). All other references to a docket are to that of the present case.

**\*5** Thus, the seven claims alleged in each final complaint arise from the same nucleus of operable facts and transactions. Accordingly, res judicata bars these claims being asserted again in this case. Defendants' motion to dismiss on this ground should be granted as to those seven claims.

### C. Sufficiency of Pleading

Fed.R.Civ.P. 8(a) requires that a pleading "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ..., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." "The purpose of this Rule is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Herbert v. Syracuse, N.Y. Welfare Office,* No. Civ. 06-848 (FJS/GHL), 2006 WL 2794400, at \*1 (N.D.N.Y. Sept. 25, 2006) (citations and internal quotation marks omitted).

Rule 10 of the Federal Rules of Civil Procedure states, in relevant part, that:

All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph

may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth.

Fed.R.Civ.P. 10(b); *see also Herbert,* 2006 WL 2794400, at \*1. Rule 10 "was designed 'to facilitate[ ] the clear presentation of the matters set forth,' so that allegations might easily be referenced in subsequent pleadings.' " *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005) (quoting Fed.R.Civ.P. 10(b)).

"A complaint that fails to comply with these Rules presents too heavy a burden for the defendants in shaping a comprehensive defense, provides no meaningful basis for the court to assess the sufficiency of the plaintiff's claims, and is properly subject to dismissal." *Herbert,* 2006 WL 2794400, at \*1 (citing *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). "As the Second Circuit has stated, '[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint.' " *Herbert,* 2006 WL 2794400, at \*1 (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1998)). "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Hudson v. Artuz,* No. Civ. 95-4768(JSR), 1998 WL 832708, at \*2 (S.D.N.Y. Nov. 30, 1998) (citation and internal quotation marks omitted).

Flemming has been instructed multiple times by this and other courts to comply with the pleading requirements of the federal rules. Despite the opportunities to file two amended complaints, the majority of Flemming's claims remain inadequately presented. Those claims are not asserted in a short and plain statement setting forth the defendant committing the alleged constitutional violation, when the deprivation occurred, where the deprivation occurred, or what, if

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

any, harm resulted.

**\*6** For the third time in his final complaint here, Flemming asserts that fourteen defendants conspired to file and continuously filed false misbehavior reports against him based on an institutional policy. Second Am. Compl. ¶ 18. While these defendants are named,[FN9] Flemming fails to assert any facts concerning the dates when these misbehavior reports were filed, what disciplinary violations were charged, whether Flemming received subsequent disciplinary hearings, and what were the final dispositions of the hearings. Furthermore, Flemming has failed to allege specific facts from which one could conclude that defendants' actions were motivated by Flemming's constitutionally protected activities as required to sustain such claims. Moreover, Flemming fails to allege any facts that could be construed to represent an agreement between these defendants sufficient to infer the existence of a conspiracy.

> **FN9.** Lovette, Malloni, Meachum, Durrante, Admiks, Rosardo, Burdick, Sharma, Mitchell, Szajer, Fletcher, Allan, and Carpenter. Second Am. Compl. ¶ 18. However, there are no dates of the alleged events and each defendant's personal involvement is only a conclusory allegation that he or she harassed and conspired against Flemming. Second Am. Compl. ¶ 55.

Additionally, Flemming continues to make conclusory allegations about the legal work that disappeared from his cell. Second Am. Compl. ¶¶ 16, 22; Flemming Mem. of Law ¶ 76. However, Flemming does not identify which papers were missing, which defendants were responsible,[FN10] and how those missing papers prejudiced his subsequent judicial activities. Thus, Flemming has not pled any facts to put forth adequately a First Amendment claim regarding his access to courts.

> **FN10.** Flemming asserts that on one occasion, March 30, 2004, Lovette confiscated some of his legal documents. Second Am. Compl. ¶ 16. Again, the documents and any prejudice which Flemming suffered were not alleged.

Furthermore, Flemming asserts that defendant Weissman and "a black nurse" violated his Eighth Amendment rights by prohibiting him from using his cane, wheelchair, and walker in his cell. Second Am. Compl. ¶¶ 40, 43-46, 55(l); Flemming Mem. of Law ¶ 72. However, Flemming has failed to assert any serious medical need necessitating such assistive devices and constitute a need outweighing the penological and institutional safety concerns and regulations which otherwise support the prohibition of inmates from having such devices which could be used as weapons.

Moreover, Flemming asserts that defendants Boucard and Weissman placed him on a diet of loaf and cabbage for seven to fifteen days at a time. Second Am. Compl. ¶ 55(l), (m); Flemming Mem. of Law ¶ 72. Again, these allegations, while naming the defendants allegedly involved, are inadequate otherwise. Even if these allegations would suffice under the general pleading requirements, a loaf-and-cabbage diet is insufficient to plead an Eighth Amendment violation. *See, e.g. Smith v. Burge,* No. 03-CV-955 (LEK/GHL), 2006 WL 2805242, at \*11 n. 78 (N.D.N.Y. Sept. 28, 2006) (gathering numerous cases holding that a loaf-and-cabbage diet is insufficient to allege a constitutional deprivation).

Lastly, it appears that Flemming has sufficiently pled facts pertaining to the two use-of-force incidents on September 5 and October 16, 2005. Second Am. Compl. ¶¶ 51, 53-55, Docket No. 85 at 48-61, 63-72. Flemming alleges only that Bezio gave multiple orders to use force against him and that Kourofsky was involved in the assault on October 16. *Id.* ¶¶ 53-55, 60. Flemming also attached portions of the reports on those dates. Docket No. 85 at 48-61, 63-72. However,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the defendants identified in Flemming's second amended complaint were not included in the voluminous incident reports submitted and relied upon by Flemming. Additionally, Flemming did not use those reports to amend his complaint properly and to name the proper parties from the documents upon which he relied.[FN11] The only individual that is both named as a defendant and involved in the use of force incidents was Charland. However even construing Flemming's submissions in the light most favorable to him, it is impossible to discern what, if any, action or inaction was done by Charland as Flemming makes reference to no other corrections officers except Kourofsky when describing the October 16 incident.

> FN11. The individuals identified in the report for September 5 are J. Hyde, S. Tulip, F. Brousseau, J. Rushlow, and D. Paquin. Docket No. 85 at 48-61. J. King operated the video camera and K. Eddy was in charge of decontaminating Flemming. *Id.* at 55, 60. The supervising officer was Lt. O'Connell. *Id.* at 54. None of these individuals are named defendants. Additionally, the individuals identified in the report for the October 16 incident are M. Tolman, T. Boulrice, J. Rufa, J. Burroughs, T. Charland, B. LeClair, and B. Bush. *Id.* at 63-72. None except Charland are named as defendants in this case.

*7 Therefore, despite a close examination of the second amended complaint and Flemming's submissions, it is impossible to determine what, if anything, each-indeed, any-person named in the second amended complaint allegedly did, or failed to do, constituting a deprivation of Flemming's rights. Accordingly, defendants' motion should be granted on this ground as well.

### 3. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Flemming's allegations as true, he has not shown that any of defendants violated his constitutional rights.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion to dismiss (Docket No. 84) be **GRANTED** and Flemming's second amended complaint (Docket No. 81) be **DISMISSED** with prejudice as to all defendants except Mitchell and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)
**(Cite as: 2008 WL 4532506 (N.D.N.Y.))**

Patrica; and

2. The second amended complant be **DIS-MISSED** without prejudice as to Mitchell and Patrica.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Flemming v. Goord
Not Reported in F.Supp.2d, 2008 WL 4532506 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Glenn GOORD, Commissioner; Donald Selsky, Director of Special Housing; Michael Maher, Deputy Acting Superintendent; Captain Dauphin; Lt. Mitchell; Lozada Rossy; Andy Meachem, Security Officer; and Sgt. H. Fitzpatrick, Security Sgt., Defendants.[FN1]

> **FN1.** The State of New York was dismissed as a defendant on August 9, 2006. *See* Second Docket Entry for 8/9/06.

No. 9:06-CV-562.
Dec. 8, 2009.

Woodrow Flemming, Malone, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### ORDER
NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David R. Homer, duly filed on the 16th day of November 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Plaintiff's motion for summary judgment is denied in all respects. Defendants' cross-motion for summary judgment is granted in all respects and judgment be entered for all defendants on all claims..

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION AND ORDER[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Woodrow Flemming ("Flemming"), an inmate currently in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, eight DOCS employees, violated his constitutional rights under the First, Fourth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are (1) Flemming's motion

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

for summary judgment pursuant to Fed.R.Civ.P. 56, Docket Nos. 102, 104, 105, 109, and (2) defendants' cross-motion for summary judgment. Docket No. 107. For the following reasons, it is recommended that Flemming's motion be denied and defendants' cross-motion be granted.

## I. Background

At all relevant times herein, Flemming was incarcerated at Mohawk Correctional Facility. Flemming Dep. (Docket No. 107-4) at 9-10. On June 30, 2004, Flemming's cell was searched in his absence. Docket No. 102-2 at 3; Flemming Dep. at 27-28. On July 2, 2004, Flemming was moved to a different cell. Docket No. 102-2 at 3; Docket No. 109 at 9; Flemming Dep. at 27-28. Upon arrival at his new cell, Flemming discovered that the transcripts of his criminal sentencing and miscellaneous other legal documents were missing. Docket No. 102-2 at 3; Docket No. 109 at 9; Flemming Dep. at 12-13.

Flemming submitted a claim for his lost or stolen property to DOCS, which was denied. Docket No. 109 at 8. Flemming also filed grievances, for which determinations were made by the grievance committees and superintendents without affording Flemming the opportunity to present evidence at a hearing. Flemming Dep. at 20-22; Fourth Flemming Decl. (Docket No. 109) ¶ 17. Defendants also allegedly failed to investigate the theft of Fleming's legal documents and negligently placed him in the Special Housing Unit ("SHU"). [FN2] Flemming asserts that proceedings challenging his criminal convictions were materially prejudiced due to the missing transcripts. Flemming Dep. at 13-14, 24-25, 28-29; *see also* Fourth Flemming Decl. ¶ 15. This action followed.[FN3]

FN2. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a

SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

FN3. These claims are derived from a liberal reading of Flemming's complaint and an attempt to decipher his nearly illegible submissions and piecemeal documentary support. It should be noted that "[t]his is not the first time that Flamming has been warned about filing illegible papers." Docket No. 35 (citing *Flemming v.. City of N.Y.,* No. 03-CV-662 (NCG/LB), 2006 WL 2853872, at *2 n. 3 (E.D.N.Y. Sept. 29, 2006); *Flemming v. Wright,* No. 06-CV-86 (GLS/GJD), 2006 WL 1174314, at *1 n. 1 (N.D.N.Y. Apr. 28, 2006)).

**\*2** Flemming has recently claimed that legal documents concerning the present litigation were stolen from his cell. Third Flemming Decl. (Docket No. 105) ¶ 4. Flemming brought an action in the Court of Claims but failed to exhaust his administrative remedies, subjecting that action to dismissal for a lack of jurisdiction. Docket No. 105 at 8-11.[FN4]

FN4. Flemming's deposition testimony indicated that he could not pinpoint a single appeal or action that was compromised by the lose of his legal materials, but instead that "everything" suffered because, if he "had had [his] transcript ... [he] could have liked properly did what [he] had to do" with respect to his state claims, writ of habeas corpus, and related proceedings. Flemming Dep. at 29. Submissions indicate multiple cases pending in state court. They include a letter from the Court of Claims dated April 6, 2005 in response to discovery questions submitted on March 17, 2005 which directed Flemming to proceed with claims dealing with the internal operations of DOCS. Docket No.

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

102-3 at 26. A Court of Claims action was apparently initiated in December 2005, although its ultimate resolution is unknown. *Id.* at 29-30. Furthermore, Flemming filed two motions challenging his criminal conviction in New York County. *Id.* at 46-48. The first was denied on May 6, 2004, prior to the alleged theft of Flemming's legal materials. Docket No. 102-3 at 46. The second was denied on September 27, 2004. *Id.* at 48. Lastly, Flemming's appeal of his guilty plea was rejected. Compl. at 12-13.

## II. Discussion

In his complaint, Flemming alleges that defendants violated his (1) First Amendment rights by retaliating against him and denying his access to the courts, (2) Fourth Amendment rights by conducting an illegal search of his cell,[FN5] and (3) Fourteenth Amendment rights by destroying and failing adequately to protect his property, failing properly to investigate and conduct hearings pertaining to the grievances he filed, and unconstitutionally confining him in SHU .[FN6] Defendants argue that (1) Flemming failed to assert the personal involvement of defendants Goord, Selsky, Maher, Dauphin, and Mitchell; (2) Flemming's constitutional claims are meritless; and (3) Flemming's motion failed to comply with the local rules.[FN7]

FN5. To the extent that Flemming claims Fourth Amendment deprivations, such claims are meritless as the Fourth Amendment does not protect against searches of prison cells. *Hudson v. Palmer,* 468 U.S. 517, 527-28 (1984).

FN6. Flemming fails to proffer evidence as to why he was placed in SHU and what deficiencies occurred in the procedural due process provided prior to his confinement. Nowhere in the record does it indicate that Flemming received time in SHU in connection with the alleged theft of his legal docu-

ments. Additionally, Flemming fails to identify any defendants who were involved with the decision to confine him in SHU. Thus, Flemming has failed to state a claim upon which relief can be granted here.

FN7. Given Flemming's pro se status and the voluminous submissions, the pertinent facts relating to the present motions could be ascertained. Therefore, any failure by Flemming to comply will not be enforced here.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P.* 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Personal Involvement

**\*3** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Goord, Selsky, and Maher

Goord was the Commissioner of DOCS. Selsky was the Director of Special Housing, and Maher was the Deputy Acting Superintendent at Mohawk. Each of these defendants was named in this action in his supervisory capacity, with Fleming citing reasons such as that each is liable for the misconduct of subordinates. Flemming Dep. at 6-7. Additionally, Flemming stated that he was charging all officials, "high and low," for alleged involvement in the constitutional infringements. *Id.* at 7-8. As previously stated, defendants are not deemed personally involved solely based on their positions in a hierarchal chain of command. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) ("[T]he doctrine of *respondeat superior* cannot be used to establish liability under Section 1983."). Accordingly, these contentions are insufficient to allege personal involvement. Moreover, to the extent that Flemming alleges that these defendants "[f]ail[ed] to properly train and supervise employees as the directive and procedures," such allegations are conclusory and insufficient to withstand a motion for summary judgment.

Therefore, defendants' motion as to these three defendants on this ground should be granted.

### 2. Dauphin

Dauphin was "in charge of investigation and he failed to properly investigate the loss of plaintiff property ...." Flemming Dep. at 15. This allegation suffices to assert that by failing to carry out his as-

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

signed duties, Dauphin contributed to the deprivation of a constitutional right alleged by Fleming. Accordingly, defendants' motion as to Dauphin on this ground should be denied.

### 3. Mitchell

Mitchell "was in charge of security [and] failed to make sure that [Flemming's] property was secured ..." and properly inventoried. Flemming Dep. at 15. Viewing Flemming's testimony in the light most favorable to Fleming, it raises a sufficient question of fact as to whether Mitchell was present during the search of his cell when the property was allegedly stolen and improperly catalogued prior to moving it to Flemming's new cell. If Mitchell was present during and after the search, he was also directly involved in the events giving rise to Flemming's First and Fourteenth Amendment claims. Therefore, defendants' motion as to Mitchell on this ground should be denied.

### C. First Amendment
#### i. Retaliation

**\*4** Liberally construing Flemming's complaint, he alleges that his property was either stolen by another inmate, or by defendants, in retaliation for filing grievances and lawsuits against him. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against the plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214-15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F .2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Flemming has failed to allege facts sufficient to support a retaliation claim. Flemming's

actions in filing grievances and law suits constitute activities protected by the First Amendment. However, Flemming proffers no facts, only conclusory allegations, to demonstrate that the filing of his grievances and lawsuits was a substantial factor in any theft of his legal materials. Moreover, Flemming has failed to show that any defendant was actually involved in the theft of the legal materials, as he also contends that another inmate could be responsible for stealing them. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

Accordingly, defendants' motion should be granted as to these claims.

#### ii. Denial of Access to Courts

Prisoners have a well-established Constitutional right to have "adequate, effective, and meaningful" access to courts. *Bounds v. Smith,* 430 U.S. 817, 821-22 (1977) (citations omitted). In order to state a claim for denial of access to the courts, a plaintiff must allege "that a defendant caused 'actual injury,' *i .e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 (1996)). More specifically, the injury must have been the result of the deliberate and malicious behavior of a defendant. *Tajeddini v. Gluch,* 942 F.Supp. 772, 780 (D.Conn.1996) (citations omitted).

In this case, Flemming has failed to show an actual injury that he suffered at the hands of any defendant. Flemming contends that his litigation pursuits in state court were substantially hindered by the missing transcripts and legal documents, but has failed to identify a specific case or motion which was prejudiced. Such conclusory allegations, without more, are insufficient to establish actual injury. *See Lewis,* 518 U.S. at 351 (offering examples of actual injury); *Gonzalez-Cifuentes v. Torres,* No. 04-CV-1470 (GLS/DRH), 2007 WL 499620, at \*6 (N.D.N.Y. Feb.

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus failed sufficiently to allege any actual injury from this alleged incident, much less that [the] conduct was deliberate and malicious.") (internal citations and quotation marks omitted).

**\*5** Moreover, the record here indicates that Flemming has had a long, involved, varied litigation history in both state and federal courts. Flemming had the assistance of counsel in his criminal case and appeal, filed multiple post-conviction challenges, and has continued to file motions in the present case despite his allegations. *See* n. 5 *supra.* This belies claims of prejudice. Lastly, Flemming has failed to establish the proper level of culpability. Flemming continually asserts that defendants were negligent in their response and treatment of Flemming. However, negligence does not rise to the level of deliberate or malicious conduct required to establish liability. *Morales v. New York State Dep't of Corrs.,* 842 F.2d 27, 28 (2d Cir.1988) ("The law is settled that a prisoner cannot base a federal civil rights action brought under 42 U.S.C. § 1983 on claims of a negligent failure of state prison officials to protect him from injury at the hands of another inmate.").

Accordingly, defendants' motion as to this claim should be granted.

### D. Due Process

An inmate possesses a right not to be deprived of property without due process. However, redress is unavailable for the deprivation of property if an adequate state court remedy was available to a plaintiff. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). New York affords such a remedy through an Article 78 proceeding. *See* N.Y.C.P.L.R. §§ 7803, 7804; see *also Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of

the disputed issue, including constitutional claims.") (citations omitted); *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). New York law also provides that any individual, including an inmate, who seeks money damages against the State may commence an action for recovery only in the New York State Court of Claims. *See* N.Y. Corr. Law § 24(2). The Article 78 procedure remains available to Flemming. Moreover, because Flemming sues for damages, he must pursue his claims against New York State in the Court of Claims pursuant to Corrections Law § 24. Thus, the proper venue to litigate these claims is in the state courts. Adequate remedies are available to Flemming under available state law procedures.[FN8]

> **FN8.** Flemming's most recent complaints of stolen legal materials assert that he attempted to file a complaint in the Court of Claims. There is no indication as to what the outcome of the claim was. However, that is of no consequence. If Flemming lost the action in the Court of Claims, that would not entitle him to seek federal relief as there was an adequate state court remedy available which Flemming unsuccessfully pursued. Likewise, there are no federal due process protections which are afforded to such claimants as the due process is properly provided in state court. Thus, Flemming's contentions that he should have received an opportunity to be heard in connection with his stolen property are incorrect.

To the extent that Flemming asserts a constitutional violation based on defendants' failures to comply with DOCS procedures, such contentions are also misplaced. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would cre-

Not Reported in F.Supp.2d, 2009 WL 4667108 (N.D.N.Y.)
**(Cite as: 2009 WL 4667108 (N.D.N.Y.))**

ate liability under state law ...."); *Gilbert v. Goord,* No. 03-CV-423 (GLS/GJD), 2007 WL 3232273, at *6 (N.D.N.Y. Oct. 31, 2007) ("Generally violations of state laws or procedures do not rise to the level of constitutional violations."). Additionally, Flemming's contentions that further investigation should have been undertaken for his loss are also without merit because an inmate enjoys no constitutional right to an internal investigation of any particular nature, extent, or duration. *See Carrasquillo v. City of N.Y.,* 324 F.Supp.2d 428, 438 (S.D.N .Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered").

**\*6** Accordingly, defendants' motion as to these claims should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Flemming's motion for summary judgment (Docket No. 102) be **DENIED** in all respects; and

Defendants' cross-motion for summary judgment (Docket No. 107) be **GRANTED** in all respects and judgment be entered for all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Flemming v. Goord
Not Reported in F.Supp.2d, 2009 WL 4667108

(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Debbie KEMP; Jeffrey Hyde; George Waterson;
Correctional Officer John A. Tatro; Correctional Of-
ficer Darrin C. Carrigeux; Correctional Officer Todd
C. Manley; Leo Palmer; Correctional Officer Wayne
I. Palmer; Correctional Officer Kevin Eddy; Correc-
tional Officer Jerry J. Herbert; and Terry James, De-
fendants.

No. 09–CV–1185 (TJM/DRH).
Aug. 30, 2012.

Woodrow Flemming, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND OR-
DER**[FN1]

> **FN1.** This matter was referred to the under-
> signed for report and recommendation pur-
> suant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.
**\*1** Plaintiff pro se Woodrow Flemming ("Flem-
ming"), an inmate in the custody of the New York
State Department of Correctional and Community
Services ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983 alleging that eleven DOCS employees

[FN2] violated his constitutional rights under the First,
Fourth, Eighth, and Fourteenth Amendments. Second
Am. Compl. (Dkt. No. 9). Presently pending are de-
fendants' motion for judgment on the pleadings pur-
suant to Fed.R.Civ.P. 12(c) or summary judgment
pursuant to Fed.R.Civ.P. 56 [FN3] and Flemming's cross
motion for summary judgment, also pursuant to
Fed.R.Civ.P. 56. Dkt Nos. 178, 179, 183.[FN4] Both
motions are opposed. Dkt. Nos. 183, 186, 191, 192,
193. For the following reasons, it is recommended that
defendants' motion be granted and Flemming's cross
motion be denied.

> **FN2.** Six other defendants were previ0usly
> dismissed. Dkt. No. 10.

> **FN3.** The motion is made on behalf of all
> remaining defendants except Eddy, who has
> never been served with process or otherwise
> appeared in this case. *See* Dkt. Nos. 13, 15,
> 58 (at p. 3), 170 (at p. 7). This action should
> be dismissed without prejudice as to Eddy in
> accordance with Fed.R.Civ.P. 4(m) (requir-
> ing completion of service upon a defendant
> within 120 days).

> **FN4.** As defendants have submitted materials
> beyond the face of the pleadings, it will be
> construed as a motion for summary judg-
> ment.

**I. Background**
The facts are related herein in the light most fa-
vorable to Flemming as the non-moving party. *See
Sheppard v. Beerman,* 18 F .3d 147, 150 (2d
Cir.1994).

**A. Procedural History**
On August 14, 2008, Flemming filed this action

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

in the Western District of New York, naming 122 defendants for alleged violations of his First, Fourth, Sixth, Eighth, and Fourteenth Amendment rights. Dkt. No. 1. In an order dated December 10, 2008, the Western District concluded that Flemming's complaint failed to state a cause of action, but allowed him an opportunity to file an amended complaint and re-plead the action before dismissing the case. Dkt. No. 5.

On July 5, 2008, Flemming filed an amended complaint, naming 113 defendants for substantially similar violations under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments. First Am. Compl. (Dkt. No. 6). Flemming contended that (1) the general conditions he was exposed to in the Special Housing Unit ("SHU") [FN5] were unconstitutional (*Id.,* ¶¶ 27, 28, 33, 36, 42–44); (2) provision of a restricted diet of loaf and cabbage was against his Eighth Amendment rights (*Id.,* ¶¶ 28, 60); (3) disciplinary hearings were conducted improperly leading to wrongful deprivations of privileges and good time credits (*Id.,* ¶¶ 30, 52); (4) he was never provided with a rule book (*Id.,* ¶ 56); (5) the general conditions of confinement were below constitutional standards (*Id.,* ¶ 31); (6) defendants conspired and retaliated against him for filing grievances and lawsuits (*Id.,* ¶¶ 32, 37–38, 59, 62); (7) being housed in SHU while on a medical machine was unconstitutional (*Id.,* ¶ 33); (8) denial of his cane and wheelchair were in contravention of the Eighth Amendment (*Id.,* ¶ 36); (9) transfer from the Regional Medical Unit to Upstate SHU [FN6] was retaliatory (*Id.,* ¶¶ 38, 40, 70); (10) he was subjected to chemical agents and a use of force on September 5, 2005 which were both in violation of his Eighth Amendment rights (*Id.,* ¶¶ 41, 62, 70, 72); (11) he was the victim of a sexual assault (*Id.,* ¶ 55); and (12) his legal work was seized which interfered with his constitutional right to access the courts (*Id.,* ¶ 58).

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to

provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

FN6. "Upstate is a maximum security correctional facility comprised exclusively of ... SHU ... cells in which inmates are confined, generally, for twenty three hours each day to serve out lengthy disciplinary confinements for serious violations of prison rules." Hyde Decl. (Dkt. No. 178–3) ¶ 5.

**\*2** Pursuant to an Order dated March 31, 2009, the Western District ruled that "[a]ll of [Flemming's] claims **except** the claim regarding the September 5, 2005 cell extraction allegedly involving use of a chemical agent are dismissed with prejudice." Dkt. No. 8 at 7–8 (emphasis in original). Moreover, Flemming was "advised that an amended complaint is intended to **completely replace** the prior complaint ... and thus ... renders any prior complaint of no legal effect." *Id.* at 8 (internal quotation marks and citations omitted) (emphasis in the original). Lastly, Flemming was "granted leave to file a Second Amended Complaint regarding **only** his claims of excessive force during the cell extraction ... on September 5, 2005." *Id.* at 9 (emphasis in the original). Further amendment of the additional First, Fourth, Eighth, and Fourteenth Amendment claims were determined futile since Flemming continued to proffer vague and conclusory allegations which failed to state a claim, despite a prior opportunity to amend his complaint, as well as due process claims and events occurring prior to August 19, 2005 being time barred and due process claims being uncognizable. *Id.* at 3–6. The court specifically held that Flemming's subsequent proposed amended complaint would be limited only to the "circumstances surrounding the cell extraction and who [Flemming] intends to hold liable....," (*Id.* at 8)

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

dismissing with prejudice any other claims Flemming previously asserted. *Id.* at 6–9.

Flemming filed a Second Amended Complaint, naming the present defendants, on April 6, 2009. Second Am. Compl. Similar to the complaints filed before it, Flemming contends that he was subjected to chemical agents as well as excessive force in violation of his Eighth Amendment rights. Second Am. Compl. at 7–9. Flemming also asserted claims of retaliation, complaints about his conditions of confinement, complaints about the conditions of SHU including deprivation of his medical machine, deprivation of privileges, and placement on a restricted diet, unconstitutional searches and seizures, and defective prison disciplinary procedures and hearings. *Id.* at 8–10, 12–13, 15. By Order dated June 12, 2009, the Western District dismissed the claims against the supervisory defendants and directed service. Dkt. No. 10 at 5–6. In an order dated September 21, 2009, the Western District transferred the case to the Northern District. Dkt. No. 18.

### B. September 5, 2005[FN7]

> FN7. The submissions of both Flemming and defendants include multiple copies of identical papers dealing with the use of force report, unusual incident report, inmate injury report, subsequent photographs, disciplinary transcripts, and medical health records. For ease and efficiency, citation will be made to the documents from defendants' submissions.

Flemming suffers from glaucoma for which he took daily eye drops. Waterson Decl. (Dkt. No. 178–4) ¶ 6; Flemming Dep. (Dkt. No. 178–21) at 15–16. "The policy at Upstate at the time was not to allow eye drop vials and dispensers to be kept in cells as they were increasingly used for purposes of committing aggravated harassments and unhygienic acts toward staff such as spraying or throwing or urine and other liquid

substances." Waterson Decl. ¶ 7. Flemming was informed of this policy on September 1, 2005 and provision of his eye drops was "made one-on-one administered (as opposed to self-carry and allowed to be retained in cell) ...." Waterson Decl. ¶ 8; *see also* Dkt. No. 179 at 6. Flemming provided his eye drops to security staff as required. Waterson Decl. ¶ 8.

**\*3** At approximately 6:45 a.m. on September 5, 2005, defendant nurse practitioner Waterson approached Flemming's cell and requested return of his eye drops which had been given to him during the morning medication round. Waterson Decl. ¶ 9; DVD 1 at 6:42 [FN8]. Waterson repeatedly requested return of the eye dropper, as it was no longer allowed to be retained in Flemming's cell, but Flemming refused and became argumentative. Waterson Decl. ¶ 9; Dkt. No. 179 at 9; DVD 1 at 6:42. Defendant Eddy, who was accompanying Waterson on rounds, also approached the window and unsuccessfully ordered the return of the eye dropper. Waterson Decl. ¶ 10; DVD 1 at 6:42–43 (showing exchange between Eddy explaining that all medical wants was the eye dropper back and that Flemming needed to follow a direct order, and Flemming, who was continually refusing). This became the basis of a misbehavior report, authored by Eddy, which charged Flemming with failing to follow direct orders and breaking medical and property protocols. Waterson Decl. ¶¶ 11–13. Eddy then notified defendant Sgt. Hyde about the problem. Hyde Decl. (Dkt. No. 178–3) ¶ 15. Hyde visited Flemming at his cell at approximately 8:44 a.m., again seeking the return of the eye dropper. Hyde Decl. ¶ 15. Hyde "instructed [Flemming] repeatedly to either hand over the medications or prepare to exit [the] cell for a search [and] ... Flemming continue to refuse ... and became increasingly argumentative." Hyde Decl. ¶ 15.

> FN8. A videotape (hereinafter "VHS") and two DVDs were traditionally filed with the Court with defendants' motion. Dkt. No. 178–5.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Refusal to follow orders and interference with staff cannot be tolerated within a maximum security facility as they constitute a threat to safety and security ... Nor can retention of unauthorized items be allowed. As relevant here, the policy at Upstate was not to allow the eye drop vials ... to be kept in cells as they were being increasingly used for purposes of committing aggravated harassments and unhygienic acts towards staff such as spraying of urine and other substances. Overtly disobeying orders also has the tendency to incite other inmates towards misbehavior and possible violence. Hyde Decl. ¶¶ 19–21. Flemming's disciplinary history is replete with violations for "creating disturbances, interfer[ing] with staff, refus[ing] to follow direct orders, failure to submit to search/frisk, violent conduct and harassment towards staff." Hyde Decl. ¶ 23.

When an inmate refused to return unauthorized items and submit to a search, it was within the discretion of the correctional staff to determine how to best gain the inmate's compliance while ensuring the safety of the inmate and officers. Hyde Decl. ¶ 24. Because entering the cell with physical force was inherently dangerous, DOCCS approved the use of chemical agents to allow officers to gain entry into the cell without resorting to physical contact. Hyde Decl. ¶¶ 25–27. These chemical agents, colloquially known as tear gas, could be deployed in non emergent situations after the acquisition of medical clearance. Waterson Decl. ¶ 16. "[T]ear gas[ ] is an aerosol irritant affecting the skin and mucus membranes and can cause tearing and uncontrolled shutting of the eyes, burning sensations, coughing, excess nasal and mouth mucus discharge, difficulty breathing, vomiting and prostration." Waterson Decl. ¶ 17. The effects "usually subside quickly after removal of the person from the area where [the tear gas] is dispersed and decontamination of the person." Waterson Decl. ¶ 18.

**\*4** Waterston was contacted by defendant Hyde later that morning, "seeking medical clearance for possible use of chemical agents against inmate Flemming due to his refusal to return the eye drops and/or submit to a search of his cell." Waterson Decl. ¶ 15. Waterson reviewed Flemming's medical chart and concluded that he did not have "any serious respiratory or cardiac ailment, allergies or contact lenses that would be a contraindication for use of chemical agents." Waterson Decl. ¶ 19. Waterson did note that Flemming had mild asthma, which was treated as needed with an inhaler, but "has consistently good oxygen saturations ... and only one episode of wheezing in the weeks prior ....," Thus, the gas would not trigger an asthma attack. Id. ¶ 20. Waterson's review of Flemming's chest x-ray from April 26, 2005, which indicated an enlarged heart also "confirmed the absence of any significant cardiac or respiratory condition ....," as there were no signs of abnormality or disease. Id. ¶ 21; see also Dkt. No. 179 at 39 (chest x-ray from August 2006, comparing findings with April 26, 2005, showing enlarged heart but no abnormalities or evidence of disease). Moreover, Flemming's prescription for nitroglycerin had also been discontinued as he had no cardiac history. Waterson Decl. ¶ 22. Lastly, while Flemming had sleep apnea and used a machine at night, Waterson did not view that as a contraindication. Id. ¶ 23. Therefore, Waterson determined, in his professional judgment, that deployment of the gas "would not pose any undue health risk or substantial risk of serious harm ...." Id. ¶ 20. Accordingly, Waterson deemed Flemming medically cleared. Id. ¶ 24; Dkt. No. 178–6 at 4; Dkt. No. 179 at 9. Administratively, defendant Kemp was notified and approved the use of chemical agents. Dkt. No. 178–6 at 4.

In compliance with the directive, attempts were made to contact representatives from both ministerial services and guidance/counseling, but no staff were available on a holiday weekend. Hyde Decl. ¶ 30. At approximately 10:37 a.m., Corrections Officer King began videotaping with a handheld video camera.[FN9] Dkt. No. 178–7 at 8; VHS. Officers Canning and Salls approached the cell and Canning gave Flemming

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
(Cite as: 2012 WL 4094196 (N.D.N.Y.))

another final and direct order to submit to a search, but Flemming refused to comply. Dkt. No. 178–6 at 4; DVD 2 at 10:45. Hyde also gave approximately six orders after Canning requested Flemming's cooperation with turning around, backing up to the cell door, and placing his hands through the feed-up slot so that restraints could be applied and he could exit the cell. Hyde Decl. ¶ 34; Dkt. No. 178–7 at 7; DVD 2 at 10:46–47. Hyde also warned that chemical agents would be applied if Flemming continued his non-compliance. Hyde Decl. ¶ 34.

> FN9. The hand held camera ran out of batteries prior to Flemming being returned to his cell, so those events were captured on the still cameras located in the facility. Dkt. No. 178–7 at 8.

In his complaint, Flemming contends that he was lying in his bed, receiving treatment from his machine, when Hyde administer the chemical agents into his cell, entered the cell, and began beating him. Second Am. Compl. at 8. Conversely, defendants' assert that at 10:48 a m., Hyde administered the first application, two one-second bursts, of gas through the feed-up slot. Hyde Decl. ¶ 36; Dkt. No. 178–6 at 1, 4; Dkt. No. 178–7 at 7; VHS at 10:48; DVD 2 at 10:47. Flemming was then repeatedly told, and continually refused, to turn around and place his hands through the slot. Hyde Decl. ¶ 37; VHS at 10:48–50. Another application of two, one-second bursts of gas was applied through the hatch at approximately 10:50 a.m. Hyde Decl. ¶ 38; Dkt. No. 178–6 at 1, 4; Dkt. No. 178–7 at 7; DVD 2 at 10:49. Altogether, Flemming was exposed to the gas for approximately seven minutes. Hyde Decl. ¶ 42; Waterson Decl. ¶ 26. Hyde continued to order Flemming to turn around and place his hands through the slot, which Flemming finally did at approximately 10:52 a m. Hyde Decl. ¶¶ 39–40; Dkt. No. 178–7 at 7; VHS at 10:53; DVD 2 at 10:52. Restraints were placed on Flemming's wrists by Corrections Officer Tulip, and he and Corrections Officer Brousseau guided Flemming out of his cell. Hyde Decl. ¶ 43; Dkt. No.

178–6 at 1; Dkt. No. 178–7 at 7, 9, 10; VHS at 10:53. Flemming was removed from his cell at approximately 10:55 a.m., without the officers ever entering his cell. Hyde Decl. ¶¶ 41, 43; VHS at 10:54–55; DVD 2 at 10:53–54.

**\*5** Conversely, Flemming testified that multiple officers, including Palmer, Tatro, Manley, Corrigaux, and Eddy, beat and kicked him upon entering his cell. Second. Am. Compl. at 8–9; Flemming Dep. at 25–28, 37–38. Flemming stated that he was handcuffed in his cell, not through the feed up slot, and that he sustained injuries to his legs, ribs, and hips. Flemming Dep. at 26–28. The officers contend, and the video demonstrates, that at the time Flemming was restrained and removed from his cell he was not beaten, kicked, dragged, or otherwise assaulted by any of the staff. Hyde Decl. ¶ 43; VHS at 10:54–55; DVD 2 at 10:53–54.

Flemming was then placed against the opposite wall for a pat frisk, conducted by Officer Tulip. Hyde Decl. ¶ 44; Dkt. No. 178–7 at 10. Flemming was then escorted to the decontamination room by Officers Tulip and Brousseau, shouting to the other inmates as he left the cell block that he "was O.K." and that "they haven't hurt [him]." Hyde Decl. ¶¶ 44–45; Dkt. No. 178–7 at 9, 10; DVD 2 at 10:55–57. Waterson arrived while Flemming was being escorted to decontamination. Waterson Decl. ¶ 25. Waterson heard Flemming stating to the other inmates in SHU that he was fine and had not been injured. Waterson Decl. ¶ 25. Video captured the same. VHS at 10:55–56. Flemming was taken immediately to the decontamination room where he was washed and his T-shirt was removed by defendant Eddy, despite Flemming's continued declarations that he was fine and did not require a decontamination shower. Hyde Decl. ¶¶ 47–48; Dkt. No. 178–7 at 7, 13. This too is confirmed by video. VHS at 10:57–58.

After decontamination, Flemming was placed in a holding area where he was maintained upright first by

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Officers Tulip and Brousseau, and next by Officers Rushlow and Paquin. Hyde Decl. ¶ 49; Dkt. No. 178–7 at 7, 9–12; VHS at 10:58–59; DVD 2 at 10:58. After Flemming's slippers were removed, a towel was placed under them so that his feet would not become cold. Hyde Decl. ¶ 50; VHS at 11:00; DVD 2 at 10:59. After decontamination, Waterson entered the holding cell around 11:00 a.m. to perform a visual inspection of Flemming which showed "no obvious signs of physical injury or distress." Waterson Decl. ¶ 28; *see also* Dkt. No. 178–6 at 2, 3; Dkt. No. 179 at 10; VHS at 11:00; DVD 2 at 11:00. Flemming disputes this, claiming injuries were reported to Waterson about his arms, legs, ribs, and hips and difficulty breathing, but were never recorded. Flemming Dep. at 31–33. Waterson returned six minutes later and took Flemming's "blood pressure (which was normal), assessed his breathing (also normal) and listened to chest sounds through a stethoscope (which were clear)." Waterson Decl. ¶ 29; *see also* Dkt. No. 178–6 at 3; VHS at 11:06–07 (capturing verbal report by Waterson of Flemming's vitals); DVD 2 at 11:05–06 (same). Flemming did complain of chest pain, but Waterson "attributed ... [the] complaints ... to be temporary irritation of his lungs due to exposure to the chemical agents that would resolve quickly." Waterson Decl. ¶¶ 29, 32; *see also* Dkt. No. 178–7 at 19 (inmate injury report). Flemming did not suffer any respiratory attack or symptoms from the gas and was subsequently returned to his cell. Waterson Decl. ¶¶ 32–33. Flemming disagrees, contending that he was wheezing and breathing hard. Flemming Dep. at 32–34. Video does not show this, demonstrating that throughout the escort and time in the holding cell Flemming was conversing with various officers in a loud, clear voice without any indications of wheezing or shortness of breath. Photographs were also taken of Flemming by defendant Paler and Sgt. Kourofsky. Hyde Decl. ¶ 54; Dkt. No. 178–7 at 30–33.

**\*6** Throughout the morning and during his deposition testimony, Flemming continually denied possessing unauthorized medicine and specifically his eye

dropper. Hyde Decl. ¶ 56 Flemming Dep. at 16–19, 22–23, 36. As Flemming was waiting in the holding area, he admitted to the possession, and described to the officers the location, of the eye dropper. Hyde Decl. ¶ 56; *see also* VHS at 11:11, 11:15–16 (reporting to officers that the bottle was in his lower bunk, under the green spread); DVD 2 at 11:10, 11:13–15 (same). Flemming's cell was searched by Eddy and James and the eye dropper was recovered. Hyde Decl. ¶ 57; Dkt. No. 178–6 at 4; Dkt. No. 178–7 at 7. Flemming was returned to his cell at approximately 11:20 a.m. by Officers Rushlow and Paquin and he entered the cell alone and without incident. Hyde Decl. ¶¶ 58–60; Dkt. No. 178–7 at 7, 9–12; DVD 2 at 11:20–21.

After Flemming was back in his cell, Waterson, Hyde and Sgt. Kourofsky went to see him. Waterson Decl. ¶ 33; Hyde Decl. ¶ 61; DVD 1 at 11:26. Flemming's only complaint was that his wrists were sore. Waterson Decl. ¶ 34; Hyde Decl. ¶ 61. Flemming held his wrists up so that Waterson could examine them and Waterson "saw no obvious injuries (no cuts, bleeding, swelling or redness) and also observed that he was able to move his hands and wrists freely." Waterson Decl. ¶ 34; *see also* Hyde Decl. ¶ 61; DVD 1 at 11:27. Flemming's testimony disputes this as well, claiming bruises and lacerations to his wrists due to the application of restraints. Flemming Dep. at 46–47. Photographs were taken. Waterson Decl. ¶ 34; Hyde Decl. ¶ 61; Dkt. No. 178–7 at 15, 34; DVD 1 at 11:27. Waterson attributed the pain to the fact that Flemming was restrained for half-an-hour, but did not feel that further treatment was warranted. Waterson Decl. ¶ 35.

Overall, Waterson found that Flemming tolerated the tear gas relatively well as he "was talking clearly, breathing easily without labored breaths or wheezing, was able to take deep breaths in response to my commands, seemed relaxed ..., had no trouble seeing or complaints about his eyes, ... and he no longer had any excessive mucus or ... discharge." Waterson Decl. ¶ 36. Flemming's vitals were also stable. Waterson

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Decl. ¶ 36. There were no signs of injuries consistent with an assault. Waterson Decl. ¶ 37.

At that point, Hyde issued a second misbehavior report charging Flemming with the failure to follow a direct order. Hyde Decl. ¶¶ 63–64; Dkt. No. 178–7 at 18 (misbehavior report). Additionally, the results of the cell search uncovered the location of the eye dropper bottle as well as excess law library materials. [FN10] Hyde Decl. ¶ 65; Dkt. No. 178–7 at 17, 20–21 (contraband receipt). James removed these papers from the cell, placed them on a cart, and confiscated it pending the subsequent disciplinary proceeding. Dkt. No. 178–7 at 16–17 (misbehavior report). While defendant James was separating the aforementioned contraband papers from those which could be properly returned to Flemming, Flemming began to use foul language towards James and threatened to have intercourse with James' wife. Dkt. No. 178–7 at 16–17 (misbehavior report); DVD 1 at 11:37–39. James then issued a third misbehavior report for various infractions including threats, interference, and harassment. Dkt. No. 178–7 at 16–17 (misbehavior report).

> **FN10.** Flemming contends that these documents and decisions were being used to challenge his criminal conviction. Flemming Dep. at 64–67, 71–72.

**\*7** Officers Palmer, Manley, Tatro, Corrigeux and, recently promoted, Sgt. Hebert are all named as defendants for events that allegedly occurred on September 5. Hyde Decl. ¶ 74. However, none were involved with the deployment of chemical agents, extraction, decontamination, cell search, or subsequent return of Flemming. Hyde Decl. ¶ 74. In fact, Manley did not begin working at Upstate until November 2005 and Tatro and Corrigeux were on vacation on that date. Hyde Decl. ¶ 75; Dkt. No. 178–14 at 1–2 (showing vacation time taken on September 5 by Corrigeux and Tatro), 3 (reassignment papers for Manley indicating employment to begin at Upstate in November). Hebert and Palmer were assigned to du-

ties in other locations at Upstate on September 5. Hyde Decl. ¶¶ 77–78; Dk. No. 178–16 at 4–5 (showing Herbert stationed in Building 8); 6–7 (showing Palmer stationed in Building 10). Flemming's testimony indicates that all of these defendants were involved in the assault, restraint, or escort of Flemming on September 5. Flemming Dep. at 51–60.

### C. Subsequent Medical Care

Flemming requested an examination on September 6, 2005, but when Waterson saw Flemming he complained only of fungus on his hands and general aches and pains. Waterson Decl. ¶ 38; Dkt. No. 179 at 10–11. Flemming was given over-the-counter pain relief and anti-inflammatory cream. Waterson Decl. ¶ 38; Dkt. No. 179 at 11. These complaints, to Waterson, appear completely unrelated to the events which occurred on September 5. Waterson Decl. ¶ 39. Flemming disagrees and testified to the fact that he saw a medical professional the following day and was complaining about his wrist, hand, and other injuries from the use of force. Flemming Dep. at 48–49.

Flemming was seen again on September 8, complaining of pain in his left shoulder and requesting Tylenol. Dkt. No. 179 at 11. The range of motion in Flemming's shoulder was good, the problem deemed chronic, and pain medication was provided. *Id.* Flemming was seen again by Waterson on September 10, 2005, requesting anti-fungal cream and acetaminophen, both of which were issued to him. Waterson Decl. ¶ 41; Dkt. No. 179 at 12. On September 13, 2005, Flemming was seen by another nurse for wheezing and shortness of breath which were both improved with use of his inhaler. Waterson Decl. ¶ 42; Dkt. No. 179 at 12. These complaints were consistent with those made in August (Dkt. No. 179 at 5), related to Flemming's asthma, as opposed to "an exacerbation caused by the chemical agents [because i]f there had been any respiratory distress related to the chemical agents, it would have been immediate and persistent and would not have arisen for the first time [eight] days later." Waterson Decl. ¶ 43.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

On September 23, 2005, Flemming complained of wrist pain for the first time since the alleged use of force, but Flemming also stated "that the pain had been present since June." Waterson Decl. ¶ 45; *see also* Dkt. No. 179 at 14. X-rays of Flemming's wrists were also taken in October 2005 and showed normal findings without evidence of any fractures or abnormalities. Waterson Decl. ¶ 46; Dkt. No. 179 at 22, 41. On September 30, 2005, Flemming also underwent x-rays of his left knee and hip which showed only degenerative changes. Dkt. No. 179 at 40. Flemming also had chest x-rays again in December 2005 which continued to show normal findings. Waterson Decl. ¶ 44; Dkt. No. 179 at 42. On September 30, Flemming made complaints of hip and knee pain, but reported that they were due to a fall and not an alleged use of force. Dkt. No. 179 at 16. Flemming contends that o n October 16, he was involved, and sought treatment for, another use of force giving him lower back, temple, head, and right elbow pain. Dkt. No. 179 at 21.

### D. Disciplinary Proceedings

***8** As a result of the three misbehavior reports Flemming received, he underwent a combined Tier III [FN11] hearing which concluded on October 11, 2005. Dkt. No. 178–9. At the conclusion of the hearing, Flemming was found guilty of all the charges except one, and was sentenced to six months confinement in SHU and six months loss of various privileges and good time credits. Dkt. No. 178–9 at 58–59; *see also* Dkt. No. 178–8 at 6–7. On November 22, 2005, the Commissioner affirmed the disciplinary disposition. Dkt. No. 178–8 at 1.

> FN11. DOCCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).

### II. Discussion

Flemming contends (1) his First Amendment rights were violated when defendants engaged in a retaliatory transfer and denied his access to courts by removing legal papers that were in his cell and confiscated pursuant to a search; (2) his cell was searched in violation of his Fourth Amendment rights; (3) his Eighth Amendment rights were infringed when he was subjected to chemical agents given his medical history, subjected to excessive force, and forced to live in subpar conditions of confinement in SHU; and (4) his Fourteenth Amendment rights were violated when he was subjected to unconstitutional disciplinary proceedings. Defendants move for summary judgment contending that (1) Flemming's claims other than those arising from the use of excessive force on September 5, 2005 are barred by the law of the case; (2) Flemming's use of force claim is barred by res judicata; (3) Flemming's constitutional claims are meritless; and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Law of the Case**

**\*9** "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ....") (internal quotation marks and citations omitted)). Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided." *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted).

In the present action, Flemming previously filed

his First Amended Complaint alleging a host of First, Fourth, Eighth, and Fourteenth Amendment violations. In no uncertain terms, the Western District ruled that the only surviving claims were Flemming's Eighth Amendment claims occurring on September 5, 2005. Every other constitutional claim was dismissed with prejudice. Furthermore, contemplation of an additional opportunity to amend was also addressed and deemed fruitless. As Flemming's additional allegations regarding the other constitutional violations have already been decided, they need not be revisit at this later stage of litigation. Accordingly, the law of the case bars reexamination of any claims except those under the Eighth Amendment for the events of September 5.

Therefore, defendants' motion on this ground as to all claims except those under the Eighth Amendment for the events of September 5, 2005 should be granted.

**C. Res Judicata**

"Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen,* 449 U.S. at 94 (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach by which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

seek[ ] dissimilar or additional relief." *Burgos,* 14 F.3d at 790 (citations omitted).

Res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Burgos,* 14 F.3d at 790 (citing *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986)). "Thus, where a plaintiff was precluded from recovering damages in the initial action by formal jurisdiction or statutory barriers, not by plaintiff's choice, a subsequent action for damages will not normally be barred by res judicata even where it arises from the same factual circumstances as the initial action." *Id.* Even if res judicata is inapplicable to a § 1983 action because the state court forum was incapable of awarding the requested relief, it does not preclude the application of collateral estoppel. *See Phifer v. City of New York,* 289 F.3d 49, 56 (2d Cir.2002).

**\*10** Defendants' contend that a prior grant of a motion to dismiss in *Flemming v. Goord,* No. 06–CV–26 (TJM/DRH) (N.D.N.Y.) (Dkt. No. 178–17) (hereinafter "the prior action") triggers the bar of *res judicata* in the present case and precludes further review of the events occurring on September 5, 2005. Defs. Mem. of Law (Dkt. No. 178–22) at 16. In the prior action, Flemming's complaint identified defendants that "were not included in the voluminous incident reports submitted and relied upon by Flemming [and] Flemming did not use those reports to amend his complaint properly and to name the proper parties from the documents upon which he relied." Dkt. No. 178–7 at 7. Accordingly, since it was impossible for the court to "determine what, if anything ... any person named in the second amended complaint allegedly did, or failed to do ..." the motion to dismiss was granted. *Id.* at 8.

Flemming's prior action specifically referenced the use of force and use of chemical agents on September 5 and was dismissed with prejudice. Dkt. No. 178–17 at 8. This serves as a final adjudication on the merits. *Federated Dep't Stores, Inc. v. Moitie,* 452

U.S. 394, 399 n. 3 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.' ") (citations omitted). While some of the proper defendants were named in the instant case, and none of the proper defendants were named in the prior action, the underlying nucleus of operative facts remains the same. Flemming was the plaintiff in both actions. Moreover, all named parties are related, could have, and should have been named in the prior action when the same constellation of events surrounding September 5 was initially pled.

Accordingly, defendants' motion on this ground should be granted.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment vio-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

lation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 1178 (2010) ("The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de *minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*11** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

Flemming's version of events claims that numerous officers entered his cell, beat him, dragged him from his cell, beat him again, and restrained him. Flemming's version is untenable given the affidavits of the defendants which were fully supported by the video evidence, captured by multiple cameras

throughout the facility. The video evidence shows that Flemming was ordered by multiple individuals, on multiple occasions, to produce the eye dropper which was ultimately found in his possession. Flemming was also ordered to turn around and place his hands out of the feed up slot so that he could be restrained and removed from his cell for a search. This request was given dozens of times and Flemming continually failed to comply. As the time passed, the other inmates on the tier also became agitated further compounding the potential security issues. After a thorough medical examination and clearance, Flemming was subjected to less than eight minutes of tear gas and was removed from his cell. The video shows that no officers entered the cell, no one beat or dragged Flemming as he left on his own accord, and as Flemming was escorted from the tier he was yelling that he was unhurt and had not been injured. Flemming was decontaminated, again stating to officers that this was unnecessary and he was unhurt. Flemming was visually inspected by medical, who insured and verbally reported that his vitals were stable, and photographed. Flemming then told the officers where the contraband was located, in direct contravention of his deposition testimony, and the officers secured the contraband. Flemming was then returned to his cell without incident.

The Supreme Court has held that

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment ... Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

**\*12** *Scott v. Harris,* 550 U.S. 372, 380–81 (2007). Clear videotape evidence has been relied upon in this

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Circuit, and District, to grant motions for summary judgment where the use of force, including chemical agents, was warranted and reasonable, despite contradictory and conclusory statements proffered by the inmate plaintiff. *See Johnson v. Woods,* No. 07–CV–1018 (DNH/DRH), 2010 WL 2039164, at *14–16 (N.D.N.Y. Mar. 2, 2010) (granting motion for summary judgment and dismissing use of force claims for extraction and use of chemical agents based upon defendants' submissions which were confirmed by video evidence) (Dkt. No. 178–23 at 46–64); *Green v. Morse,* No. 00–CV–6533–CJS, 2009 WL 1401642 (W.D.N.Y. May 18, 2009) (granting summary judgment and dismissing use of force claims regarding cell extraction and chemical agents based on video footage) (Dkt. No. 178–23 at 23–37); *Lipscomb v. Vann,* No. 02–CV–596 (GLS/DEP) at 17 (holding that dismissal was appropriate in an excessive force case using chemical agents where the "written and visual accounts [via videotape] ... are lacking in any evidence from which a reasonable factfinder could conclude ... that excessive force was applied to carry out the mission of removing Lipscomb from his cell against his will.") (Dkt. No. 178–23 at 65–92). In this case, there is no possibility that a reasonable juror could ever believe Flemming's recitation of the events surrounding September 5.

Moreover, evaluating Flemming's contentions in light of the *Scott* factors compels a the sameconclusion. First, Flemming suffered no severe injury during the course of the extraction or exposure to the chemical agents. Flemming's complaints were of chest pain, which Waterson attributed to the brief exposure to tear gas. Flemming's vitals were promptly checked after the use of chemical agents and he was determined to be stable. He was speaking clearly and was not wheezing or experiencing an asthma attack. This was further corroborated by his medical records which indicated his lungs were clear and that in the days following September 5 he was not treated for any signs or symptoms of respiratory or cardiac distress.

However, a serious injury is only a factor in the analysis. A *de minimus* injury may still survive summary judgment if there was a malicious use of excessive force. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513 (2010) (granting certiorari for an Eighth Amendment case which was dismissed based upon the inmate's *de minis* injury without discussion or regard for the fact that "injury suffered ... is one factor ... [yet] it is [force] that ultimately counts," in determining whether excessive force was used). Maliciousness is determined by the five factor test enumerated above, in *Scott.* Accordingly, after applying such a test in light of the record and videos, no reasonable person could conclude that defendants' actions were malicious or wanton rather than necessary to uphold discipline and ensure safety.

**\*13** The first factor militates in favor of defendants. As previously discussed, Flemming did not suffer from sufficiently serious injuries as a result of the extraction. The defendants' declarations and video tape all show that Flemming was agitated and yelling.

The second and fourth factors also weigh in favor of defendants. Multiple defendants and unnamed corrections officers attempted multiple times to persuade Flemming verbally to return the eye dropper bottle or peacefully leave his cell for it to be searched. Defendants attempted to call in counsel from the ministerial or guidance services, but those individuals were unavailable probably due to the holiday weekend. When it was clear that Flemming was not going to comply with their repeated orders, or voluntarily leave his cell, requests were made for the deployment of chemical agents so that no physical force would be necessary to enter or restrain Flemming. Flemming's continued non-compliance posed a serious threat to defendants' health and safety. As the situation progressed, it was clear that other inmates were becoming agitated by the increased levels of yelling and noise on the tier.

The third factor, the amount of force used in re-

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

lation to the need, also supports defendants' motion for summary judgment. After approximately four hours and three separate trips by multiple officers attempting to persuade Flemming to comply, defendants resorted to the introduction of gas into the cell. When the gas was deployed, Flemming remained non-compliant, yelling and refusing to follow direct orders. When Flemming did finally comply, no further gas was dispensed into the cell, he was restrained through the feed up slot, immediately removed from his gas filled cell, pat frisked, and taken to the decontamination room.

Lastly, as previously discussed, the record undeniably shows defendants' attempts to temper and diffuse the situation far before the suggestion of chemical agents. Flemming's repeated refusals indicated that he was not willing to comply with the direct orders. This was inciting the other inmates. Additionally, Flemming was refusing to return his eye dropper which led officers to be at risk for harassment and unhygienic acts. Defendants were charged with running a correctional facility, ensuring the health and safety of both inmate and officers alike. Defendants' declarations and the facility video tapes and DVDs fail to raise any question of material fact that defendants could have pursued a different option or that their actions were not reasonably calculated to ensure safety.

Accordingly, defendants' motion should be granted on this ground.

### 2. Use of Chemical Agents
#### a. Excessive Force

For the same reasons articulated *supra,* Johnson's allegations that the use of chemical agents was excessive force are also insufficient to raise any material issue of fact. First, the use of chemical agents alone does not represent "malicious or sadistic" actions. *Combs v. Wilkinson,* 315 F.3d 548, 557 (6th Cir.2002) (citations omitted). Second, the use of such chemicals did not cause any harm or pain to Flemming, as noted by his statements, vitals, and subsequent medical

records. Third, the introduction of gas was appropriate and necessary given Flemming's repeated non-compliance which had unfolded and increased throughout the hours as defendants attempted to obtain his cooperation.

#### b. Deliberate Indifference

**\*14** Flemming also contends that Waterson was deliberately indifferent to his medical needs, particularly his pulmonary disease, asthma, and sleep apnea, in medically clearing Flemming pursuant to the request to deploy chemical agents and his subsequent care.

The Eighth Amendment prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

*Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)).* The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith, 316 F.3d at 185.*

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance, 143 F.3d at 702.* Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble, 429 U.S. 97, 104 (1976).* "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance, 143 F.3d at 703.* Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).*

Flemming fails to establish that Waterson was deliberately indifferent in either regard. First, Waterson completed a detailed assessment of Flemming's medical history and current condition prior to deeming him medically fit to receive the tear gas. Waterson contemplated his diagnoses and various radiology and test reports which indicated that Flemming had good oxygen saturations, no cardiac or respiratory conditions, abnormalities or diseases, and no general contraindications based on the treatments, including the sleep apnea machine, that Flemming was receiving. Waterson also noted that Flemming was no longer receiving nitroglycerin, which further corroborated the absence of any cardiac concerns. Such detailed examination and explanation of Flemming's medical conditions refutes claims of deliberate indifference, conversely showing careful inspection and consideration prior to providing the necessary medical clearance.

*15 Further, the treatment provided to Flemming immediately after the deployment of the chemical agents also fails to demonstrate deliberate indifference. Waterson's declaration establishes that the effects of tear gas are temporary and quickly alleviated with removal from the gassed area and decontamination. The defendant officers immediately restrained and removed Flemming from his cell the moment he complied with their directives to turn and place his hands out of the feed up slot. The officers also escorted Flemming directly to the decontamination room, providing him with a shower and removing his clothing despite Flemming's uncontroverted statements that he was unharmed.

Minutes after Flemming was removed from his cell, Waterson arrived to do a visual inspection and take Flemming's vitals. Both evidence from the video and corresponding medical records indicate that Flemming's vitals were stable and his lungs were clear. Flemming did complain of chest pains, but Waterson explained that they were a temporary irritation from the gas exposure. Such contentions are further supported by the medical records in the subsequent days which showed Flemming reporting to sick calls, but not complaining of specific pain or respiratory difficulties. Such notations contradict claims of serious medical need. Flemming was treated with pain medication and cream for his generalized complaints, none of which seem reasonably related to the events of September 5. Such treatment refutes any claims of deliberate indifference. Additionally, to the extent that there were later injuries complained of, specifically Flemming's wrist and asthma, they were immediately treated, occurred at a time too distant to be categorized as an exacerbation of any alleged injury occurring on September 5, and were attributed to other preexisting causes.

Accordingly, defendants' motion on this ground should be granted.

**E. Personal Involvement**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Defendants contend that Flemming has failed to establish that Palmer, Manly, Tatro, Corrigeuz or Herber were personally involved in any of the alleged constitutional deprivations.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

**\*16** (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

While Flemming contends that these individuals were involved in various aspects of the events on September 5, such conclusory and unsupported claims are belied by the use of force and unusual incident reports on which Flemming relies to prove his claim. None of these individuals were seen on the video tape, submitted memoranda for the various incident reports detailing their respective involvement, or were referenced in anyone else's submissions relating to the use of force. Moreover, time sheets, log book entries, and reassignment paperwork indicate that (1) Manley did not begin working at Upstate until after September 2005; (2) Tatro and Corrigeux were on vacation; and (3) Palmer and Herbert were working in different buildings. Accordingly, there exists no issue of fact that none of these defendants were directly involved in the actions on September 5. Moreover, none of these individuals were supervisory defendants involved in training, supervising, or creating policies. Accordingly, in the alternative, defendants' motion should be granted on this ground as to these defendants.

### F. Meritless Constitutional Claims

Despite the fact that the law of the case precludes review of these additional claims, defendants argue that, in the alternative, they should still be dismissed as meritless. Defs. Memorandum of Law at 28–32.

#### 1. Due Process

Flemming's contentions surrounding the inadequacy of his disciplinary proceedings and loss of privileges and good time credit are barred because of the "favorable termination" rule of *Heck v.. Humphrey,* 512 U.S. 477, 487–88 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641 (1997). There is no evidence that Flemming's disciplinary convictions were ever vacated, overturned, or expunged. In fact, supporting documentation indicates they were ex-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

pressly affirmed. Thus, the *Heck* rule still applies and any procedural challenges are barred. Because Flemming's recovery of damages here for faulty hearing procedures and his requested relief would necessarily imply the invalidity of his disciplinary convictions, the requested relief based on that hearing is barred.

### 2. Destruction of Property

**\*17** Any claims Flemming has made regarding destruction of his property during a cell search also fail to state an actionable claim. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L .R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N .Y. Corr. Law § 24(2).

Such claims fail as a matter of law for at least two reasons. First, the Article 78 [FN12] procedure exists and affords an adequate state court remedy. Second, because Flemming is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

FN12. N.Y. C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

### 3. Cell Searches

To the extent that Flemming claims a Fourth Amendment deprivation, such claims are meritless. The Fourth Amendment does not protect against searches and seizures of prison cells where the contraband and legal work here was kept. *Hudson v. Palmer,* 468 U.S. 517, 527–28 (1984).

### 4. Confiscation of Legal Work

Flemming contends that defendants confiscated legal work in connection with his appeal of his conviction. In order to state a claim of denial of access to the courts a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

Even viewing the facts in the light most favorable to Flemming, he has failed to establish any actual injury. First, with regard to Flemming's direct appeal, he testified that he was represented by counsel, but still wanted to submit his own papers, which he was able to submit successfully. Flemming Dep. at 63–68. These papers included three legal arguments from his attorney and eleven from Flemming, and were filed in June and July 2005 respectively, both prior to the alleged confiscation. *Flemming v. New York,* No. 06–CV–15226(RJH)(HBP), 2009 WL 6325520, at \*4 (S.D.N.Y. Aug. 10, 2009) (Dkt. No. 178–20 at 6). This direct appeal was denied, as was the subsequent application for leave to appeal. *Id.* at \*5 (Dkt. No. 178–20 at 7).

**\*18** Flemming then filed papers for a habeas

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

corpus action in the New York Appellate Division, First Department on September 1, 2006, subsequent to the alleged confiscation. *Flemming v. New York, 2009 WL 6325520, at \*6 (Dkt. No. 178–20 at 8).* The court's opinion stated that it allowed Flemming to file an amended petition, which he did, "on or about February 7, 2007, asserting over fifty purported claims for relief." *Id.* The court went on to issue a twenty-six page decision which addressed every claim Flemming proffered. Such submissions refute any claims that paperwork which was taken from the cell produced an actual injury. It is clear from the court's decision that Flemming was able to adequately, though ultimately unsuccessfully, pursue his legal claims. Accordingly, defendants' motion should be granted on this ground.

### 5. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996); see also Lipton v. County of Orange, 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004)* (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County, 549 F.Supp.2d 204, 214–15.* Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)* (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Flemming has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment, Flemming has failed specifically to alleged who he filed grievances and lawsuits against and when they were filed. Flemming has failed to allege any facts to establish that defendants' adverse

actions were motivated by, or temporally related to, any constitutionally protected conduct. Thus, all Flemming has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

Accordingly, defendants' motion should be granted as to these claims.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002)* (McAvoy, J.), *aff'd, 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003).* However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir.1990)* (internal citations omitted)).

**\*19** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz, 533 U.S. 194, 201 (2001).* Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken, 236 F.Supp.2d at 230.* Here, the second prong of the inquiry need not be reached because, as discussed *supra,* it has not been shown that defendants violated Flemming's constitutional rights.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)
**(Cite as: 2012 WL 4094196 (N.D.N.Y.))**

Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Dkt. No. 178) be **GRANTED** as to all moving defendants and all claims;

2. Flemming's cross-motion for summary judgment (Dkt. No. 183) be **DENIED;** and 3. The Second Amended Complaint be **DISMISSED** without prejudice as to defendant Eddy.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2012.
Flemming v. Kemp
Not Reported in F.Supp.2d, 2012 WL 4094196 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)
**(Cite as: 2008 WL 907364 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Mrs. ROSADRO, Head of RMU Medical; Anthony
Durrante, Security, RMU Walsh Medical; Anthony
Boucaud, Deputy for Administration, Upstate Cor-
rectional Facility; Dr. Sharma, Head Medical Dr. at
RMU Medical; Dr. Burdick, Medical Doctor; Lt.
Admiks, Hearing Lt. and acting Captain, RMU; SGt.
Bishop, Sgt. for Security, Upstate Correctional Facil-
ity; Sgt. Pierce, Security Sgt., RMU Walsh; N. Smith,
Nurse Administrator, Upstate Correctional Facility;
Evelyn Weissman, Head Medical Dr., Upstate Cor-
rectional Facility; DEana L. Buffham, Medical Med-
ication Nurse, Upstate Correctional Facility; NUrse
Batis, RMU Medical; Lisa O'Bryant, Nurse, RMU
Walsh Medical; Mrs. Lovett, security Officer, RMU
Walsh; C.O. Szajer, security Officer at RMU Walsh;
C.O. Gardner, C.O. with stick Sgt. Officer; Nurse
Davis, Medication Nurse, RMU Walsh; Nurse Miller,
RMU Walsh Medical; Michael Maher, Acting Su-
perintendent, RMU Walsh Medical; Maria Tirone,
Deputy Supt. for Program, Upstate Correctional Fa-
cility, Glenn S. Goord, Donald Selsky, and Lester
WRight, Dr., Defendants.

No. 9:06CV809 (FJS/RFT).
March 31, 2008.

Woodrow Flemming, Upstate Correctional Facility,
Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General, Megan
M. Brown, AAG, of Counsel, Albany, NY, of De-
fendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** In a Report-Recommendation and Order dated
January 15, 2008, Magistrate Judge Treece recom-
mended that this Court grant Defendants' motion to
dismiss Plaintiff's complaint without prejudice. *See*
Dkt. No. 59. In response to these recommendations,
Plaintiff filed a document that he referred to as
"Plaintiff Amend Complaint, Memoran of Law in
Support of Rule 8(a), 34, 37, 56(c), Pursuant 56.1,
56.2, 1871, 1988 and 1985." *See* Dkt. No. 60. After
reviewing that document, the Court determined that it
would consider the document to constitute Plaintiff's
objections to Magistrate Judge Treece's recommen-
dations. *See* Text Order dated February 6, 2008.

As Magistrate Judge Treece noted, "Plaintiff's
Complaint is illegible at certain points and unintelli-
gible at others." *See* Dkt. No. 59 at 2 n. 2 (citation
omitted). The same is true of Plaintiff's objections to
Magistrate Judge Treece's recommendations. *See,
generally,* Dkt. No. 60. Nonetheless, the Court has
reviewed these objections carefully and has construed
them to raise all arguments reasonably related to
Plaintiff's claims and Magistrate Judge Treece's rec-
ommendations regarding the disposition of those
claims.

In his objections, to the extent that the Court can
decipher them, Plaintiff appears to make many of the
same arguments that he made in opposition to De-
fendants' motion to dismiss. The Court finds such
objections without merit for the same reasons that
Magistrate Judge Treece rejected those arguments in
his Report-Recommendation and Order. Moreover, to
the extent that Plaintiff is requesting leave to file an
amended complaint, the Court denies that request
based upon a review of his proposed amendments as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)
**(Cite as: 2008 WL 907364 (N.D.N.Y.))**

futile. *See Tocker v. Philip Morris Cos., Inc.,* 470 F.3d 481, 491 (2d Cir.2006) (holding that "a motion for leave to amend a complaint may be denied when amendment would be futile" (citation omitted)).FN1

> FN1. The Court notes that, the document that Plaintiff filed entitled "Amend Complaint," *see* Dkt. No. 60, would be subject to dismissal as an amended pleading for a number of reasons, including the fact that it does not comply with Rules 8 and 10 of the Federal Rules of Civil Procedure or this Court's Local Rules for such a pleading. Moreover, it suffers from the same deficiencies as Plaintiff's original complaint in that it does not state a claim upon which this Court can grant relief.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Treece's January 15, 2008 Report-Recommendation and Order is **ADOPTED IN ITS ENTIRETY for the reasons stated therein;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's complaint is **GRANTED** and Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION AND ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Woodrow Flemming brings this action pursuant to 42 U.S.C. § 1983 alleging violation of his rights under the Eighth and Fourteenth Amendments to the United State Constitution. Dkt. No. 1, Compl. The Defendants have filed a Motion to Dismiss for failure to state a claim upon which relief can be granted under Rule 12 of the Federal Rules of Civil Procedure. Dkt. No. 38, Defs.' Mot. to Dismiss. Plaintiff opposes this Motion.FN1 Dkt. No. 41, Pl.'s Opp. to Defs.' Mot. to Dismiss. For the reasons stated herein below, it is recommended that Defendants' Motion to Dismiss be **granted** for failure to state a claim.

> FN1. Plaintiff's submission in response to Defendants' Motion to Dismiss was labeled "Cross Motion for Summary Judgment." *See* Dkt. No. 41. Defendants ask this Court to consider Plaintiff's Cross-Motion as simply opposition to their dispositive Motion due to the fact that no discovery had been exchanged and because they feel the Cross-Motion fails to comport with this Court's Local Rules. Dkt. No. 44. The Court agrees with Defendants and finds it proper at this moment to treat Plaintiff's submission as his Response in opposition to the Motion to Dismiss.

### I. BACKGROUND

**\*2** Plaintiff is an inmate incarcerated in the Upstate Correctional Facility located in Malone, New York. Compl. at p. 1. The factual basis for Plaintiff's Complaint, to the extent discernible,FN2 is that on or about March 21, 2004, he was not afforded a seat to sit on during a search of his cell, and as a result, he fell to the ground and injured himself. *Id.* at p. 14. Plaintiff states that he "fell with his walker" as a result of the "negligence of C.O. Durrante and [the] medical staff that was on duty." *Id.* at p. 15. Plaintiff also complains that he was wrongly placed in the Special Housing Unit (SHU) given his medical condition and was wrongly transferred from Walsh Medical Facility to Upstate Correctional Facility. *Id.* at pp. 11 & 8.

> FN2. As the Defendants note in their Memorandum of Law in Support of the Motion to Dismiss (Dkt. No. 38), Plaintiff's Complaint

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)
**(Cite as: 2008 WL 907364 (N.D.N.Y.))**

is illegible at certain points and unintelligible at others. *See generally* Comp. We have construed Plaintiff's Complaint to raise all possible constitutional claims that are reasonably related to the facts stated therein.

## II. DISCUSSION
### A. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B. T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). Additionally, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green v. New York State Dep't of Corr. Servs.,* 2003 WL 22169779, at *1 (N.D.N.Y. Aug. 27, 2003) (internal quotation marks and citations omitted) (alterations in original).

Pleadings submitted by *pro se* litigants "should be 'construed liberally,' *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (per curiam)," and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations[,]' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (quoting *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997)). A "dismissal on the pleadings is never warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Phillips v. Girdich,* 408 F.3d at 128.

### B. Eighth Amendment Claim

Plaintiff alleges that Defendant C.O. Durrante forced him to stand during the search of his cell, causing him to fall and injure himself, though he does not state what specific injuries resulted from the fall. Compl at p. 15. Plaintiff further alleges that the "medical staff" failed to adequately treat the injuries he allegedly sustained. *Id.*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666-67 (1962) (cited in *Trammell v. Keane, et al.,* 338 F.3d 155, 161 (2d Cir.2003)). To prove a violation of the Eighth Amendment, the Second Circuit stated that an inmate must show,

> **\*3** (1) that the deprivation alleged is "objectively sufficiently serious" such that the plaintiff was denied "the minimal civilized measure of life's necessities," and (2) that the defendant official possessed a "sufficiently culpable state of mind" associated with "the unnecessary and wanton infliction of pain."

*Trammell v. Keane,* 338 F.3d at 161 (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Punishments prohibited by the Eighth Amendment include those that are "grossly disproportionate" to the severity of the crime including unnecessary and wanton inflictions of pain which are "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 737 (2002).

Plaintiff's claim against Defendant C.O. Durrante, even considering all facts and construing all arguments in Plaintiff's favor, is not viable under the Eighth Amendment. The record reflects that Plaintiff's cell was searched, at which point he was forced to stand using his walker as support. Compl. at p. 15. Plaintiff's subsequent accidental fall does not create a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)
**(Cite as: 2008 WL 907364 (N.D.N.Y.))**

valid Eighth Amendment claim. *See Graham v. Poole,* 476 F.Supp.2d 257 (W.D.N.Y.2007) (claim of plaintiff who fell after he slipped in the shower due to the absence of non-slip mats was dismissed because allegations of negligence are not actionable under the Eighth Amendment). Plaintiff does not allege that Durrante intended to cause any injury or unnecessary pain; nor are there sufficient facts plead to conclude that Durrante's alleged denial of a seat to Plaintiff might have been wanton, reckless or even negligent for that matter. In short, Plaintiff's conclusory claim that Durrante is responsible for his fall is not a claim upon which relief can be granted. *See Bell. Atl. Corp. v. Twombly,* 127 S.Ct. at 1958-59 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). Also, Plaintiff has failed to alleged his injury was sufficiently serious under the objective prong of the Eighth Amendment test, just as he has failed to allege that any of the Defendants acted with the requisite culpability under that standard.

Plaintiff's deliberate indifference claim against the medical staff is similarly hollow. There are no facts plead to indicate what his medical needs were,[FN3] nor how those needs were neglected, nor which members of the staff were involved in the failure to adequately treat him. *See generally* Compl.

> FN3. Plaintiff states that Defendants failed to take an x-ray or MRI of his injury, but he does not explain why those tests were necessary or what effect that omission had. Nonetheless, the failure to take an X-ray or MRI, without more, would not rise to a deliberate indifference claim. *See Perkins v. Obey,* 2003 WL 238036, at *8 (S.D.N.Y. Feb. 10, 2004) (stating that so long as the treatment is adequate, prisoners have no right to any specific form of treatment such as x-rays). court claim or his transfer. Because Plaintiff's due process claims are conclusory at best, we recommend that the Defendants'

Motion to Dismiss on these claims be **granted** as well. *See Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. at 413 (citations omitted).

Although it is incumbent upon us to construe this *pro se* Plaintiff's Complaint in the light most favorable to him, we cannot interject allegations that have not been plead. *Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. 406, 413 (N.D.N.Y.1997) (citing *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987) for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotation marks omitted). For all of the aforementioned reasons, we recommend that Defendants' Motion to Dismiss Plaintiff's Eighth Amendment claims be **granted.**

### C. Due Process Claim

**\*4** Although it is unclear, it appears that Plaintiff is asserting violations of his due process rights because of his confinement in SHU, the rejection of his state court claim, and his transfer from Walsh Medical Facility to Upstate Correctional Facility. *See* Compl. at pp. 11-13. Plaintiff offers no factual allegations as to why his SHU confinement was unconstitutional or otherwise improper, nor does he indicate on what basis his due process rights were implicated by the denial of his state court claim or his transfer. Because Plaintiff's due process claims are conclusory at best, we recommend that the Defendants' Motion to Dismiss on these claims be **granted** as well. *See Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. at 413 (citations omitted).

### D. Personal Involvement & Qualified Immunity

The Defendants assert that Plaintiff's claims should be dismissed because he fails to identify how each Defendant was personally involved in the alleged constitutional violations. The Defendants also assert the affirmative defense of qualified immunity. However, because we find Plaintiff's constitutional claims to be without merit, we need not address these de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)
**(Cite as: 2008 WL 907364 (N.D.N.Y.))**

fenses.[FN4] *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries regarding qualified immunity.")

> FN4. Similarly, Defendants'assertion that the Complaint should be dismissed for violating the Federal Rules of Civil Procedure 8 & 10 and their claim for a protective order will not be addressed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 38) be granted, and it is further

**RECOMMENDED,** that Plaintiff's Complaint (Dkt. No. 1) be dismissed without prejudice, and it is further

**ORDERED,** that the Clerk of the Court terminate Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 41) as it has been construed to be Plaintiff's opposition to Defendants' Motion to Dismiss; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.
Flemming v. Rosadro
Not Reported in F.Supp.2d, 2008 WL 907364 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Nancy SMITH, et al., Defendants.

No. 9:11–CV–00804 (NAM/TWD).
Signed July 24, 2014.

Woodrow Flemming, New York, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Richard Lombardo, Esq., Assistant Attorney General, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Therese Wiley Dancks, duly filed on the 2nd day of July 2014. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's ReportRecommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The amended complaint is dismissed with prejudice under 28 U.S .C. § 1915A.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case. Plaintiff shall be served by certified mail, return receipt requested.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Hon. Norman A. Mordue, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). In his original Complaint, Plaintiff set forth nine causes of action alleging numerous claims against forty-two defendants arising out of his confinement at Upstate Correctional Facility ("Upstate").FN1 (Dkt. No. 1.) By Decision and Order dated June 28, 2012, Judge Mordue dismissed all but two of Plaintiff's causes of action asserted against twenty-one remaining defendants pursuant to 28 U.S.C. § 1915A(b).

> FN1. The District Court found that the three-strikes provision of 28 U.S.C. § 1915(g) barred Plaintiff from proceeding *in forma pauperis.* (Dkt. No. 14). Plaintiff has filed more than thirty lawsuits in the Northern District of New York since 2005. *See* https://ecf.nynd.cir2.dcn/cg ibin/iquery.pl?17461056886244–L_1_1–0–4 80245–pty–pla–plaintiff (last visited June 26, 2014).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

The two surviving causes of action alleged the denial of adequate medical care and deliberate indifference to Plaintiff's serious medical needs in violation of his rights under the Eighth Amendment. The remaining Defendants were Upstate medical staff members Nancy Smith ("Smith"), Nurse Administrator; Evelyn Weissman ("Weissman"), M.D.; Richard Adams ("Adams"), M.D.; Patrick Johnson ("Johnson"), P.A.; Glenn Schruyer ("Schruyer"), R.N. II; Dianna Harvey ("Harvey"), R.N. II; Patsy Nakahara ("Nakahara"), R.N. II; George Waterson ("Waterson"), R.N. II; Marla Travers ("Travers"), R.N. II; Elizabeth White ("White"), R.N. II; Renee Holmes ("Holmes"), R.N. II; Dana Griffith ("Griffith"), R.N. II; Julia Gordon ("Gordon"), R.N. II; David Hammac ("Hammac"), R.N. II; Rodney Cook ("R.Cook"), R.N. II; Neil Cook ("N.Cook"), R.N. II; James Chesbrough ("Chesbrough"), R.N. II; Christy Conklin ("Conklin"), R.N. II; Kathy Sullivan ("Sullivan"), R.N. II; Rosanna Lordi ("Lordi"), R.N. II; and Candy Atkinson ("Atkinson"), R.N. II.

The matter is currently before the Court for the screening of Plaintiff's Amended Complaint (Dkt. No. 49), filed following the conditional grant of the remaining Defendants' motion to dismiss Plaintiff's Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(6). (Dkt. No. 48.) For the reasons set forth below, the Court finds that Plaintiff has failed to correct the deficiencies in his original Complaint and recommends that Plaintiff's Amended Complaint be dismissed with prejudice.

## I. BACKGROUND

### A. Allegations of the Original Complaint

**\*2** Plaintiff was confined at Upstate after being transferred there in 2005 for infirmary placement while he served time in the Special Housing Unit. [FN2] (Dkt. No. 1 at 22–23.) In October of 2009, Plaintiff complained of feeling weak to Defendants Johnson,

Atkinson, Sullivan, Smith, White, Harvey, and Nakahara. (Dkt. No. 1 at second ¶ 73.) Although Plaintiff alleged that the Defendants to whom he complained failed to act in response to his complaints, he acknowledged in his Complaint that he was taken to the hospital three times in connection with the weakness. *Id.* The third time, blood work revealed Plaintiff may have been being over-medicated at Upstate. *Id.*

> FN2. According to Plaintiff, his original Complaint "consolidated issues from July 2008 within 3 years filing." (Dkt. No. 1 at ¶ 56.)

Plaintiff also claimed to have serious medical problems with his left shoulder, back, hip and knees which Defendants knew about and nonetheless failed to diagnose, and denied his requests to be examined by a doctor and given treatment and therapy. *Id.* at ¶¶ 61, 63, 65, 67, 72, 74. Plaintiff identified the Defendants to whom he complained about his left shoulder, back, hip, and knee as Weissman, Smith, Johnson, Nakahara, Waterson, White, Holmes, Griffith, Gordon, Hammac, R. Cook, N. Cook, Chesbrough, Sullivan, Lordi, and Atkinson. *Id.* at ¶¶ 72, 73. Plaintiff also complained from July 29, 2010, Defendant Adams, a physician at Upstate, took away the walking cane Plaintiff used for his left side and left leg weakness and his pain medication, without an examination or therapy. *Id.* at ¶ 68.

On September 28, 2010, Plaintiff fell and was taken to the emergency room at the Alyce Hyde Medical Center in Malone, New York, by authorization of Defendant Weissman, another Upstate physician. (Dkt. Nos. 1 at ¶ 74; 39–1 at 7–9.) X-rays taken of Plaintiff's lumbar spine, left shoulder, left hip, left knee, pelvis, c-spine, chest and ribs were negative. (Dkt. No. 1 at 52.) Plaintiff was also given a head CT scan and diagnosed with a concussion. *Id.;* Dkt. No. 39–1 at 9. Plaintiff alleged that neither his concussion nor complaints about head pain and nosebleeds after

the fall were addressed following return to Upstate. (Dkt. No. 1 at ¶¶ 74–75, 77.) Plaintiff identified the Defendants to whom he complained about his headaches and nosebleeds for over the nine months following his concussion as Adams, Smith, Waterson, Atkinson, Sullivan, Lordi, Conklin, Hammac, Travers, White, Holmes, Griffith, R. Cook, and Schruyer. *Id.* While at Upstate, Plaintiff was given a blood test that revealed his blood platelet count was somewhat elevated. *Id.* at ¶ 76. The results of a follow up test on March 14, 2011, showed a more significantly elevated count of 869. *Id.* at ¶ 78 and 26. The normal range is 144–400. *Id.* Although Plaintiff alleged that the medical staff did nothing for him, he has also acknowledged in his Complaint that a decision was made to send to him to an outside doctor in April of 2011. *Id.* at ¶ 79. Defendant Adams ordered a hematology consult based upon the blood test results and report. (Dkt. No. 39–1 at 38.) Plaintiff signed a contract for specialty care on March 21, 2011. *Id.* Plaintiff was seen by a hematologist on April 26, 2011, and the results of his blood work were reviewed by a provider on May 2, 2011. (Dkt. No. 1 at 35.) Based upon the hematologist's recommendation, Plaintiff was prescribed Hydroxyurea 500 mg twice daily, ASA 325 mg daily, and an abdominal ultrasound and a follow-up hematology consult was ordered. *Id.*

**B. Ruling on Defendants' Motion to Dismiss**

**\*3** Defendants moved to dismiss the remaining Eighth Amendment claims in Plaintiff's original Complaint on the grounds that: (1) the District Court lacked personal jurisdiction over the Defendants because Plaintiff failed to serve the summons and complaint in the manner required to obtain personal jurisdiction; (2) the Complaint failed to state a claim upon which relief could be granted under 42 U.S.C. § 1983; and (3) Defendants were entitled to qualified immunity. (Dkt. No. 36.)

This Court recommended that Defendants' motion to dismiss for failure to state a claim be granted with leave to amend. (Dkt. No. 45.) The Court's recom-

mendation was based upon: (1) Plaintiff's failure to allege any non-conclusory facts suggesting deliberate indifference on the part of Defendants Johnson, Atkinson, Sullivan, Smith, White, Harvey, and Nakahara with regard to his claim of weakness, *id.* at 14–15; (2) Plaintiff's failure to allege non-conclusory facts plausibly showing that he had a serious medical condition with regard to his claims of pain in his back, hips, and knees, and failure to allege any non-conclusory facts suggesting deliberate indifference with regard to his frozen shoulder and pain in his back, hips and knees by Defendants Weissman, Smith, Johnson, Nakahara, Waterson, White, Holmes, Griffith, Gordon, Hammac, R. Cook, N. Cook, Chesbrough, Sullivan, Lordi, and Atkinson, *id.* at 16–20; (3) records annexed to Plaintiff's Complaint failed to support his claim that he needed a walking cane, and Plaintiff failed to allege non-conclusory facts showing deliberate indifference on the part of Defendant Adams in taking away the cane in July of 2010, *id.* at 20–21; (4) Plaintiff's failure to allege facts regarding the medication alleged to have been wrongfully discontinued by Adams, the medical condition for which the medication was being taken, and the facts and circumstances surrounding the alleged discontinuance, *id.* at 21; (5) Plaintiff's failure to allege sufficient facts to make a facially plausible showing that the headaches and nosebleeds of which he complained constituted serious medical conditions and failure to allege non-conclusory facts showing deliberate indifference with regard his concussion, headaches and nosebleeds by Defendants Adams, Smith, Waterson, Atkinson, Sullivan, Lordi, Conklin, Hammac, Travers, White, Holmes, Griffith, R. Cook, and Schruyer, *id.* at 22–23; and (6) failure to allege non-conclusory facts supporting a claim of deliberate indifference on the part of Adams or any other Defendant with regard to Plaintiff's claim that treatment for his elevated blood platelets was delayed. *Id.* at 23–24.

The District Court accepted this Court's recommendation that Defendants' motion to dismiss be granted for failure to state a claim, with leave to

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

amend, and ordered that the action would be dismissed with prejudice for failure to state a claim unless Plaintiff filed an amended complaint within thirty-days. (Dkt. No. 48.) The District Court also ordered that if Plaintiff filed an amended complaint that survived initial review, new summonses were to be issued for defendants named in the amended complaint, since service of the initial summons and complaint on defendants was inadequate. *Id.*

**C. Allegations of Amended Complaint**

**\*4** Plaintiff filed a nearly illegible handwritten Amended Complaint with voluminous exhibits on September 23, 2013.[FN3] (Dkt. No. 49.) A day later, Plaintiff filed additional medical records and grievance records in support of his Amended Complaint. (Dkt. No. 50 .) Plaintiff's Amended Complaint asserts the same Eighth Amendment claims for deliberate indifference to his serious medical needs as his original Complaint.[FN4] While wordier and more repetitive than his original Complaint, the allegations in Plaintiff's Amended Complaint are no less conclusory and do not correct the deficiencies in the original Complaint.

> FN3. A large number of the documents annexed to Plaintiff's Amended Complaint relate to matters that occurred prior to July 2008, the date Plaintiff identified as the start time for the claims asserted in his lawsuit and have no relevance in this action.

> FN4. In his Amended Complaint, Plaintiff has also attempted to resurrect the supervisory claims relating to his placement and the inadequacy of his care in the special housing unit, as well as inadequate training and supervision claims against defendants Smith and Weissman and a number of original defendants, including Lester Wright, against whom the Complaint was dismissed on initial review. (*See, e.g.,* Dkt. No. 49 at ¶¶ 24, 26, 32.) The claims, as asserted in the Amended

Complaint, suffer from the deficiencies that led to their dismissal on initial review. (*See* Dkt. No. 21.)

**II. LEGAL STANDARD**

Under 28 U.S.C. § 1915A (2006), "[t]he court shall review ... a complaint in a civil action in which a prisoner seeks redress from a[n] ... employee of a governmental entity." 28 U .S.C. § 1915A(a) (2006).[FN5] In conducting this review, "the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."[FN6] 28 U.S.C. § 1915A(b)(1–2) (2006)

> FN5. Although Plaintiff was released from custody in or about March of 2014 (Dkt. No. 56 at 2), he was incarcerated at the time this action was commenced and when he filed the Amended Complaint. (*See* Dkt. Nos. 1 and 49.) Therefore, § 1915A is applicable. See *Rogers v. New York City Police Dept.,* No. 12 CV 3042(CBA) (MG), 2012 WL 4863161, at *1 n. 3, 2012 U.S. Dist. LEXIS 147663, at *4 n. 3 (E.D.N.Y. Oct.12, 2012) (a plaintiff who has been released from incarceration is still considered a prisoner under § 1915A if he was imprisoned at the time the action was commenced); *see also Brown v. Jacobson,* No. 98 Civ. 0565 LBS, 1999 WL 1125122, at * 5, 1999 U.S. Dist. LEXIS 18921, at *13–14 (S.D.N.Y. Dec.8, 1999) (prisoner's complaint subject to heightened scrutiny under the Prison Litigation Reform Act of 1999 even after release from custody because it advances concerns about prison officials' misconduct) (citing *Johnson v. Hill,* 965 F.Supp. 1487, 1488 n. 2 (E.D.Va.1997)).

> FN6. In determining whether an action is frivolous, the court must look to see whether

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (superceded by statute on other grounds).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." [FN7] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

> FN7. Where a plaintiff proceeds *pro se,* the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (citation omitted).

Because a court has a duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (*per curiam* ), extreme caution

should be exercised in ordering *sua sponte* dismissal of a *pro se* action. *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983).

## III. ANALYSIS

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*5** A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. See *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id.* at 72. (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citation omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance,* 912 F.2d at 607) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U .S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (quoting *Hathaway,* 99 F.3d at 553).

**\*6** Conclusory allegations that medical staff defendants were aware of a plaintiff's medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care. *See, e.g., Gumbs v. Dynan,* No. 11–CV–857 (RRM)(LB), 2012 WL 3705009, at \*12, 2012 U.S. Dist. LEXIS 120664, at \*36 (E.D.N.Y. Aug. 26, 2012) ("[C]onclusory allegations that defendants were aware of plaintiff's medical needs and chronic pain but failed to respond are generally not sufficient proof of defendant's deliberate indifference and cannot survive a Rule 12(b) (6) motion to dismiss.") (citing *Adekoya v. Holder,* 751 F.Supp.2d 688, 691, 697 (S.D.N.Y.2011) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss a claim of inadequate medical care); *Thomas v. Douglas,* No. 9:09–CV–0548 (GLS/DEP), 2010 WL 3724183, at \*5, 2010 U.S. Dist. LEXIS 97660, at \* 15 (N.D.N.Y. Aug.12, 2010) (deliberate indifference claim set forth in wholly conclusory terms alleging that plaintiff was merely "continuously denied proper treatment," without supporting facts to establish a plausible medical indifference claim cannot survive a motion to dismiss). This case is no exception.

**A. Plaintiff's Weakness Claim**

Plaintiff has again alleged that he suffered from weakness and dizziness in October of 2009 that resulted in his being hospitalized, thus making a plausible showing that he suffered from a serious medical condition. (Dkt. Nos. 49 at ¶¶ 36–42; 49–1 at 32–47.) However, the allegations in Plaintiff's Amended Complaint with regard to the deliberate indifference component of his Eighth Amendment claim are as conclusory, and therefore as inadequate, as those in his original Complaint.

In his original Complaint, Plaintiff alleged in conclusory fashion that he complained about his weakness to Defendants Johnson, Atkinson, Sullivan, Smith, White, Harvey, and Nakahara, and they did

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

nothing. (Dkt. No. 1 at ¶ 73.) In his Amended Complaint, Plaintiff has alleged, again in conclusory fashion, that he complained about the weakness not only to the Defendants identified in his original Complaint, but also to Defendants Griffith, Holmes, Gordon, Waterson, Chesbrough, N. Cook, R. Cook, Hammac, Lordi, and Weissman, and that they all intentionally denied or delayed treatment. (Dkt. No. 49 at ¶¶ 39, 42.)

The absence of specific allegations as to how each defendant was deliberately indifferent to Plaintiff's weakness and dizziness is fatal to his claim. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983."). Therefore, the Court recommends that Plaintiff's Eighth Amendment claim in his Amended Complaint with regard to his weakness and dizziness in October of 2009 be dismissed with prejudice.

**B. Plaintiff's Left Shoulder, Back, Hip, and Knee Complaints and Stopping**
**\*7** Pain Medication

In his Amended Complaint, Plaintiff again alleges that he had a frozen left shoulder and back, hip, and knee problems that left him in severe pain. (Dkt. No. 49 at ¶¶ 36, 42–44.) As with his original Complaint, Plaintiff has failed to allege facts making a plausible showing that his chronic back pain and hip and knee problems were severe enough to constitute a serious medical condition for Eighth Amendment purposes. *Id.*

Plaintiff has alleged in conclusory fashion in his Amended Complaint that Defendants Johnson, Adams, Smith, Weissman, Harvey, Hammac, R. Cook, N. Cook, Chesbrough, Conklin, Sullivan, Waterson, Travers, White, Holmes, Griffith, Gordon, Lordi, Atkinson, and Nakahara knew of his frozen shoulder and back, hip, and knee problems and pain and acted

with deliberate indifference in denying him the proper medical care and attention and pain medication. [FN8] *Id.* at ¶¶ 43–44.

> **FN8.** In his Amended Complaint, Plaintiff alleges that discontinuance of the drug Ultram constituted cruel and unusual punishment. (Dkt. No. 49 at ¶ 43.) However, according to the Superintendent's decision on Plaintiff's Grievance No. UST–43915–10, dated September 29, 2010, attached to Plaintiff's Amended Complaint, investigation of the grievance revealed that:
>
> ... grievant was seen by his primary provider on 07/29/10. Based on exam and evaluation of medical issues, M.D. ordered Ultram to be tapered down and discontinued. Risk factors associated with Ultram in conjunction with current medical problems can lead to seizures and Seratonin Syndrome. Tylenol 325 mg two times a day for pain was ordered.
>
> (Dkt. No. 49–1 at 64, 91.) *See Matusovsky v. Merrill Lynch,* 186 F.Supp.2d 397, 399–400 (S.D.N.Y.2002) (noting that in evaluating a Rule 12(b)(6) motion, a court may consider documents attached to the complaint as exhibits, and "[i]f a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.")

This Court explained in its Report–Recommendation and Order on Defendants' motion to dismiss that conclusory allegations that medical staff defendants were aware of a plaintiff's medical needs and failed to provide adequate care were insufficient to state an Eighth Amendment claim for deliberate indifference to a serious medical condition. (Dkt. No. 45 at 14–15.) *See e.g., Adekoya,* 751

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

F.Supp.2d at 691 (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss a claim of inadequate medical care).

Plaintiff has failed to correct the pleading deficiency in his original Complaint with regard to Defendants' alleged deliberate indifference to his frozen shoulder, chronic back pain, and hip and knee problems and need for medication, despite having been given an opportunity to do so. Therefore, the Court recommends that Plaintiff's Eighth Amendment claim in his Amended Complaint with regard to his shoulder, back, hip, knee, and pain medication be dismissed with prejudice.

### C. Plaintiff's Cane

Plaintiff alleges in his Amended Complaint that Defendant Adams, knowing Plaintiff had a weak left hip and many problems with his knee and needed a walking cane to help him stand, took away the cane. (Dkt. No. 49 at ¶ 45.) Plaintiff's conclusory assertion that he needed a cane is contradicted by grievance proceeding documents annexed by Plaintiff to his Amended Complaint. *See Matusovsky,* 186 F.Supp.2d at 399–400. Plaintiff filed a grievance on July 30, 2010, complaining that on the day before, Defendant Adams, who had never seen him before, took away his cane without first doing an MRI. (Dkt. No. 49–1 at 83.) The Internal Review Grievance Committee found that investigation revealed that there was no clinical indication for the cane, and that RN's had observed Plaintiff ambulating with good physical mobility, upright posture, and steady gait. *Id.* at 98. On appeal from denial of the grievance, the Superintendent affirmed, indicating that Plaintiff had been evaluated by his provider, and there was no indication for a cane. *Id.* at 9. The Central Office Review Committee affirmed, noting that a cane was not medically indicated.

**\*8** Plaintiff's conclusory allegation that he needed a cane, particularly when contradicted by the griev-

ance documents he himself has submitted, along with his failure to allege facts showing a deliberate indifference to his alleged need for a cane on Defendant Adams' part, fails to make a plausible showing that Plaintiff's Eighth Amendment rights were violated, and the Court recommends that his claim regarding the cane be dismissed with prejudice.

### D. Head Pain and Nosebleeds

Plaintiff alleges in his Amended Complaint that he complained about headaches and his daily nose bleeds to Defendants Smith, Weissman, Harvey, Atkinson, Nakahara, Lordi, Hammac, R. Cook, N. Cook, Chesbrough, Conklin, Sullivan, Waterson, Travers, White, Holmes, and Griffith, and they treated his medical needs with deliberate indifference by refusing him the necessary medical treatment. (Dkt. No. 49 at ¶¶ 46–47.) As with his initial Complaint, Plaintiff's allegations regarding the Defendants' deliberate indifference are conclusory and wholly inadequate to make a plausible showing of deliberate indifference. *See e.g., Adekoya,* 751 F.Supp.2d at 691, 697. Therefore the Court recommends that Plaintiff's Eighth Amendment claim regarding his headaches and nosebleeds be dismissed with prejudice.

### E. Plaintiff's Elevated Platelets

In his Amended Complaint, Plaintiff alleges that Defendant Adams did not send him to an outside doctor for a month after finding out his platelet level was elevated to eight-hundred. (Dkt. No. 49 at ¶ 48.) On a claim based upon a significant delay in receiving treatment, "a plaintiff must allege that the individuals causing the delay had the requisite state of mind, which ... is the equivalent of criminal recklessness." [FN9] *Jones v. Vives,* 523 F. App'x 48, 50 (2d Cir.2013) (citing *Hathaway,* 99 F.3d at 553. The allegations in Plaintiff's Amended Complaint regarding Defendant Adams' state of mind in treating Plaintiff for elevated blood platelets and referring him to an outside physician are no less deficient than those in his original Complaint. Therefore, the Court recommends that Plaintiff's Eighth Amendment claim with regard to his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3698004 (N.D.N.Y.)
**(Cite as: 2014 WL 3698004 (N.D.N.Y.))**

platelet count be dismissed with prejudice.

> FN9. It is not at all clear that the one month delay in outside treatment alleged by Plaintiff was significant under the circumstances.

**ACCORDING,** it is hereby

**RECOMMENDED,** that Plaintiff's Amended Complaint (Dkt. No. 49) be dismissed with prejudice under 28 U.S.C. § 1915A; and it is

**ORDERED,** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOUR-TEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2014.
Flemming v. Smith
Slip Copy, 2014 WL 3698004 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174314 (N.D.N.Y.)
**(Cite as: 2006 WL 1174314 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Woodrow FLEMMING, Plaintiff,
v.
Dr. Lester WRIGHT, M.D., et al., Defendants.

No. 9:06-CV-0086 (GLS)(GJD).
April 28, 2006.

Woodrow Flemming, Plaintiff, pro se.

**DECISION and ORDER**

GARY L. SHARPE, U.S. District Judge.

I. Background.

**\*1** The Clerk has sent to the Court an amended Complaint filed by Woodrow Flemming ("Plaintiff" or "Flemming") in accordance with this Court's Order dated February 22, 2006 ("February Order"). Docket No. 4.

The February Order advised Plaintiff that:

Plaintiff's complaint names twenty defendants. However, it unclear whether the complaint sets forth sufficient allegations of wrong doing by each of the defendants because the complaint is only partially legible. In this regard, plaintiff is advised that Local Rule 10.1 requires the text of all documents to be legibly written (typewritten, printed or reproduced) and double spaced.

The Court has, to the best of its ability, attempted to decipher the complaint presently before it. As best as it can be determined, it does not appear that plaintiff has set forth allegations of wrongful con-

duct by each defendant. Rather, plaintiff refers generically to "the defendant" or "the defendants" when setting forth his narrative of events. Accordingly, it is impossible for this Court to determine what, if anything, each person named in the complaint allegedly did, or failed to do, and how such action or inaction violated plaintiff's rights.

Therefore, plaintiff will be required to file an amended complaint that is fully legible. The amended complaint must set forth all alleged wrongful acts of the defendants that give rise to plaintiff's claims. When re-drafting his complaint, plaintiff should focus on clearly and concisely setting forth the ***facts,*** including the wrongful acts that give rise to the claims, the dates, times and places of the alleged acts, and the individual(s) who committed each alleged wrongful act ... Finally, plaintiff is cautioned that conclusory statements of wrong doing (e.g., defendant violated my Eighth Amendment rights) are not sufficient. Rather, plaintiff must state what actions were taken, by whom they were taken, where such events occurred, and how such actions violated plaintiff's rights.

Docket No. 4.

A review of the amended Complaint finds that Flemming's statement of claims, to the extent it is legible,[FN1] is an incomprehensible grouping of conclusory allegations regarding alleged violations of his Eighth Amendment rights, alleged conspiracies, movement of Plaintiff from one facility to another, and alleged failure to train and supervise staff. While Plaintiff sets forth a listing of individuals who he seeks to name as Defendants herein, the statement of Plaintiff's claims fails to sufficiently allege any wrongful conduct by each of the named Defendants. Rather, Plaintiff simply repeats the conclusory allegations that the February Order directed were insufficient. From

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174314 (N.D.N.Y.)
**(Cite as: 2006 WL 1174314 (N.D.N.Y.))**

the portions of the amended Complaint that this Court has been able to decipher, it does not appear that sufficient facts have been alleged to state claims against the defendants named therein. As such, the Court must dismiss Plaintiff's amended Complaint without prejudice.

> FN1. The Court notes that Plaintiff has filed six been admonished regarding the Local Rule requirement legible. Cf. 9:05-CV-0179. Plaintiff has not complied preparation of his amended Complaint.

**\*2** 'The Court notes that Plaintiff has filed six other actions in this District, and has previously been admonished regarding the Local Rule requirement that all papers filed with the Court be legible. *Cf.* 9:05-CV-0179. Plaintiff has not complied with those prior admonitions in the preparation of his amended Complaint.

WHEREFORE, it is hereby

ORDERED, that this action is dismissed, without prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B) and Rule 5.4(a) of the Local Rules of Practice of this District, and it is further

ORDERED, that the Clerk serve a copy of this Order on the Plaintiff by regular mail.

It is hereby certified that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3).

IT IS SO ORDERED.

N.D.N.Y.,2006.
Flemming v. Wright
Not Reported in F.Supp.2d, 2006 WL 1174314 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. California.
Jacie Lee GOUDLOCK, Jr., Plaintiff,
v.
R. PEREZ, Correctional Sergeant, R. Amiling, Correctional Officer, and R. Esquilin, Correctional Officer, Defendants.

Civil No. 08cv204 AJB(RBB).
March 13, 2012.

Jacie Lee Goudlock, Jr., Los Angelels, CA, pro se.

Suzanne Antley, California Attorney General, San Diego, CA, for Defendants.

**ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

ANTHONY J. BATTAGLIA, District Judge.

**\*1** On February 1, 2008, Plaintiff Jacie Lee Goudlock, a state prisoner proceeding *pro se* and *in forma pauperis,* filed a civil rights complaint pursuant to 28 U.S.C. § 1983. (Dkt. No. 1.) A second amended complaint ("SAC") was filed on April 11, 2011. (Dkt. No. 63.) On July 22, 2011, Defendants filed a motion to dismiss the second amended complaint. (Dkt. No. 70.) An opposition was filed on July 28, 2011. (Dkt. No. 71.) On December 20, 2011, Magistrate Judge Brooks filed a report and recommendation granting in part and denying in part Defendants' motion to dismiss the second amended complaint. (Dkt. No. 74.) Objections were filed on January 30, 2012. (Dkt. No. 77.) For the reasons set forth below and with modifications

stated herein, the Court ADOPTS the report and recommendation AS MODIFIED and GRANTS in part and DENIES in part Defendants' motion to dismiss.

**Procedural Background**

On August 8, 2008, Plaintiff filed a first amended complaint against Correctional Officer Thompson, Correctional Sergeant Cruz and Registered Nurse Peterson. (Dkt. No. 7.) On September 15, 2009, the Court issued an order adopting the report and recommendation granting Defendant Peterson's motion to dismiss without leave to amend. (Dkt. No. 34.) On October 13, 2010, the Court issued an order dismissing Defendant Cruz for failure to serve. (Dkt. No. 48.) On November 19, 2010, the remaining Defendant, Thompson, filed a motion to dismiss the first amended complaint. (Dkt. No. 52.) On December 2, 2010, Plaintiff filed a motion for leave to file a second amended complaint. (Dkt. No. 53.) On January 28, 2011, Magistrate Judge Brooks issued a Report and Recommendation recommending that Defendant Thompson's motion to dismiss the first amended complaint be denied as moot and Plaintiff's motion for leave to file a second amended complaint be granted. (Dkt. No. 59.) On March 14, 2011, the case was transferred to the undersigned judge. (Dkt. No. 62.) On March 29, 2011, the Court issued an order adopting report and recommendation denying Defendant Thompson's motion to dismiss and granting Plaintiff's motion for leave to file a second amended complaint. (Dkt. No. 62.)

On April 11, 2011, a second amended complaint was filed against Defendants Correctional Sergeant Perez, Correctional Officer Esquilin and Correctional Officer Amiling. (Dkt. No. 63.) On July 22, 2011, Defendants filed a motion to dismiss the second amended complaint. (Dkt. No. 70.) On July 28, 2011, Plaintiff filed an opposition. (Dkt. No. 71.) On De-

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

cember 20, 2011, the Magistrate Judge filed a report and recommendation granting in part and denying in part Defendants' motion to dismiss. (Dkt. No. 74.) On January 30, 2012, Defendant Perez filed an objection to the report and recommendation. (Dkt. No. 77.)

### Factual Background

According to the second amended complaint, on June 15, 2007, at around 4:00, Plaintiff fell asleep due to a medical condition while on the top bunk of a bunk bed. (SAC at 3 [FN1].) As a result of his fall, he cut his left foot "to the point that the injury needed stitches, and was bleeding-profusely, as well as twisting my ankle,-shaving off skin on my right thigh, and causing further damage to an already damaged ciatic nerve." (*Id.* at 3.) He and his cell mate screamed for assistance from Correctional Officers Esquilin and Amiling who were on duty at the time and they both refused to respond. (*Id.*) After about 30 minutes and as the pain became unbearable, his cell mate yelled for medical help screaming "man down." (*Id.*) The pleas for help were heard and ignored by both officers. (*Id.*)

> [FN1]. The pagination is based on the CM/ECF pagination.

**\*2** A few days before the fall, on June 12, 2007, Plaintiff claims he spoke with Correctional Sergeant Perez about the "dangerous condition" where he was housed. (*Id.* at 11.) Plaintiff explained how two officers forced him into a top bunk on a top tier on June 11, 2007.(*Id.*) Plaintiff showed Perez his comprehensive medical chrono. (*Id.*) Perez asked Plaintiff if his condition was documented in his medical file and Plaintiff replied yes. (*Id.*) Plaintiff further explained that he had "severe sleep apnea" and that he had fallen from his bunk bed at his previous facility. (*Id.*) He claims that he talked with Defendant Perez two more time that week; however, Perez failed to act and allowed Plaintiff to remain in a dangerous situation. (*Id.*)

### Discussion

**A. Scope of Review of Magistrate Judge's Report and Recommendation**

The district court "shall make a *de novo* determination of those portions of the report ... to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *see also* Fed.R.Civ.P. 72(b). A district court may adopt those parts of a Magistrate Judge's report to which no specific objection is made, provided they are not clearly erroneous. *Thomas v. Arn,* 474 U.S. 140, 152–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**B. Eleventh Amendment Immunity**

Plaintiff has not filed objections as to the Magistrate Judge's recommendation that Plaintiff's monetary claims against the Defendants in their official capacities be granted under the Eleventh Amendment. After a review of the report and recommendation, the Court GRANTS Defendants' motion to dismiss on Eleventh Amendment grounds to the extent that Plaintiff seeks monetary damages against Defendants in their official capacity and that such claims be DISMISSED with prejudice.

**C. Section 1983 Claims**

The Magistrate Judge issued a report and recommendation denying Defendants Esquilin and Amiling's motion to dismiss on Plaintiff's claim for deliberate indifference to serious medical needs under the Eighth Amendment. (Dkt. No. 74.) Defendants Esquilin and Amiling did not file objections to the Magistrate Judge's report and recommendation. After having the reviewed the briefs, applicable law, and report and recommendation, the Court ADOPTS the report and recommendation that Defendants Esquilin and Amiling's motion to dismiss the claim for deliberate indifference to serious medical needs be DENIED.

The report and recommendation also recommended denying Perez' motion to dismiss as to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

claim for deliberate indifference to serious medical needs and concluded that since Defendant Perez failed to move to dismiss the conditions of confinement claim, that claim remained. On January 30, 2012, Defendant Perez filed objections to the Magistrate Judge's report and recommendation denying the motion to dismiss. (Dkt. No. 77.) Accordingly, the Court reviews *de novo* the portions of the report that Perez has filed objections.

**\*3** First, the Court must determine what the cause or causes of action are pled against Defendant Perez. The Magistrate Judge and Defendant Perez have a different interpretation of the cause of action or actions against Perez.

In the report and recommendation, the Magistrate Judge concluded that although Perez is only named in count two for a conditions of confinement claim, he substantively addresses Plaintiff's first count of deliberate indifference to a serious medical need claim directed against Defendants Esquilin and Amiling. (Dkt. No. 74 at 10.) Consequently, the Magistrate Judge concluded that Perez did not argue that the conditions of confinement claim for failure to prevent harm should be dismissed. (*Id.*)

In his objections, Defendant Perez asserts that the report and recommendation erroneously concluded that Plaintiff, in his second amended complaint, asserted both a deliberate indifference claim and a conditions of confinement claim against Defendant Perez. Perez directs the Court to the history of the case, particularly looking at the first amended complaint and the prior report and recommendation and what was intended by Plaintiff and the prior Magistrate Judge's report. (Dkt. No. 59.) According to the prior report and recommendation, "Goudlock should be granted leave to file a second amended complaint asserting only his deliberate indifference to serious medical needs claim and his conditions of confinement claim against 'Correctional Sergeant R. Perez.' (*Id.* at 24.) Although he was given leave to assert two claims against Perez,

Plaintiff did not have to assert both claims. On a motion to dismiss, the Court need only look at the second amended complaint to make a determination whether Plaintiff has stated a cause of action against Defendant Perez. Once the second amended complaint was filed, all claims in the first amended complaint not alleged in the second amended complaint will be considered waived. *See King v. Atiyah,* 814 F.2d 565, 567 (9th Cir.1987).

The second amended complaint contains two counts. The first count alleges claims of "right to medical care, eighth amendment, cruel and unusual punishment/treatment" against Defendants Esquilin and Amiling. (SAC at 3.) The Magistrate Judge construed this claim as one of deliberate indifference to serious medical needs under the Eighth Amendment. The second count alleges "forced into conditions in prison in which were in-adequate for my medical condition and-condoning violation by failure to act" against Defendant Perez. Defendant Perez construes the second count as a deliberate indifference to serious medical needs cause of action while the Magistrate Judge construed the second count as a conditions of confinement cause of action. Based on the facts alleged in count two and Plaintiff's opposition where he alleges that Perez was "deliberately indifference to my medical condition" (opp. at 5–6), the Court concludes that Plaintiff has alleged a claim of deliberate indifference to serious medical needs in violation of the Eight Amendment in count two of the second amended complaint.[FN2] In the motion to dismiss, Defendant Perez moved to dismiss that claim against him.

> FN2. The Court notes that the legal analysis for a claim under deliberate indifference to serious medical needs and a conditions of confinement claim are similar. *See Beyerbach v. Sears,* 49 F.3d 1324, 1326 n. 1 (8th Cir.1995) abrogation on other grounds recognized by *Reece v. Groose,* 60 F.3d 487, 492 (8th Cir.1995); *see Hill v. Dekalb Regional*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

*Youth Detention Ctr.,* 40 F.3d 1176, 1186 (11th Cir.1994) ("deliberate indifference to serious medical needs standard has an objective and a subjective component") (quotation omitted); *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (equating inadequate provision of medical care as a "condition" of confinement and equating subjective standard required for both types of claims); *Hudson v. McMillian,* 503 U.S. 1, 8–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (observing that analysis of the objective component in a conditions-of-confinement claim is similar to the objective component of a medical needs case because both require a serious deprivation of needs). The United States Supreme Court held that " '[w]hether one characterizes the treatment received by [the prisoner] as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle.*" *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (*quoting Wilson,* 501 U.S. at 303).

**1. Motion to Dismiss**

**\*4** A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Twombly,* 550 U.S. at 555 (on motion to dismiss court is "not bound to accept as true a legal conclusion couched as a factual allegation."). "In sum, for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences [drawn] from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) (*quoting Iqbal,* 129 S.Ct. at 1949).

Where a plaintiff appears in propria persona in a civil rights case, the court must construe the pleadings liberally and afford the plaintiff any benefit of the doubt. *Karim–Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 623 (9th Cir.1988). The rule of liberal construction is "particularly important in civil rights cases." *Ferdik v. Bonzelet,* 963 F.2d 1258, 1261 (9th Cir.1992). In giving liberal interpretation to a pro se civil rights complaint, however, the court may not "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska,* 673 F.2d 266, 268 (9th Cir.1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.*

**2. Deliberate Indifference to Serious Medical Needs**

The Magistrate Judge recommended that Defendant Perez' motion to dismiss the claim for deliberate indifference to serious medical needs be denied. Defendant Perez objects to the report and recommendation because he claims that Plaintiff has failed to state a claim for deliberate indifference to serious medical needs.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

"Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citation omitted). This principle "establish[es] the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. The Supreme Court has noted that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.; see also West v. Atkins,* 487 U.S. 42, 54–55, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

**\*5** Thus, to establish a violation of the Eighth Amendment, Plaintiff must plead sufficient acts or omissions to show that defendants were deliberately indifferent to his serious medical needs. *See Estelle,* 429 U.S. at 106; *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989). Deliberate indifference to serious medical needs occurs when prison officials "deny, delay, or intentionally interfere with medical treatment." *Hunt,* 865 F.2d at 201 (*quoting Hutchinson v. United States,* 838 F.2d 390, 394 (9th Cir.1984)). A section 1983 plaintiff must allege facts that show the seriousness of his medical need as well as "the nature of the defendant's response to that need." *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992) *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997) (en banc).

A medical need is serious "if the failure to treat the condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Id.* at 1059. The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a person has a serious need for medical treatment. *Id.* at 1059–60 (citations omitted).

The report and recommendation concluded that Plaintiff's "severe sleep apnea" constituted a serious medical need based on a document attached to the complaint which is not fully legible by this Court. However, courts have concluded that sleep apnea may be a serious medical condition. *See Pierce v. Gonzales,* No. 1:10cv285 JLT(PC), 2011 WL 703594, at \*12 (E.D.Cal. Feb. 18, 2011); *see also Cramer v. Iverson,* No. 07–725(DWF/SRN), 2008 WL 4838715 at \*3 n. 3 (D.Minn. Nov.5, 2008) (assuming that sleep apnea constitutes a serious medical condition). Therefore, for purposes of this motion, the Court concludes that sleep apnea is a serious medical condition.

A prison official acts with deliberate indifference if he knowingly fails to respond to a serious medical need, thereby inflicting harm on the plaintiff. *Farmer v. Brennan,* 511 U.S. 825, 838–842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.' " *McGuckin,* 974 F.2d at 1060 (*quoting Hudson v. McMillian,* 502 U.S. 1, 112 S.Ct. 4, 116 L.Ed.2d 1 (1992)). The indifference to medical needs must be substantial; inadequate treatment due to malpractice, or even negligence, does not amount to a constitutional violation. *Estelle,* 429 U.S. at 106; *McGuckin,* 974 F.2d at 1059. Further, a mere difference of opinion over proper medical treatment does not constitute deliberate indifference. *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996).

**\*6** In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a Court may consider exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint whose authenticity no party questions. *See Swartz v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

*KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007); *Lee v. City of Los Angeles,* 250 F.3d 668, 688–689 (9th Cir.2001); *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) ("A court may, however, consider certain materials-documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice-without converting the motion to dismiss into a motion for summary judgment."). Plaintiff has attached exhibits to the complaint which include medical records, his comprehensive accommodation chrono and his appeals through the administrative process. (*See* SAC.) The report and recommendation and objections to the report and recommendation delve into an analysis of the facts. However, on a motion to dismiss, the Court's role is to focus on the sufficiency of the a claim rather than the claim's substantive merits.

Plaintiff's allegations must be taken as true and construed in the light most favorable to him. *See Cahill,* 80 F.3d at 337–38. Plaintiff alleged that prior to his fall, on June 12, 2007, he told Defendant Perez that he was forced in a "top bunk" on a "top tier ." (SAC at 11.) He personally informed Perez that he had "severe sleep apnea," showed him his comprehensive medical chrono, stated that his condition was documented in his files, and informed Perez that at his previous facility, Plaintiff had fallen from a bunk bed." (*Id.*) Plaintiff also claims that he spoke with Perez two additional times that week before his fall. (*Id.*) Despite that information, Plaintiff claims that Perez failed to act to remedy Plaintiff's situation. Therefore, Perez knew about Plaintiff's sleep apnea, knew he had a medical chrono for a lower bunk, knew that he had previously fallen from a bunk bed at his previous facility and should have drawn the inference that a substantial risk of serious harm existed. *See Farmer,* 511 U.S. at 837.

Drawing all reasonable inferences from the record most favorably to Plaintiff, the Court concludes that Plaintiff has alleged facts demonstrating a violation of his Eighth Amendment rights.

**D. Qualified Immunity**

In the report and recommendation, the Magistrate Judge concluded that Defendant Perez is not entitled to qualified immunity. Defendant objects to the report and recommendation and argues that Perez should be entitled to qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established at the time of the challenged conduct.' " *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The lowers courts have discretion to decide which of the two prongs of qualified immunity analysis to decide first. *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

**\*7** The courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 195, 201 (2001). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.* at 200. However, "[q]ualified immunity is an affirmative defense that should be pled by the defendant." *Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993). [FN3] Moreover, because facts necessary to establish an affirmative defense generally must be shown by matter outside the complaint, however, a qualified immunity defense is generally not amenable to a Rule 12(b) (6) motion. *See Morley v. Walker,* 175 F.3d 756, 761 (9th Cir.1999) (holding that, in light of the fact that all allegations in the complaint must be regarded as true on a motion to dismiss, "dismissal [on qualified immunity grounds] for failure to state a claim under 12(b)(6) is inappro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)
**(Cite as: 2012 WL 846444 (S.D.Cal.))**

priate."). The court is usually "not equipped at this stage to determine whether qualified immunity will ultimately protect [the defendant]. Those issues must be resolved at summary judgment or at trial." *Id.; see also Groten v. California,* 251 F.3d 844, 851 (9th Cir.2001) ("Rule 12(b)(6) dismissal is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies.") (*citing Jensen v. City of Oxford,* 145 F.3d 1078, 1085 (9th Cir.1998)).

> FN3. The failure to assert an immunity defense in an Answer will not act as a waiver of the defense so long as its assertion at the summary judgment stage does not prejudice the plaintiff. *Paine v. City of Lompoc,* 265 F.3d 975, 981 n. 1 (9th Cir.2001) (*citing Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993)).

Taken in the light most favorable to the Plaintiff, the second amended complaint presented a cognizable claim against Perez for deliberate indifference to serious medical care in violation of the Eighth Amendment. Second, at the time of the alleged violation, it was clearly established that conduct, where a prison official fails to take action when he is informed that a prisoner has a severe sleeping disorder and such disorder is documented in his files, has a lower bunk chrono and has previously fallen from a prison bunk bed at another facility, is unlawful. *See Farmer,* 511 U.S. at 838–842. Accordingly, Defendant Perez is not entitled to qualified immunity.

#### Conclusion

Based on the above, the Court SUSTAINS in part and OVERRULES in part Defendant's objections to the report and recommendation. As modified, the Court ADOPTS the Magistrate Judge's report and recommendation. The Court DENIES Defendants' motion to dismiss the first cause of action of deliberate indifference as to serious medical needs as to Defendants Amiling and Esquilin. The Court DENIES

Defendants' motion to dismiss the second cause of action of deliberate indifference as to serious medical needs as to Defendant Perez. The Court DENIES Defendants' motion to dismiss based on qualified immunity. The Court GRANTS Defendants' motion to dismiss Plaintiff's monetary claims against all Defendants in their official capacities and DISMISSES the claims with prejudice.

**\*8** IT IS SO ORDERED.

S.D.Cal.,2012.
Goudlock v. Perez
Not Reported in F.Supp.2d, 2012 WL 846444 (S.D.Cal.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Donald GRIFFIN, Plaintiff,
v.
Dr. Gerald AMATUCCI and Nurse Smith, Nurse
Administrator, Upstate Correctional Facility, De-
fendants.

No. 9:11–cv–1125 (MAD/TWD).
Signed June 19, 2014.

Donald Griffin, Albion, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Adrienne J. Kerwin, Esq., James
B. McGowan, Esq., of Counsel, Albany, NY, for
Defendants.

**DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.
**I. INTRODUCTION**
**\*1** Plaintiff commenced this civil rights action in
September of 2011, alleging that his constitutional
rights were violated while he was incarcerated at Up-
state Correctional Facility. *See* Dkt. No. 1. Plaintiff
alleges that Defendants violated his Eighth Amend-
ment right to adequate medical care by providing him
with a CPAP machine without the humidifier attach-
ment recommended by his treating specialist. *See id.*

On October 31, 2013, Defendants filed a motion
for summary judgment pursuant to Rule 56(a) of the
Federal Rules of Civil Procedure. *See* Dkt. No. 37–2 at
1. In a Report–Recommendation and Order dated
April 29, 2014, Magistrate Judge Dancks recom-

mended that the Court deny Defendants' motion. *See*
Dkt. No. 42. On May 16, 2014, Defendants filed ob-
jections to Magistrate Judge Dancks' Re-
port–Recommendation and Order. *See* Dkt. No. 43.

Currently before the Court is Magistrate Judge
Dancks' Report–Recommendation and Order.

**II. BACKGROUND**
On August 24, 2010, Plaintiff, then an inmate at
Upstate Correctional Facility, underwent a sleep study
at Alice Hyde Medical Center. *See* Dkt. No. 1 at 5.[FN1]
Plaintiff was diagnosed with obstructive sleep apnea.
*See id.* Plaintiff underwent another sleep study at
Alice Hyde Medical Center on January 11, 2011, to
determine the best treatment for his condition. *See*
Dkt. No. 1 at 5; Dkt. No. 37–4 at ¶ 3. The specialist
who conducted the study stated that "CPAP should be
initiated using an UltraMirage full face medium mask
with heat and humidity[.]" *See* Dkt. No. 1 at 12; Dkt.
No. 37–4 at ¶ 4.

> FN1. To avoid confusion, anytime the Court
> references a specific page number for an en-
> try on the docket, it will cite to the page
> number assigned by the Court's electronic
> filing system.

On February 14, 2011, Defendant Nancy Smith, a
Nurse Administrator at Upstate Correctional Facility,
received a quote for the price for Plaintiff's CPAP
machine. *See* Dkt. No. 1 at 13. The document did not
contain a quote for the humidifier recommended by
the specialist. *See id.* CPAP machines with humidifi-
ers cost approximately $230 more than those without.
*See id.* at 20. Defendant Smith submitted a request for
approval for the cost of the CPAP machine without a
humidifier. *See* Dkt. No. 41–4 at 3. Defendant Gerald
Amatucci approved Defendant Smith's request for that
CPAP machine on February 15, 2011. *See* Dkt. No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

37–4 at ¶ 6. On February 22, 2011, Defendant Smith issued Plaintiff a CPAP machine without a humidifier attachment. *See* Dkt. No. 1 at 6; Dkt No. 37–4 at ¶ 8.

On February 23, 2011, Plaintiff wrote to Defendant Smith and informed her that the CPAP machine without a humidifier was exacerbating his sleep apnea symptoms by drying out his throat. *See Dkt.* No. 1 at 6. Defendant Smith responded in writing on March 7, 2011, that Plaintiff "will not receive a humidifier" for the CPAP machine because Defendant Amatucci, the Regional Medical Director, "will not approve them." *See id.* at 17. Defendant Smith stated that the humidifier was "not needed for [the] CPAP machine to work." *See id.* Defendant Amatucci has never examined Plaintiff (*see* Dkt. No. 37–3 at 28:16–18), and nothing in the record indicates that Defendant Amatucci reviewed Plaintiff's medical files in the course of considering Defendant Smith's request.

**\*2** Plaintiff submitted a grievance regarding the humidifier issue on May 17, 2011. *See* Dkt. No. 1 at 19. Plaintiff attached a letter from an unnamed person, which was addressed to him, stating that "Stephanie spoke with Alice Hyde Hospital Sleep Apnea Center ... According to them the humidifier should always be used." *See id.* at 20. Plaintiff asserts that this letter indicates that "Alice Hyde Medical Center Sleep Lab made it clear" that the humidifier was required. *See id.* at 7.

Plaintiff's grievance was denied at the first level of review. *See id.* On June 16, 2011, the Superintendent denied the grievance at the second level of review. *See id.* at 30. The Superintendent's denial stated that Plaintiff "has been repeatedly advised that per ... Dr. Amatucci, no humidifiers for CPAP machines will be approved as they are not medically necessary. Humidification has no effect on the performance of the machine in preventing sleep apnea. [Plaintiff] has a functional CPAP machine that does not require humidification to operate properly." *See id.* Plaintiff's

grievance was denied at the final level of review on August 24, 2011. *See id.* at 36. The denial stated that "upon review by the Regional Medical Director, a humidifier for [the] CPAP machine is not medically indicated at this time." *See id.*

Plaintiff filed the complaint in this action on September 22, 2011. *See* Dkt. No. 37–2 at ¶ 3. He alleges that he "is suffering from sleep deprivation," which produces "continuous headaches, burning eyes, and heighten[ed] anxiety from fear of having a stroke or a[ ] heart attack or failure." *See* Dkt. No. 1 at 10. Plaintiff requests injunctive relief and damages. *See id.* at 38.

Defendants Amatucci and Smith moved to dismiss the complaint. *See* Dkt. No. 16. Plaintiff opposed the motion. *See* Dkt. No. 21. The Court denied the motion, finding that although "[t]his is a very close case," Plaintiff had alleged facts plausibly suggesting that Defendants, perhaps motivated by cost considerations, violated the Eighth Amendment by reflexively applying a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians. *See* Dkt. No. 27 at 9; Dkt. No. 29. Defendants answered the complaint (*see* Dkt. No. 30; Dkt. No. 37–2 at ¶ 5), and the parties engaged in discovery. Defendants then moved for summary judgment. *See* Dkt. No. 37–2 at ¶ 2.

In her Report–Recommendation and Order, Magistrate Judge Dancks recommended that the Court deny Defendants' motion for summary judgment. *See* Dkt. No. 42. Noting that "this remains an extremely close case," Magistrate Judge Dancks found that Defendants have not met their burden of showing that no genuine issue of material fact exists. *See id.* at 11. Specifically, Magistrate Judge Dancks stated that "Defendants have not included any facts about Plaintiff's particular experience of sleep apnea symptoms in their separate statement of facts or directed the Court to any specific part of Plaintiff's medical record describing Plaintiff's symptoms." *See id.* at 10.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

**\*3** Currently before the Court is Magistrate Judge Dancks' April 29, 2014 Report–Recommendation and Order and Defendants' objections thereto.

### III. DISCUSSION

**A. Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. See Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006) (citation omitted). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See id. at 273. To defeat summary judgment, the nonmoving party must do more than "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 259, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted). Rather, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. In determining whether a genuine issue of material [FN2] fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. Anderson, 477 U.S. at 248.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. O'Diah v. Mawhir, No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. See Cephas v. Nash, 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. See Frank v. Johnson, 968 F.2d 298, 299 (2d Cir.1992); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

**\*4** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. See

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

*Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66.

The test for an Eighth Amendment claim is two-fold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quotation omitted). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* (quotation omitted). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

There is no distinct litmus test to determine if a medical condition is serious, so courts weigh certain factors to make this determination, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagree-

ment over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**B. Defendants' Objections**

In their objections to Magistrate Judge Dancks' Report–Recommendation and Order, Defendants object on three grounds. *See* Dkt. No. 43 at 1. First, Defendants argue that "the court misstated and misapplied the summary judgment standard[.]" *See id.* Defendants claim that while Plaintiff's allegations were sufficient to withstand a motion to dismiss, Plaintiff has not provided enough admissible evidence to support these allegations and defeat summary judgment. *See id.* at 2. Defendants argue that, "[a]t the summary judgment stage, it is the lack of proof of a previously-deemed sufficient allegation that sinks a plaintiff." *See id.*

**\*5** Second, Defendants argue that Plaintiff's claim can only be viewed in two ways, and either way will result in Plaintiff losing on the merits. *See id.* If Plaintiff is claiming that the treatment provided for sleep apnea was insufficient, Defendants argue that disagreements between the specialist and Defendant Amatucci on how to treat sleep apnea cannot be the basis for a deliberate indifference claim. *See id.* at 2–3. Likewise, if Plaintiff is claiming that the treatment caused dry mouth and sleep difficulty, Defendants argue that "plaintiff does not suffer from a sufficiently serious medical need to establish an Eighth Amendment violation." *See id.* at 3–4.

Third, Defendants claim that they are entitled to qualified immunity. *See id.* at 1. Defendants argue that both Dr. Amatucci and Nurse Administrator Smith acted objectively reasonable and consistent with professional medical standards when they chose not to provide Plaintiff with the humidifier. *See id.* at 4.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

Defendants assert that it is "unreasonable and shocking" that they may be found liable for a constitutional violation when their actions were based on accepted medical standards. *See id.*

## C. Analysis

Contrary to Defendants' contentions, Magistrate Judge Dancks correctly recommended that the motion for summary judgment should be denied. Although Defendants continue to maintain that Plaintiff has not suffered a serious medical condition, they have not submitted any facts about Plaintiff's particular condition or sleep apnea symptoms. Defendants overlook the fact that the CPAP machine is exacerbating Plaintiff's sleep apnea symptoms, and these worsened symptoms may result in serious health problems. *See* Dkt. No. 38–1 at 8–10, 12–15, 21, 23–24, 26; Dkt. No. 1 at 6, 9. Although Defendants cited cases where various courts have found that alleged worse conditions than sleep apnea did not constitute a serious medical need, district courts in other circuits have concluded that sleep apnea may be a serious medical condition. *See Ross v. Westchester County Jail,* No. 10 Civ. 3937, 2012 WL 86467, *5 (S.D.N.Y. Jan. 11, 2012)* (holding that sleep apnea is a serious medical condition which "may be a life-threatening disorder"); *Dortch v. Davis,* No. 11–cv–841, 2014 WL 1125588, *5 (S.D.Ill. Mar.21, 2014)* (finding sleep apnea a serious medical condition, with long term effects that may include "high blood pressure, stroke, heart failure, diabetes, depression, and ADHD") (citation omitted); *Goudlock v. Perez,* No. 08cv204, 2012 WL 846444, *5 (S.D.Cal. Mar.13, 2012)* (citations omitted); *see also Pierce v. Gonzales,* No. 1:10cv285, 2011 WL 703594, *12 (E.D.Cal. Feb.18, 2011);* *Cramer v. Iverson,* No. 07–cv–725, 2008 WL 4838715, *3 n. 3 (D.Minn. Nov.5, 2008)* (assuming that sleep apnea constitutes a serious medical condition). Whether Plaintiff's conditions rise to the level of seriousness discussed in those cases is uncertain, but Defendants have not submitted enough specific evidence about Plaintiff's condition to warrant granting Defendants' motion for summary judgment. As previously mentioned, summary judgment can only be granted if there are no genuine issues to any material facts and the burden of proof is on the moving party. Although this remains a close case, the Court finds that Magistrate Judge Dancks correctly concluded that there are still genuine issues as to the material facts regarding the seriousness of Plaintiff's medical condition.

**\*6** Moreover, concerning Defendants' claim that Plaintiff cannot establish that they acted with deliberate indifference, Magistrate Judge Dancks correctly recommended that Defendants have not met their burden of demonstrating that they are entitled to summary judgment on this ground. As to Defendant Amatucci, the evidence suggests that he implemented a blanket policy against CPAP machines with humidifiers that may or may not have been medically supported in Plaintiff's individual case. *See* Dkt. No. 1 at 17; Dkt. No. 38; Dkt. No. 37–3 at 26. The reflexive application of a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians may indicate deliberate indifference. *See Johnson v. Wright,* 412 F.3d 398, 400 (2d Cir.2005). Although a blanket policy would not be considered deliberate indifference if the medical personnel considered the plaintiff's particular medical needs as part of the decision-making process (*see, e.g., Byng v. Wright,* No. 09 Civ. 9924, 2012 WL 967430, *9–10 (S.D.N.Y. Mar.20, 2012),* there is no evidence in the record indicating that Defendant Amatucci personally examined Plaintiff or considered Plaintiff's particular medical needs when implementing the blanket policy. *See* Dkt. No. 37–3 at 28:16–18. Defendant Amatucci also continues to assert that Plaintiff merely disagrees with the treatment that Defendants provided. The evidence, however, suggests that this is not a mere disagreement with the treatment he received, but was a blanket policy against the prescribed device which led to the exacerbation of the symptoms related to Plaintiff's sleep apnea. *See* Dkt. No. 37–7 at 5; Dkt. 41–3 at 2; Dkt. No. 38–1. Accordingly, the Court finds that Defendant Amatucci is not entitled to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

summary judgment.

Similarly, as to Defendant Smith, Magistrate Judge Dancks correctly found that she also is not entitled to summary judgment. Although Defendant Smith claims that she did not act with deliberate indifference because she has no ability to challenge the policy implemented by Defendant Amatucci, the evidence presented suggests that Defendant Smith checked with Defendant Amatucci about the policy only after she failed to provide Plaintiff with all of the prescribed equipment. *See* Dkt. No. 37–7 at 3. In light of the special solicitude the Court must afford to *pro se* plaintiffs, the Court finds that Defendant Smith is not entitled to summary judgment.

Finally, Magistrate Judge Dancks correctly recommended that the Court deny Defendants' motion for summary judgment based on qualified immunity. As Magistrate Judge Dancks stated, "Second Circuit precedent clearly establishes that the reflexive application of a blanket policy to deny medical care without considering the individualized needs of a particular inmate can violate the Eighth Amendment." *See* Dkt. No. 42 at 18–19 (citing *Johnson,* 412 F.3d at 400). Since a reasonable juror could find that it was not objectively reasonable for Defendants to believe that their conduct was lawful, the Court finds that summary judgment is not appropriate on qualified immunity grounds.

**\*7** Based on the foregoing, the Court denies Defendants' motion for summary judgment.

### IV. CONCLUSION

After carefully considering Magistrate Judge Dancks' Report–Recommendation and Order, Defendants' objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Dancks' April 29, 2014 Report–Recommendation and Order is

**ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve the parties with a copy of this Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION and ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Donald Griffin alleges that Defendants violated his Eighth Amendment right to adequate medical care by providing him with a CPAP machine without the humidifier attachment recommended by the specialist who treated Plaintiff. (Dkt. No. 1.) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 37.) For the reasons that follow, I recommend that Defendants' motion be denied.

### I. BACKGROUND

On August 24, 2010, Plaintiff, then an inmate at Upstate Correctional Facility, underwent a sleep study at Alice Hyde Medical Center. (Dkt. No. 1 at 5.[FN1]) Plaintiff was diagnosed with obstructive sleep apnea. *Id.* Plaintiff underwent another sleep study at Alice Hyde Medical Center on January 11, 2011, to determine the best treatment for his condition. (Dkt. No. 1 at 5; Dkt. No. 37–4 ¶ 3.) The specialist who conducted the study stated that "CPAP should be initiated using an UltraMirage full face medium mask with heat and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

humidity." (Dkt. No. 1 at 12; Dkt. No. 37–4 ¶ 4.)

> FN1. Page numbers in citations to the complaint refer to the page numbers assigned by the Court's electronic filing system rather than to the page numbers in the original document.

On February 14, 2011, Defendant Nancy Smith, a Nurse Administrator at Upstate Correctional Facility, received a quote for the price for Plaintiff's CPAP machine. (Dkt. No. 1 at 13.) The document did not contain a quote for the humidifier recommended by the specialist. *Id.* Defendant Smith submitted a request for approval for the cost of the CPAP machine without a humidifier. (Dkt. No. 41–4 at 3.) Defendant Regional Medical Director Gerald Amatucci approved Defendant Smith's request for that CPAP machine on February 15, 2011. (Dkt. No. 37–4 ¶ 6.) On February 22, 2011, Defendant Smith issued a CPAP machine without a humidifier attachment to Plaintiff. (Dkt. No. 1at 6, Dkt. No. 37–4 ¶ 8.)

On February 23, 2011, Plaintiff wrote to Defendant Smith and informed her that the CPAP machine without a humidifier was exacerbating his sleep apnea symptoms by drying out his throat. *Id.* Defendant Smith responded in writing on March 7, 2011, that Plaintiff "will not receive a humidifier" for the CPAP machine because Defendant Amatucci "will not approve them." *Id.* at 17. Defendant Smith stated that the humidifier was "not needed for [the] CPAP machine to work." *Id.*

**\*8** Defendant Amatucci has never examined Plaintiff. (Dkt. No. 37–3 at 28:16–18.) Northing in the record indicates that Defendant Amatucci reviewed Plaintiff's medical files in the course of considering Defendant Smith's request. Defendant Amatucci declares that:

I did not approve requests for humidifiers to be used

with CPAP machines to treat sleep apnea because humidification has no effect on the performance of CPAP machines in preventing sleep apnea. Contrary to the belief of the plaintiff, using a CPAP machine without a humidifier does not worsen or exacerbate sleep apnea. It treats it.

In a response to a letter from the plaintiff written on my behalf by my designee, the plaintiff was informed that humidifiers for CPAP machines will not be approved because they are not medically necessary to treat sleep apnea.

I understand that the plaintiff alleges that he experienced a dry mouth and throat, and did not sleep, the two [or] three times that he used the CPAP machine provided to him. These are common side-effects associated with the use of CPAP machines. However, such effects do not affect a user's sleep apnea, or interfere with the effectiveness of the CPAP machine in treating sleep apnea. In my experience, most CPAP machine users become accustomed to the dryness after using the CPAP machine for a period of time.

My decision not to approve the use of humidifiers with CPAP machines was based upon my medical judgment, and was consistent with the standard of care in treating sleep apnea.

(Dkt. No. 37–5 ¶¶ 4–7.)

Plaintiff testified at his deposition that he has not used his CPAP machine since approximately March 2011. (Dkt. No. 37–3 at 31:2–8.) Plaintiff submitted a grievance regarding the humidifier issue on May 17, 2011. (Dkt. No. 1 at 19.) Plaintiff attached a letter from an unnamed person to Plaintiff stating that "Stephanie spoke with Alice Hyde Hospital Sleep Apnea Center .... According to them the humidifier should always be used." *Id.* at 20. Plaintiff asserts that this letter indicates that "Alice Hyde Medical Center

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

Sleep Lab made it clear" that the humidifier was required. *Id.* at 7.

Plaintiff's grievance was denied at the first level of review. *Id.* On June 16, 2011, the Superintendent denied the grievance at the second level of review. *Id.* at 30. The Superintendent's denial stated that Plaintiff "has been repeatedly advised that per ... Dr. Amatucci, no humidifiers for CPAP machines will be approved as they are not medically necessary. Humidification has no effect on the performance of the machine in preventing sleep apnea. [Plaintiff] has a functional CPAP machine that does not require humidification to operate properly." *Id.* Plaintiff's grievance was denied at the final level of review on August 24, 2011. *Id.* at 36. The denial stated that "upon review by the Regional Medical Director, a humidifier for [the] CPAP machine is not medically indicated at this time." *Id.*

**\*9** Plaintiff filed the complaint in this action on September 22, 2011. He alleges that he "is suffering from sleep deprivation," which produces "continuous headaches, burning eyes, and heighten[ed] anxiety from fear of having a stroke or a[ ] heart attack or failure." *Id.* at 10. Plaintiff requests injunctive relief and damages. *Id.* at 38.

In its initial review of the complaint, the Court dismissed Plaintiff's claims against two supervisory officials without prejudice for failure to sufficiently plead their personal involvement. (Dkt. No. 7 at 5–7.) The Court also dismissed Plaintiff's retaliation claim without prejudice. *Id.* at 7–8. The Court found that Plaintiff's Eighth Amendment claims against Defendants Smith and Amatucci were sufficiently well-pleaded to warrant a response from Defendants. *Id.* at 8–9.

In the same order, the Court denied Plaintiff's request for a temporary restraining order, finding that Plaintiff had failed to establish a clear or substantial likelihood of success on the merits of his Eighth

Amendment claims. *Id.* at 9–12. The Court found that Plaintiff's motion for a temporary restraining order failed to clearly or substantially establish the objective prong of an Eighth Amendment claim because the only injuries Plaintiff claimed were a dry nose and throat and a general worsening of unspecified sleep apnea symptoms. *Id.* at 11. Moreover, the Court found that Plaintiff failed to clearly or substantially establish that either of the remaining Defendants acted with deliberate indifference. *Id.* at 11–12.

Defendants Amatucci and Smith moved to dismiss the complaint. (Dkt. No. 16.) Plaintiff opposed the motion. (Dkt. No. 21.) The Court denied the motion, finding that although "[t]his is a very close case," Plaintiff had alleged facts plausibly suggesting that Defendants, perhaps motivated by cost considerations, violated the Eighth Amendment by reflexively applying a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians. (Dkt. No. 27 at 9; Dkt. No. 29.)

Defendants answered the complaint (Dkt. No. 30) and the parties engaged in discovery. Defendants now move for summary judgment. (Dkt. No. 37.) Plaintiff has opposed the motion. (Dkt. No. 41.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id. at 273.* The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

"simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> **FN2.** A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### III. ANALYSIS

**\*10** Plaintiff alleges that Defendants Amatucci and Smith violated his Eighth Amendment right to adequate medical care by failing to provide him with a CPAP machine with a humidifier attachment. (Dkt. No. 1.) Defendants argue that they are entitled to summary judgment because (A) there is no evidence that Plaintiff suffered any serious medical need due to the lack of a humidifier; (B) there is no evidence that Defendants acted with deliberate indifference; and (C) they are entitled to qualified immunity. (Dkt. No. 37–7.)

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102 (quoting *Trop v. Dulles,* 356 U.S. 86, 100, 78

S.Ct. 590, 2 L.Ed.2d 630 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

#### A. Serious Medical Need

Defendants argue that Plaintiff has not demonstrated a serious medical need. (Dkt. No. 37–7 at 2 [FN3].) For the reasons discussed below, I recommend that the Court find that Defendants have not, at this time, met their burden of establishing that they are entitled to judgment as a matter of law on this ground.

> **FN3.** Page numbers in citations to Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

**\*11** In their motion to dismiss, Defendants focused almost entirely on the subjective prong of Plaintiff's Eighth Amendment claim. (Dkt. No. 16–1.) In my Report–Recommendation regarding that motion, I found that

> Defendants cursorily argue that Plaintiff has not alleged facts plausibly suggesting that he suffers from a serious medical need. Defendants do not cite any authority for this argument. (Dkt. No. 16–1 at 6.) It appears that there is no decision from either the Second Circuit or the district courts in this circuit discussing whether sleep apnea is a serious medical condition for Eighth Amendment purposes. District courts in other circuits have concluded that sleep apnea may be a serious medical condition. *Goudlock v. Perez,* No. 08cv204, 2012 U.S. Dist. LEXIS 33485, at \*14–15, 2012 WL 846444, at \*5 (S.D.Cal. Mar.13, 2012) (collecting cases). Accordingly I find, for the purposes of this motion only, that Plaintiff has pleaded facts plausibly suggesting the objective prong of his Eighth Amendment claim.

(Dkt. No. 27 at 7, footnote omitted.)

In objections to the Report–Recommendation, Defendants argued that:

> [T]he medical need at issue in this case is a dry throat. There is no dispute that the plaintiff was treated for his sleep apnea. The allegations in this case are that the plaintiff's sleep apnea was not being treated precisely as a specialist recommended and, as a result, the plaintiff suffered a dry throat—apparently a sleep apnea symptom. Therefore, the defendants ... object to the Report and Recommendation to the extent that it is read as finding that the serious medical need at issue in this case is untreated sleep apnea.

(Dkt. No. 28 at 1 n. 1, citations omitted.)

In the Court's order adopting the Report–Recommendation, the Court stated that:

> [T]o the extent that Defendants argue that after providing Plaintiff with a CPAP machine, his only medical need requiring treatment is a "dry throat," the Court finds that Plaintiff has sufficiently alleged a serious medical need. Plaintiff has alleged that without the recommended heat and humidity, the CPAP machine is in fact exacerbating his sleep apnea symptoms and can lead to more serious health consequences, other than mere dry mouth.

(Dkt. No. 29 at 10, citations omitted.)

In the pending motion, Defendants argue, without citation to evidence or authority, that "[t]he only alleged untreated medical need alleged by the plaintiff is the dry mouth and throat and lack of sleep that his sleep apnea treatment was causing him. There can be no serious argument that dry mouth and throat and difficulty sleeping are the types of medical needs that the Eighth Amendment was designed to address." (Dkt. No. 37–7 at 2.) Defendants' Statement Pursuant to Rule 7.1(a)(3) does not include any facts supporting the argument that Plaintiff does not suffer from a serious medical need. (Dkt. No. 37–6.) Defendants' current argument is precisely the same as presented in their objections to the previous Re-

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

port–Recommendation. Yet Defendants have presented no new evidence to overcome the Court's previous observation that "Plaintiff has alleged that without the recommended heat and humidity, the CPAP machine is in fact exacerbating his sleep apnea symptoms." (Dkt. No. 29 at 10.) Moreover, Defendants' argument disregards the fact that Plaintiff testified at his deposition that he has not used his CPAP machine since approximately March 2011. (Dkt. No. 37–3 at 31:2–8.) Thus, Plaintiff claims that the CPAP machine without a humidifier attachment is akin to having no CPAP machine at all. Plaintiff's complaint alleges that he suffered dry throat, "worsening sleep apnea symptoms," and that because he cannot cope with the CPAP machine without the humidifier he is at risk for serious health problems. (Dkt. No. 1 at 6, 9.)

**\*12** As the Court noted in its previous order, it appears that there is no decision from either the Second Circuit or the district courts in this circuit discussing whether sleep apnea is a serious medical condition for Eighth Amendment purposes. District courts in other circuits have concluded that sleep apnea may be a serious medical condition. *Goudlock v. Perez,* No. 08cv204, 2012 U.S. Dist. LEXIS 33485, at \*14–15, 2012 WL 846444, at \*5 (S.D.Cal. Mar.13, 2012) (collecting cases).[FN4] While it may be that Plaintiff's particular experience of sleep apnea does not rise to the level of seriousness discussed in those cases, Defendants have not met their burden of showing through the production of admissible evidence that no genuine issue of material fact exists on this issue. As noted above, Defendants have not included any facts about Plaintiff's particular experience of sleep apnea symptoms in their separate statement of facts or directed the Court to any specific part of Plaintiff's medical record describing Plaintiff's symptoms.

> FN4. The Court has previously provided Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557

F.3d 76 (2d Cir.2009).

While this remains an extremely close case, two policy considerations warrant a finding that the issue of the seriousness of Plaintiff's medical condition should survive summary judgment. First, as in any motion for summary judgment, the burden is on Defendants as the moving parties to show, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Second, the Second Circuit requires district courts to afford special solicitude to pro se litigants such as Plaintiff. *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d. Cir.2010). Therefore, Defendants have not demonstrated that they are entitled to judgment as a matter of law on this ground.

### B. *Deliberate Indifference*

Defendants argue that Plaintiff cannot establish that they acted with deliberate indifference. (Dkt. No. 37–7 at 3–4.) For the reasons discussed below, I find that Defendants have not met their burden of demonstrating that they are entitled to judgment as a matter of law on this ground.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. "[M]ere disagreement over proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703. However, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Id.* (quoting *Hathaway,* 99 F.3d at 553).

**\*13** The reflexive application of a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians may indicate deliberate indifference. *Johnson v. Wright,* 412 F.3d 398, 400 (2d Cir.2005) (reversing summary judgment for defendants and finding triable issue of fact where evidence showed that non-treating physician administrators applied blanket policy against providing hepatitis C medication despite treating physicians' recommendations). The application of a blanket policy by non-treating administrators and medical personnel does not demonstrate deliberate indifference where the defendant considers the plaintiff's particular medical needs as part of the decision-making process. *See, e.g., Byng v. Wright,* No. 09 Civ. 9924(PKC)(JCF), 2012 U.S. Dist. LEXIS 39618, at *23–26, 2012 WL 967430, at *9–10 (S.D.N.Y. Mar. 20, 2012) (defendants entitled to summary judgment because, unlike *Johnson,* plaintiff's former treating physician agreed with administrator's decision and evidence showed that defendant administrator considered plaintiff's medical records when making decision rather than reflexively applying a policy); *Watson v. Wright,* No. 9:08–CV–62 (NAM/ATB), 2011 U.S. Dist. LEXIS 116709, at *32–34, 2011 WL 4527789, at *10 (N.D.N.Y. Aug.4, 2011) (defendants entitled to summary judgment because, unlike *Johnson,* there was disagreement between plaintiff's treating physicians regarding the proper treatment and defendant administrator "became actively involved in plaintiff's treatment and reviewed his medical records" rather than reflexively applying a blanket policy).[FN5]

> **FN5.** The Court will provide Plaintiff with copies of these unpublished decisions in accordance with the Second Circuit's decision

in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

### 1. *Defendant Amatucci*

Defendants argued in their motion to dismiss that "Plaintiff admits that he was issued a CPAP machine to treat his sleep apnea. However, plaintiff would prefer to have a CPAP machine with a humidifier attached. Although plaintiff disagrees with the treatment he is being provided, without more he has failed to allege an Eighth Amendment violation." (Dkt. No. 16–1 at 6.)

In my Report–Recommendation, I found that:

> This is a very close case. However, because the Court must afford special solicitude to pro se civil rights plaintiffs and draw all inferences in Plaintiff's favor, I recommend that the Court deny Defendants' motion to dismiss. The specialist at Alice Hyde Medical Center, who it appears is the only doctor mentioned in the complaint who actually examined Plaintiff, believed that Plaintiff required heat and humidity for the CPAP machine to be effective. Reading the complaint in the light most favorable to Plaintiff, it appears that Defendants rejected the specialist's recommendation not because they disagreed with the specialist's opinion about what was best for Plaintiff, but because of a general policy against providing CPAP machines with humidifiers. Defendant Smith's statement that Defendant Amatucci "will not approve *them"* suggests the existence of a blanket policy against CPAP machines with humidifiers that may or may not be medically supported in Plaintiff's individual case. (Dkt. No. 1 at 17.) A blanket policy is also suggested by the Superintendent's response to Plaintiff's grievance, which stated that "no humidifiers for CPAP machines will be approved ...." *Id.* at 30. The reflexive application of a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians may indicate deliberate indifference. *Johnson v. Wright,* 412 F.3d

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

398, 400 (2d Cir.2005) (reversing summary judgment for defendants and finding triable issue of fact where evidence showed that non-treating physician administrators applied blanket policy against providing hepatitis C medication despite treating physicians' recommendations). In addition, given the lower price of CPAP machines without humidifiers (Dkt. No. 1 at 20), there is at least an inference plausibly suggesting that Defendants consciously chose an easier and less efficacious treatment plan rather than properly treating Plaintiff's serious medical need.

**\*14** (Dkt. No. 27 at 8–9.)

Defendants objected to the Report–Recommendation. (Dkt. No. 28.) Regarding the subjective prong of the Eighth Amendment claim against Defendant Amatucci, they argued that:

the complaint and attached documents allege that Dr. Amatucci will not approve humidifiers because they are "not needed for [the] CPAP machine to work," and "are not medically necessary." While the complaint also contains an allegation that CPAP machines with humidifiers are more expensive than those without humidifiers, there are no allegations in the complaint that the reason behind Dr. Amatucci's alleged position on this issue is based on financial concerns. Since the reasons actually stated in the complaint and attached documents are based on Dr. Amatucci's medical judgment, and there is no allegation that the humidifier will not be provided because of the cost, the complaint should be dismissed as against Dr. Amatucci.

*Id.* at 2 (citations omitted).

The Court rejected Defendants' objections as follows:

Plaintiff has plausibly suggested that this is not simply a mere disagreement regarding medical treatment. Rather, he argues that the CPAP machine with no humidifier is not an adequate treatment for his condition and that is contrary to the treatment prescribed by the only specialist to whom Plaintiff was sent. Magistrate Judge Dancks correctly noted that this is a "very close call," but that given the special solicitude afforded to pro se plaintiffs, the motion to dismiss should be denied. Plaintiff's complaint could be read to plausibly argue that Defendants ignored the specialist's recommendation regarding heat and humidity because of a general policy against providing CPAP machines with humidifiers. The reflexive application of a blanket policy against a particular treatment in the face of contrary recommendations from treating physicians may indicate deliberate indifference.

(Dkt. No. 29 at 10, citations and punctuation omitted.)

Here, as they did in their motion to dismiss (Dkt. No. 16–1 at 6), Defendants argue that Plaintiff merely disagrees with the treatment Defendants provided and would simply prefer to have a CPAP machine with a humidifier attached. (Dkt. No. 37–7 at 3.) Defendants argue their lack of deliberate indifference as follows:

Dr. Amatucci has testified that, in his professional medical judgment, despite causing a dry mouth and throat, the CPAP machine without a humidifier sufficiently treats sleep apnea. Additionally, the evidence in the record demonstrates that Nurse Administrator Smith did not order a humidifier for plaintiff's CPAP machine pursuant to her understanding of Dr. Amatucci's medical position that humidifiers are not medically necessary. However, upon plaintiff's complaint, Nurse Administrator Smith confirmed with Dr. Amatucci that a humidifier would not be approved. As a result, there is no evidence in this case that the defendants were deliberately indifferent to plaintiff's serious medical needs.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

*15 (Dkt. No 37–7 at 3–4.)

As he did in opposition to the motion to dismiss (Dkt. No. 21 at 2), Plaintiff argues that he does not simply "prefer" the CPAP with a humidifier. Rather, he argues, the CPAP machine with no humidifier is not adequate treatment because it is not the treatment that the specialist recommended and because the lack of humidifier dries out his mouth, which causes him to wake up choking. (Dkt. No. 41–3 at 2.) Plaintiff argues that the specialist who prescribed the CPAP machine with a humidifier was "clearly aware" of Plaintiff's dry-mouth issue and "showed it by recommending the humidifier." *Id.*

As noted above, Plaintiff has never met Defendant Amatucci. (Dkt. No. 37–3 at 28:16–18.) There is no indication in the evidence before the Court that Defendant Amatucci considered Plaintiff's medical records or anything about Plaintiff's particular medical needs before applying his blanket policy against humidifiers. The specialist at Alice Hyde Medical Center, who it appears is the only medical professional who actually examined Plaintiff for his sleep apnea, believed that Plaintiff required heat and humidity for the CPAP machine to be effective. (Dkt. No. 41–4 at 2.) Accordingly, although this remains a very close case, I recommend that the Court reject Defendant Amatucci's argument that he is entitled to judgment as a matter of law on this ground.

### 2. *Defendant Smith*

In objections to the Report–Recommendation on their motion to dismiss, Defendants argued that "while Judge Dancks finds that the complaint may support a claim that a blanket prohibition against the use of humidifiers with CPAP machines in DOCCS is arguably evidence of 'deliberate indifference,' ... the complaint fails to allege that N.P. Nancy Smith has any ability to make, or challenge, such a policy." (Dkt. No. 28 at 1–2.) The Court rejected that objection as follows:

> As to Defendant Smith, although she may have been simply following the policy of a supervisor in not providing Plaintiff with the requested additions to his CPAP machine, construing the facts in the light most favorable to Plaintiff, the Court cannot grant Defendants' motion on this ground. Specifically, Plaintiff alleges that Defendant Smith failed to submit his request for a humidifier for his CPAP machine to Defendant Amatucci. Moreover, Plaintiff alleges that Defendant Smith ignored the Alice Hyde Medical Center's prescription that Plaintiff receive a machine that provides 'heat and humidity' when she failed to obtain a price quote for a CPAP machine with those capabilities from the medical supplier. Although Defendant Smith may be able to establish in a properly filed motion for summary judgment that she was merely following procedures put in place by her supervisors in failing to provide Plaintiff with all of the prescribed equipment, in light of the special solicitude the Court must afford to pro se plaintiffs, the Court finds that Magistrate Dancks correctly recommended that the Court deny Defendants' motion as to the claims against Defendant Smith.

*16 (Dkt. No. 29 at 9.)

In support of the pending motion for summary judgment, Defendant Smith declares that "[a]t the request of an Upstate physician, on February 15, 2011 I requested authorization to acquire a CPAP machine, full face mask, headgear and tubing." (Dkt. No. 37–4 ¶ 5.) Defendant Smith further declares that "[o]n March 3, 2011 I responded to a letter from the plaintiff informing the plaintiff that Regional Medical Director, Dr. Amatucci, does not approve the use of humidifiers with CPAP machines." *Id.* ¶ 9. Finally, Defendant Smith declares that "I clarified with Dr. Amatucci via email on May 24, 2011 that he does not approve the use of humidifiers with CPAP machines, and informed the plaintiff." *Id.* ¶ 10.

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

Defendants argue that this evidence establishes that Defendant Smith "did not order a humidifier for plaintiff's CPAP machine pursuant to her understanding of Dr. Amatucci's medical position that humidifiers are not medically necessary." (Dkt. No. 37–7 at 3 .) However, the evidence presented establishes only that Defendant Smith checked with Defendant Amatucci about the policy *after* she failed to provide Plaintiff with all of the prescribed equipment. Thus, it does not establish that she was "merely following procedures put in place by her supervisors" when she placed the order. Therefore, although I stress yet again that this is a very close case, Defendants have not established that they are entitled to judgment as a matter of law on this ground.

C. *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity. (Dkt. No. 37–7 at 4.) Defendants' qualified immunity argument states:

[B]oth defendants acted reasonably and in conformance with their duties and authority in a good faith attempt to provide the plaintiff with appropriate medical care. Defendant Smith reasonably relied on the medical judgment of [Defendant] Amatucci when ordering plaintiff's medical equipment, and defendant Amatucci reasonably exercised his medical judgment in determining that a humidifier was not required to treat plaintiff's sleep apnea. Therefore, the defendants are entitled to qualified immunity.

*Id.* Defendants' argument is without merit.

"Public officials enjoy qualified immunity from suit for damages under 42 U.S.C. § 1983 for acts undertaken in their official capacity, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known." *Harhay v. Town of Ellington Bd.*

*of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013) (punctuation omitted).

**\*17** Here, as discussed above, Plaintiff has, for the purposes of this motion, shown facts making out the violation of a constitutional right. As discussed above, Second Circuit precedent clearly establishes that the reflexive application of a blanket policy to deny medical care without considering the individualized needs of a particular inmate can violate the Eighth Amendment. *Johnson,* 412 F.3d at 400. Finally, a reasonable juror could conclude that it was not objectively reasonable for Defendants to believe that their conduct was lawful. Conversely, of course, a reasonable juror could conclude that it *was* objectively reasonable for Defendants to believe that their conduct was lawful. Because the facts regarding Defendants' conduct could be construed as either reasonable or unreasonable by a jury, summary judgment is not appropriate on qualified immunity grounds. Therefore, I recommend that the Court deny Defendants' motion for summary judgment.[FN6]

> FN6. This recommendation does not conflict with the Court's earlier ruling denying Plaintiff's motion for a temporary restraining order. Here, Defendants bear the burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. In moving for a temporary restraining order, Plaintiff was required to establish a clear or substantial likelihood of success on the merits.

**ACCORDINGLY,** it is

Slip Copy, 2014 WL 2779305 (N.D.N.Y.)
**(Cite as: 2014 WL 2779305 (N.D.N.Y.))**

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be ***DENIED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Byng v. Wright,* No. 09 Civ. 9924(PKC)(JCF), 2012 U.S. Dist. LEXIS 39618, 2012 WL 967430 (S.D.N.Y. Mar. 20, 2012) and *Watson v. Wright,* No. 9:08–CV–62 (NAM/ATB), 2011 U.S. Dist. LEXIS 116709, 2011 WL 4527789 (N.D.N.Y. Aug.4, 2011).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

Dated: April 29, 2014.

N.D.N.Y.,2014.
Griffin v. Amatucci
Slip Copy, 2014 WL 2779305 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 425986 (W.D.Pa.)
**(Cite as: 2012 WL 425986 (W.D.Pa.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Richard A. NESMITH, Plaintiff,
v.
SOUTHERN HEALTH PARTNERS, et al, Defendants.

Civil Action No. 11–425.
Feb. 9, 2012.

Richard A. Nesmith, Pittsburgh, PA, pro se.

John R. Ninosky, Johnson, Duffie, Stewart & Weidner, Lemoyne, PA, for Defendants.

### *MEMORANDUM ORDER*

TERRENCE F. McVERRY, District Judge.

**\*1** On March 31, 2011, a motion for leave to proceed *in forma pauperis* was filed in the above captioned case. (ECF No. 1.) The motion was granted (ECF No. 2) and Plaintiff's Complaint was filed that same day (ECF No. 3). On July 5, 2011, this case was referred to United States Magistrate Judge Lisa Pupo Lenihan for pretrial proceedings in accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1), and Local Rules 72.C and 72.D.

Defendants filed a motion to dismiss Plaintiff's Complaint on July 5, 2011 (ECF No. 17), and on January 10, 2012, the magistrate judge entered a Report recommending that Defendants' motion be granted (ECF No. 22). Plaintiff was served with the Report at his listed address and was advised that he had until January 27, 2012, to file written objections. No objections were filed to the Report.

After *de novo* review of the pleadings and documents in the case, together with the Report and Recommendation, the following order is entered.

**AND NOW,** this 9th day of February, 2012,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 17) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Report and Recommendation (ECF No. 22) dated January 10, 2012, is **ADOPTED** as the opinion of the Court.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED.**

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

W.D.Pa.,2012.
Nesmith v. Southern Health Partners
Not Reported in F.Supp.2d, 2012 WL 425986 (W.D.Pa.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)
**(Cite as: 2012 WL 426606 (W.D.Pa.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Richard A. NESMITH, Plaintiff,
v.
SOUTHERN HEALTH PARTNERS, et al, Defendants.

Civil Action No. 11–425.
Jan. 10, 2012.

Richard A. Nesmith, Pittsburgh, PA, pro se.

John R. Ninosky, Johnson, Duffie, Stewart & Weidner, Lemoyne, PA, for Defendant.

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

LISA PUPO LENIHAN, United States Chief Magistrate Judge.

### I. RECOMMENDATION

**\*1** For the reasons that follow, it is respectfully recommended that Defendants' Motion to Dismiss (ECF No. 17) be granted and that Plaintiff's Complaint (ECF. No. 3) be dismissed.

### II. REPORT

On March 31, 2011, Plaintiff, Richard A. Nesmeth, commenced this action under 42 U.S.C. § 1983 (ECF No. 3) alleging violations of his constitutional rights stemming from his incarceration in the Beaver County Jail. Plaintiff named as Defendants Southern Health Partners and Beth Harris (identified as "Beth" in the Complaint). Plaintiff filed a supplement to his Complaint on May 5, 2011. (ECF No. 7–1, 7–2.)

On July 5, 2011, Defendants filed a Motion to Dismiss Plaintiff's Complaint (ECF No. 17) and a brief in support of the Motion to Dismiss (ECF No. 18). Plaintiff filed a Response to Defendants' Motion to Dismiss (ECF No. 19) on July 12, 2011.

### A. Standard of Review

When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), courts must accept all factual allegations in the complaint as true and read them in the light most favorable to the plaintiff. *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 556 (2007). "Factual allegations must be enough to raise a right to relief above a speculative level." *Id.* at 555. The court need not accept inferences drawn by the plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.,* 394 F.3d 126, 143 (3d Cir.2004) (citing *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997)). Nor must the court accept legal conclusions set forth as factual allegations. *Bell Atlantic Corp.,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Additionally, a civil rights claim "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983 ." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987).

Courts generally consider the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss. *Pension Benefit Guar. v. White Consol. Indus., Inc.,* 998 F.2d 1192,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)
**(Cite as: 2012 WL 426606 (W.D.Pa.))**

1196 (3d Cir.1993). Factual allegations within documents described or identified in the complaint also may be considered if the plaintiff's claims are based upon those documents. *Id.* (citations omitted). Moreover, a district court may consider indisputably authentic documents without converting a motion to dismiss into a motion for summary judgment. *Spruill v. Gills,* 372 F.3d 218, 223 (3d Cir.2004); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

**\*2** Finally, a court must employ less stringent standards when considering *pro se* pleadings than when judging the work product of an attorney. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). When presented with a *pro se* complaint, the court should construe the complaint liberally and draw fair inferences from what is not alleged as well as from what is alleged. *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003). In a section 1983 action, the court must "apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name." *Higgins v. Beyer,* 293 F.3d 683, 688 (3d Cir.2002) (quoting *Holley v. Dep't of Veteran Affairs,* 165 F.3d 244, 247–48 (3d Cir.1999)). *See also Nam i v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) ("Since this is a § 1983 action, the [pro se] plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution.") (quoting *Higgins,* 293 F.3d at 688). Notwithstanding this liberality, *pro se* litigants are not relieved of their obligation to allege sufficient facts to support a cognizable legal claim. *See, e.g., Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378 (5th Cir.2002); *Riddle v. Mondragon,* 83 F.3d 1197, 2102 (10th Cir.1996).

### B. Plaintiff's Allegations

Plaintiff claims that Defendants failed to provide him with proper medical care and attention during the time he was incarcerated at the Beaver County Jail. Specifically, Plaintiff alleges that upon his arrival at the jail in August 2010, he informed Defendant Beth Harris that he suffered from chronic sleep apnea and

lower back pain.[FN1] (ECF No. 3 at 2.) He contends that he was denied proper medical treatment for the pain in his lower back, namely an MRI, and denied timely access to his breathing machine to aid with his sleep apnea.

> FN1. Plaintiff also asserts that he informed Defendant Beth Harris that he had previously suffered a heart attack as well. (ECF No. 3 at 2.) However, with the exception of some conclusory statements regarding some chest pain he experienced due to his sleep apnea condition, Plaintiff fails to allege any facts in his Complaint that would support any kind of constitutional violation in connection with his heart attack.

First, Plaintiff alleges that he suffers from lower back pain because he had three discs removed from his back. (ECF No. 3 at 2.) He states that prior to entering the Beaver County Jail he received on-going pain management from his doctor. (ECF No. 3 at 2.) According to Plaintiff, Defendant Beth Harris would give him the "run around" and not allow him to see the doctor every time he put in a medical request or sick call slip for his lower back pain. (ECF No. 3 at 2, 4.) Specifically, Plaintiff asserts that he put in a medical request slip into Defendant Beth Harris on January 5, 2011, stating that he needed an MRI, but he received no response to the request. (ECF No. 3 at 4.) Plaintiff claims that he started experiencing numbness in his arms, hands, legs and feet on March 18, 2011, and requested to see a nurse the following day. (ECF No. 7–2 at 19.) Plaintiff was seen by a nurse and later seen by medical on March 24, 2011, at which time an x-ray was ordered of Plaintiff's neck. (ECF No. 7–2 at 19–20.) Plaintiff, however, refused the x-ray because he felt that it would not address what he believed to be the main problem, the pain in his lower back. (ECF No. 7–2 at 19–20.)

**\*3** Plaintiff also alleges that Defendants failed to provide him with his sleep apnea breathing machine in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)
**(Cite as: 2012 WL 426606 (W.D.Pa.))**

a timely fashion. (ECF No. 7–2 .) According to Plaintiff, his sleep doctor faxed in the necessary paperwork regarding his sleep apnea condition and the jail received his breathing machine on December 28, 2010. (ECF No. 7–2 at 3.) Plaintiff states, however, that despite numerous requests his machine remained in Defendant Beth Harris' office until February 11, 2011. (ECF No. 7–2 at 2–3, 5, 7, 10, 12.)

### C. Defendant's Motion to Dismiss

In support of dismissal, Defendants assert that: (1) Plaintiff has failed to state a claim for a violation of his constitutional rights; and (2) Plaintiff's cause of action against Defendant Southern Health Partners should be dismissed because it is premised under a theory of vicarious liability. (ECF No. 18.)

### 1. *No Violation of Constitutional Right*

Defendants contend that Plaintiff fails to demonstrate deliberate indifference to a serious medical condition. The Eighth Amendment mandates that prisoners receive access to basic medical treatment. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order for a prisoner to state a claim under § 1983 for the denial of medical care, he must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Therefore, a prisoner must demonstrate: (1) deliberate indifference by prison officials to (2) a serious medical need. *Id.* at 106; *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Reynolds v. Wagner,* 936 F.Supp. 1216, 1224 (E.D.Pa.1996) (citations omitted). The seriousness of an inmate's medical needs may also be accessed where denial or delay of medical treatment "cause[d] an inmate to suffer life-long handicap or permanent loss." *Monmouth Country Correctional Institutional Inmates,*

834 F.2d at 347. If the "unnecessary and wanton infliction of pain" results from the denial or delay of adequate medical care, "the medical need is of the serious nature contemplated by the Eighth Amendment." *Estelle,* 429 U.S. at 103.

Deliberate indifference is more than inadvertent failure to provide adequate medical care and is characterized by "obduracy and wantonness." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *see also Estelle,* 429 U.S. at 105 (noting that "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain' or to be repugnant to the conscience of mankind' "). Additionally, deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 837–38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Furthermore, the Court of Appeals for the Third Circuit has recognized that "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napolean,* 897 F.2d 103, 110 (3d Cir.1990).

**\*4** However, the Third Circuit has found deliberate indifference in circumstances which include where prison officials (1) deny reasonable requests for medical treatment exposing the inmate to "undue suffering or the threat of tangible residual injury"; (2) knowingly and intentionally refuse to provide the inmate with necessary medical care; (3) erect arbitrary and burdensome procedures that result in intermediate delays and outright denials of medical care to suffering inmates; (4) opt for easier and less efficacious treatment of the inmate's condition; and (5) prevent an inmate from receiving recommended treatment of serious medical needs or deny access to a physician capable of evaluating the need for such treatment. *See Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993) (citing *Monmouth County Correctional Instutional Inmates,* 834 F.2d at 346–47).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)
**(Cite as: 2012 WL 426606 (W.D.Pa.))**

In the instant case, Plaintiff has failed to establish a set of facts that demonstrate that Defendants violated his constitutional right to adequate medical treatment. Plaintiff's allegations fail to establish that Defendants were deliberately indifferent to his serious medical needs. With regard to Plaintiff's sleep apnea condition, Plaintiff's claim of deliberate indifference relates to the delay he faced in receiving his breathing machine. Even if the Court were to assume that Plaintiff's sleep apnea was a serious medical condition requiring the treatment he states he did not receive, namely his breathing machine, all Plaintiff has complained of is a delay in receiving such treatment. Where a prisoner alleges delay in receiving medical treatment, he must show that the delay led to further harm. *See, e.g., Brooks v. Kyler,* 204 F.3d 102, 105 n. 4 (3d Cir.2000) (The prisoner-plaintiff "presented no evidence of any harm resulting from a delay in medical treatment.") Although Plaintiff states that he did not sleep well due to his sleep apnea and would occasionally wake up with headaches and chest pain, there is no allegation of substantial harm caused by the delay in receiving his machine. Furthermore, there is no allegation that Defendants specifically acted with the intention of delaying his treatment. While Plaintiff alleges that Defendant Beth Harris kept his breathing machine in her office for a monthand-a-half,[FN2] he acknowledges that Defendant had to first do a medical check with Plaintiff's sleep doctor regarding his sleep apnea condition and verify that it was in fact his machine before they could provide him with it. *See* ECF No. 7–2 at 5, 19 at 2. As such, Plaintiff has failed to establish that Defendant Beth Harris was acting with deliberate indifference to his medical needs simply by following proper jail protocol before providing him with his machine.

FN2. In Plaintiff's response to Defendants' Motion to Dismiss, Plaintiff states that his breathing machine remained in the Defendant's office for four months. (ECF No. 19 at 2.) However, he states several times in the supplement to his complaint that Defendant received the machine on December 28, 2010, (ECF No. 7–2 at 3, 5, 10), and he was provided with the machine on February 11, 2011 (ECF No. 7–2 at 12).

With regard to Plaintiff's lower back pain, Plaintiff was not denied medical care but rather disagreed with the particulars of the care he received. Plaintiff admits that he was provided with aspirin but refused to take the pain reliever medication after three months because he believed his condition required more serious medical attention. (ECF No. 19 at 2.) Plaintiff also admits that he was provided with an extra mattress for his back and given a wheel chair to use when he was experiencing pain. (ECF No. 3 at 4.) Additionally, Plaintiff admits that he was taken to medical after he complained of numbness but refused the x-ray of his neck because he did not believe it would address his back pain or be as beneficial as an MRI. (ECF No. 7–2 at 20, 19 at 2.) Plaintiff's belief that the care he received was inadequate is insufficient to support an Eighth Amendment violation. *See Monmouth County Correctional Institutional Inmates,* 834 F.2d at 346 (mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim); *see also White,* 897 F.2d at 108–10 (medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider).

**\*5** Viewing the facts in the light most favorable to Plaintiff, he has failed to assert a claim upon which relief may be granted against Defendants in connection with the medical care he received at the Beaver County Jail.

2. *Vicarious Liability*

Defendant Southern Health Partners has moved to dismiss the complaint on the grounds that it is improperly premised upon vicarious liability and Plaintiff has failed to show how a policy or procedure of Southern Health Partners caused a constitutional violation. (ECF No. 18 at 3.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)
**(Cite as: 2012 WL 426606 (W.D.Pa.))**

A "defendant in a civil rights action must have personal involvement in the alleged wrong; liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).* Southern Health Partners is the corporate medical provider of Beaver County Jail. As a corporate medical provider, Southern Health Providers cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability unless "it knew of and acquiesced in the deprivation of the plaintiff's rights." *Monell v. New York City Dept. of Sec. Serv., 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).* To meet this burden with respect to a private corporation, the plaintiff must show that the corporation, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused constitutional harm." *Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir.1989).* Plaintiff has not alleged that Defendant Southern Health Partners had a policy or practice that caused him harm nor has he alleged that Defendant Southern Health Partners knew of or acquiesced in the utilization of a policy or practice that presented a substantial risk of harm. In fact, the Complaint demonstrates that Plaintiff was assessed by medical personnel after complaints of pain, provided medication and access to diagnostic testing which he refused, and provided access to his breathing machine once the medical check had cleared. As such, Plaintiff has failed to demonstrate a cause of action against Defendant Southern Health Partners.

**III. *CONCLUSION***

The Third Circuit has held that, even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to Rule 12(b)(6) dismissal, a court must permit a curative amendment unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002)* (citing *Shane v. Fauver, 213 F.3d 113, 116 (3d Cir.2000)*). An amendment would be futile when the complaint, as

amended, would fail to state a claim upon which relief could be granted. *In re NAHC, Inc. Securities Litig., 306 F.3d 1314, 1332 (3d Cir.2002).* In this instant case, amendment to the Complaint would in fact be futile. Therefore, for the reasons set forth above, it is respectfully recommended that Defendants' Motion to Dismiss (ECF No. 17) be granted and that Plaintiff's Complaint be dismissed with prejudice.

**\*6** In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C) ] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections may constitute a waiver of that party's appellate rights.

W.D.Pa.,2012.
Nesmith v. Southern Health Partners
Not Reported in F.Supp.2d, 2012 WL 426606 (W.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Robert O'CONNOR, Plaintiff,
v.
Robert MCARDLE, D.D.S., Individually, and Mo-
hammed Ahmed, D.D.S., Individually, Defendants.

No. 04-CV-314.
Feb. 22, 2006.

DECISION & ORDER
MCAVOY, Senior J.
I. INTRODUCTION
   **\*1** Plaintiff Robert O'Connor, an inmate in the
custody of the New York State Department of Cor-
rectional Services ("DOCS"), commenced this action,
with the assistance of counsel, pursuant to 42 U.S.C. §
1983. *See* Compl. [dkt. # 1]. Plaintiff asserts that De-
fendants Robert McArdle, Director of Dental Services
for DOCS, and Mohammed Ahmed, a dentist em-
ployed by DOCS, violated his constitutional right
under the Eighth Amendment when they denied him
appropriate dental care. *Id.* Defendants have moved
for summary judgment pursuant to FED. R. CIV. P. 56
contending that they were not deliberately indifferent
to a serious medical need by Plaintiff.

II. BACKGROUND
   Plaintiff is an inmate who is serving a lengthy
sentence in the custody of DOCS. Prior to his incar-
ceration, Plaintiff had a history of dental work, in-
cluding having a root canal in tooth # 8 and having a
fixed anterior upper bridge spanning the 7-11 teeth. In
addition, Plaintiff was missing his # 9 tooth.

   On November 6, 1992, while incarcerated at
Eastern Correctional Facility, a DOCS facility dentist
replaced a loose filling in Plaintiff's # 7 tooth, and
informed Plaintiff that the tooth was "badly decayed"
and that the prognosis for the # 7 tooth was poor.
Although Plaintiff saw dental care providers between
November 6, 1992 and February 22, 2000, Plaintiff
did not seek or receive any treatment on his # 7 tooth
until this latter date.

   Plaintiff was first incarcerated at Sullivan Cor-
rectional Facility ("Sullivan") from August 1994 until
March 2002. On December 1, 1999, Sullivan dentist
Kevin McGraw noted that Plaintiff's # 8 tooth ap-
peared "apical and radilucent." Plaintiff was unable to
feel pain in his # 8 tooth because of a root canal that
had been performed prior to his incarceration. Dr.
McGraw referred Plaintiff to an oral surgery clinic for
evaluation and a possible apicoectomy.[FN1] Dr.
McGraw again saw Plaintiff on January 26, 2000 and
February 10, 2000 in relation to problems with Plain-
tiff's # 15 tooth, and Plaintiff did not mention any
problems with his # 7 and # 8 teeth on either of these
occasions.

   FN1. An apicoectomy is a procedure
   whereby an oral surgeon raises a flap of soft
   tissue, or "gingiva," to access the tip of a
   tooth inside the jaw bone. High-speed in-
   strumentation is then used to remove the ap-
   ical third, or tip of the root of the tooth, as
   well as any infectious tissue. Apicoectomy
   procedures are performed in conjunction
   with root canal treatments. An apicoectomy
   is typically performed by the oral surgeon
   after the root canal is completed by the
   treating dentist.

   On February 22, 2000, Dr. John Frattellone, an
oral surgeon who was employed part time by DOCS,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

examined Plaintiff, diagnosed him with a possible "alveolar abscess" of Plaintiff's # 7 and # 8 teeth, and advised him about potential methods of treatment, including an apicoectomy. Dr. Frattellone informed Plaintiff of the risks and benefits of such treatment and further advised that it could compromise his existing bridge.

Also on February 22, 2000, after meeting with Dr. Fratalone, Plaintiff wrote to defendant Dr. Robert McArdle, Director of Dental Services for DOCS, and stated in his letter that "[he] was advised that [his 7 tooth] was infected and decayed." He further wrote that "[w]ith his tooth gone, [he] will then have two teeth missing-and [his] old bridge would be useless." Plaintiff further requested that he could replace the bridge at his own expense. On March 23, 2000 Plaintiff advised Dr. Fratalone that he desired to get the apicoectomy procedure, and on March 28, 2000 Dr. McArdle responded to Plaintiff's letter and indicated that a treatment plan would be presented to Plaintiff upon his upcoming visit with the oral surgeon.

**\*2** Plaintiff did not the keep appointment with the oral surgeon scheduled for September 2000, and he contends that he was prevented from attending because he was confined to his cell. When Plaintiff returned to see Dr. Frattellone on October 19, 2000, he told Dr. Frattellone that he was "managing" the pain by gargling with saltwater-sometimes as much as twelve times a day-but that he no longer wished to have the apicoectomy procedure if it "carried the possibility of compromising [his] bridge." O'Connor Dep. 57:7-58:25. Dr. Frattellone also examined Plaintiff on this date and found that Plaintiff's gum around his # 7 and # 8 teeth were "nontender," and that there was "no mobility to bridge/buckle expansion over [Plaintiff's # 7 and # 8 teeth]." Frattellone Dep. 47:3-12. Defendant Dr. Mohammed Ahmed, Sullivan's facility dentist, was also present while Dr. Frattellone examined Plaintiff. Dr. Ahmed discussed the pain Plaintiff had experienced and, although Plaintiff was not in pain at that time, told Plaintiff that he could

perform a root canal on Plaintiff's # 7 tooth to "ward off any future potential pain from this tooth." O'Connor Dep., Exh. B at pp. 3-4. On October 19, 2000, Plaintiff wrote to Dr. Ahmed and stated that he wished to proceed with the root canal.

On January 28, 2001, Plaintiff wrote to Dr. Ahmed and stated that on the previous day, his # 7 tooth had "started giving [him] considerable pain." Plaintiff's Exh. 9. While Plaintiff was still able to eat despite his pain, it did interfere with his eating. O'Connor Dep. 132:17-20. Two days later, on January 30, 2001, Dr. Ahmed again examined Plaintiff, noted a chronic periapical pathology, and recommended that Plaintiff's # 7 tooth be extracted. Dr. Ahmed offered to extract the tooth, replace it with a partial removable denture, and cut the crown from # 7 so that the rest of the bridge would stay intact. Ahmed Dep., 59:21-60:9. Because Plaintiff did not want to lose his permanent fixed bridge, he refused the extraction and insisted that Dr. Ahmed perform a root canal on the tooth instead. *Id.* Although Dr. Ahmed believed the root canal would be unsuccessful, Ahmed Dep., 80:16-20, he agreed to perform the root canal and apicoectomy anyway. On his follow-up appointment on February 7, 2001, Dr. Ahmed again expressed his reservations to Plaintiff about the root canal and apicoectomy procedure, but Plaintiff persisted. On February 14, 2001, Dr. Ahmed began the root canal treatment on Plaintiff's # 7 tooth and completed the procedure on February 22, 2001.

Plaintiff submitted a grievance to Sullivan's Inmate Grievance Resolution Committee on February 26, 2001, in which he wrote:

[t]he dental department at Sullivan diagnosed an abscessed and decayed top incisor of mine in 1998. It was thereafter negligent. I was repeatedly advised that since the tooth referred to is under a crown that is part of a permanent bridge that spans five teeth in the front of my mouth, it would be best to leave it alone as long as it was not giving me pain. The pain became unbearable on January 27, 2001. Thereafter, I was ad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

vised by the dental department that even with the root canal treatment that I was now offered and have had performed, that there was a poor prognosis for the success of this tooth-as well as the other teeth under the bridge. Further, I was advised by the dental department that the tooth referred to has been placed in even more jeopardy because it will be more at risk for decay considering that part of the crown was drilled away to perform the root canal and the tooth will not be sufficiently enclosed. The Health Services Policy Manual, Policy 2.0 Dental Policy, states that the "scope of Services" includes fixed prostheses (bridges)" (p. 5 of 19). It is hard to imagine a more compelling case where a replacement bridge would be more appropriate.

**\*3** Plaintiff requested that DOCS provide him with a replacement bridge to replace his existing permanent fixed bridge. Plaintiff had filed this grievance after Dr. Ahmed had performed a root canal on Plaintiff's # 7 tooth but before Dr. Fratalone had completed the apicoectomy on his # 7 and # 8 teeth and therefore, at that point, it was impossible to tell whether the efforts undertaken by the two doctors would ultimately save his # 7 and # 8 teeth.

On March 1, 2001, Dr. Frattellone conducted the apicoectomy on Plaintiff and obtained what he considered a "good result." Frattellone Dep., 54:14-55:5. On March 12, 2001, the Sullivan facility Superintendent denied Plaintiff's grievance and wrote: "[t]he Sullivan Correctional Facility Dentist states the [Plaintiff's] dental needs are being addressed, in accordance with the New York State Health Service Policy Manual 2.0-sick call procedure." Plaintiff then appealed the Superintendent's decision to DOCS's Central Office Review Committee ("CORC"), which in April 18, 2001, unanimously rejected Plaintiff's February 26, 2001 grievance and denied Plaintiff's request for a replacement bridge. In CORC's decision, they noted that:

[Plaintiff] has been examined by Regional Dental

Director and was advised that the procedure performed by the oral surgeon could not be determined to be successful until more time had passed. [Plaintiff] is advised that if the dentist determines in the future that the bridge needs to be replaced, that the grievant must request this service through an outside provider at his expense.

In fact, Plaintiff had met with DOCS's Regional Dental Directors Dr. William Griffin and Dr. Martin Korfman on April 5, 2001, who explained to Plaintiff that it was too early to determine whether Plaintiff would need to replace his bridge because the apicoectomy procedure had been performed only recently.

On June 11, 2001, Plaintiff submitted a second grievance, in which he again requested that he be provided with a new permanent fixed bridge to replace the one he had when he first entered DOCS' custody. Ultimately, this grievance was also denied, and the Superintendent wrote in the denial that although there is a risk that Plaintiff could lose his # 7 tooth, it has been treated, and the bridge was then intact and operable. The Superintendent further advised that if the Plaintiff were to lose his tooth or bridge in the future, that Plaintiff could submit a dental slip to the facility dentist for appraisal at that time.

On March 8, 2002, Dr. Ahmed submitted a formal request for the approval of a replacement permanent fixed bridge, in which he wrote: "[b]ridge slightly wiggles due to root caries on abutment # 7 tooth. Offered [patient] to cut the crown # 7 from the bridge [anterior] to # 7, [and] replace [with] partial. Plaintiff keeps insisting on a fixed bridge." On March 18, 2002, Dr. McArdle denied authorization for a permanent fixed bridge, and authorized only a removable partial denture.

**\*4** To this date, Plaintiff still has his # 7 and # 8 teeth and, on May 4, 2005, Dr. Gary Epstein saw

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

nothing about Plaintiff's # 7 or # 8 teeth "that rendered [their] condition[s] questionable" or indicated that the care previously provided to Plaintiff had been improper. On or about that date, Dr. Epstein also removed and replaced Plaintiff's old fixed bridge.

### III. STANDARD FOR SUMMARY JUDGMENT

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105,

114 (2d. Cir.1998).

### IV. DISCUSSION

Plaintiff's Complaint, and argument in opposition to summary judgment, revolves around his claim that Defendants denied him a replacement fixed bridge which he had agreed to purchase at his own expense, and thereby violated his Eighth Amendment right. *See* Compl, ¶ 4 ("Summary of Claim: This claim is for the deliberate indifference by [Defendants] for their failure to provide claimant with access to preventative, curative, restorative, and prosthetic dental care to maintain good dental and general health."). In this regard, Plaintiff proceeds on a theory that as a state prisoner, he is entitled to "the same standard of care that would be available to him in the general community." Plaintiff's Statement of Material Facts in Dispute ("Plf's Rule 7.1 Stat."); ¶ 146, Rosenthal Aff." ¶ 4 ("O'Connor did not receive ... that which was commensurate with what he would have received in the non-prison community."); Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Opposition Brief") at 15-16 ("the standard of care acceptable in the general community was to develop a treatment plan that allowed [plaintiff] the choice of a replacement bridge for the existing bridge."). Defendants take exception with the legal premise of Plaintiff's claim, *see* Def. Reply Mem., pp. 1-2, and argue that the motion for summary judgment should be granted because no Eighth Amendment rights have been violated.

### A. Eighth Amendment Analysis

**\*5** Generally, the Eighth Amendment provides that prison officials have a duty to supply inmates with medical care. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). However, "[t]his does not mean ... that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). A prison official will only be held liable for failure to provide medical treatment to an inmate under the Eighth Amendment if he is deliberately indifferent to an inmate's serious medical need. *Id.* at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

104. Thus, in order to prevail on such a claim, a Plaintiff must prove that he (1) suffered from a serious medical condition, and (2) that the prison official was deliberately indifferent to Plaintiff's serious medical condition. *Id.*

The first element, serious medical condition, exists where there is " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). Factors to be considered in determining whether Plaintiff suffered from a serious dental, as well as medical, condition include "pain suffered by the Plaintiff, the deterioration of the teeth due to lack of treatment, or the inability to engage in normal activities." *Id.* at 703 (citations omitted).

The second element, deliberate indifference, involves a subjective test designed to determine whether a prison official acted with a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834 (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). While "deliberate indifference entails something more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. The test is whether the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The Second Circuit has stated:

It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.

*Chance,* 143 F.3d at 703 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) and *Estelle,* 429 U.S. at 106).

*B. Need for Replacement Bridge*

Plaintiff arguably presents two intertwined claims-an Eighth Amendment claim arising from the denial of a replacement fixed bridge, and an Eighth Amendment claim arising from the denial or delay in treatment to Plaintiff's # 7 & # 8 teeth causing Plaintiff to suffer unnecessary and wanton pain. The Court will address each claim independently starting with the claim arising from the denial of a replacement fixed bridge.

*1. Serious Medical Condition*

**\*6** Drawing every ambiguity and reasonable inference in favor of Plaintiff, no reasonable jury could find that Plaintiff's need for a permanent fixed bridge to replace his existing one constitutes a "serious medical need." Plaintiff argues that this replacement bridge was necessary to avoid any future tooth decay in his # 7 and # 8 teeth. However, Plaintiff offers nothing but speculation to support his conclusion that a replacement bridge was necessary to avoid tooth decay. *See e.g.,* Epstein Dep., 28:15-30:10.

Further, at the time Plaintiff demanded a replacement bridge in his February 26, 2001 letter, Dr. Ahmed had just recently performed a root canal on Plaintiff's # 7 tooth, and Dr. Frattellone had yet to complete the apicoectomy on his # 7 and # 8 teeth. Thus, at that point, it was impossible to tell whether these procedures would ultimately save his # 7 and # 8 teeth and prevent the future decay that Plaintiff worried about. Plaintiff's "need" for a replacement bridge was merely speculative, in that he thought his bridge could be put in "jeopardy" were he to lose either his # 7 or # 8 teeth. Since the treatment provided by Dr. Ahmed and Dr. Frattellone proved successful and Plaintiff never lost either of the teeth under the fixed

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

bridge, there was no urgent need for a replacement.

*2. Deliberate Indifference*

Even assuming that Plaintiff could show that his need for a replacement bridge constituted a "serious medical condition," no reasonable jury could find that Defendants were deliberately indifferent to his needs. When Dr. Ahmed discovered that Plaintiff's "[b]ridge slightly wiggles" and submitted a formal request to Dr. McArdle for approval of a fixed permanent bridge, he offered the alternative procedure of cutting the # 7 crown from the bridge and replacing it with a removable partial denture. Dr. McArdle denied the authorization of the replacement bridge, but did authorize the alternative removable partial denture. Although it was perhaps not Plaintiff's ideal solution, this procedure would have been adequate to solve Plaintiff's bridge problems. Plaintiff's argument, boiled to its core, is simply that he did not receive the care that he *wanted*. But that is not the standard under the Eighth Amendment. As the Second Circuit has noted:

The State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for dental care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls.... We are governed by the principle that the objective is not to impose upon a state prison a model system of dental care beyond average needs but to "provide the minimum level of [dental] care required by the Constitution." "The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves...." "[T]he essential test is one of medical necessity and not one simply of desirability."

**\*7** Dean, 804 F.2d at 215 (citations omitted) (alterations in original).

At most, Plaintiff asserts a medical malpractice claim, claiming that he received one treatment when he should have received another. Medical malpractice claims, however, are not actionable under 42 U.S .C. § 1983. Chance, 143 F.3d at 703. "[T]here is no right to the medical treatment of one's choice if the prescribed treatment is based on applicable medical standards," Hogan v. Russ, 890 F.Supp 146, 149 (N.D.N.Y 1995), and Plaintiff's "mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment." Estelle, 429 U.S. at 106. Thus, to the extent Plaintiff's claim is based upon the denial, or the delay, in receiving the replacement bridge, the claim is dismissed.

*C. Denial of, or Delay in, Appropriate Treatment*

To the extent Plaintiff argues that the condition of his # 7 and # 8 teeth themselves constituted a serious medical need to which Defendants were deliberately indifferent, the claim also fails. In this regard, Plaintiff seemingly argues that, like the plaintiff in Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir.2000), the denial or delay of dental treatment constituted a serious medical condition that caused him to suffer substantial pain and to which the Defendants were deliberately indifferent.

*1. Serious Medical Condition*

In *Harrison*, the incarcerated-plaintiff suffered from a cavity in one of the few teeth remaining in his mouth. Harrison, 219 F.3d at 134-137. When he sought treatment for the cavity, prison dentists felt that another tooth was more seriously affecting his well being and should be extracted, and refused to treat the cavity until Harrison consented to the extraction of this other tooth. *Id* . Harrison refused and thus his cavity went untreated for a significant period of time despite his complaints of pain from the tooth with the cavity. *Id.*

Of course, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Id.* at 136 (quoting Chance, 143 F.3d at 702). The *Harrison* majority held

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

that while a cavity is not a serious medical condition in the strict sense, it is a degenerative condition which, if left untreated indefinitely, "is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction." *Id.* at 137. Consequently, the Court held in *Harrison* that "because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Id.* (citing *Chance,* 143 F.3d at 702-03).

The facts of the instant case are clearly distinguishable from *Harrison.* First, as the *Harrison* majority stated:

**\*8** This is *not* a case of *delayed* treatment as the dissent suggests. Defendants' conduct on this record can be construed as: (1) a flat refusal of medical treatment for a condition that if left untreated is serious and painful; or (2) a conditional refusal of such treatment, subject to Harrison's consent to undergo an unwanted medical procedure that would deprive him of a body part he wished to keep. Either way, a reasonable jury could find that Harrison was *refused treatment* of a degenerative condition that tends to cause acute infections, debilitating pain and tooth loss if left untreated.

*Harrison,* 219 F.3d at 137 (emphasis in original).

In the instant case, and despite Plaintiff's contention to the contrary, there was no "flat refusal of medical treatment" nor was there a "conditional refusal of such treatment,"-at least not a refusal of medical condition that reasonably could have caused significant pain in the future. The refusal here, if there was one, was to Plaintiff's demand to provide him a replacement bridge. As indicated above, there is no evidence that the refusal in this regard could have resulted in further *significant* injury or the unnecessary and wanton infliction of pain. Further, the facts

indicate that Plaintiff was offered certain procedures addressed to his decayed # 7 tooth that *he* initially declined in order to save the viability of the bridge, and that Plaintiff failed to advise of the severe pain that he now complains of with regard to his # 7 & # 8 teeth until January 28, 2001.[FN2]

> FN2. In this regard, the record indicates: (i) plaintiff made numerous visits to DOCS' facility dental clinics between November 6, 1992 and February 22, 2000, and never once sought treatment for either of those teeth (Plf's 7.1 Statement, ¶¶ 12-13.; O'Connor Dep., Exh. A at DOCS 120-27); (ii) on more than one occasion plaintiff advised members of DOCS' dental staff that his # 7 and # 8 teeth were not causing him pain, or that his dental issue had "stabilized" (Plf's 7.1 Statement at ¶¶ 25 and 61; O'Connor Dep., 58:20-25 and Exh. A at DOCS 126, 128, Deposition of John Frattellone, Sept. 13, 2005 ("Frattellone Dep."), 46:16-47:12; 48:21-49:5); (iii) as a result of the root canal performed on plaintiffs' 8 tooth before his incarceration, plaintiff admittedly could not feel pain at his 8 tooth (Plf's 7.1 Statement, ¶ 26); (iv) plaintiff regularly refused the treatment that was recommended and offered by DOCS' dental providers (Frattellone Dep., 46:16-47:12; 48:21-49:5 and Plf's Exh. 6; O'Connor Dep., 58:20-25; Plf's 7.1 Statement, ¶¶ 69-72, 82.), (v) plaintiff was not in pain on October 19, 2000, when Ahmed nevertheless suggested "that he could perform a root canal to ward of *any future potential pain* from [plaintiff's 7 tooth]" (O'Connor Dep., Def's Exh. B at 3-4); (vi) in a letter addressed to Dr. Ahmed dated Sunday, January 28, 2001, plaintiff wrote that his 7 tooth *"started* giving him pain" on January 27, 2001 (Deposition of Mohammed Ahmed, Aug. 8, 2005 ("Ahmed Dep."), Plf's Exh. 9 (emphasis added)), and (vii) plaintiff de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

clined to undergo treatment for his 7 an 8 teeth because they were "not giving [him] any great or chronic pain" (O'Connor Dep., Exh. D at DOCS 217-18).

Second, it is highly doubtful that Plaintiff could establish the requisite "serious medical condition" even as applied in *Harrison*.[FN3] As District Court Judge Castel of the Southern District recently pointed out:

> FN3. The application of the serious medical need element of an Eighth Amendment claim was a central point of dissent in *Harrison*. *See id.,* at 142 ("[T]he *Estelle* standard "deliberate indifference to serious medical needs" has metamorphosed to include "deliberate indifference to non-serious medical needs if they might become serious in the face of deliberate indifference.") (Meskill, C.J.)(dissenting).

"A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Harrison,* 219 F.3d at 136 (quoting *Chance,* 143 F.3d at 702). Although "there is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," the Second Circuit has identified several relevant factors. *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003). Specifically, a court should inquire about "whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' ... whether the medical condition significantly affects daily activities, and ... the 'existence of chronic and substantial pain." ' *Id.* "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in evaluating the

objective prong. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (emphasis in original). In doing so, a court may consider the "absence of adverse medical effects or demonstrable physical injury" associated with such delay or interruption. *Id.* at 187.

**\*9** *Farid v. Ellen,* 2006 WL 59517, at \*10 (S.D.N.Y. Jan. 11, 2006).

Plaintiff's facts, even when accepted as true, do not meet this standard. In February of 2000 when Plaintiff first complained to Dr. Fratalone of transient swelling and pain in tooth # 7, Dr. Fratalone advised of treatment options. It was not until March 23, 2000 that Plaintiff indicated that he wished to proceed with the apicoectomy. While there is a lapse in the treatment during this time period, when Plaintiff again saw Dr. Fratalone on October 19, 2000, Plaintiff indicated that he has been managing the pain with salt water rinses and indicated that he did not wish to have the apicoectomy if it raised the possibility of compromising his bridge. Further, on this date Defendant Dr. Ahmed offered to do a root canal on the # 7 tooth to alleviate any pain he might then be having or might have in the future.

While the level of the pain that Plaintiff might have been experiencing at this time cannot be evaluated on the cold record, it is significant to note that on January 28, 2001 Plaintiff wrote to Dr. Ahmed and advised that he was "starting" to experience severe pain in the tooth. From this point forward, as discussed below, the treatment of Plaintiff's teeth and related pain moved relatively quickly. Thus, it is difficult to imagine that the reports of pain before this period of time amounted to a condition that either the dentists or Plaintiff perceived as "important and worthy of comment or treatment," that *significantly* affected Plaintiff's daily activities, or that caused "chronic and substantial pain." *Brock,* 315 F.3d at 162.

Further, there is little if any "demonstrable physical injury" associated with the delay or interruption in treatment of the # 7 tooth other than his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

subjective claims of pain. *Smith,* 316 F.3d at 185; *see also Farid,* 2006 WL 59517, at *10 ("Despite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment."); *Gross v. Buscema,* 298 F.Supp. 289, 298 (N.D.N.Y.2003) (McAvoy, J.) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Plaintiff still has his # 7 & # 8 teeth, Plf's 7.1 Statement, ¶ 153; *see also,* Rosenthal Dep., 101:1-16, and Dr. Gary Epstein, plaintiff's treating physician (and designated expert) offered uncontroverted testimony that as of May 4, 2005, there was nothing about Plaintiff's # 7 or # 8 teeth "that rendered [their] condition[s] questionable" or indicated that the care previously provided to Plaintiff had been improper. Plf's 7.1. Statement, ¶ 154; Epstein Dep., 32:16-34:12; 84:23-85:5; 87:10-18.

*2. Deliberate Indifference*

**\*10** Further, even assuming that Plaintiff's condition with his # 7 and # 8 teeth amounted to a serious medical condition, no reasonable jury could find that Defendants were deliberately indifferent to this need. Plaintiff's # 7 and # 8 teeth had been badly decayed prior to coming under the care of Defendants. When Plaintiff advised Dr. Ahmed that his # 7 tooth had been giving him "considerable pain" on January 28, 2001, Dr. Ahmed recommended on January 30, 2001 that Plaintiff's # 7 tooth be extracted, and he further offered to replace it with a removable denture, and cut the crown from # 7 so that the rest of the bridge would stay intact. Fearful of losing his permanent bridge, Plaintiff refused this procedure and insisted on a root canal and apicoectomy instead. On February 2, 7, & 12, 2001, Plaintiff was seen by Dr. Ahmed at which times Plaintiff's prescription medication was addressed, and on February 14, 2001, Dr. Ahmed started the root canal procedure. The root canal was com-

pleted on February 22, 2001, and, on March 1, 2001, Dr. Frattellone performed the apicoectomy. Both procedures obtained a "good result" and, as indicated above, Plaintiff still has these teeth.

Based on these facts, no reasonable jury could find that Defendants knowingly disregarded an excessive risk to Plaintiff's health for an inordinate length of time. *See Harrison,* 219 F .3d at 138 ("District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials") (citations omitted). Rather, once Plaintiff notified Dr. Ahmed of his significant pain, Dr. Ahmed and Dr. Fratalone very promptly performed the procedures on Plaintiff that he desired, and Plaintiff retains his # 7 and # 8 teeth to this day. No reasonable jury could conclude that Dr. Ahmed, or Dr. McArdle,[FN4] were deliberately indifferent to Plaintiff's serious medical needs. *See Harrison,* 219 F.3d at 138.

> [FN4]. Plaintiff concedes that Dr. McArdle did not perform any dental work on plaintiff. Plf's 7.1 Statement, ¶¶ 144, 145. Moreover, Plaintiff offers nothing to rebut the Dr. McArdle's sworn statement that he "was not in any way involved in providing dental care to plaintiff with respect to his 7 and 8 teeth." *See* Declaration of Robert F. McArdle, D.D.S., executed on Dec. 5, 2005 ("McArdle Dec."), ¶ 4. Accordingly, Dr. McArdle did not have the requisite degree of personal involvement upon which to premise a claim under the Eighth Amendment arising solely from the denial of treatment to the # 7 & # 8 teeth. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

V. CONCLUSION

Based upon the reasons set forth above, the Defendants' motion for summary judgment is GRANTED and the action is DISMISSED.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 436091 (N.D.N.Y.)
**(Cite as: 2006 WL 436091 (N.D.N.Y.))**

IT IS SO ORDERED

N.D.N.Y.,2006.
O'Connor v. McArdle
Not Reported in F.Supp.2d, 2006 WL 436091
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Christopher ROSS, Plaintiff,
v.
WESTCHESTER COUNTY JAIL, Westchester
County Department of Corrections Medical Depart-
ment, Warden Anthony Amicucci, Captain Ray
Rhodes, Captain Soychek, Sergeant Martinez, Ser-
geant Schmidt, Sergeant Del Treste, Sergeant Bell,
Sergeant Woods, Sergeant Coley, Sergeant MaCca-
bee, Officer Burges, Medical Liaison June Yozzo,
Defendants.

No. 10 Civ. 3937(DLC).
Jan. 11, 2012.

Christopher Ross, Valhalla, NY, pro se.

Christine Lynne D'Alessio Assistant County Attorney
Westchester County Attorney's Office, White Plains,
NY, for defendants.

*OPINION & ORDER*
DENISE COTE, District Judge.
**\*1** Plaintiff Christopher Ross ("Ross"), proceed-
ing *pro se,* brings this action pursuant to 42 U.S.C. §
1983 for injunctive relief and compensatory damages
against the Westchester County Jail ("Jail"), the
Westchester County Department of Corrections
Medical Department ("Medical Department") and
twelve officers and employees at the Jail. Ross prin-
cipally alleges that the defendants failed to provide
adequate medical care for his sleep apnea; denied his
Freedom of Information Law ("FOIL") requests; fal-
sified documents; retaliated against him for the filing

of grievances and this action; and violated his right to
medical privacy under the Health Insurance Portabil-
ity and Accountability Act of 1996 ("HIPAA"), 29
U.S.C. § 1182, the Fourteenth Amendment, and state
law.[FN1]

> FN1. Ross's allegations of violations of his
> right to medical privacy and HIPAA are
> contained in his opposition to the defendants'
> motion.

The defendants have filed a motion under
F.R.C.P. 12(b)(6), to dismiss Ross's amended com-
plaint. For the following reasons, the motion is
granted in part. The claims against all the individual
defendants are dismissed.

BACKGROUND
The following facts are taken from Ross's Feb-
ruary 24, 2011 amended complaint or his opposition to
the motion to dismiss and assumed to be true for the
purposes of this motion. On August 14, 2009, Ross
arrived at the Jail and informed a Nurse Practitioner
that he had recently been released from Greenwich
Hospital and suffered from cardiomyopathy, high
blood pressure, hypertension and sleep apnea. Ross
explained that he had had a catheterization procedure
to inspect the left side of his heart for blockage be-
cause he had cognitive heart failure. Ross provided the
medical staff with a list of prescribed medications.

*December 2009 Grievance and Lack of Treatment for
Sleep Apnea*
On December 5, Ross filed a grievance ("De-
cember 2009 Grievance") requesting a continuous
positive airway pressure machine ("CPAP") for his
sleep apnea. Later that day, he was examined by a
Nurse Practitioner who told him that he should see a
doctor. On December 7, Ross was seen by Dr. Gold-
berg and transferred from the Special Housing Unit

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

("SHU") to the infirmary where he was given access to an outdated bi-level positive airway pressure machine ("Bi–PAP").

On December 8, Sgt. Schmidt ("Schmidt") rejected Ross's December 2009 Grievance as unsubstantiated. Ross asserts that this decision was based on a report by Medical Liaison June Yozzo ("Yozzo") that falsely stated that Ross had previously refused to be housed in the infirmary and to use the CPAP machine on August 14 and December 5, 2009.

On December 11, Sgt. Martinez ("Martinez") delivered to Ross a memorandum from Warden Anthony Amicucci ("Amicucci") answering the December 2009 Grievance. The next day, however, Martinez came back to retrieve the memorandum, stating that Amicucci needed it back. Ross asked Martinez about a statement in the memorandum suggesting that he had previously refused the SHU.[FN2] Martinez told him not to worry about it because he had won his grievance.

> [FN2]. The memorandum stated, "[o]ddly the CPAP machine was offered to you again on the same day you filed your grievance. It would seem that the reemergence of your condition has coincided with your disciplinary problem that landed you in the SHU. It now seems that you are accepting the offer because you get relocated to the infirmary."

**\*2** After Martinez retrieved the original memorandum decision on the December 2009 Grievance, Ross requested a copy of the memorandum and was instructed by Martinez to fill out a FOIL request for copies of the grievance file. On December 11, Ross filed a FOIL request for the grievance file and on December 22, three dollars were deducted from his inmate account for the FOIL request.

On December 18, Sgt. Woods ("Woods") brought the appeal portion of the December 2009 Grievance to

Ross and asked him if he still wanted to appeal. Ross indicated that he would like to appeal. Later that day, Sgt. Burligham brought back a copy of the memorandum but the language in it had been changed and Amicucci's initials were now omitted ("Altered Memorandum"). Ross was told that the Altered Memorandum had come from Captain Rhodes ("Rhodes").

On January 12, 2010, Captain Soychek ("Soychek") approached Ross and called him a "scammer" in the presence of Correction Officer Mack, who is not a member of the medical staff, and other prisoners, and "threaten[ed][him] in a hostile manner." Soychek told him that he had faked his medical condition to get out of SHU "but he was going to make it his business to have [Ross] back in the SHU."

On January 17, Ross filed a grievance, number J–14–10 ("January 2010 Grievance") claiming that the memorandum responding to the December 2009 Grievance had been altered. Ross later accused Rhodes of tampering with the memorandum.

On January 20, Ross filed a FOIL request for his medical records. The fee was deducted from his inmate account on January 22, and he received the records on January 27.

That same day, Amicucci stated in response to Ross's appeal of the December 2009 Grievance, that he had been placed in the infirmary because of the medical staff's assessment of his medical condition, not because of the grievance he had filed. Ross claims that the defendants only provided him with treatment for his sleep apnea because he filed the December 2009 Grievance.

*February 2010 Grievance*
On February 16, 2010, Ross filed a grievance, number J–29–10 ("February 2010 Grievance"), con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

cerning the denial of his FOIL request for copies of the file of the December 2009 Grievance. On February 22, Sgt. Del Treste ("Del Treste") informed Ross that his February 2010 Grievance was denied because he had not filed it within five days of the act or occurrence giving rise to the grievance. Ross told him that the February 2010 Grievance was based on a letter he had written to the cashier about not receiving the copies of the December 2009 Grievance.

Later that day, Ross had a conversation with Rhodes, who was accompanied by Yozzo, about the February 2010 Grievance. Rhodes asked why Ross was complaining, as he had already received his medical records. Ross explained that his February 2010 Grievance was not about the medical records, but about not receiving copies of the December 2009 Grievance file that he paid for. Ross also asked Rhodes why he had altered the decision on the December 2009 Grievance, at which point Rhodes became hostile, started screaming and left.

**\*3** On February 23, Del Treste gave Ross an "addendum" stating that copies of his medical records were being provided to him as a courtesy. Ross informed him that his February 2010 Grievance did not concern the medical records and that he wanted a refund because he had been refused copies of his December 2009 Grievance file. Ross then asked Del Treste to read to him what the February 2010 Grievance was about, but Del Treste became extremely hostile and said "I don't have to do this shit I am not your Mother or Father." When Ross informed him that Ross's parents were deceased, Del Treste said he didn't care and called Ross a "dumb nigger." On February 24, Amicucci denied Ross's FOIL request. Ross asserts that this was an attempt to cover-up the creation of the Altered Memorandum.

### March 2010 Grievance Concerning Bi–PAP

On March 18, Ross filed another grievance stating that he was experiencing difficulty breathing and sleeping at night in the infirmary ("March 2010

Grievance"). Ross claimed that the Bi–PAP machine was outdated and the pressure setting, which had not been set by a medical technician or doctor during the three months he had been using the machine, was not working properly. Ross requested that his sleep apnea be tested with a Nocturnal Polysomnography, Oximetry or Portable Cardiorespiratory, and sought a referral to an otolaryngologist and a sleep study specialist to get a proper prescription for adjustment of the Bi–PAP machine. Ross's grievance was denied.

### May 2010 Davis Visit

On May 8, Ross's fiancée, Caroline Davis ("Davis"), attempted to visit Ross at the Jail. When she arrived at the entry point, she was harassed by Correction Officer Burges ("Burges"), who told her that Ross did not have a scheduled visit. When she informed him that the visit had been switched, Burges replied "Oh Ross that's the guy who hit the guy in the head with a chair. He is in I–Block (Infirmary) faking like he got sleep apnea." When Davis attempted to leave money for Ross, she was told she could not leave money because Ross did not have a scheduled visit.

On May 12, Ross filed a grievance ("May 2010 Grievance") with Bell and wrote a formal complaint to the Department of Health and Human Services about the incident with Davis. On May 18, Sgt. Bell ("Bell") made false statements in his report about the incident with Davis. When Ross tried to submit a statement from Davis stating that she was harassed by Burges, Bell refused to accept it. Bell informed Ross that he had spoken to Sgt. Maccabee ("Maccabee"), who stated that Davis had refused to make a statement. Ross told Bell that was a "bold face lie" and that Davis had made several attempts to call someone at the Jail to complain but that she had been "given the run around." On May 20, Ross submitted a letter about these false statements to the Westchester County Executive's Office, the Westchester County Department of Health, the New York State Commission of Correctional Services, and the Department of Health and Human Services.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)

**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

*June 2010 Efforts to Review Medical Records*

**\*4** On June 28, Ross attempted to file another grievance concerning the refusal to allow him to review his medical records, but Woods refused to take it. Ross was also told that he could not review his medical records or get a sleep study number from the doctor's office. Ross complained to Block Officer Freeman, who filed the grievance in the infirmary log book.

On June 29, Ross filed another grievance with Sgt. Coley ("Coley") about the continuing failure to adjust the Bi–PAP machine ("June 2010 Grievance"). Ross also complained that Yozzo had told him that he could not review his medical records without first paying for the entire medical file. Coley told him that he would take the June 2010 Grievance so that he would not get suspended. The next day, however, Coley returned the June 2010 Grievance and stated that Ross had previously grieved the same issue. Ross tried to explain that although the medical issues were the same, the Bi–PAP machine was different and that he had the right to review his medical file. Coley became hostile and verbally abused Ross, saying he was a "fat piece of shit, who thinks [he's] a lawyer and that he would kick [Ross's] ass if their [sic] were not camera's [sic] watching."

*Ross Files Federal Lawsuit in May 2010*

On May 12, 2010, Ross commenced this lawsuit. The complaint was first served on several of the defendants on June 17. In an August 16 letter to the defendants, Ross requested permission to amend his complaint. Ross was directed to file an amended complaint by November 19. Ross did not file an amended complaint, and on January 13, 2011, the defendants moved to dismiss all claims in the complaint. On February 4, a pre-trial conference was held, and Ross was permitted to file an amended complaint. Ross filed the amended complaint ("Complaint") on February 24. The defendants then renewed their motion to dismiss, which became fully submitted on July 26.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC,* 570 F.3d 471, 475 (2d Cir.2009). Moreover, pleadings filed by *pro se* plaintiffs are to be construed liberally. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949–50.

**\*5** Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940. In determining the adequacy of a complaint "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

In their motion to dismiss, the defendants identify four reasons why Ross's Complaint should be dismissed. They are that the Complaint fails: (1) to state a claim; (2) to allege that the defendants were personally involved in the alleged violations; and (3) to allege that Westchester County promulgated a policy or custom resulting in the violation of Ross's rights. They also assert that the individual defendants are entitled to qualified immunity.

A. Deliberate Indifference to Serious Medical Needs

Ross asserts a claim against Westchester County [FN3] for deliberate indifference to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights.[FN4] "There are two elements to a claim of deliberate indifference to a serious medical condition: [t]he plaintiff must show that [he] had a 'serious medical condition' and that it was met with 'deliberate indifference .' " *Caiozzo*, 581 F.3d at 72 (citation omitted); *see also Hill v. Curcione,* 657 F.3d 116, 122–23 (2d Cir.2011); *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). Deliberate indifference is a mental state akin to "recklessness," and is measured using a "subjective test" that discerns whether the defendant was "actually aware of an excessive risk to an inmate's health or safety," *Caiozzo,* 581 F.3d at 69, and therefore "act[ed] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).[FN5]

> FN3. Ross named the Jail and the Medical Department as defendants. These defendants do not, however, have legal identities separate and apart from the County and, therefore, cannot be sued. *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't,* 557 F.Supp.2d 408, 416 n. 4 (S.D.N.Y.2008).

> FN4. The defendants represent that Ross was a pretrial detainee during the events in question. The Eighth Amendment does not apply to a pretrial detainee. *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). Nonetheless,

"[c]laims for deliberate indifference to a serious medical condition ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Id.* at 72.

> FN5. In his opposition to this motion, Ross asks the Court to consider the U.S. Department of Justice Investigation Report issued on November 19, 2009, regarding conditions at the Jail. "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006). Therefore, the report will not be considered in deciding this motion.

"As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 844–47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Hill,* 657 F.3d at 123 (citation omitted). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

Ross's allegations are sufficient to state a claim against the County for deliberate indifference to a serious medical need. Sleep apnea may be a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

life-threatening disorder. Ross alleges that it causes him to stop breathing while he sleeps. Ross also alleges that although the medical staff was informed about his sleep apnea when Ross arrived at the Jail on August 14, 2009, Westchester County failed to provide him any treatment for over three months and that the Bi–PAP machine he was given on December 7, 2009, was not properly adjusted for his prescription. Ross does not seek to hold any individual defendant liable for these medical claims, rather he seeks to hold the County responsible for the deliberate indifference to his medical needs.

**\*6** Ross's remaining allegations regarding his medical treatment at the Jail, however, must be dismissed. His complaints that the Bi–PAP machine he was given to use on December 7 was not a state-of-the-art machine, that he was not referred to an otolaryngologist or a sleep study specialist, and that his illness was not tested with specific kinds of tests, constitute mere disagreements with a course of treatment and fail to state a claim. *See Hill,* 657 F.3d at 123.

**B. Retaliation Claims**
Ross alleges that the defendants retaliated against him for filing grievances and this § 1983 lawsuit by verbally threatening him on several occasions, harassing Davis when she attempted to visit him, and interfering with his ability to file further grievances. Ross has not alleged a retaliation claim.

To establish a First Amendment claim of retaliation, a plaintiff must show:

(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

*Espinal v. Goord,* 558 F.3d 119, 128 (2d

Cir.2009) (citation omitted). Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which these claims of retaliation may be fabricated," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted).

In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted).

In order to satisfy the causation requirement, a plaintiff must allege facts suggesting that the protected conduct "played a substantial part in the adverse action." *Dawes,* 239 F.3d at 492. "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 558 F.3d at 129.

**\*7** It is undisputed that Ross has satisfied this first prong of a retaliation claim. The First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits.[FN6] *See id.* As described below, however, Ross's pleadings do not allege conduct

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
(Cite as: 2012 WL 86467 (S.D.N.Y.))

on the part of individual defendants that rises to the level of adverse action.

> FN6. To the extent any of Ross's retaliation claims are premised solely on the filing of this lawsuit, however, all those acts of retaliation that are alleged to have occurred before June 17, 2010, must be dismissed. Ross alleges multiple acts by the defendants that occurred between January 12, 2010 and June 30, 2010. Ross filed this action on May 12, 2010, and first served it on a defendant on June 17, 2010, well after most of the alleged retaliatory acts had taken place.

The threats and hostile comments that Ross alleges were made by Soychek, Del Treste and Coley are insufficient to establish a constitutional violation. [FN7] Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim. *Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (calling prisoner a "stoolie" in the presence of fellow inmates), *abrogated on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Dawes,* 239 F.3d at 493 (calling a prisoner a "rat" or "informant"); *see also Davis,* 320 F.3d at 353; *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (rudeness and namecalling). Ross does not allege threats and comments by these three defendants that were direct and specific enough to deter a prisoner from exercising his First Amendment rights. *See Gill,* 389 F.3d at 381.

> FN7. Although Ross claims that Rhodes was hostile and screamed at him, Ross does not allege that Rhodes did so with a retaliatory intent.

Ross's claims of retaliatory conduct by Burges also fail to satisfy the adverse action standard. Ross alleges that Burges divulged his sleep apnea condition to Davis, "harassed" her when she attempted to visit Ross at the jail, and prevented her from seeing him or making deposits in his commissary account asserting, erroneously, that her visit was unscheduled. Burges's alleged disclosure of Ross's sleep apnea condition does not constitute an adverse action because, as discussed below, sleep apnea is not an intimate or shameful condition whose disclosure is likely to result in acts of discrimination or intolerance. Likewise, even if Burges's alleged harassment of Davis could be construed as an indirect effort to deter Ross from exercising his First Amendment rights, as noted above, such stray remarks do not satisfy the adverse action requirement. *See Morales,* 278 F.3d at 131–32. Nor can it be said that the one occasion on which Burges prevented Davis from visiting Ross or making deposits into his commissary account constituted conduct "that would deter a similarly situated individual of ordinary firmness from exercising his [ ] constitutional rights." *Davis,* 320 F.3d at 353. Ross does not allege that Burges regularly denied him visitations or that the isolated incident involving Davis resulted from bad faith rather than from an innocent misunderstanding regarding the date for which her visit had been scheduled.

Ross's retaliation claim against Bell fares no better. Ross asserts that Bell authored a report that falsely stated that Davis never sought to make a complaint. It is true that the filing of a false report may be actionable if made in retaliation for a prisoner's exercise of his constitutional rights. *Gill,* 389 F.3d at 380; *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Bell's alleged actions, however, are simply *de minimis* and fall outside the ambit of constitutional protection. *Davis,* 320 F.3d at 353. Ross does not articulate any particular harm that he suffered as a result of Bell's actions that would likely deter a similarly situated person of ordinary firmness from continuing to file grievances.

*8 Ross's remaining retaliation claim [FN8] is against Woods for refusing to file a grievance that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

Ross submitted to him on June 28, 2010. [FN9] The refusal to file a single grievance is, without more, insufficient to constitute an adverse action. A refusal to file a single grievance is not the kind or retaliatory act which deter a prisoner of "ordinary firmness" from filing other grievances. *Id.*

> **FN8.** Although Ross alleges that Yozzo denied him his right to review his medical file and Sgt. Coley returned his June 2010 Grievance, Ross does not allege that Yozzo and Coley acted with retaliatory intent.

> **FN9.** Ross asserts in his opposition to the motion to dismiss that the Jail has failed to maintain an adequate detainee grievance system. To the extent Ross seeks to raise a standalone claim based on the prison grievance process and its failure to properly investigate his grievances, it must be dismissed. A claim of violation of a state grievance procedure is not cognizable under § 1983 because prison grievance procedures are not constitutionally mandated. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991) (per curiam).

C. False Statements in Documents

Ross alleges that defendants Amicucci, Rhodes, Yozzo, Bell and Maccabee created documents containing false accusations and statements. A prisoner has no "general constitutional right" to be free from false accusations. *Boddie,* 105 F.3d at 862. To violate a plaintiff's constitutional rights, "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.* The claims based on the assertion that certain defendants created reports with false statements are therefore dismissed.

D. Denial of FOIL Request

Ross claims that the defendants improperly denied his FOIL request for copies of the December

2009 Grievance. This is construed as a claim that Ross was deprived of property without due process of law. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation omitted).

Ross does not have a property interest in obtaining documents under FOIL. *See Papay v. Haselhuhn, No. 07 Civ. 3858(LAP), 2010 WL 4140430, at \*7 (S.D.N.Y. Oct.21, 2010); O'Bradovich v. Village of Tucahoe,* 325 F.Supp.2d 413, 432 (S.D.N.Y.2004). FOIL documents are not produced as of right but only after request and investigation by the state entity. *See* N.Y. Pub. Off. Law §§ 84–89. A plaintiff therefore has only an expectation of receipt of such documents. *See O'Bradovich,* 325 F.Supp.2d at 432–33. Because Ross has no property interest in the FOIL documents, the defendants' failure to provide the requested documents does not constitute a violation of Ross's constitutional rights.

Even if Ross had a constitutionally protected interest in obtaining documents pursuant to FOIL, his due process claim would still fail. Whether or not the denial of his FOIL request is considered "random and unauthorized," *Rivera–Powell v. New York City Bd. Of Elections,* 470 F.3d 458, 465–67 (2d Cir.2006), New York's Article 78 procedures constitute an adequate postdeprivation remedy for an alleged FOIL violation. *See Harris v. Mills,* 572 F.3d 66, 76 (2d Cir.2009).

E. *HIPAA and Medical Privacy Claims*

Ross alleges that the defendants violated HIPAA and his right to medical privacy by improperly disclosing his medical information. Ross bases his claims on three alleged disclosures: Soychek's discussing his medical condition in the presence of another correction officer and other prisoners and calling him a "scammer"; Rhodes's and Yozzo's discussing his medical condition; and Burges's assertion to Davis

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

that Ross was "faking like he got sleep apnea."

   **\*9** Although HIPAA generally provides for the confidentiality of medical records, 42 U.S.C. §§ 1320d–1 to d–7, an individual cannot sue for its enforcement or for damages caused by disclosures. *See Acara v. Banks,* 470 F.3d 569, 571 (5th Cir.2006); *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d 371, 377 (S.D.N.Y.2009) (collecting cases). Only the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action. *See* 42 U.S.C. § 300gg–22. Therefore, Ross's HIPAA claim against Soychek, Rhodes, Yozzo and Burges is dismissed.

   Nor can Ross convert this claim into a claimed violation of his constitutional rights. The Fourteenth Amendment Due Process Clause protects prisoners from the unwanted disclosure of certain medical information. *See Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.,* 631 F.3d 57, 63–64 (2d Cir.2011). A prisoner's right of privacy varies depending on the medical condition. Greater protection is afforded to conditions that are "excruciatingly private and intimate in nature," such as HIV status and transsexualism. *Id.* at 64 (citation omitted).

   Ross's claims regarding the disclosure of his sleep apnea do not state a constitutional violation. Sleep apnea is not an intimate or shameful condition that may expose those who suffer it to discrimination and intolerance. Ross's medical privacy claim against Soychek, Rhodes, Yozzo and Burges is therefore dismissed.

   Finally, Ross alleges that the defendants violated Public Health Law § 2780 by disclosing his medical condition. N.Y. Public Health Law §§ 2780–2787 sets forth a comprehensive scheme for dealing with HIV and AIDS related information. Because Ross does not bring a claim based on those conditions his Public Health Law § 2780 is dismissed.

**F. Personal Involvement**

   The defendants further argue that Ross fails to provide sufficient factual support showing the defendants' personal involvement in any constitutional wrongdoing. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone,* 634 F.3d 642, 644 (2d Cir.2011) (citation omitted). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Accordingly, it is "well settled" that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). When it comes to claims of deliberate indifference to serious medical needs, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

   **\*10** The only claim that has survived the motion to dismiss is the claim against Westchester County for deliberate indifference to Ross's medical needs. Ross does not allege that any of the individual defendants had any part in the failure to provide him medical treatment for his sleep apnea for three months and the improper calibration of the Bi–PAP machine he was given on December 7, 2009. The claims against each of the individual defendants are therefore dismissed.

**G. Municipal Liability**

   Finally, the defendants argue that Ross has failed to allege a municipal policy or custom to support the remaining deliberate indifference to medical need claim against Westchester County. "Section 1983 'imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights.' " *Okin v. Village of*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

*Cornwall–on–Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

> *Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.

*Id.* (citation omitted). Municipal liability may spring from a single action. *See, e.g., Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004).

Ross has alleged facts sufficient to state a claim of municipal liability. He alleges that the Westchester Department of Corrections medical staff does not have an adequate system to identify prisoners with medical needs and make sure they are properly treated. Ross has asserted that this defendant did not treat his sleep apnea for over three months and that the Bi–PAP machine he was given on December 7, 2009, was not properly adjusted for his condition. These are plausible claims of deliberate indifference to his serious medical needs. Ross's allegations are therefore sufficient to sustain his claim of deliberate indifference to his medical needs against Westchester County.

CONCLUSION

The defendants' June 6, 2011 motion to dismiss is granted in part. All of the claims against the individual defendants are dismissed. Ross's claims based on retaliation, the creation of documents with false statements, the denial of FOIL requests, and HIPAA and medical privacy are dismissed. The motion to dismiss Ross's claim of inadequate medical care against Westchester County is denied to the extent described herein. The Clerk of Court will amend the caption to add Westchester County and remove Westchester County Jail and Westchester County Department of Corrections Medical Department as defendants.

SO ORDERED:

S.D.N.Y.,2012.
Ross v. Westchester County Jail
Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Pedro SANTANA, Plaintiff,
v.
Correct Care Solutions, LLC, New York Correct Care
Solutions Medical Services, P.C., Wanda Smithson,
Dr. Raul Ulloa, June Yozzo, Linda Beyer, Westches-
ter County, Jean WATSON, Defendants.

No. 13 Civ. 1549(SAS).
Signed May 6, 2014.

Pedro Santana, Marcy, NY, pro se.

John Murtaugh, Esq., Gaines, Novick, Ponzini, Cossu
& Venditti LLP, White Plains, NY, for Defendants.

### OPINION AND ORDER
SHIRA A. SCHEINDLIN, District Judge.
## I. INTRODUCTION

**\*1** Pedro Santana, presently incarcerated and
proceeding pro se, brings this action pursuant to sec-
tion 1983 of Title 42 of the United States Code.;
Santana sues Westchester County ("the County"),
Correct Care Solutions, LLC ("CCS"), New York
Correct Care Medical Solutions, P.C. ("NYCCS"),
Linda Beyer, Wanda Smithson, Dr. Raul Ulloa, Jean
Watson, and June Yozzo alleging that these defend-
ants deprived Santana of medical treatment in viola-
tion of the Eighth Amediment. Santana seeks injunc-
tive relief, a declaration that defendants violated his
constitutional rights, and punitive damages in the
amount of $9,999,000 against each defendant.

Defendants move for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Procedure

on the grounds that Santana was not deprived of any
constitutional right and that defendants were not de-
liberately indifferent to Santana's serious medical
needs. For the reasons stated below, defendants' mo-
tion for summary judgment is GRANTED.

## II. BACKGROUND[FN1]

> FN1. The facts recited below are drawn from
> the pleadings, the parties' Local Civil Rule
> 56.1 Statements, the declarations submitted
> in connection with this motion, and the ex-
> hibits attached thereto. These facts are un-
> disputed unless otherwise noted. Where
> disputed, the facts are viewed in the light
> most favorable to the nonmoving party. *See*
> *Beard v. Banks,* 548 U.S. 521, 529–30
> (2006).

CCS is a limited liability company that provides
medical care to inmates at Westchester County Jail,
and NYCCS is its wholly owned subsidiary.[FN2] Dr.
Ulloa, Nurse Beyer, and Nurse Watson were em-
ployees of CCS working at Westchester County Jail at
all relevant times.[FN3] Smithson is the Deputy Com-
missioner of Corrections for the County, and Yozzo is
the County's former Medical Liaison for the
Westchester County Jail.[FN4]

> FN2. *See* Memorandum of Law in Support of
> Defendants' Motion for Summary Judgment
> ("Def.Mem.") at 1.

> FN3. *See id.* at 2.

> FN4. *See id.*

On October 10, 2012, Santana was arrested in
Westchester County and held for twenty-four hours at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

the police precinct.[FN5] He was then transferred to Westchester County Jail where Nurse Watson performed his medical intake examination.[FN6] During this examination, Santana informed Watson that he has multiple medical conditions including diabetes, hypertension, high cholesterol, and sleep apnea.[FN7] Santana explained that he had been prescribed a continuous positive airway pressure ("CPAP") machine to treat his sleep apnea.[FN8] Watson made a note in the record that Santana has "unspecified sleep apnea," but told Santana that she could not issue a CPAP machine "without a prescription." [FN9] Santana submitted a health service request for a CPAP machine the next day.[FN10] On October 12, a different nurse took Santana's vitals and observed "no acute distress," but did not respond to his CPAP request or make any notes related to sleep apnea.[FN11] Santana had another medical examination on October 21.[FN12] The record from this examination, electronically signed by Nurse Watson and Dr. Ulloa, notes that Santana's physical and mental status was normal, and he did not report any pain.[FN13] The notes state that Santana intended to submit another health service request for a "sleep apnea machine and evaluation." [FN14] Santana submitted no further health service requests for his sleep apnea until November 9.[FN15]

> FN5. *See* Deposition of Santana ("Santana Dep."), Ex. A to Declaration of John M. Murtaugh ("Murtaugh Decl."), counsel for defendants, at 14:2–16:6.

> FN6. *Id.* at 18:2–16.

> FN7. *See id.* at 18:6–19:4.

> FN8. *See* Santana's Rule 56.1 Statement of Material Facts in Opposition to Summary Judgment ("Santana 56.1") ¶ 3. Defendants contend that Santana denied being treated for any illness or health problem other than flat feet. *See* Defendants' Rule 56.1 Statement of

Material Facts in Support of Summary Judgment ("Def.56 .1") ¶ 2.

> FN9. Medical Records of Santana ("Medical Records"), Ex. B to Murtaugh Decl., at D00035; Santana Dep. at 19:10–13.

> FN10. *See id.* at 21:2–22; Medical Records at D00147.

> FN11. Medical Records at D00134.

> FN12. *Id.* at D00026–32.

> FN13. *Id.*

> FN14. *Id.* at D00032.

> FN15. *See* Def. 56.1 ¶ 5; Santana 56.1 ¶ 7.

On November 7, Nurse Beyer asked Santana to sign a release authorizing Westchester County Jail medical personnel to obtain medical records related to his sleep apnea.[FN16] The next day, a CCS employee spoke to the office manager at Santana's primary health care provider and was told that the office had no record that Santana was being treated for sleep apnea.[FN17] The employee then called multiple health care providers in an attempt to learn where Santana had been treated.[FN18] She reached a sleep center whose staff could not access its records, but was told to call back the following week.[FN19] The medical staff made further efforts to obtain records related to Santana's sleep apnea treatment over the next three weeks. [FN20]

> FN16. *See* Def. 56.1 ¶ 6; Medical Records at D00091.

> FN17. *See* Medical Records at D00133.

> FN18. *See id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN19. *See id.*

FN20. *See id.;* Def. 56.1 ¶ 8.

**\*2** In the meantime, on November 15, Santana submitted a grievance complaining that he had yet to be issued a CPAP machine.[FN21] On November 20, the grievance coordinator denied Santana's grievance after receiving an email from Director of Nursing Michael Kelly finding that there was no record of Santana's sleep apnea at any of the clinics contacted by the medical staff.[FN22] However, in a letter to Smithson, Kelly noted that Santana had submitted a request for care on October 12 and that there was "no documentation to support that the [nurse practitioner] addressed [Santana's] concern about sleep apnea or a CPAP unit." [FN23] Santana appealed this denial. [FN24] On November 28, Dr. Ulloa finally verified Santana's prescription and recorded in his progress notes that Santana would be called and started on a CPAP machine that day.[FN25] However, Santana did not have continuous access to a CPAP machine adjusted to his prescribed setting until approximately five days later, in part because one of the nurses was not authorized to adjust the CPAP machine.[FN26] On December 3, Smithson, who had reviewed Santana's grievance appeal, sent a memorandum to Santana stating that the medical staff had had difficulty verifying that Santana had been prescribed a CPAP machine, but that his complaint had been substantiated and his remedy granted.[FN27] Santana testified that he had access to a CPAP machine on a daily basis and made no complaints from December 3 through December 11 when he was transferred out of the Westchester County Jail.[FN28] Santana was in the custody of the New York City Department of Corrections between December 11, 2012 and January 29, 2013, when he was returned to the Westchester County Jail.[FN29]

FN21. *See* J–255–12 New York State Commission of Correction Grievance Forms

("J–255–12 Grievance Forms"), Ex. C to Declaration of Santana ("Santana Decl."), at 1.

FN22. *See id.* at 3.

FN23. 11/20/12 Letter from Kelly to Smithson, Ex. D to Santana Decl., at 1.

FN24. *See* J–255–12 Grievance Forms at 3.

FN25. *See* Def. 56.1 ¶ 9; Santana 56.1 ¶ 11.

FN26. *See* Santana 56.1 ¶ 5. It is not clear from this record precisely when Santana had access to an adequate CPAP machine. On December 3, Santana complained that his CPAP machine was "being taken away from him before he want[ed] it taken from him." Medical Records at D00127. Records indicate that Santana's CPAP machine was initially kept at "the bubble" where it was not immediately accessible to him. *Id.* at D00127–29, D0014314. Notes in his medical file indicate that Santana was in "no acute distress" when he was seen by medical staff on December 3. *Id.*

FN27. *See* J–255–12 Grievance Forms at 5.

FN28. *See* Def. 56.1 ¶¶ 11–12; Santana Dep. at 27:2–25.

FN29. *See* Def. 56.1 ¶¶ 11–12.

Santana received a CPAP machine as soon as he was returned to the Westchester County Jail.[FN30] This machine was faulty, but he was issued a replacement that same day.[FN31] On January 31, Santana submitted a health service request because his CPAP machine was on the wrong setting and was giving him "too much

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

pressure." [FN32] This problem was not addressed by medical staff for three days.[FN33] Santana testified that he was "continuously complaining" during this time because his chest and stomach were hurting. [FN34] On February 3, Dr. Ulloa ordered that Santana was to be kept in the infirmary until a new CPAP machine could be obtained.[FN35] Medical staff procured a new CPAP machine, but the machine needed service, so Santana was held overnight in the infirmary for observation.[FN36] The notes of the nurse on duty that evening report, "[Santana] is ambulatory and in no acute respiratory distress. He denies c/o or discomfort [of] any nature." [FN37] Santana testified that "everything was fine" with his CPAP machine between February 3 and some time in March, when he had an issue that was "immediately" addressed.[FN38]

> FN30. *See* Medical Records at D00125; Santana Dep. at 30:10–14.

> FN31. *See* Santana Dep. at 30:10–25.

> FN32. *Id.* at 31:3–8; Medical Records at D00142.

> FN33. *See* Def. 56.1 ¶ 15; Medical Records at D000124.

> FN34. Santana Dep. at 32:4–15.

> FN35. *See* Def. 56.1 ¶ 15; Medical Records at D00124.

> FN36. *See* Medical Records at D00122.

> FN37. *Id.*

> FN38. Santana Dep. at 34:6–12.

Santana submitted a grievance on February 10, claiming that the medical personnel at the Westchester County Jail were not qualified to treat his sleep apnea and that the CPAP machines were faulty.[FN39] This grievance was denied on appeal through the final level of review, the Citizens' Policy and Complaint Review Board.[FN40] Nonetheless, Santana maintains that medical care at the Westchester County Jail is inadequate because there is no sleep specialist on staff, multiple members of the medical staff were not trained to adjust his CPAP machine to the proper setting, and he has been given a CPAP machine on the wrong setting and has had to adjust the settings himself. [FN41] In further support of this contention, Santana has cited to the case of another Westchester County inmate whose sleep apnea treatment was similarly delayed.[FN42] He also cites to a 2009 report stating that grievance forms were unavailable to prisoners at Westchester County Jail, and detailing deficiencies in infection control and dental care.[FN43]

> FN39. *See* J–22–13 New York State Commission of Correction Grievance Forms ("J–22–13 Grievance Forms"), Ex. E to Santana Decl ., at 1.

> FN40. *See id.* at 2–8.

> FN41. *See* Staffing Plan, Ex. H to Santana Decl. (prison does not have a sleep specialist on medical staff); Santana Dep. at 33:10–11 (testifying that Ulloa, Yozzo and a third member of the medical staff "couldn't even program the [CPAP] machine"); *Id.* at 36:9–17 (testifying that Ulloa asked Santana set up his own CPAP machine); Santana 56.1 ¶ 5 (alleging that a nurse practitioner not named as a defendant told Santana she was not authorized to touch the CPAP machine).

> FN42. *Ross v. Westchester Cnty.,* No. 10 Civ. 3937, 2013 WL 5178354, at *6 (S.D.N.Y. Sept. 16, 2013), *appeal dismissed* (Feb. 20, 2014) (inmate raised a material question of

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

fact as to the County's deliberate indifference to treating his sleep apnea over a three month period).

FN43. *See* CRIPA Investigation of the Westchester County Jail, Ex. G to Santana Decl., at 23.

**\*3** Prior to Santana's incarceration, Dr. Ahmed Fadil diagnosed him with "moderate" sleep apnea and prescribed a CPAP machine.FN44 In a "Letter of Medical Necessity" dated August 20, 2013, Fadil characterized Santana's condition as "Severe Obstructive Sleep Apnea," for which a CPAP machine is "medically necessary," and directed that Santana should continue using the CPAP machine indefinitely.FN45 According to Dr. Fadil, "[f]ailure to treat sleep apnea will result in a wide range of medical complications to name a few, heart attacks, strokes, hypertension, and chronic fatigue [.]"FN46

FN44. Insomnia and Sleep Medicine Records, Ex. A to Santana Decl., at 14.

FN45. 8/20/13 Letter of Medical Necessity ("Fadil Letter"), Ex. A to Santana Decl., at 1A.

FN46. *Id.*

Defendants' medical expert, Dr. Fred Lin, who is the Director of the Mount Sinai Sleep Surgery Center, reviewed Santana's medical records and deposition testimony.FN47 In Dr. Lin's medical opinion, Santana suffers from "moderate" sleep apnea.FN48 Dr. Lin opines that there are no physiological complications of untreated moderate sleep apnea besides loss of sleep and states with "a reasonable degree of medical certainty" that Santana's "moderate sleep apnea was not the cause of Santana's other medical conditions.FN49 Santana claims that the failure to treat his sleep apnea has caused him physical pain, loss of sleep, and emo-

tional anguish stemming from his worries that he would die without access to a CPAP machine.FN50

FN47. *See* Def. Mem. at 12.

FN48. Report of Dr. Fred Lin ("Lin Report"), Ex. E to Murtaugh Decl., at 1.

FN49. *Id.* at 2. Santana objects to the use of this expert report because it was submitted after the date initially set by Magistrate Judge Peck, September 30, 2013. *See* Santana 56.1 ¶ 21; Transcript of 9/4/13 Conference before Magistrate Judge Peck at 8:13–25. However, both the discovery deadlines and the deadline to file motions for summary judgment were extended after that conference. *See* 11/4/13 Letter from Murtaugh to Magistrate Judge Peck. Santana does not allege that he did not receive defendants' expert report, or that disclosure was not made in accordance with the new deadlines, merely that defendants did not file an expert report before September 30.

FN50. *See* Complaint ¶¶ 21, 25; Santana Dep. at 41:13–42:20.

### III. APPLICABLE LAW

### A. Summary Judgment

"Summary judgment is appropriate 'only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.' " FN51 "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN52 " 'A fact is material if it might affect the outcome of the suit under the governing law.' " FN53

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN51. *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11,19 (2d Cir.2014) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 96 (2d Cir.2009)) (other quotations omitted).

FN52. *Benn v. Kissane,* 510 Fed. App'x 34, 36 (2d Cir.2013) *cert. denied,* 134 S.Ct. 78 (2013) (quoting *General Star Nat'l Ins. Co. v. Universal Fabricators, Inc.,* 585 F.3d 662, 669 (2d Cir.2009)) (other quotations omitted).

FN53. *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012) (quoting *Bessemer Trust Co. v. Branin,* 618 F.3d 76, 85 (2d Cir.2010)).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." [FN54] To defeat a motion for summary judgment, the non-moving party ' "must do more than simply show that there is some metaphysical doubt as to the material facts,' " [FN55] and " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN56]

FN54. *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

FN55. *Valenti v. Penn Mut. Life Ins.* Co., 511 Fed. App'x 57, 58 (2d Cir.2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

FN56. *Northeast Research, LLC v. One Shipwrecked Vessel,* 729 F.3d 197, 214 (2d Cir.2013) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998)).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." [FN57] " 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." [FN58]

FN57. *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

FN58. *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir.2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

Although "[p]ro se parties are entitled to 'extra consideration' on summary judgment motions," they are not relieved from "the usual requirements of summary judgment." [FN59] "Thus, a pro se plaintiff's 'failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion [for summary judgment] ineffectual.' " [FN60]

FN59. *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004) *aff'd sub nom. Maalouf v. Citigroup Global Mkts., Inc.,* 156 Fed. App'x 367 (2d Cir.2005) ( ' "Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' " (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999))).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN60. *Anderson v. City of New York Dep't of Corr.,* No. 11 Civ. 4069, 2013 WL 702918, at *2 (S.D.N.Y. Feb. 26, 2013) (quoting *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994)).

**B. Section 1983**

**\*4** "To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state ... law.' " [FN61] Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN62] Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation.[FN63] "Because vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [FN64] Thus, a supervisory official cannot be held liable solely on account of the acts or omissions of her subordinates.[FN65]

FN61. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)).

FN62. *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)).

FN63. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991))).

FN64. *Ashcroft v. Iqbal,* 556 U.S. 662, 676–77 (2009) (citations omitted) (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

FN65. *See Grullon v. City of New Haven,* 720 F.3d 133,138 (2d Cir.2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

In *Monell v. New York City Department of Social Services,* the Supreme Court held that to establish a claim against a municipality under section 1983, a plaintiff must show harm resulting from an identified municipal "policy or custom." [FN66] A municipality may not be found liable simply because one of its employees or agents is guilty of some wrongdoing.[FN67] In the absence of an established written municipal policy, a plaintiff must prove that a practice ' "was so persistent or widespread as to constitute a custom or usage with the force of law,' " [FN68] or that a practice or custom of subordinate employees was ' "so manifest as to imply the constructive acquiescence of senior policy-making officials.' " [FN69] Thus, municipal liability under section 1983 may be established through evidence that "the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue." [FN70] However, a policy or custom is not established by a single instance of unconstitutional conduct by an employee.[FN71] "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." [FN72]

FN66. 436 U.S. 658, 694(1978).

FN67. *See Cash v. County of Erie,* 654 F.3d

324, 333 (2d Cir.2011).

FN68. *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quoting *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004)) (other quotation marks omitted).

FN69. *Id.* (quoting *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992)).

FN70. *Green,* 465 F.3d at 80 (citing *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125–26 (2d Cir.2004)).

FN71. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell.*").

FN72. *Rojas v. Alexander's Dep't Store,* 924 F.2d 406, 409 (2d Cir.1990). *Accord Whalen v. Allers,* 302 F.Supp.2d 194, 203 (S . D.N.Y.2003).

## C. Deliberate Indifference to a Serious Medical Need

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." [FN73] To establish a claim for deliberate indifference, a plaintiff must show that the deprivation of medical care was "sufficiently serious" and that the charged official acted with a "sufficiently culpable state of mind." [FN74] Thus, "[t]o show that he has been

subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." [FN75]

FN73. *Estelle v. Gamble,* 429 U.S. 97, 101 (1976).

FN74. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

FN75. *Taylor v. Goorde* [sic], No. 13–1196–pr., 2013 WL 6670716, at *1 (2d Cir. Dec. 19, 2013) (citing *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)).

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," [FN76] and "the serious medical need inquiry must be tailored to the specific circumstances of each case." [FN77] The Second Circuit has set forth factors to guide this analysis, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain." [FN78] A "serious" medical condition is one that may "produce death, degeneration or extreme pain." [FN79] "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." [FN80] When considering an alleged temporary delay or interruption in the provision of medical care, "the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " [FN81]

FN76. *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003).

FN77. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
(Cite as: 2014 WL 1803308 (S.D.N.Y.))

FN78. *Brock,* 315 F.3d at 162 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). *Accord Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

FN79. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005).

FN80. *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

FN81. *Id.* (quoting *Smith,* 316 F.3d at 185).

**\*5** In addition to establishing an objectively serious medical need, a plaintiff bringing Eighth Amendment deliberate indifference claims must prove that the defendants acted with a sufficiently culpable state of mind.[FN82] "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.' "[FN83] "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[FN84] "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.' "[FN85] Thus, deliberate indifference is more substantial than mere disagreement over a course of treatment, negligence or even medical malpractice.[FN86]

FN82. *See Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

FN83. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

FN84. *Farmer,* 511 U.S. at 842.

FN85. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

FN86. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance,* 143 F.3d at 703; *Stevens v. Goord,* 535 F.Supp.2d 373, 384 (S.D.N.Y.2008).

**IV. DISCUSSION**

**A. Seriousness**

Santana alleges that he was deprived of sleep apnea treatment in violation of his constitutional rights. It is undisputed that Santana was not given a CPAP machine for the first month and a half of his incarceration at the Westchester County Jail and that he has had intermittent problems with the functioning of several different CPAP machines. However, the record does not establish that Santana's sleep apnea was sufficiently serious such that these lapses in care amounted to an Eighth Amendment violation.

Both Dr. Lin and Dr. Fadil opine that Santana has "moderate" sleep apnea.[FN87] Santana's only evidence that his sleep apnea constitutes a serious medical condition is an unsworn letter in which Fadil contradicts his medical notes by stating that Santana has "severe" sleep apnea.[FN88] In his letter, Fadil states that Santana's CPAP machine treatment is "medically necessary," and goes on to list the complications of untreated sleep apnea– "heart attacks, strokes, hypertension, and chronic fatigue."[FN89] But this opinion is not offered as to Santana's condition. It is a statement solely about the potential complications of sleep apnea in general.[FN90]

FN87. Insomnia and Sleep Medicine Records at 14; Lin Report at 1.

FN88. Fadil Letter at 1A.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

FN89. *Id.*

FN90. I note that Fadil is a treating physician, not a Rule 26 expert. *See* Fed.R.Civ.P. 26(a)(2).

But even if Santana had produced sufficient evidence that his sleep apnea is sufficiently grave to be constitutionally cognizable, because this condition was eventually treated, the focus of the inquiry here is the severity of the delay and interruption in his care rather than the seriousness of his medical condition.[FN91] There is no indication that Santana's health declined during the time he was without a CPAP machine, or that the temporary deprivation significantly affected his daily activities or caused him chronic and substantial pain.[FN92] Prison medical records show that Santana did not mention that he was suffering adverse effects from the lack of a CPAP machine during his October 21 exam or when he was held for observation on February 3. There is no evidence that Santana was ever in acute distress or experienced excessive pain. Therefore, Santana has not established that the delay and intermittent interruption in the provision of a CPAP machine were sufficiently serious to constitute an Eighth Amendment violation.

FN91. *See Salahuddin,* 467 F.3d at 280.

FN92. *See Brock,* 315 F.3d at 162.

**B. Subjective Intent**

**1. Watson**

**\*6** When viewed in the light most favorable to Santana, the facts bearing on Watson's liability do not give rise to a claim for deliberate indifference to a serious medical need. The parties dispute whether Santana informed Watson during his intake exam that he had a prescription for a CPAP machine. Further, it is unclear whether Kelly's letter addressing Santana's grievance refers to Watson or to the nurse practitioner who failed to follow up on the CPAP request during Santana's October 12 medical exam. At most, these facts show that Watson knew Santana had a prescription for a CPAP machine and failed to follow up on his CPAP request in a timely manner. There is no indication that she deliberately denied access to a CPAP machine, or that she knew that the failure to provide a CPAP machine posed an excessive risk to Santana's health or safety. Summary judgment for Watson is GRANTED.

**2. Ulloa**

Santana claims that Dr. Ulloa denied Santana CPAP treatment and was negligent in the supervision and training of subordinates. As evidenced by his electronic signature on Santana's medical records, Ulloa learned on October 21 that Santana had sleep apnea and was requesting a CPAP machine. But given that Santana did not present objective complications or notify staff that he was in pain during this exam, there is no indication that Ulloa knew or should have known that Santana's condition posed a serious risk of "death, degeneration, or extreme pain." [FN93] Further, because vicarious liability does not apply in section 1983 cases, Santana's claims against Ulloa cannot be based solely on the actions of his subordinates.[FN94] Indeed, the only evidence regarding Ulloa's supervisory actions show that he ordered medical personnel to issue Santana a CPAP machine after speaking to Dr. Fadil. There is no evidence that Ulloa violated Santana's constitutional rights through his own acts or omissions or that he was grossly negligent as a supervisor. Summary judgment for Ulloa is GRANTED.

FN93. *Johnson,* 412 F.3d at 403.

FN94. *See Iqbal,* 556 U.S. at 676–77.

**3. Beyer**

Santana has not produced evidence that Beyer

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**

was personally involved in the alleged deprivation of medical care. He states that Beyer provided him with a form to authorize the release of his medical records, and after Santana signed this form, the medical staff endeavored to find his CPAP prescription. Thus, the only evidence concerning Beyer's actions shows that she affirmatively aided Santana's treatment. Summary judgment for Beyer is GRANTED.

### 4. Yozzo

Santana claims that Yozzo refused to authorize his CPAP machine, failed to provide needed medical attention, and interfered with the orders of a licensed polysomnographic physician.[FN95] Because Santana has not cited any evidence of these claims, or even stated specific factual allegations against Yozzo, summary judgment for Yozzo is GRANTED.

> FN95. *See* Complaint ¶ 29.

### 5. Smithson

Santana claims that Smithson was negligent in her supervision of subordinates, that she "refused to act on information" of unconstitutional medical practices in 2009, and that she failed to remedy the medical grievance procedure. [FN96] But Santana has failed to adduce any facts that would support a jury finding that Smithson was deliberately indifferent to his constitutional rights or that she was grossly negligent in supervising employees. The record shows that Smithson reviewed and responded to Santana's November 15 grievance about his care, ensuring that his concerns had been investigated and addressed. [FN97] Further, to the extent that Smithson is responsible for remedying medical grievance policy, Santana has neither pled nor substantiated that the medical grievance procedure at the Westchester County Jail is currently ineffective. Santana's only evidence with regard to this claim is the 2009 report finding that grievance forms were unavailable to prisoners at the Westchester County Jail.[FN98] Santana has submitted multiple grievances, and has not alleged any difficulty in filing these grievances. Summary judgment for Smithson is GRANTED.[FN99]

> FN96. *Id.* ¶ 27.

> FN97. *See* J–255–12 Grievance Forms at 5; 11/20/12 Letter from Kelly to Smithson at 1.

> FN98. *See* CRIPA Investigation of the Westchester County Jail at 23.

> FN99. Santana's submissions have been construed liberally and interpreted to raise the strongest arguments they suggest. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). It is unclear whether Santana's claims that Ulloa, Yozzo, and Smithson were negligent are intended as a theory of liability under section 1983, or whether he seeks to bring state law claims against these parties. I do not reach the issue of Ulloa's alleged negligence, but all pendent state law claims against Yozzo and Smithson are dismissed without prejudice. *See* 28 U.S.C. § 1367.

### C. *Monell* Claims

**\*7** Because Santana has not shown that he was deprived of a constitutional right, there is no basis for *Monell* liability.[FN100] Summary judgment for CCS, NYCCS and the County is GRANTED.

> FN100. *See Bobolakis v. DiPietrantonio,* 523 Fed. App'x 85, 87 (2d Cir.2013) (no basis for imposing municipal liability where plaintiff had not suffered a violation of his constitutional rights).

### V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this motion (Docket No. 51) and this case.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1803308 (S.D.N.Y.)
**(Cite as: 2014 WL 1803308 (S.D.N.Y.))**


    SO ORDERED:

S.D.N.Y.,2014.
Santana v. Watson
Slip Copy, 2014 WL 1803308 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Kenny WATSON, Plaintiff,
v.
Corrections Officer Adam MAYO, Defendant.

No. 07 Civ. 54(NRB).
Feb. 26, 2008.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

**\*1** Plaintiff Kenny Watson brings this suit under 42 U.S.C. § 1983 seeking damages for an assault that he allegedly suffered on January 5, 2004, while he was incarcerated at the Ossining Correctional Facility in Ossining, New York.FN1

> FN1. Plaintiff was an inmate at the Ossining Correctional Facility from January through March of 2004. *See Watson v. Delgado et al., 2006 WL 1716869 at \* 1 (S.D.N.Y. June 20, 2006)* (SAS) (Order denying defendants' motion for summary judgment).

Plaintiff has previously proceeded to a jury trial on these same claims against three other corrections officers who were involved in the incident, and lost. *Watson v. Delgado et. al.,* 05 Civ. 6071(SAS)(AJP) (S.D.N.Y.2005). In fact, Corrections Officer Adam Mayo was named in the prior complaint, but was dismissed therefrom without prejudice for lack of timely service. However, only two weeks after Mayo was dismissed, plaintiff served Mayo with a copy of the summons and complaint. Nevertheless, plaintiff made no effort to re-join Mayo in the action, or even

bring the service success to the Court's attention and ask for reconsideration of the dismissal. Instead, ten months later, the case went to trial against the other three corrections officers. At trial, Mayo testified on behalf of the defendants, and was cross-examined by plaintiff's counsel. After the close of evidence, the jury found in favor of the defendants. Three months after that trial, and exactly one day before the expiration of the statute of limitations, plaintiff filed the instant suit against Mayo.

Mayo now moves to dismiss the instant suit pursuant to Fed.R.Civ.P. 12(c) on the basis of laches. As explained more fully below, we believe that plaintiff should not be allowed a second opportunity to bring the same claims here against a defendant who had been named in the original complaint in a prior case and was eventually served well before trial in that case began. The only conceivable explanations for plaintiff's failure to join Mayo in the earlier action either raise issues of competence on the part of plaintiff's counsel or efforts of tactical gamesmanship to reserve the proverbial second bite at the apple before a different judge and jury. Neither explanation merits allowing this second, duplicative suit to proceed. Accordingly, we grant defendant's motion to dismiss.

### BACKGROUND

At about 12:35 p.m. on January 5, 2004, Watson was let out of his cell in Gallery 3 of the Special Housing Unit ("SHU") at the Ossining Correctional Facility for a shower.FN2 On his way to pick up a razor, he was ordered to return to his cell to lock back in, apparently because he had refused a shower earlier that day, and was not entitled to have a second opportunity to shower.FN3 Watson alleges that he returned the razor, and then as he was walking back to his cell Officer Mayo struck him with a baton and assaulted him.FN4

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

FN2. Complaint ¶¶ 9-12.

FN3. *See* Declaration of Andrew F. Plasse, Esq., Ex. 1, (Transcript of Tier III Prison Disciplinary Hearing).

FN4. Complaint ¶¶ 13-14.

Mayo's version of the events, memorialized the same day in a Use of Force report, is quite different.[FN5] According to Mayo, Watson refused to comply with the order to return to his cell. Watson then became "extremely agitated," and took a swing at Mayo with a closed right first. Mayo then pulled Watson down to the floor, and struck him with a baton. Watson continued to resist and disobey orders, and it took three other Corrections Officers-Alfonso Orrico, Enrique Delgado, Manuel Moscoso-to hold Watson down and apply mechanical restraints.

FN5. *See* Declaration of Susan Odessky, Ex. B (Memoranda From Officers Mayo, Delgado, Orrico and Moscoso dated January 5, 2004); Defendant's Reply Memorandum of Law at 4-5.

**\*2** Watson filed five grievances against the various officers involved in the January 5, 2004 incident, which were all denied.[FN6] Having exhausted his administrative remedies, on June 30, 2005 Watson then filed a § 1983 complaint in this Court against all four corrections officers involved in the incident. *Watson v. Delgado et. al.,* 05 Civ. 6071(SAS) (S.D.N.Y.2005). The complaint alleged that all four officers assaulted him while he was returning to his cell.[FN7]

FN6. The five grievances following this incident are SS-38472-04, SS-38473-04, SS-38477-04, SS-38505-04, and SS-38622-04. All five were denied, and the Court in the prior action found that Watson had exhausted his administrative remedies.

*See Watson v. Delgado et al.,* 2006 WL 1716869 at * 7 (S.D.N.Y. June 20, 2006) (SAS) (Order denying defendants' motion for summary judgment).

FN7. In the prior case, Watson alleged that he was "grabbed from behind and thrown into a wall, then onto the floor," "felt a sharp stick in his leg," and was handcuffed. As a result of the alleged assault, Watson claimed that he had suffered "a laceration to his left leg requiring sutures," a "swollen" face, a laceration on his lip, and an injury to his left wrist, for which he received "ongoing medical treatment" and physical therapy. *See Watson v. Delgado et al.,* 2006 WL 1716869 at * 1 (S.D.N.Y. June 20, 2006)(SAS) (Order denying defendants' motion for summary judgment) (citations omitted).

On July 22, 2005, Judge Shira Scheindlin referred the case to Magistrate Judge Andrew Peck for "General Pretrial."[FN8] Over the next few months, plaintiff served three of the defendants-Orrico, Delgado, and Moscoso-but failed to serve Mayo. The reasons for the failure to serve are unclear, and are disputed here. Andrew F. Plasse, Esq., Watson's attorney in the first action as well as here, sent Mayo a waiver of service form, which was never executed.[FN9] Plasse then dispatched a process server to serve Mayo in person on two separate occasions, first at Ossining Correctional Facility and then at Great Meadow Correctional Facility, where Mayo had been transferred.[FN10] Both facilities refused to accept service on Mayo's behalf. Mayo argues that the refusals were made in good faith, because Mayo no longer worked at the first facility, and because plaintiff was mistaken as to Mayo's first name, believing it to be "John" and not, as it actually was, Adam.[FN11] Plaintiff, on the other hand, alleges that Mayo actively avoided service, at least on the second occasion, since Plasse's process server had Mayo's name correctly listed as "Adam" when he tried to serve Mayo at Great Meadow Correctional Facili-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

ty.[FN12]

> **FN8.** See *Watson v. Delgado et. al.,* 05 cv 6071(SAS) (filed July 22, 2005) (Order referring the case to a Magistrate Judge).

> **FN9.** Plasse Decl., Ex. 5.

> **FN10.** Plaintiff's process server timely filed an affidavit of due diligence after each failed attempt. *See* Plasse Decl., Exs. 6, 9.

> **FN11.** Defendant's Reply Memorandum of Law at 5.

> **FN12.** Plaintiff's Memorandum of Law at 5; Plasse Decl. Ex. 8.

Whatever the reason for the failure, plaintiff failed to timely serve Mayo within 120 days of filing the complaint, as required by Fed.R.Civ.P. 4(m). Accordingly, at a pre-trial status conference on November 21, 2005, Magistrate Judge Peck *sua sponte* dismissed Mayo without prejudice from the action.[FN13]

> **FN13.** *See* Plasse Decl. Ex. 12 (Transcript of proceedings before Magistrate Judge Peck, dated November 21, 2005, 4:15-17, ("So it would be, in the case .. hold the Mayo. I couldn't resist.")).

Just two and a half weeks later, on December 9, 2005, plaintiff succeeded in serving Mayo at Great Meadow Correctional Facility.[FN14] However, plaintiff did not alert the Court to the fact that service had been made, nor did plaintiff in any way seek to join Mayo in the ongoing action.[FN15]

> **FN14.** Plasse Decl. Ex. 11.

> **FN15.** *See, e.g.,* Defendant's Reply Memorandum of Law at 6.

The case against the other three officers proceeded, and ten months later, following the denial of defendants' summary judgment motion, went to trial. The trial commenced before Magistrate Judge Peck and a jury on October 16, 2006. During the trial, Mayo testified in person as a witness for the defendants, and was cross-examined by Plasse, plaintiff's attorney. Mayo admitted that of the officers involved in restraining Watson, he was the one who struck Watson with a baton.[FN16] Mayo's testimony in this regard was consistent with the Use of Force report issued on the date of the incident, which noted that Mayo had been the only officer to deploy a baton.[FN17] On October 19, 2006 the jury returned a verdict in favor of the defendants.

> **FN16.** Plaintiff's Memorandum of Law at 4.

> **FN17.** *See supra* n. 5.

**\*3** On January 4, 2007, three months after the verdict in the prior action, and exactly one day before the expiration of the three year statute of limitations,[FN18] plaintiff filed the instant complaint against Mayo.[FN19]

> **FN18.** *See, e.g., Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994) (New York state law supplies the applicable three year statute of limitations for suits under 42 U.S.C § 1983).

> **FN19.** We note further that Mayo was not served in the instant case until March 2007, two more months after the complaint was filed, and thirty-eight months from the date of the original incident.

### DISCUSSION

We begin our analysis of whether the defendant is

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

correct that this complaint must be dismissed on laches or some other ground with the observation that plaintiff could not at the outset have sued Corrections Officer Mayo in one lawsuit and his three fellow corrections officers in another lawsuit, as that would constitute an impermissible splitting of a cause of action. *See Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit") (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).[FN20]

> FN20. Technically, the test for dismissal of a duplicative lawsuit is whether, if the first suit were final, claim preclusion would apply. As the Supreme Court stated over 100 years ago in *United States v. The Haytian Republic,* 154 U.S. 118, 124, 14 S.Ct. 992, 38 L.Ed. 930 (1894), "[T]he true test of the sufficiency of a plea of 'other suit pending' in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as 'the thing adjudged,' regarding the matters at issue in the second suit."

The reasons for the rule against splitting a cause of action are obvious: splitting a cause of action provides a plaintiff with the proverbial two bites at the apple; creates a myriad of possible prejudices to the defendant; creates genuine possibilities of inconsistent results; and imposes an unwarranted burden on courts and jurors. As the Second Circuit has put it, "The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation, ... to protect parties from the vexation of concurrent litigation over the same subject matter, ... [and to] foster[ ] judicial economy and protect[ ] the parties from vexatious and expensive litigation." *Curtis,* 226 F.3d at 138 (citations omitted). *See also Green v. Wolf Corp.,* 406 F.2d 291, 297 (2d Cir.1968) ("Early in the development of our civil

procedures it became apparent that judicial efficiency demanded the elimination of multiple suits arising from the same facts and questions of law.").

Although in its most common form the rule against splitting a cause of action applies when a plaintiff has sued the same defendant in two separate suits, *see, e.g., Curtis,* 226 F.3d at 139 ("plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time"), the rule applies with equal force to different defendants when there is identity of interest with prior defendants and adequate representation. *Alpert's Newspaper Delivery, Inc. v. The New York Times Co.,* 876 F.2d 266, 270 (2d Cir.1989). The rule would have applied had Watson initially attempted to sue Mayo and the other three officers separately because all the officers were alleged to have been involved in the exact same incident, and their interests were sufficiently aligned such that they may have been in privity with each other. *See Barclay v. Lowe,* 131 Fed.Appx. 778, 779, (2d Cir.2005) (upholding a district court's dismissal of a second suit against prison guards as duplicative although the second suit named different individual guards because all defendants in both suits were prison guards at Attica and the interests of the second set of defendants were adequately represented by those in the first suit). *See also Curtis,* 226 F.3d at 139 ("[T]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion.").

**\*4** In this context, Mayo now moves to dismiss this second suit on the grounds of laches, to which plaintiff responds that laches is inapplicable in a § 1983 case that seeks only damages and no equitable relief. We have no quarrel with that response if the issue here were simply Watson's delay in filing the instant suit against Mayo. Indeed, that is the fact pattern of the main authority on which plaintiff relies, *Ivani Contracting Corp. v. City of New York,* 103 F.3d

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

257, 260 (2d Cir.1997) *cert. den'd* 520 U.S. 1211, 117 S.Ct. 1695, 137 L.Ed.2d 821 (1997). However, the doctrine of laches does not just implicate time periods, and should be applied here because of plaintiff's vexatious and inequitable litigation tactics.

Beyond the question of laches, in the alternative we find that this second suit is barred by the doctrine of claim preclusion.

**A. Laches**

**1. Applicable Law**

Traditionally, the doctrine of laches bars suits where (1) the plaintiff knew of the defendant's alleged misconduct, (2) plaintiff inexcusably delayed in taking action, and (3) the defendant was prejudiced thereby. *See, e.g., Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Air Cargo News, Inc. v. Tabmaq Publishing, Ltd.,* 07 Civ. 480(DI), 2007 U.S. Dist. LEXIS 36873, at *33, 2007 WL 1101183 (E.D.N.Y.April.11, 2007).

The word "laches" traces its origin back to the Latin word "laxus" which means "lax," and it is thought that the doctrine has its roots in Roman law.[FN21] The doctrine entered American law through England, where the doctrine applied in equity, and was invoked by the Chancellor in Equity to withhold relief when a plaintiff's delay in coming to Equity was inordinate, and the delay had caused prejudice to the defendant. *See* Henry L. McClintock, *Handbook of the Principles of Equity* § 28 (2d ed.1948); Ashraf Ray Ibrahim, Note, *The Doctrine of Laches in International Law,* 83 Va. L.Rev. 647, 647 (1997); Thomas G. Robinson, Note, *Laches in Federal Substantive Law: Relation to Statutes of Limitation,* 56 B.U. L.Rev. 970 (1976).

> FN21. Visdean R. Vass & Xia Chen, *The Admiralty Doctrine of Laches,* 53 La. L.Rev.

495, 497 (1992).

Since the doctrine of laches pre-dated the enactment by legislatures of statutory time limits,[FN22] the Second Circuit has held that laches can not be used in lieu of legislatively prescribed limitations periods: "The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." *Ivani Contracting,* 103 F.3d at 260. The Second Circuit grounded this rule on separation of powers principles, on the theory that federal courts should not infringe on the legislature's determination of when a claim becomes stale. 103 F.3d at 260 ("An express limitations period reflects a legislative value judgment striking the appropriate balance between the interests promoted by the statute and countervailing interests of repose.").

> FN22. As the Second Circuit noted, statutory enactments of time limits began in earnest in 1624 with the statute of 21 James I, ch. 16. *Ivani Contracting,* 103 F.3d at 259.

*Ivani Contracting* involved a § 1983 claim brought by a private contractor who believed that it had been wrongly denied two New York City contracts to build sewers in Queens. Although the contractor's suit was timely within the three year statute of limitations, the district court dismissed the suit on laches grounds because the contractor had not filed its complaint until the construction projects themselves were almost entirely completed by other contractors. The district court noted that the contractor should have initiated Article 78 proceedings in New York State court or brought an action to stop the construction before it began, for a decision against the City at a later juncture would force the City to pay twice, once for the completion of the projects and once for damages. On appeal, the Second Circuit reversed, holding that laches could not cut short a statutory limitations period.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

**\*5** Yet, historically, the doctrine of laches has encompassed broader equitable concerns beyond simply waiting too long to file suit. Originally in the Court of Chancery, and also subsequently in this country, laches has been invoked in the face of litigation abuse or changed relationships between parties that may have nothing to do with the amount of time that has passed since the claim arose. As one law review article notes, "[T]he doctrinal underpinnings of the laches principle are not based upon extrajudicially prescribed time limits, but instead upon a rich history of justice, fairness, and the equitable balancing of rights." Ibrahim, *The Doctrine of Laches in International Law,* 83 Va. L.Rev. at 647.

A prime example is a United States Supreme Court case from 1892, *Galliher v. Cadwell,* 145 U.S. 368, 12 S.Ct. 873, 36 L.Ed. 738 (1892).[FN23] In *Galliher,* the Court invoked laches to bar a widow's claim to homestead lands that had been entered on by her husband prior to the current occupant. [FN24] Without reaching the question of whether the widow's claims to the land were timely within the statutory period, the Court found that it would be unfair to allow the widow to assert her claim to the lands at the time of suit, given that the value of land in question had exploded in the interim since her husband had entered the property.[FN25] The Court stressed that laches was appropriate not because of the amount of time the widow had waited, but because of the fundamental change in the value of the land: "[T]he question of laches turns not simply upon the number of years which have elapsed between the accruing of her rights, whatever they were, and her assertion of them, but also upon the nature and evidence of those rights, the changes in value, and other circumstances occurring during that lapse of years." *Id.* at 371-72. The Court stressed that laches was more than equity's equivalent of a statutory limit: "Laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced-an inequity founded upon some change in the condition or rela-

tions of the property or the parties." *Id.* at 373.

FN23. It is thought that the doctrine of laches first entered American law in an 1815 opinion by Justice Story. *See Brown v. Jones,* 4 F. Cas. 404, 406 (C.C.D.Mass.1815) (No.2017).

FN24. The Court also noted that it could have rested its decision on any of the numerous statutory grounds which had been presented for review, but held that laches superceded the statutory claims: "The laches of the appellant is such as to defeat any rights which she might have had, even if these prior questions were determined in her favor." 145 U.S. at 371.

FN25. The land in question was located in Tacoma, Washington, which in the 1880 census had a population of 1,098, but by the 1890 census had a population of over 36,000. It is fair to assume that the value of the land was roughly proportional to the demand.

The difference between *Galliher* and *Ivani Contracting* is instructive. Whereas in *Ivani Contracting,* the plaintiff's delay had been the source of prejudice to the defendant, in *Galliher* the Court applied laches to prevent the widow from using her legal rights to gain an unfair and undeserved advantage.

This broader conception of laches survived into twentieth century American law, even after the merger of law and equity in 1935. *See* Henry L. McClintock, *Handbook of the Principles of Equity* § 28 (2d ed.1948) (stating that in applying laches, American courts have generally considered: (1) unreasonable delay; (2) prejudice to the defendant; (3) potential loss of evidence; and (4) change in the value of the subject-matter involved).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

For example, in 1938 the Supreme Court of Michigan noted that laches was available in actions at law even when the statutory period had not run. *Kipp v. Van Wagoner,* 286 Mich. 202, 207-08, 281 N.W. 592, 594-95 (Mich.1938) ( "laches ... bar[s] the assertion of such right later under changed conditions, even though the statute of limitations has not run.") (*citing Olson v. Williams,* 185 Mich. 294, 301, 151 N.W. 1043 (1915).

**\*6** In 2002, the Seventh Circuit applied laches to bar a federal statutory claim brought by Indianapolis, Indiana firefighters under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 ("USERRA"). *Miller v. City of Indianapolis,* 281 F.3d 648, 653 (7th Cir.2002). The Seventh Circuit did not address what statute of limitations applied to the firefighters' claims, but held that laches barred the claims because of plaintiffs' unexplained delay and the resulting prejudice to the defendants. The Seventh Circuit cited *Galliher,* and explained that "Laches is based not on simply the passage of time, as is a statute of limitations, but rather upon changes of conditions or relationships."

As recently as 2005 the United States Supreme Court cited its *Galliher* holding with approval in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York,* 544 U.S. 197, 217, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005) for the proposition that "Laches is not ... a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced-an inequity founded upon some change in the condition or relations of the property or the parties." 544 U.S. at 217.

Thus, laches does not necessarily infringe on legislative prerogatives as to the timeliness of a suit, because laches is more than mere delay. The doctrine has a rich history of equitable considerations as to the relationship between the parties, or the equities of a given case.

Further, for the sake of completeness, we note that even as regards a narrower, mere delay conception of laches, the Second Circuit's rule in *Ivani Contracting* appears to be unique among the federal circuits. Some circuits have affirmed the use of laches within a statutory limitations period. *See A.C. Aukerman Co. v. R .L. Chaides Construction Co.,* 960 F.2d 1020, 1029-30 (Fed.Cir.1992) (en banc); *Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix,* 283 F.3d 877 (7th Cir.2002) (Posner, J.). Other circuits have invoked a presumption against the use of laches to shorten a statute of limitations, but have not made the presumption conclusive. *See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.,* 270 F.3d 298, 321 (6th Cir.2001); *United States v. Rodriguez Aguirre,* 264 F.3d 1195, 1207-08 (10th Cir.2001); *Lyons Partnership v. Morris Costumes, Inc.,* 243 F.3d 789, 799 (4th Cir.2001).

Indeed, in the most recent circuit decision on point, Judge Posner, writing for a Seventh Circuit panel in *Teamsters & Employers Welfare Trust,* held that the doctrine of laches is available in suits at law because it is the functional equivalent of the doctrine of equitable tolling (in reverse). *See also Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 822 (7th Cir.1999). Judge Posner specifically criticized *Ivani Contracting's* rationale that a separation of powers issue arose when federal judges cut short a limitations period for § 1983 suits because the statute of limitations for § 1983 suits is borrowed from state law in the first place. According to Judge Posner, laches does not interfere with federal legislative prerogatives because the borrowing of state statutes of limitations is fundamentally different from Congressional enactment of a statute of limitations: "[w]hen Congress fails to enact a statute of limitations, a court that borrows a state statute of limitations but permits it to be abridged by the doctrine of laches is not invading congressional prerogatives." *Teamsters & Employers Welfare Trust,* 283 F.3d at 881.

**2. Watson's Failure to Join Mayo in the Prior Ac-**

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

**tion**

**\*7** Here, plaintiff's failure to join Mayo in the prior action after Mayo had in fact been served with a summons and complaint is inexcusable. This is true no matter whether the failure was professional negligence, or, worse, a deliberate tactic to get a second bite at the apple before a different judge and jury.

Accordingly, all three elements of laches defense are present. First, the plaintiff clearly knew of the defendant's alleged misconduct-Mayo was named in the prior complaint and then properly served at least ten months prior to the start of trial. Second, plaintiff inexcusably delayed in taking action. By not asking Magistrate Judge Peck to reconsider the dismissal of Mayo or in any other way seeking to join Mayo in the ongoing litigation, but instead bringing a separate suit, plaintiff's counsel split his cause of action. Third, the defendant has been prejudiced by these tactics. This second suit will impose real costs not only on Mayo, but also on the resources of this Court. Defendant Mayo will be prejudiced by the excessive gap between the incident and a second trial and having to stand before a jury alone, although it is clear that there were other officers involved in the incident. The public interest will also be harmed, as such duplicative litigation strains the resources of the federal judiciary, and imposes a burden on taxpayers who supported the Attorney General's office who will need to defend this case a second time.

Further, applying laches in this context presents no separation of powers issues, as our ruling concerns plaintiff's failure to join Mayo in the earlier action, not plaintiff's delay in bringing the second suit. We do not implicate the time within which a plaintiff must file suit, but his manner of doing so. Our application of laches, in this context, far from infringing on legislative prerogative, falls within the peculiar province of the judiciary, since courts retain inherent authority to regulate their own docket. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

Finally, we deny plaintiff's argument that laches is inapplicable here because defendant Mayo has unclean hands. *See, e.g., PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 493 2d Cir.2004) (unclean hands defeats the affirmative defense of laches). First, given that Mayo reported on the Use of Force memo that he deployed his baton against plaintiff, there is no colorable argument that Mayo attempted to mislead the plaintiff into thinking that any of the other officers deployed their batons. Second, there is no direct evidence of any kind that Mayo actively avoided service. Finally, regardless of any dispute about plaintiff's effort to serve Mayo, the fact remains that he was served a full ten months before trial.

**B. Claim Preclusion**

In the alternative, we dismiss Watson's complaint on the grounds of claim preclusion.

Under the doctrine of claim preclusion, or *res judicata* as it is sometimes called, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000) (*quoting Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103, (1981)); *see also Legnani v. Alitalia Linee Aeree Italiane, S.p.A.,* 400 F.3d 139, 141 (2d Cir.2005) (" '[T]he first judgment will preclude a second suit only when it involves the same 'transaction' or connected series of transactions as the earlier suit ....' " (quoting *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997))).

**\*8** The facts alleged in Watson's first complaint are identical to those in his second complaint. Thus, the claims clearly arise from the same common nucleus of operative fact, and the only question relevant to the preclusion analysis is whether Mayo was "in privity" with the defendants in the prior action.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

Traditionally, the doctrine of privity applied only to a narrow class of relationships between defendants in which a latter-sued defendant is "so identified in interest with a party to a former litigation that he represents precisely the same right in respect to the subject matter involved." *Kourtis v. Cameron,* 419 F.3d 989, 996 (9th Cir.2005). However, the modern doctrine of privity has been expanded significantly, such that privity will be found whenever a party's "interests were adequately represented by another vested with the authority of representation." *Alpert's Newspaper Delivery, Inc. v. The New York Times Co.,* 876 F.2d 266, 270 (2d Cir.1989). *See also Northern Assurance Co. of America v. Square D Co.,* 201 F.3d 84, 89 (2d Cir.2000) (noting that "courts have expanded the concept of privity beyond its literal meaning"). Another Second Circuit decision has suggested that the test for privity is whether a subsequent defendant's relationship to an earlier defendant was "sufficiently close" to justify preclusion. *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 367-68 (2d Cir.1995) ("[P]rivity bars relitigation of the same cause of action against a new defendant known by a plaintiff at the time of the first suit where the new defendant has a sufficiently close relationship to the original defendant to justify preclusion.").

Courts have routinely found privity between co-employees sued in separate suits over allegedly tortious acts that occurred during the course of their employment. *See, e.g., Adams v. California Dep't. of Health Services,* 487 F.3d 684, 691 (9th Cir.2007) (holding that co-employees of a state agency as well as independent contractors hired by the state agency were in privity with the state agency itself and various other individual defendants who had been sued in a prior action). Indeed, almost directly on point, the Second Circuit has held certain prison guards to be in privity with other prison guards in the context of a § 1983 complaint brought by a prison inmate. *Barclay v. Lowe,* 131 Fed.Appx. 778, 779, (2d Cir.2005). In

*Barclay,* the Second Circuit affirmed a district court's dismissal of a prisoner's duplicative lawsuit even though the prisoner's second suit named different prison guards as defendants: "Although [the plaintiff] named different defendants in the second suit than in the first, the suits are nonetheless duplicative because the defendants in the second suit are in privity with the defendants in the first suit. All defendants are employees of Attica and their interests are adequately represented by those in the first suit who are 'vested with the authority of representation.' " 131 Fed.Appx at 779 (citing *Alpert's Newspaper Delivery,* 876 F.2d at 270).

**\*9** We believe that the same analysis applies here. The three corrections officers in the first suit had identical interests with Mayo, so much so that he participated in the trial as a witness on their behalf. *See Kourtis,* 419 F.3d at 996 (citing as additional factors in privity analysis "a close relationship, substantial participation [in the prior suit], and tactical maneuvering.") *See also Adams,* 487 F.3d at 691 (finding privity between co-employees in part because the new defendants had submitted declarations regarding their participation in the alleged cause of action).

Further, in testifying on their behalf, Mayo did not distance his interest from theirs by overstating his role so as to deflect liability away from them and onto himself. From the Use of Force Report issued back on the date of the incident in question it was unquestionably clear that Mayo was the only officer to deploy his baton. His testimony at the trial was not inconsistent therewith.

Accordingly, Mayo is in privity with the officers sued in the prior action, and the doctrine of claim preclusion bars Watson's suit against Mayo.

### CONCLUSION

Under the particular circumstances here the doctrine of laches precludes the plaintiff from proceeding

Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)
**(Cite as: 2008 WL 538442 (S.D.N.Y.))**

on a split cause of action, and pursuing a second claim against Mayo when Mayo had been named in the original complaint and then eventually served in that action. Alternatively, the doctrine of claim preclusion bars this action. Accordingly, defendant's motion is granted and plaintiff's complaint is dismissed with prejudice. The Clerk of the Court is directed to close the case.

   **SO ORDERED.**

S.D.N.Y.,2008.
Watson v. Mayo
Not Reported in F.Supp.2d, 2008 WL 538442 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.